**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| JOHN MCLEMORE, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| LUMEN TECHNOLOGIES, INC. f/k/a CENTURYLINK, INC., KATE JOHNSON, CHRIS STANSBURY, JEFFREY K. STOREY, and INDRANEEL DEV, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff John McLemore ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lumen Technologies, Inc. ("Lumen" or the "Company") f/k/a CenturyLink, Inc. ("CenturyLink"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Lumen securities between March 11, 2019 and July 14, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Lumen is a telecommunications and technology company that provides various integrated products and services to businesses and residential customers in the U.S. and internationally.   Lumen operates, *inter alia*, a copper cable network for certain of its telecommunications services.  The Company was formerly known as "CenturyLink, Inc." and changed its name to "Lumen Technologies, Inc." in September 2020.

3.     Lumen is a member of USTelecom, a broadband association that represents companies in the industry.  Lumen is also one of multiple telecommunications companies that inherited the Bell Telephone Company's (a/k/a "Ma Bell" or the "Bell System") telecom cables in the decades following the breakup of the Bell System's telecommunications monopoly in 1984.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lumen owned and/or still owns thousands of miles of cables wrapped in lead, a known neurotoxin, within the U.S.; (ii) the foregoing has harmed and posed the risk of further harming the environment, exposed Company employees, and the general public, thereby posing a significant public health risk and environmental pollution risk; (iii) Lumen was on notice about the damage and risks presented by these lead-covered cables but did not disclose them as a potential threat to everyday

2

people and communities, as well as failed to provide adequate lead training to employees; (iv) all the foregoing subjected the Company to a heightened risk of governmental and regulatory oversight and enforcement action, as well as legal and reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On July 9, 2023, the *Wall Street Journal* ("*WSJ*") published an article reporting that more than 2,000 lead-covered cables previously used by Ma Bell and, subsequently, by various successor telecommunication companies, were degrading and leaching into soil and groundwater, posing a significant public health risk.

6.     On this news, Lumen's stock price fell $0.13 per share, or 5.94%, to close at $2.06 per share on July 10, 2023.

7.     On July 11, 2023, the *WSJ* published an article reporting that "[l]awmakers are demanding that telecom firms act to ensure that Americans are safe after [the *WSJ*'s] investigation revealed that phone companies have left behind a network of cables covered in toxic lead, tainting water and soil in some locations".  The article also cited legislators' and regulators' intentions to scrutinize lead cables owned by USTelecom members and to hold those members accountable.

8.     On July 12, 2023, the *WSJ* published another article that detailed, *inter alia*, Lumen's ownership of lead-covered cables previously owned by Ma Bell, as well as evidence suggesting that Lumen's workers still faced exposure to lead in the modern era.

9.     On this news, Lumen's stock price fell $0.03 per share, or 1.45%, to close at $2.04 per share on July 12, 2023.

10.     On July 14, 2023, *Seeking Alpha* reported that a J.P. Morgan analyst had concluded that "Lumen. . . likely . . . ha[s] 'exposure' to potential copper [cable] lead sheathing liability."

11.     On this news, Lumen's stock price fell $0.21 per share, or 10.19%, to close at $1.85 per share on July 14, 2023.

12.     Also on July 14, 2023, during post-market hours, the *WSJ* published article citing various analyst and market concerns related to, *inter alia*, Lumen's exposure to enormous liabilities related to its lead-sheathed cables.  In particular, the article noted that, after AT&T Inc. ("AT&T"), Verizon Communications Inc. ("Verizon") and Lumen would have the most lead-covered cables to remove.

13.     On this news,  Lumen's stock price fell $0.15 per share, or 8.11%, to close at $1.70 per share the next trading day on July 17, 2023.

14.     Then, on August 1, 2023, on a quarterly earnings call, Lumen's executive management addressed the recent reporting on the Company's exposure to liability  related to lead-sheathed cables, disclosing that, by Lumen's own estimation, not more than ***35,000 miles*** of its copper network could contain lead.  In a response to an analyst's inquiry regarding whether Defendants "had any discussions around remediation" for the lead-sheathed cable issue, Company management noted that Lumen had spent considerable time determining how much lead was in the Company's telecom system and could not estimate potential remediation costs.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Lumen is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff, as set forth in the attached Certification, acquired Lumen securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21.     Defendant Lumen is incorporated in Louisiana with principal executive offices located at 100 CenturyLink Drive, Monroe, Louisiana 71203.  Lumen's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "LUMN".

22.     Defendant Kate Johnson ("Johnson") has served as Lumen's President, Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors ("Board") since November 7, 2022.

23.     Defendant Chris Stansbury ("Stansbury") has served as Lumen's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 4, 2022.

24.     Defendant Jeffrey K. Storey ("Storey") served as Lumen's President, CEO, and a member of the Board from before the start of the Class Period to November 7, 2022.

25.     Defendant Indraneel Dev ("Dev") served as Lumen's EVP and CFO from before the start of the Class Period to April 1, 2022.

26.     Defendants Johnson, Stansbury, Storey, and Dev are sometimes referred to herein collectively as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control the contents of Lumen's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Lumen's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Lumen, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     Lumen and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Lumen is a telecommunications and technology company that provides various integrated products and services under the Lumen, Quantum Fiber, and CenturyLink brands to businesses and residential customers in the U.S. and internationally.  Lumen operates, *inter alia*, a

copper cable network for certain of its telecommunications services.  The Company was formerly known as "CenturyLink, Inc." and changed its name to "Lumen Technologies, Inc." in September 2020.

30.     Lumen is a member of USTelecom, a broadband association that represents companies in the industry.  Lumen is also one of multiple telecommunications companies, including, among others, AT&T and Verizon, that inherited Ma Bell's telecom cables in the decades following the breakup of the Bell System's telecommunications monopoly in 1984.

**Materially False and Misleading Statements Issued During the Class Period**

31.     The Class Period begins on March 11, 2019, when Lumen—then still known as CenturyLink—filed an annual report on Form 10-K with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2018 (the "2018 10-K").  With respect to Lumen's cable network, the 2018 10-K stated, in relevant part, that "[m]ost of our products and services are provided using our telecommunications network, which consists of [*inter alia*] . . . copper cables" and that, "[a]t December 31, 2018, our network included . . . [a]pproximately 910,000 miles of copper plant;" without discussing what, if any, percentage of this copper cable network contained lead.

32.     The 2018 10-K also downplayed Lumen's risks related to environmental matters while simultaneously touting the Company's environmental, safety, and health compliance activities, stating, in relevant part:

> From time to time we ***may*** incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment. Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, ***we do not currently believe that future environmental compliance and remediation expenditures will have a material adverse effect on our financial condition or results of operations***.

* * *

> In connection with our current operations, we use, handle and dispose of various hazardous and non-hazardous substances and wastes. In prior decades, certain of our current or former subsidiaries owned or operated, or are alleged to have owned or operated, former manufacturing businesses, for which we have been notified of certain potential environmental liabilities. *We monitor our compliance with applicable regulations or commitments governing these current and past activities.* Although *we believe that we are in compliance with these regulations in all material respects*, our use, handling and disposal of environmentally sensitive materials, or the prior operations of our predecessors, *could* expose us to claims or actions that *could potentially* have a material adverse effect on our business, financial condition and operating results.

(Emphases added.)  Plainly, the foregoing risk warnings accompanying these positive statements regarding Lumen's environmental, safety, and health compliance activities were generic "catch-all" provisions that were not tailored to the Company's actual known risks regarding its ownership of lead-covered cables, much less the significant public health and environmental pollution risks these cables posed, or the Company's potential liability for damages associated with these cables.

33.     Appended as an exhibit to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Storey and Dev certified that the 2018 10-K "fully complies with the requirements of Section 13(a) of the [Exchange Act] and that the information contained in the [2018] 10-K fairly presents, in all material respects, the financial condition and results of operations of CenturyLink as of the dates and for the periods covered by such report."

34.     On February 28, 2020, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K").  With respect to Lumen's cable network, the 2019 10-K stated, in relevant part, that "[m]ost of our products and services are provided using our telecommunications network, which consists of [*inter alia*] . . . copper cables" and that, "[a]t December 31, 2019, our

network (both owned and leased) included . . . [a]pproximately 916,000 miles of copper plant;" without discussing what, if any, percentage of this copper cable network contained lead.

35.     The 2019 10-K also contained the same statements as referenced in ¶ 32, *supra*, downplaying Lumen's risks related to environmental matters while simultaneously touting the Company's environmental, safety, and health compliance activities.

36.     In addition, the 2019 10-K discussed Lumen's environmental contingencies, without disclosing the particular nature or cause of those contingencies, stating, in relevant part:

### Environmental Contingencies

In connection with our largely historical operations, we have responded to or been notified of potential environmental liability at approximately 200 properties. We are engaged in addressing or have liquidated environmental liabilities at many of those properties. We could potentially be held liable, jointly, or severally, and without regard to fault, for the costs of investigation and remediation of these sites. The discovery of additional environmental liabilities or changes in existing environmental requirements could have a material adverse effect on our business.

(Emphasis in original.)

37.     Appended as exhibits to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Storey and Dev.

38.     On February 25, 2021, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").  The 2020 10-K stated that Lumen's "mass-marketed legacy copper-based services[ are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide most of our products and services consists of [*inter alia*] . . . copper cables"; and that, "[a]t December 31, 2020, our network (both owned and leased) included . . . [a]pproximately 916,000 miles of copper plant;" without discussing what, if any, percentage of this copper cable network contained lead.

39.     The 2020 10-K also provided generic, boilerplate representations that continued to downplay Lumen's risks related to environmental matters, stating, in relevant part:

> Our networks and properties are subject to numerous federal, state and local regulations, including environmental compliance and remediation expenses . . . . Such regulations *may* also require us to pay substantial fees.
>
> * * *
>
> As a large multinational business with complex operations, we face various other *general* risks, including among others:
>
> - the risk a *perceived* failure to meet evolving environmental, social and governance ("ESG") practices or benchmarks *could* adversely impact our business, brand, stock price or cost of capital; [and]
>
> - the risk a challenge to our ESG statements *could* lead to reputational harm or lawsuits[.]
>
> * * *
>
> From time to time, we are subject to judicial and administrative proceedings brought by various governmental authorities under [environmental protection and health and safety] laws. Several such proceedings are currently pending, *but none is reasonably expected to exceed $300,000 in fines and penalties*.

(Emphases added.)  Plainly, these risk warnings, too, were generic "catch-all" provisions that were not tailored to Lumen's actual known risks regarding its ownership of lead-covered cables, much less the significant public health and environmental pollution risks these cables posed, or the Company's potential liability for damages associated with these cables.

40.     Appended as exhibits to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Storey and Dev.

41.     On April 22, 2021, Lumen issued a press release announcing the publication of its 2020 environmental, social, and governance ("ESG") report (the "2020 ESG Report").  The 2020 ESG Report quoted Defendant Storey, who represented, in relevant part, that Defendants are "deeply involved in activities that protect the health and wellbeing of our people, our customers

and our communities"; that "we are mindful that social responsibility and environmental stewardship are inherent in the Lumen purpose and everything we do"; that "[w]e deliver our promise through [*inter alia*] . . . our respect for the environment and our ongoing involvement in our communities"; and that "Lumen supports environmental sustainability and social wellbeing and . . . implement[s] the governance necessary to ensure we hold ourselves to the highest standards of corporate ethics and responsibility."

42.     With respect to Lumen's occupational health and safety ("OHS") practices, the 2020 ESG Report represented, *inter alia*:

> The health and safety of our employees and business partners is a top priority for Lumen. We are committed to providing a workplace free of recognized hazards. Our environment, health and safety (EHS) team oversees our OHS program, focusing on continuous improvement by incorporating "risk-based thinking" into our organizational safety goals, prioritization of health and safety objectives, and safety management systems.

43.     With respect to how Lumen purportedly combatted unsafe and hazardous conditions, the 2020 ESG Report stated, in relevant part:

> Our people know to promptly report unsafe or hazardous conditions or suspected violations of the law to management. If an unsafe or hazardous condition is reported, managers provide necessary notices, warnings or controls to prevent exposure to the hazardous condition and report the condition to the company's EHS team and/or our 24/7 incident reporting system. Suspected violations of the company's Code of Conduct or legal obligations are reported to the Integrity Line, the company's compliance hotline.

44.     With respect to Lumen's purported environmental compliance procedures, the 2020 ESG Report stated, *inter alia*:

> Our environmental management systems (EMS) help us identify and reduce the environmental impacts of our operations, drive continuous improvement in our results and facilitate regulatory compliance. We consider both internal and external issues, including authority and the ability to control and influence, organizational units, physical boundaries, legal requirements and contractual obligations as we determine the scope of our EMS work. Lumen is committed to complying with applicable environmental regulations.

45.     On February 24, 2022, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  The 2021 10-K stated that Lumen's "mass-marketed legacy copper-based services[ are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide most of our products and services, consists of [*inter alia*] . . . copper cables"; and that, "[a]t December 31, 2021, our Mass Markets broadband-enabled locations consisted of 25.8 million copper-based passings"; without discussing what, if any, percentage of this copper cable network contained lead.

46.     The 2021 10-K also touted Lumen's purported environmental compliance and sustainability operations, stating, in relevant part:

> Environmental stewardship is inherent in our identity. We review the impact of our operations and make choices to reduce our environmental footprint. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors. Our Environment, Health and Safety ("EHS") team oversees and executes the company's EHS and environmental sustainability visions.

> * * *

> • Environmental compliance and management: The Lumen EHS team assesses and reviews our company programs, operational facilities and waste management vendors. We monitor environmental legislative activity and collaborate with other internal groups to develop documented practices and procedures that support compliance with applicable laws and regulations.

> * * *

> • Waste: We aim to reduce our waste through minimization, re-use and recycling. We divert millions of pounds of electronic and communications equipment from landfills each year. We recycle telecommunications equipment[.]

> * * *

- Occupational Health and Safety: The EHS team conducts risk assessments and monitors health and safety legislation to develop policies and procedures designed to eliminate or control safety hazards and support compliance with applicable laws and regulations.

47.     The 2021 10-K also provided substantively the same generic, boilerplate representations as referenced in ¶ 39, *supra*, continuing to downplay Lumen's risks related to environmental matters while failing to address the Company's ownership of lead-covered cables and the attendant risks of owning and/or failing to remove Company-owned lead-covered cables.

48.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Storey and Dev.

49.     On November 4, 2022, Lumen issued a press release announcing the release of its 2021 ESG report (the "2021 ESG Report").  The  2021 ESG Report quoted Defendant Storey, who continued to represent that "[o]ur social responsibility and environmental stewardship are inherent in everything we do[.]"

50.     With respect to Lumen's OHS practices, the 2021 ESG Report represented, *inter alia*:

> Providing a safe and healthy working environment for our people, partners and visitors is of paramount importance. We are committed to workplaces that are free of recognized hazards.
>
> **Our approach**
>
> We design our safety management systems to drive continuous improvement in performance by incorporating "risk-based thinking" into our organizational objectives and goals. Our environment, health and safety (EHS), risk management and operations teams continuously monitor safety performance to evaluate opportunities to eliminate or reduce the risks of workplace hazards.

51.     With respect to Lumen's waste reduction practices, the 2021 ESG Report stated, in relevant part:

> **Recycling and product end-of-life management**

Each year, we divert millions of pounds of electronic and communications equipment away from landfills. ***We recycle telecommunications equipment and items such*** as batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents.

(Emphases in bold and italics added.)

52.     With respect to Lumen's purported commitment to protecting the environment, the

2021 ESG Report stated, *inter alia*:

We are committed to environmental stewardship, knowing that sustainability promotes the health of both our planet and our business and creates value for our customers, employees, suppliers, communities and investors . . . . We also regularly assess our impact to find new ways to reduce carbon emissions, eliminate waste and manage water consumption.

* * *

Lumen is committed to incorporating appropriate environmental sustainability principles and practices throughout our operations as we work to serve our customers and our communities.

53.     With respect to Lumen's purported environmental compliance procedures, the 2021

ESG Report stated, *inter alia*:

To determine the scope of our EMS [environmental management system] work, we explore the most material environmental issues inside and outside our business alongside our legal requirements, and we consider where and how we can make an impact. We assess and review our programs, operational facilities and designated suppliers through our EHS team. We also monitor emerging legislation and regulation.

To drive improved performance, we collaborate with teams across our business to develop effective, documented practices and procedures, which we make available to all employees on our intranet.

We broaden our impact by participating in the Environment, Health & Safety Communications Panel (EHSCP) Environment Committee, a forum through which industry professionals share best practices, monitor emerging issues and engage with policy makers.

54.     On February 23, 2023, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K stated that Lumen's "mass-marketed legacy copper-based services[ are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide most of our products and services, consists of [*inter alia*] . . . copper cables"; and that, "[a]t December 31, 2022, approximately 3.1 million of our Mass Markets broadband-enabled units were capable of receiving services from our fiber-based infrastructure, with the remainder connected with copper-based infrastructure"; without discussing what, if any, percentage of this copper cable network contained lead.

55.     The 2022 10-K also continued to tout Lumen's purported environmental compliance and sustainability operations, stating, in relevant part:

> Environmental stewardship is inherent to our mission and identity. We believe our commitment to environmental sustainability promotes the financial health of our business and strengthens our relations with our employees, communities, customers and investors.
>
> In early 2022, we formed the Sustainability Management Committee ("SMC") comprised of employees from across the business. The SMC designs and oversees our company-wide sustainability program . . . and is responsible for driving the sustainability agenda with the Board and senior leadership. Additionally, our Environment, Health and Safety ("EHS") team is responsible for overseeing and implementing our EHS and environmental sustainability initiatives.
>
> * * *
>
> • Environmental compliance and management: The Lumen EHS team assesses and reviews our company programs, operational facilities and waste management vendors. We monitor environmental legislative activity and collaborate with other internal groups to develop documented practices and procedures that support compliance with applicable laws and regulations.
>
> * * *
>
> • Waste: We are committed to reusing and recycling products, minimizing material use and carefully managing our waste. Each year, we divert millions

of pounds of electronic and communications equipment from landfills. We recycle telecommunications equipment[.]

* * *

- Occupational Health and Safety: The EHS team conducts risk assessments, reviews safety incident data and monitors health and safety legislation to develop policies and procedures designed to minimize safety hazards and support compliance with applicable laws and regulations. We carry out periodic reviews to identify steps designed to improve overall safety performance.

56.     The 2022 10-K also provided substantively the same generic, boilerplate representations as referenced in ¶ 39, *supra*, continuing to downplay Lumen's risks related to environmental matters while failing to address the Company's ownership of lead-covered cables and the attendant risks of owning and/or failing to remove Company-owned lead-covered cables.

57.     Appended as exhibits to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 33, *supra*, signed by Defendants Johnson and Stansbury.

58.     The statements referenced in ¶¶ 31-57 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Lumen owned and/or still owns thousands of miles of cables wrapped in lead, a known neurotoxin, within the U.S.; (ii) the foregoing has harmed and posed the risk of further harming the environment, exposed Company employees, and the general public, thereby posing a significant public health risk and environmental pollution risk; (iii) Lumen was on notice about the damage and risks presented by these lead-covered cables but did not disclose them as a potential threat to everyday people and communities, as well as failed to provide adequate lead training to employees; (iv) all the foregoing subjected the Company to a heightened risk of governmental and regulatory oversight

16

and enforcement action, as well as legal and reputational harm; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

59.     On Sunday, July 9, 2023, the *WSJ* published an article entitled "America Is Wrapped in Miles of Toxic Cables", reporting that more than 2,000 lead-covered cables previously used by Ma Bell and, subsequently, by various successor telecommunication companies, were degrading and leaching into soil and groundwater, posing a significant public health risk, stating, *inter alia*:

> [T]elecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a [*WSJ*] investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.
>
> \* \* \*
>
> The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.
>
> Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency . . . .
>
> For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.
>
> Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

* * *

In response to the Journal's reporting . . . telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

60.     On this news, Lumen's stock price fell $0.13 per share, or 5.94%, to close at $2.06 per share on July 10, 2023.

61.     On July 11, 2023, during post-market hours, the *WSJ* published an article entitled "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After WSJ Investigation", reporting on legislators' and regulators' intentions to scrutinize lead cables owned by USTelecom members and to hold those members accountable, stating, *inter alia*:

Lawmakers are demanding that telecom firms act to ensure that Americans are safe after a [*WSJ*] investigation revealed that phone companies have left behind a network of cables covered in toxic lead, tainting water and soil in some locations.

"This is corporate irresponsibility of the worst kind," Sen. Edward Markey, a Massachusetts Democrat, said in a letter Tuesday to USTelecom, the industry group representing telecom companies . . . .

"The telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects. The members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way."

* * *

Rep. Patrick Ryan, a New York Democrat, said he is considering introducing legislation to address remediating contamination from the lead cables, following discussions with the Environmental Protection Agency.

* * *

"There is no safe level of lead exposure—*none*—which is why I'm so disturbed by these reports of lead cable lines throughout the country," said Rep. Frank Pallone, Jr., a New Jersey Democrat and ranking member of the House Energy and Commerce committee. "It is imperative that these cables be properly scrutinized and addressed."

* * *

The EPA said it is reviewing the [*WSJ*] investigation, adding: "Protecting Americans from lead exposure—especially those living in communities already overburdened by pollution and other health and social stressors—is a key focus of the agency's mission to protect public health[.]"

"Exposure to lead in our soil and water can significantly harm public health, especially for children in frontline communities," Sen. Tom Carper (D., Del.), chairman of the Environment and Public Works Committee, said in a statement. "As we learn more about the impact of these abandoned lead cables across our country, we must ensure that we are taking all the necessary steps and actions to protect communities from lead exposure."

The New York State Department of Health and the Department of Environmental Conservation are "reviewing information on identified locations of potential lead-containing telecommunications cables and will work with local health departments and municipalities to conduct testing if appropriate to ensure public health and the environment are protected."

The Federal Communications Commission, which regulates telecom companies, said it has reached out to the EPA and the White House Council on Environmental Quality about the issues raised by the [*WSJ*]'s report and stands "ready to assist addressing these public health concerns."

"We take seriously the concerns raised about potential lead exposure from communications lines—including the infrastructure that first connected so many remote and rural parts of the country," an FCC spokesperson said. "We are currently looking into what authorities may exist under the Communications Act to address this issue."

62.     On July 12, 2023, during pre-market hours, the *WSJ* published an article entitled "What AT&T and Verizon Knew About Toxic Lead Cables", which detailed, *inter alia*, Lumen's ownership of lead-covered cables previously owned by Ma Bell, as well as evidence suggesting that Lumen's workers have still faced exposure to lead in the modern era, stating, in relevant part:

> For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.
>
> * * *
>
> Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.
>
> * * *
>
> The cables were laid by . . . the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers[.]
>
> * * *
>
> ***Evidence suggests that workers have still faced exposure to lead in the modern era. A worker at CenturyLink, a company that descended from Ma Bell, alerted the CWA union that he was feeling intensely fatigued following work in manholes, triggering a 2013 Minnesota OSHA investigation that led to nine "serious" lead-related citations, according to union officials and regulatory records for CenturyLink, which now goes by Lumen Technologies.***
>
> ***A Minnesota OSHA document called [Lumen]'s lead training "inadequate" and showed that a worker handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit.***
>
> ***"The well-being of our employees and communities is of the utmost importance," a Lumen spokeswoman said, adding that the company has specialized safety***

***training for handling lead-sheathed cables and will provide testing to current and former employees.***

(Emphases added.)

63.     On this news, Lumen's stock price fell $0.03 per share, or 1.45%, to close at $2.04 per share on July 12, 2023.

64.     On July 14, 2023, during intraday trading hours, *Seeking Alpha* reported that a J.P. Morgan analyst had concluded that "Lumen. . . likely . . . ha[s] 'exposure' to potential copper [cable] lead sheathing liability."

65.     On this news, Lumen's stock price fell $0.21 per share, or 10.19%, to close at $1.85 per share on July 14, 2023.

66.     Also on July 14, 2023, during post-market hours, the *WSJ* published an article entitled "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables", which cited various analyst and market concerns related to, among other things, Lumen's exposure to enormous liabilities related to its lead-covered cables, stating, in relevant part:

> Wall Street analysts [have] raised questions about liabilities related to the [lead-covered] cables. One analyst estimated it could cost $59 billion for the telecom industry to remove all the lead cables nationwide.
>
> "Potential copper lead sheathing liability is unquantifiable at this time, but will be a substantial long-term overhang on AT&T and the industry," wrote JPMorgan analyst Philip Cusick in a note to investors[.]
>
> * * *
>
> ***Lumen Technologies, another telecom company with Bell assets, dropped more than 15% this week.***
>
> * * *
>
> JPMorgan analysts discussed the lead cable issue with industry contacts and have been "unable to find a reasonable way to calculate any potential liability."

Removing all lead-cased copper wires across the country could cost as much as $59 billion, New Street Research analyst Jonathan Chaplin estimated in a report this week. That is based partly on industry estimates of labor costs to install fiber optic cables across networks.

AT&T would have the most lead-covered cables to remove, Chaplin wrote, followed by Verizon **and Lumen.** The report cautioned that individual company figures are more difficult to cite, due to a lack of disclosure by the telecom companies about their lead-cable networks.

"To be clear, the [companies] aren't giving any guidance and very little context on the issue," Chaplin wrote.

\* \* \*

Citigroup analyst Michael Rollins cited the [*WSJ*]'s findings in a note to investors earlier this week, warning that stocks with exposure to wirelines networks could trade lower in the near-term because of uncertainty and risk related to the lead-cable concerns.

(Emphases added.)

67.     On this news,  Lumen's stock price fell $0.15 per share, or 8.11%, to close at $1.70 per share the next trading day on July 17, 2023.

68.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Post-Class Period Developments

69.     On August 1, 2023, Lumen held a conference call with investors and analysts to discuss the Company's second quarter 2023 results (the "2Q23 Earnings Call").  On the 2Q23 Earnings Call, in his prepared remarks, Defendant Stansbury addressed the recent reporting on the Company's exposure to liability for lead-covered cables, stating, in relevant part:

Now before we go to Q&A, I'd like to take a moment to address recent media reports regarding lead sheet cables and telecommunication networks. We began phasing out lead sheet cables from our network infrastructure during the 1950s. And based on our initial analysis, ***we currently estimate that less than 5% of our***

> *approximately 700,000-mile copper network contained lead, of which we believe the majority, is buried* and conduit based infrastructure.

(Emphasis added.)  In other words, by Lumen's own estimation, not more than ***35,000 miles*** of its copper network could contain lead, the buried majority of which could be seeping into soil and ground water.

70.    A Morgan Stanley analyst immediately questioned Defendant Stansbury on the lead cable issue when the Q&A portion of the 2Q23 Earnings Call began, asking "[h]ave you had any discussions around remediation?"  Defendant Stansbury noted that Lumen had spent considerable time determining how much lead was in the Company's telecom system and could not estimate potential remediation costs, stating, in relevant part:

> Yes. So I guess, first of all, I think it's very early for that. Again, ***we spent a lot of time just determining how much lead is in the system***. And the good news is, it's quite small. But beyond that, ***we don't really think there's any meaningful way to estimate what that would be at this point***. And so we will continue to, as we said, work with regulators and outside experts as this moves forward.

(Emphases added.)

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

71.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Lumen securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

72.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lumen securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lumen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lumen;

- whether the Individual Defendants caused Lumen to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Lumen securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

77.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Lumen securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Lumen securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

78.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

79.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

80.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

81.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

82.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lumen securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lumen securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

83.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Lumen securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lumen's finances and business prospects.

84.    By virtue of their positions at Lumen, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

85.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Lumen, the Individual Defendants had knowledge of the details of Lumen's internal affairs.

86.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lumen.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lumen's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the

aforementioned false and misleading reports, releases and public statements, the market price of Lumen securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Lumen's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Lumen securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

87.     During the Class Period, Lumen securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lumen securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Lumen securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Lumen securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

88.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

90.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91.     During the Class Period, the Individual Defendants participated in the operation and management of Lumen, and conducted and participated, directly and indirectly, in the conduct of Lumen's business affairs.  Because of their senior positions, they knew the adverse non-public information about Lumen's misstatement of income and expenses and false financial statements.

92.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lumen's financial condition and results of operations, and to correct promptly any public statements issued by Lumen which had become materially false or misleading.

93.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lumen disseminated in the marketplace during the Class Period concerning Lumen's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lumen to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Lumen within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lumen securities.

94.     Each of the Individual Defendants, therefore, acted as a controlling person of Lumen.  By reason of their senior management positions and/or being directors of Lumen, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lumen to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Lumen and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

95.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lumen.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 15, 2023                    Respectfully submitted,

O'BELL LAW FIRM, LLC

*/s/ Eric J. O'Bell*
Eric J. O'Bell (La. Bar. #26693)

3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8653
ejo@obelllawfirm.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*