**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **IN RE: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION II** | **CIV. ACTION NO. 3:23-1290**<br><br>**JUDGE: TERRY A. DOUGHTY**<br>**MAG. JUDGE: KAYLA D. MCCLUSKY** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

*May It Please the Court*:

Plaintiffs respectfully submit this memorandum in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint [Doc. No. 36] (the "Motion") and the materials submitted in support thereof, including Defendants' Memorandum In Support of their Motion [Doc. No. 37-2] (the "Memorandum" or "Mem."). Unless otherwise noted, all capitalized terms have the same meaning ascribed to them in the First Amended Class Action Complaint for Violations of the Federal Securities Laws, filed December 29, 2023 [Doc. No. 35] (the "AC"), as reproduced in the Table of Abbreviations set forth below. Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia, and citations to "Defs.' Ex." refer to exhibits attached to the Declaration of Lyle Roberts, filed April 26, 2024 [Doc. No. 36-2]. Unless otherwise noted, all internal citations are omitted.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................1

STATEMENT OF FACTS ..............................................................................................................3

     A.    Lumen's Corporate History and Business ...........................................................3

     B.    Lead Is a Well-Known Toxin Extremely Harmful to Human Health.....................3

     C.    The Sprawl of Lead Hidden In Lumen's Copper Network....................................4

     D.    Lumen Misled The Investing Public About Its Legacy Practices As It Publicly Touted Its Decision to Transition to Fiber and Evolve Into a New Company ...............................................................................................................7

     E.    Investors Are Harmed as the Truth Emerges.........................................................9

STANDARD OF REVIEW ...........................................................................................................11

ARGUMENT .................................................................................................................................11

I.     PLAINTIFFS STATE A SECTION 10(B) CLAIM...........................................................11

     A.    The AC Adequately Alleges Misstatements and Omissions of Material Fact.......................................................................................................................12

          1.    The AC Pleads an Array of Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made.........13

          2.    Defendants' Efforts to Shield All of Their Misstatements As Inactionable As a Matter of Law Are Meritless........................................19

     B.    The AC Raises a Strong Inference of Scienter ....................................................22

          1.    The AC's Allegations Offer Compelling Direct Evidence of Scienter ....................................................................................................23

          2.    The AC Pleads Strong Circumstantial Evidence of Severe Recklessness ..........................................................................................27

          3.    The AC Pleads a Strong Individualized Motive to Defraud .....................29

          4.    The Inference of Scienter Is Overwhelming.............................................31

     C.    The AC Pleads Loss Causation.............................................................................32

II.     PLAINTIFFS STATE A CONTROL PERSON CLAIM....................................................35

CONCLUSION ........................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ...............................................................................12

*In re Adv. Auto Parts, Inc. Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ..............................................................31

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ..................................................................18

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ....................................................................27, 29

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ...............................................................................32

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)...................................................................................17

*Alich v. Opendoor Technologies Incorporated*,
2024 WL 839146 (D. Ariz. Feb. 28, 2014)...........................................................35

*Alich v. Opendoor Techs. Inc.*,
2024 WL 2153529 (D. Ariz. May 14, 2024) .........................................................35

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................24

*In re Apache Corp. Sec. Litig.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ..........................................19, 22, 23

*Bachow v. Swank Energy Income Advisers, LP*,
2010 WL 70520 (N.D. Tex. Jan. 6, 2010) ............................................................12

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ..........................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................11

*BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).................................................................16, 20

*Blum v. AT&T Corp., et al.*,
No. 6:23-cv-01748 (W.D. La.)..............................................................................26

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................................16, 20, 29

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012).................................................................................21

*In re Capstead Mortg. Corp. Sec. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ...............................................................................18

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) .................................................................................19

*In re Cassava Scis., Inc. Sec. Litig.*,
    2023 WL 3442087 (W.D. Tex. May 11, 2023) ...............................................................13, 15

*Catogas v. Cyberonics, Inc.*,
    292 F. App'x 311 (5th Cir. 2008) ........................................................................................34

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
    2013 WL 1100819 (W.D. La. Mar. 15, 2013) .................................................................29, 33

*In re Concho Res. Inc. Sec. Litig.*,
    2023 WL 2297425 (S.D. Tex. Feb. 23, 2023), *aff'd in part and rev'd on other
    grounds*, 2023 WL 4146278 (S.D. Tex. June 23, 2023).....................................................22, 28

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    620 F. Supp. 3d 603 (S.D. Tex. 2022) .............................................................................29, 32

*Dura Pharms., Inc. v. Boudo*,
    544 U.S. 336 (2005)..........................................................................................................11, 32

*Edge v. Tupperware Brands Corp.*,
    2023 WL 6310236 (M.D. Fla. Sept. 28, 2023) ...................................................................20

*Edwards v. McDermott Int'l, Inc.*,
    2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) .....................................................................20

*In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*,
    298 F. Supp. 2d 544 (E.D. Tex. 2004).............................................................................26, 35

*Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*,
    2014 WL 6638793 (E.D. La. Nov. 21, 2014) .......................................................................29

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    1998 WL 781118 (N.D. Ill. Nov. 4, 1998) .................................................................17, 27, 32

*Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ..............................................................................................31

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
  565 F. 3d 200 (5th Cir. 2009) ........................................................................30

*In re Franklin Bank Corp. Sec. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011) ...........................................................30

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .................................................35

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
  514 F. Supp. 3d 942 (S.D. Tex. 2021) .......................................................18, 21

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ..........................................................................16

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ..........................................................................26

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019) .....................................................33

*Hall v. Rent-A-Center, Inc.*,
  2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).................................................30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)........................................................................................11

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ..........................................................................18

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................................................22

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*
  45 F.4th 1236 (10th Cir. 2022) .......................................................................13

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)..............................................................................17

*Irvin v. S. Snow Mfg., Inc.*,
  517 F. App'x 229 (5th Cir. 2013) ....................................................................12

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
  237 F. Supp. 3d 492 (S.D. Tex. 2017) .............................................................18

*Kanefsky v. Honeywell Int'l Inc.*,
  2020 WL 2520669 (D.N.J. May 18, 2020).......................................................22

*KB Partners I, L.P. v. Pain Therap., Inc.*,
  2015 WL 7760201 (W.D. Tex. Dec. 1, 2015) .........................................................................21

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................................11

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)........................................................................31

*Linenweber v. Sw. Airlines Co.*,
  2023 WL 6149106 (N.D. Tex. Sept. 19, 2023)........................................................................16

*Local 731 I.B. of T.Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ................................................................................................28

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ........................................................................................ *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007)..............20, 23, 31

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) .................................................................................33

*McNamara v. Bre-X Mins. Ltd.*,
  197 F. Supp. 2d 622 (E.D. Tex. 2001)....................................................................................14

*N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) ............................................................................13, 35

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...........................................................................................23, 27

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ................................................................................................30

*Nykredit Portefølje Admin. A/S v. ProPetro Holding Corp.*,
  2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)..................................................................34, 35

*In re OCA, Inc. Sec. & Deriv. Litig.*,
  2006 WL 3747560 (E.D. La. Dec. 14, 2006)......................................................................28, 29

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ......................................................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................................12, 22

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)..................................................................16

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) .........................................................................27, 30

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) .................................................................................25

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys*,
  769 F.3d 313 (5th Cir. 2014) ...................................................................32, 33, 34

*Ramirez v. Exxon Mobil Corp.*,
  334 F. Supp. 3d 832 (N.D. Tex. 2018) ..............................................................34, 35

*Regions Ins., Inc. v. Potter*,
  2018 WL 4288439 (W.D. La. Mar. 26, 2018) .........................................................6

*Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ................................................................................32

*Ret. Sys. v. Walgreen Co.*,
  2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) .......................................................33

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)........................................................28

*Salzman v. ImmunityBio, Inc.*,
  2024 WL 3100274 (S.D. Cal. June 20, 2024).........................................................14

*SEC v. World Tree Fin., LLC*,
  43 F.4th 448 (5th Cir. 2022) ..................................................................................14

*Simons v. Dynacq Healthcare, Inc.*,
  2006 WL 1897270 (S.D. Tex. July 10, 2006).........................................................20

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  545 F. Supp. 3d 120 (S.D.N.Y. 2021)....................................................................34

*In re SolarWinds Corp. Sec. Litig.*,
  595 F. Supp. 3d 573 (W.D. Tex. 2022)....................................................16, 20, 29

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) .............................................................................19, 25

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ........................................................................ *passim*

*Stephens v. Uranium Energy Corp.*,
  2016 WL 3855860 (S.D. Tex. Jul. 15, 2016)...........................................................34

*Stone v. Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014)................................................................19, 21

*Taylor v. Charter Med. Corp.*,
  162 F.3d 827 (5th Cir. 1998) .............................................................................6

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) ...................................................................31

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)......................................................................................14

*In re Vale S.A. Sec. Litig.*,
  2020 WL 2610979 (E.D.N.Y. May 20, 2020) .....................................................15, 16

*In re Venator Materials PLC Sec. Litig.*,
  547 F. Supp. 3d 624 (S.D. Tex. July 7, 2021) .........................................................26

*Wieland v. Stone Energy Corp.*,
  2007 WL 2903178 (W.D. La. Aug. 17, 2007), *aff'd*, 2007 WL 4403548 (W.D.
  La. Oct. 1,2007) .....................................................................................26, 27

**Statutes**

15 U.S.C. § 78j(b) ...........................................................................................11

15 U.S.C. § 78u-4 ...........................................................................................12

15 U.S.C. § 78u-5(c) ........................................................................................21

Private Securities Litigation Reform Act of 1995 ......................................12, 21, 23, 27

**Rules and Regulations**

17 C.F.R. § 229.105(a).......................................................................................20

17 C.F.R. § 229.303 .........................................................................................17

17 C.R.F. § 240.10b-5 ...................................................................................11, 12

Fed. R. Civ. P. 8.............................................................................................32

Fed. R. Civ. P. 9.........................................................................................11, 12

Fed. R. Civ. P. 12...........................................................................................35

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | ECF No. 35 |
| ASC | Accounting Standards Codification | AC ¶ 248 |
| AT&T | AT&T Inc. | AC ¶ 32 |
| Baby Bells | Seven independent regional operating companies formed in connection with the breakup of the Bell System in 1984 | AC ¶ 103 |
| Bell System | The monopoly of local telephone operating companies operated by AT&T's predecessor | AC ¶ 35 |
| Brightspeed | Cable company formed by Apollo Global Management, Inc. | AC ¶ 50 |
| CenturyLink | Lumen predecessor CenturyLink, Inc. | AC ¶ 38 |
| CERCLA | The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | AC ¶ 91 |
| Class Period | November 8, 2018 to October 31, 2023, both dates inclusive | AC ¶ 1 |
| CW | Confidential Witness | AC ¶¶ 24-31 |
| Defendants | Lumen and the Individual Defendants | AC at 1 |
| Defs.' Ex. | Exhibits attached to the Declaration of Lyle Roberts, filed April 26, 2024 | Mem. preface |
| Dev | Defendant Indraneel (Neel) Dev | AC ¶ 23 |
| DOJ | U.S. Department of Justice | AC ¶ 53 |
| DSL | Digital Subscriber Line technology | AC ¶ 125 |
| EHS | Environmental, health, and safety | AC ¶ 51 |
| EHSCP | The Environmental, Health & Safety Communications Panel, a consortium of communications EHS professionals | AC ¶ 72 |
| ESG | Environmental, Social, and Governance | AC ¶ 53 |
| EPA | Environmental Protection Agency | AC ¶ 125 |
| Embarq | Embarq Corporation | AC ¶ 38 |
| Ex. | Exhibits attached to the accompanying Declaration of Justin D. D'Aloia | Mem. preface |
| FCC | Federal Communications Commission | AC ¶ 182 |
| GAAP | Generally accepted accounting principles | AC ¶ 248 |
| ILEC | Incumbent local exchange carrier under the Telecommunications Act of 1996 | AC ¶ 48 |
| Individual Defendants | Johnson, Stansbury, Storey and Dev | AC at 1 |
| Johnson | Defendant Kate Johnson | AC ¶ 20 |
| Level 3 | Level 3 Communications, Inc. | AC ¶ 41 |
| Lumen | Lumen Technologies, Inc. | AC at 1 |
| Memorandum | Defendants' Memorandum In Support of Their Motion | ECF No. 37-2 |
| Motion | Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint | ECF No. 36 |
| NIOSH | National Institute for Occupational Safety and Health | AC ¶ 62 |

| OSHA | Occupational Safety and Health Administration | AC ¶ 78 |
|---|---|---|
| OSHA Lead Standard | OSHA's final rule establishing standards for lead exposure in general industry, codified at 29 C.F.R. § 1910.1025. | AC ¶ 80 |
| Pacific Telecom | Pacific Telecom, Inc. | AC ¶ 35 |
| Plaintiffs | Michael Glauber and John McLemore | AC at 1 |
| PPE | Personal protective equipment | AC ¶ 81 |
| PSLRA | Private Securities Litigation Reform Act of 1995 | |
| Qwest | Qwest Communications International Inc. | AC ¶ 39 |
| RCRA | The Resource Conservation and Recovery Act of 1976 | AC ¶ 88 |
| SEC | U.S. Securities and Exchange Commission | AC at 1 |
| SOX | Sarbanes-Oxley Act of 2002 | AC ¶ 409 |
| Stansbury | Defendant Chris Stansbury | AC ¶ 21 |
| Storey | Defendant Jeff K. Storey | AC ¶ 22 |
| Superfund | The Comprehensive Environmental Response, Compensation, and Liability Act of 1980. | AC ¶ 91 |
| Verizon | Verizon Communications Inc. | AC ¶ 32 |
| Washington DOSH | Washington's Division of Occupational Safety and Health | AC ¶ 83 |

## PRELIMINARY STATEMENT

This case involves what lawmakers have described as "corporate irresponsibility of the worst kind." In July 2023, the *Wall Street Journal* (*WSJ*) released a series of reports following a two-year investigation revealing—to the surprise of many, including the nation's own telecom regulator—that Lumen and other successors to the assets of the Bell System own a nationwide web of ancient copper telephone cables covered in highly toxic lead, which they chose to simply leave scattered across the country like littered trash as they built a new network using more lucrative fiber optic technology.

Lumen, previously CenturyLink, is a large telecommunications company that is technically based in Monroe but has since moved its main offices to Colorado and sold all its assets in Louisiana to pursue business elsewhere. On the first day of the Class Period, it set on a course to wind down its copper wire business in order to transition into the thriving market for fiber optic service and rebrand as a new, digital-era company. To sell investors on this new strategy, Defendants said that Lumen was "replacing" copper with fiber and, in doing so, taking costs out of the business. They also touted the Company's sustainability and corporate citizenship, claiming that that it was taking active steps to protect the environment, including by "recycl[ing]" its "copper wire" as it was taken offline, and monitoring employee performance to ensure its workplace was "free" from hazards.

The reality, however, is that Lumen was simply abandoning its lead-covered cables to rot in place across the United States as they were displaced by fiber, and exposing its frontline workers who worked with the lead remaining in its network to severe health problems by failing to provide them with the protections it said it did. These practices are inexplicable. For years, the Company and its leadership have known—as should be apparent to any casual observer—that the lead wrapped around this ancient hardware posed serious dangers to human health and the environment.

The existence of this toxic material in Lumen's network, and the financial exposure created by its practices, are not open for debate. Whether it comprises 5% or a fraction of 1% of the total,

Lumen has admitted that there is still *35,000 miles* of lead in its network.  It hangs exposed over busy city streets, runs through underground ducts, and passes through waterways.  Lumen has also admitted that these cables may give rise to extraordinary liabilities.  The AC pleads that cleanup could cost from $6 billion to $23 billion, consistent with analyst estimates.  Remediation aside, Lumen undeniably has faced, and will continue to face, many expenses now that the issue is known, including an ongoing, multi-stage investigation by the EPA under its Superfund law, among others.

Faced with these facts, Defendants attempt to turn the tables by insisting—as incontrovertible fact—that Lumen's ownership of these cables was a matter of public knowledge by attaching a host of materials beyond the four corners of the AC.  That tactic cannot be credited on a motion to dismiss.  What is more, their sweeping conclusion finds no support in the proffered materials.  Indeed, Defendants' conjecture begs the question: why would the *WSJ* devote two years of resources and publish a series of stories to expose an issue that was already well known?  The dramatic drop in Lumen's stock price when the news broke confirms that this contention is drawn from whole cloth.  The arguments they offer in support of their Motion are equally devoid of substance.

For example, Defendants maintain their statements are not actionable because none address the topic of lead-covered cables.  But that is only so because they *never disclosed it*.  And the law is clear that by discussing matters impacted by their lead cable practices, they assumed a duty to do so.

Ironically, Defendants also argue that the AC fails to plead that they knew any of the adverse facts. But their attempt to have it both ways—suggesting they did not know about an issue that was apparently known all along by the public—smacks of implausibility and revisionism.  If that were not enough, the AC pleads a cascade of specific facts which, individually and collectively, support the inference that Defendants knew about the toxic cables and the dangers they posed.

Defendants' remaining efforts to disprove loss causation suffer from similar infirmities.

At its core, the Motion is a transparent ploy to defeat liability by raising merits arguments not properly adjudicated at this stage without the benefit of fulsome discovery. The AC pleads facts upending those contentions, which must be accepted as true. The Motion should be denied.

## STATEMENT OF FACTS

### A.    Lumen's Corporate History and Business

Previously known as CenturyLink, Lumen is a large telecommunications company based in Monroe. AC ¶ 32. Unlike rivals AT&T and Verizon, Lumen has focused almost exclusively on cable-based services as opposed to wireless or mobile technology. *Id.* Since its formation in 1968, Lumen grew to become the third largest cable-based telecommunications company in the United States by acquiring other major wireline providers or their cable assets, including Pacific Telecom, Embarq, Verizon, Qwest, and Level 3. *Id.* ¶¶ 32-41. By the start of the Class Period in 2018, Lumen owned an extensive network made of "legacy" copper telephone cables, as well as a separate network made of newer, high-speed fiber optic cable. *Id.* ¶¶ 46-47. In October 2022, Lumen sold almost 400,000 miles of its "legacy" assets in 20 states, including Louisiana, to a startup called Brightspeed because it decided it was more profitable to focus on other markets. *Id.* ¶¶ 49-50. Even so, Lumen still owned approximately *700,000 miles* of copper cable after the sale. *Id.* ¶ 111.

### B.    Lead Is a Well-Known Toxin Extremely Harmful to Human Health

Lead is a brittle heavy metal that can release unnoticeable particles on contact. AC ¶¶ 56, 59. In this form, lead is a potent neurotoxin that can cause catastrophic damage to nearly every major body system in humans. *Id.* ¶ 60. Exposure of this type can produce a range of severe health conditions, including impaired cognition, organ failure, coma, birth defects, and, in extreme cases, death. *Id.* ¶ 62. Children are acutely vulnerable. *Id.* ¶ 63. Because it accumulates in the body over time and may go undetected for years, lead has earned the nickname the "silent killer." *Id.* ¶¶ 61, 64. It is almost universally recognized that there is no safe level of lead in the human body. *Id.* ¶ 76.

- 3 -

Due to its unique physical properties, lead was used ubiquitously as a common industrial material until its dangers became better understood in the mid-twentieth century. *Id.* ¶¶ 58, 66.

Since the 1970s, the U.S. government has taken a series of well-known steps to protect the public from lead and eradicate its continued use. Among other things, it banned the use of lead in residential paint, gasoline, and pipes used in public water systems. *Id.* ¶¶ 67-68, 72, 75. Through these efforts and others, the dangers of lead have become widespread public knowledge. *Id.* ¶ 76.

Nevertheless, there still exists a not insignificant amount of lead remaining in certain industries. *Id.* ¶ 77. As such, OSHA has promulgated stringent occupational safety standards for workers who handle lead. *Id.* ¶¶ 78-82. These standards set rules on exposure limits, monitoring, employee training, compliance controls, and PPE. *Id.* The rules are technical but necessary: it is recognized that occupational exposure is *one of the leading causes of lead poisoning*. *Id.* ¶ 77.

Lead is also harmful to plants and wildlife, and poses a threat to surrounding communities, when released into the environment. *Id.* ¶¶ 86-87. As such, there are several laws that govern the handling or disposal of lead, including the RCRA. *Id.* ¶ 88. Lead is subject to the RCRA because the EPA has classified it as a "toxic" waste, a type of material that "may be able to leach from waste and pollute groundwater." *Id.* ¶ 89. Other forms of toxic waste include arsenic and mercury. *Id.* The EPA also has broad power under its "Superfund" law, CERCLA, to investigate and order the cleanup of any toxic waste that is released into the environment, including lead. *Id.* ¶ 91.

## C.    The Sprawl of Lead Hidden In Lumen's Copper Network

Until it was phased out in the 1950s, lead was the industry standard protective covering, or "sheathing," for telephone cables and used extensively as such by the companies that built out the nation's telephone network, including, most notably, those in the Bell System. AC ¶¶ 95-96, 99-102. Lumen added lead-covered cables to its network by acquiring wireline assets from the Baby Bells created by the federal government's breakup of the Bell System in 1984 or otherwise owning

- 4 -

companies that operated prior to the phase out of lead.  *Id.* ¶¶ 98, 105.

Defendants claim that these cables are "left over from an earlier era" (Mem. at 7) but even after the Brightspeed transaction there still remained some ***35,000 miles*** of lead-covered cable spread across Lumen's nationwide network of copper telephone cables.  *Id.* ¶ 111.  Frontline workers tasked with maintaining this network frequently encountered lead cables across the geographies where Lumen operates, especially in the oldest parts of its network that envelop densely populated metropolitan areas, including Denver, Las Vegas, Minneapolis, Portland, Salt Lake City, Seattle, and elsewhere.  *Id.* ¶¶ 107-09.  This ancient hardware sits in piles in underground vaults, hangs on utility poles overhead, and runs directly into residential buildings.  *Id.*  As explained below (*infra* p. 10), the AC expressly pleads that industry experts had *no idea* that these lead cables remained in use.

In an apparent effort to deflect Lumen's failure to alert the public about these cables, much less the extent of the sprawl, Defendants labor to cobble together a mix of esoteric materials that refer to lead-sheathed telephone cables, including:  (1) one-line references to lead cables in judicial decisions dating back to 1903; (2) materials presented at EHSCP industry conferences intended for EHS professionals from the communications industry; (3) industry-sponsored studies on subsurface lead cable; (4) a comment letter submitted in response to a proposed EPA rule by a Lumen employee on behalf the EHSCP; (5) a notice addressed to members of a workers union announcing Lumen's agreement to settle charges that it violated the OSHA lead standard posted to the union's website; (6) correspondence with Washington regulators described in the AC; and (7) select reports that Lumen filed with the EPA under the RCRA that refer to lead.  *See* Mem. at 4-8.

Defendants repeatedly cite these materials *en masse* in an attempt to have this Court accept, as incontrovertible *fact*, that Lumen's ownership of lead cables was a longstanding matter of public record and, thus, known to investors.  *See* Mem. at 18, 20, 25, 33-34.  They do no such thing.

- 5 -

Neither the cases nor the comment letter refer to lead cables owned by Lumen or any of its predecessors. AC ¶ 143. Indeed, the cases involve *entirely different companies*.[1] Lumen's RCRA filings, while probative of Defendants' scienter, merely indicate that it handled lead at three facilities without any mention of *lead cables*—hardly surprising for a business that regularly uses lead batteries. *Id.* ¶¶ 143, 175-81, 307, 315, 321, 329. And the AC expressly pleads that that EHSCP is a "private group . . . closed to the public" whose annual conference materials are reserved for members. *Id.* ¶ 128. The fact that Defendants are forced to rely on "archived" webpages, including one that admittedly *lacks* the presentation they cite, disproves that all such materials are "available on the EHSCP's website." Mem. at 5 & n.2. Tellingly, Defendants do not offer a public source, archived or otherwise, for the *sole* presentation that refers to Lumen (AC ¶¶ 161-63).

Defendants' reliance on hand-picked "studies" about the health and environmental impacts of lead cables is even more preposterous. None mention Lumen *at all*. *See* Defs.' Exs. 16-17, 19-21. And none purport to represent the unanimous consensus view on the topic being studied. *Id.* Contrary studies abound. To give just one example, a 1996 study published in the *American Journal of Industrial Medicine* by a group that included scientists from NIOSH concluded that "the ongoing replacement of lead-sheathed telephone cable with fiber optics . . . in many areas of the country" may "represent[] a widespread and little recognized setting for lead overexposure" and observed that "telephone companies pulling cable are uniquely positioned to play a key role in prevention." Ex. 1. Further, each of the environmental studies cited by Defendants was limited to lead sheathed cable buried directly *in soil* (Defs.' Exs. 19-21), and therefore say nothing about the environmental impact of exposed *aerial* cables, like those that rained down lead dust to the ground below when disturbed

---

[1] To the extent Defendants are suggesting that the Court should take judicial notice of the *facts* stated in these decisions—limited as they are—Defendants are wrong. It has long been the law that a court may do so only "to establish the fact of such litigation and related filings," but cannot usually take notice of *findings of fact* from a collateral proceeding because those facts are almost always, by nature, disputed. *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998); *see also Regions Ins., Inc. v. Potter*, 2018 WL 4288439, at *3 (W.D. La. Mar. 26, 2018) (same).

by Lumen employees.  AC ¶ 113.  Finally, while Defendants repeatedly characterize these studies as "independent" (Mem. 1, 6, 25) it bears mention that all but the EPRI study were either prepared, commissioned, or requested by a telecommunications company.  *See* Defs. Exs. 16-17 (Bell System), 20 (Swedish media company Telia), 21 (Dutch telecom operator KPN Telecom).

All that remains is a notice about Lumen's OSHA settlement that was posted to a website for *union members* and a to technicians performing work on lead casings in a letter submitted by a CenturyLink employee in response to a proposed rulemaking initiative by Washington DOSH in 2017.  AC ¶¶ 151, 166-67.  If that were not flimsy enough for the conclusion Defendants advocate, the 2017 letter expressly said that the technicians who perform that work did so "*infrequently.*"  *Id.*

Tellingly, Defendants do not cite a single *investor disclosure* by Lumen, or, for that matter, any other telecommunications company, addressing lead cables or their dangers.

**D.      Lumen Misled The Investing Public About Its Legacy Practices As It Publicly Touted Its Decision to Transition to Fiber and Evolve Into a New Company**

Before the start of the Class Period, the majority of Lumen's revenues derived from products and services that relied on its copper telephone lines, like local and long-distance calling and DSL internet access.  AC ¶¶ 40, 45.  But its revenues were progressively declining as demand for these legacy services subsided with the proliferation of higher-speed alternatives like wireless and high-speed internet.  *Id.* ¶ 40.  On November 1, 2017, Lumen completed a $34 billion transaction to acquire a leading provider of fiber optic services to business, or "enterprise," clients.  *Id.* ¶ 41.

By the start of the Class Period, Storey and Dev decided to exit the market for legacy services on the consumer side as well.  On November 8, 2018, Storey announced a new strategic direction for Lumen which involved winding down its copper-based services and becoming a leading provider of fiber optic technology as part of an ongoing "digital transformation."  *Id.* ¶ 115.  One key "pillar" of this vision was taking costs out of the legacy business and managing it for cash.  *Id.* ¶¶

382, 408.  This decision was based on a detailed examination of Lumen's legacy portfolio by Storey and Dev.  *Id.* ¶ 408.  This initiative was a key focus for Lumen throughout the Class Period.

However, CenturyLink's history as a stalwart of the copper line market did not comfortably align with this new vision and the Company soon began to enhance its public image.  Consistent with the goal of establishing itself as a next generation leader, in mid-2019, CenturyLink enhanced its sustainability reports to provide more robust disclosures around its corporate citizenship and ESG initiatives.  *Id.* ¶ 54.  Then, in 2020, the Company officially rebranded as "Lumen" as part of its ongoing plan to transform into a leader for the "4th Industrial Revolution."  *Id.* ¶ 43.

During the Class Period, Defendants regularly spoke about Lumen's "digital transformation" program and touted its ESG efforts.  Call after call, they told investors that they were "replacing" legacy infrastructure with fiber and that doing so would yield substantial cost savings.  *Id.* ¶¶ 260-83.  Meanwhile, in its ESG disclosures, Lumen represented that it was "actively making choices to lessen [its] environmental impact," and had programs in place to "ensure the appropriate disposition of hazardous waste."  *Id.* ¶¶ 305-35.  It even specified that it "recycles telecommunications equipment," such as "copper wire," as one might expect from a sustainably minded company shutting down its copper network.  *Id.*  The Company also repeatedly touted its commitment to providing a workplace "free" from hazards.  *Id.* ¶¶ 284-304.  As part of this commitment, Lumen said that it regularly reviews "safety performance" to identify gaps that need improvement.  *Id.*

These statements could not be further from the truth.  Far from "recycling" or "replacing" the lead cables in its copper network once retired, Lumen was simply leaving those decaying cables littered across the country like discarded trash to save more money.  *Id.* ¶ 383.  Equally abhorrent, frontline workers who handled the lead remaining in Lumen's legacy network confirmed that there were no controls in place to verify adherence to any standards and Lumen took no efforts to evaluate

- 8 -

their performance.  *Id.* ¶¶ 113-14. As such, there was rampant noncompliance with the OSHA lead standard, exposing Lumen's workforce and the communities where they work to lead poisoning.  *Id.*

Lumen's undisclosed practices are indefensible.  In the years leading up to the Class Period, it received a cascade of evidence, and took various actions, demonstrating that those cables posed serious environmental and human health risks—a conclusion reinforced by common sense—and, thus, exposed it to costly liability, reputational harm, and regulatory scrutiny.  Since 2010, Lumen has reported its retirement of copper wireline to the FCC.  *Id.* ¶¶ 182-88.  Senior leaders from Lumen's EHS group attended industry conferences where leading lead experts warned that lead cables "leach" particles into the surrounding environment and workers were being exposed to unsafe levels of this noxious dust.  *Id.* ¶¶ 125-37.  Lumen agreed to establish a "lead abatement" program after an OSHA investigation found that its frontline workers were exposed to excessive levels of lead and violated numerous provisions of the OSHA lead standard.  *Id.* ¶¶ 145-63.  Defendants repeatedly attested that they understood the human health and environmental dangers associated with lead.  *Id.* ¶¶ 374-81.  Lumen consistently filed reports with the government designating lead handled at its facilities as a regulated "hazardous waste" under the RCRA.  *Id.* ¶¶ 174-81.  The list goes on.

Based on real-world estimates prepared by expert consultants and public utility companies, full-scale removal of all the lead cables remaining in Lumen's network would cost it between $6 billion to $23 billion.  *Id.* ¶¶ 384-86.  Indeed, analysts quickly determined after the news about the lead cables that cleanup could cost the entire industry as much as $59 billion, placing Lumen's share comfortably in the range dictated by the real-world estimates. *Id.* ¶ 357.

**E.    Investors Are Harmed as the Truth Emerges**

In July 2023, the *WSJ* published a series of stories based on an 18-month investigation into a tip that there is a patchwork of old telephone cables encased in lead sitting across the country that are owned by the nation's telecommunications companies.  AC ¶¶ 218, 220, 354, 357, 359, 363.  The

investigation uncovered thousands of miles of lead-sheathed cables scattered around the country, including near homes, playgrounds and parks; environmental contamination exceeding permissible lead standards near such cables, especially exposed aerial cables; and extensive evidence showing that the large telecommunication companies, including Lumen, were fully aware of the environmental and human health posed by these cables. *Id.* ¶¶ 218, 220. Defendants attempt to minimize these reports by stressing that they "barely" mention Lumen. Mem. at 1. But they explained in extensive detail how the lead cables remaining in the nation's telephone network date back to the Bell System, part of which was acquired by Lumen. AC ¶¶ 218, 103-05.

News of these cables took everyone by surprise, even veteran industry experts. Trade publications said these cables "seem to have flown under the radar, until now." *Id.* ¶ 219. Senior telecom analysts said they "never" encountered the topic before. *Id.* Four former chairs of the FCC, the nation's wireline regulator, indicated they were unaware of these cables. *Id.* The head of a trade association for environmental regulators said that this issue "isn't on the national radar." *Id.* ¶ 218. Indeed, the *WSJ* investigation was launched because the reporter who first learned of the issue "never heard of lead cables in the telecom networks." *Id.* ¶ 204. The *WSJ*'s reporting itself even observed that "the lead-covered cables have been largely unknown to the public." *Id.* ¶ 220.

Lawmakers and regulators also responded with corresponding alarm. A senior Congressman deeply involved in telecommunications policy described the indifference shown by the owners of these cables "corporate irresponsibility of the worst kind." *Id.* ¶ 227. Another called on these companies to "clean up their mess." *Id.* ¶ 228. By the end of July, the DOJ and the EPA both launched investigations into the lead cables. *Id.* ¶ 231. The EPA has contacted Lumen. *Id.* ¶ 237.

On August 1, 2023, Stansbury finally confirmed that Lumen still had some *35,000* miles of lead sheathing in its network. *Id.* ¶ 234. Later that same day, Lumen filed a periodic report with the

- 10 -

SEC which finally disclosed a "loss contingency" for the liability it could face for the "lead-sheathed cables" that it owned throughout the Class Period without disclosing a specific figure for the potential loss. *Id.* ¶ 12, 366. On October 31, 2023, it revealed that it anticipated incurring "investigative costs" as a result of the "recent media coverage." *Id.* ¶ 368.

The market's reaction was severe: Lumen's stock price sharply declined after each of these disclosures. *Id.* ¶¶ 352-69. All told, it traded down to its lowest level in over *40 years*. *Id.* ¶ 13.

## STANDARD OF REVIEW

To survive dismissal, a complaint need only plead facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this assessment, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). "If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for the most aggrieved plaintiff" to state a claim. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

## ARGUMENT

## I.   PLAINTIFFS STATE A SECTION 10(B) CLAIM

Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder prohibit fraud in securities transactions by false or misleading statements. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). Investors enjoy a private right of action to enforce this rule. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). A valid claim requires proof of: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Boudo*, 544 U.S. 336, 341-42 (2005).

As with any averment of fraud, claims of this type must satisfy the heightened pleading requirements of Rule 9(b). *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th

- 11 -

195, 206 (5th Cir. 2023). In addition, the PSLRA requires that plaintiffs bringing such a claim (i) specify the "reasons why the statement is misleading" and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1), (b)(2).

Defendants dispute elements (1), (2), and (6), and thus concede Plaintiffs have adequately pled all others. *See Irvin v. S. Snow Mfg., Inc.*, 517 F. App'x 229, 231 (5th Cir. 2013) (argument not raised in opening brief is waived). Because these elements often involve "fact-specific inquiries," dismissal is often "difficult to obtain." *Bachow v. Swank Energy Income Advisers, LP*, 2010 WL 70520, at *2 (N.D. Tex. Jan. 6, 2010). As set forth below, Defendants' arguments are meritless.

### A.    The AC Adequately Alleges Misstatements and Omissions of Material Fact

By its terms, Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face but as well the omission of any material facts necessary to make statements that are made "not misleading." 17 C.F.R. § 240.10b-5(b). Thus, whether a statement is misleading "is measured not by literal truth," but its ability to "accurately inform." *Six Flags*, 58 F.4th at 218; *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187-93 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). That is, once a company chooses to speak on a topic, it must tell the "*full* truth." *Six Flags*, 58 F.4th 217 (emphasis added); *see also Lormand*, 565 F.3d at 249 ("[A] duty to speak the full truth arises when a defendant undertakes . . . to say anything.").

The PSLRA's heightened pleading requirements were enacted to filter out "frivolous strike suits," but not "facially valid claims." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). Accordingly, Plaintiffs need only "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" to satisfy Rule 9(b) and the 15 U.S.C. § 78u-4(b)(1). *Id.* at 350.

Here, the AC identifies dozens of misstatements made by Defendants during the Class Period

about: (1) the cost benefits of transitioning away from copper cable services; (2) employee health and safety; (3) environmental stewardship; (4) GAAP compliance; and (5) EHS contingencies. AC ¶¶ 253-350. Defendants do not dispute that the AC identifies the statements, speakers, and settings with adequate specificity but, instead, maintain that these statements are not adequately alleged to be false or are otherwise inactionable as a matter of law. Those contentions are flawed.

> **1.      The AC Pleads an Array of Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made**

From the very outset, Defendants' arguments proceed from the flawed premise that dismissal is required because the AC fails to plead that their statements were "false." Mem. at 26. But it is "well-settled" that "literal truth" is no defense because such statements can still *mislead* by omission. *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D. Tex. May 11, 2023); *see also Ind. Pub. Ret. Sys. v. Pluralsight, Inc.* 45 F.4th 1236, 1251 (10th Cir. 2022) (that statements are not "*literally* false" is "beside the point"). Even Defendants' case accepts that statements are actionable if they are "false *or misleading*." *N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 745 (N.D. Tex. 2013). The AC pleads a plethora of facts to this effect.

**<u>Benefits of converting from copper to fiber</u>**. Throughout the Class Period, Defendants told investors that Lumen was "replacing" its old copper lines with new fiber technology and assured that doing so would yield substantial cost savings. AC ¶¶ 260-83. But far from "replacing" its lead-encased cables, Lumen simply *abandoned* them across the country, exposing it to myriad liabilities. *Id.* Defendants do not offer any rejoinder to the allegations of abandonment, insisting, instead, that the AC fails to allege that Lumen "was not, in fact, prioritizing fiber investment." Mem. at 28. That is irrelevant. As pled, these statements "gave the false impression that Lumen's legacy services . . . would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm." AC ¶¶ 265, 267, 270, 273, 275, 277, 279, 281, 283. This does not improperly conflate

"copper" with "lead-sheathed."  Mem. at 28.  Lumen's lead cables were *part of its copper network* (AC ¶ 111), and Defendants had a duty to provide a complete picture—both good and bad—when they chose to speak about the benefits of shuttering that network.  *See Lormand*, 565 F.3d at 248-49 (when party speaks about "benefits" of a plan it must disclose "firm-specific adverse facts that affect the validity or plausibility of that prediction" to avoid misleading investors).  As one court recently put it, "a company's decision to boast sweepingly does not operate to truncate its duty to disclose . . . it extends it."  *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *7 (S.D. Cal. June 20, 2024).

Unable to refute these well-pled allegations, Defendants resort to misdirection, claiming the AC fails to allege that "*removing* retired lead-sheathed cables . . . would be more economical than leaving them in place."  Mem. at 28.  This is not an environmental case and Plaintiffs do not seek to hold Defendants liable for failing to remove such cables but, rather, for the costly exposures created by *failing to disclose* to this was its practice, not the least of which risked protracted regulatory scrutiny and potential fines, which Lumen has only now acknowledged.  AC ¶ 366.

That these cables comprised only 5% of the copper network (Mem. at 28) hardly makes Lumen's illicit practice immaterial.  Materiality turns on whether there is a "substantial likelihood" a reasonable investor would consider the information "important."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449-50 (1976).  Because that is a "fact-specific" inquiry, it is a matter best left to "the trier of fact."  *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 459 (5th Cir. 2022).  As such, a claim should not be dismissed for failure to plead materiality unless the omitted facts are "so obviously unimportant . . . that reasonable minds could not differ."  *McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001).  The *billions* in potential financial exposure created by Lumen's practices were enough to eclipse Lumen's *revenue* (Mem. at 3), much less its profit.  AC ¶¶ 357. 384-86.  The market's severe reaction in response to the truth negates the conclusion that the

information was *unimportant* to investors.  *See, e.g.*, *Cassava Scis.*, 2023 WL 3442087, at *8 ("materiality" of omitted facts was "supported by the drops in stock price" when truth came out).

**Environmental stewardship**.  Defendants also repeatedly touted Lumen's environmental and social citizenship, proclaiming that it was "actively making choices to lessen [its] environmental impact," and highlighting that it "recycles" its "copper wire" at the end of its life.  AC ¶¶ 305-35.  In truth, Lumen flouted those representations by (i) using thousands of miles of wires covered in lead in communities where it operated despite evidence that it leaches out from its surface over time and is classified as a toxic waste harmful to human health under environmental laws for that very reason; and (ii) littering those toxic cables across the country rather than recycle them once retired.  *Id.*; *see also id.* ¶¶ 89, 135, 174-81.  Defendants admit that these cables are adequately alleged to be "an environmentally sensitive material" (Mem. at 23) but attempt to offset these facts by measuring them against Lumen's "*overall* impact on the environment" (Mem. at 28).  Here too literal accuracy offers no protection.  By issuing glowing descriptions about Lumen's environmental choices, Defendants were obligated to disclose "a 'mix of information'" on that topic "that is not misleading" *Six Flags*, 58 F.4th at 217, and no investor would understand these statements to mean that it was actively leaving regulated waste across the country.  *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12-13 & n.15 (E.D.N.Y. May 20, 2020) (ignoring signs that one of several hundred dams faced increased risk of collapse incompatible with statements touting "sustainability" and "commitment to . . . preserve the environment" as core values).  Moreover, Lumen's practice of abandoning lead cables directly conflicts with Defendants' assurances that "copper cables" were "recycled."

**Employee safety**.  Year after year, Defendants emphasized that Lumen was committed to providing a workplace "free" from hazards and, as such, regularly reviewed "safety performance" to improve it.  AC ¶¶ 284-304.  Yet Lumen had no system to check if employees who worked with

lead—one of the most perilous tasks at the Company—followed the perfunctory protocols it had for them, much less evaluate their performance to identify areas for improvement. *Id.* Indeed, multiple CWs were never even told when jobs involved lead, and reported there was rampant non-compliance with the OSHA Lead Standard. *Id.* ¶¶ 80-81, 113-14. It is of no moment that Lumen had "safety training" and "guidelines" for working with lead. Mem. at 27. Many CWs never *received* any. AC ¶ 113. More fundamentally, Plaintiffs do not allege that Lumen failed to *design* any protocols, but that it failed to *enforce* them, much less enhance them through regular scrutiny, as represented. *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 585-87 (W.D. Tex. 2022) (there were "differences between the image projected . . . and the reality on the ground" when issuer often said it was "focusing on cybersecurity 'hygiene'" but employees were "not aware" of security policies and "did not receiving [any] training"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012) (statements signaling safety reforms were "implemented" belied by safety failures caused by "a lack of oversight" and "failure to train employees properly"); *see also BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80-81 (S.D.N.Y. 2017) (similar for statements touting "commitment" to safety and efforts to "relentlessly identify and manage material health and safety risks").[2] Whether Defendants were "aware" (Mem. at 27) is inapposite—that confuses falsity with scienter.

**GAAP Compliance**. In each periodic SEC filing that Lumen made before August 1, 2023, Defendants represented that the financial statements therein followed GAAP. AC ¶¶ 336, 347-50. But none reported a "loss contingency" for the sprawling web of toxic cables that Lumen left across the country, as required by ASC 450. *Id.* As such, they are "presumed to be misleading" under SEC Regulation S-X. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 249 (5th Cir. 2003). Lumen

---

[2] The cases relied on by Defendants (Mem. at 27) are not inconsistent with these holdings. *See Linenweber v. Sw. Airlines Co.*, 2023 WL 6149106, at *7 (N.D. Tex. Sept. 19, 2023) (failure to plead that "Southwest lacked compliance policies and procedures" dispositive because it only stated that it "has" such policies); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 229-30 (S.D.N.Y. 2018) (statement that company "monitors . . . quality and food safety programs" not actionable because plaintiff did "not allege that Chipotle failed to undertake such endeavors").

eventually made this disclosure on August 1, 2023, after the *WSJ* revealed the facts. AC ¶ 366.

The need for Defendants to parse the text of their belated disclosure to claim that it did not reveal that it should have been made earlier highlights, rather than masks, its problematic content. *See* Mem. at 25-26. According to its text, the loss contingency arose from potential "environmental liabilities" associated with "lead-sheathed cables [installed] several decades ago" that Lumen owned *throughout the Class Period* without any mention of "media coverage." AC ¶ 366. There is no reason why this disclosure could not have been made earlier in the Class Period.

Similarly unpersuasive are Defendants' fact-based challenges to ASC 450. As pled (AC ¶ 250), disclosure is required if a loss is "reasonably possible," *i.e.*, "more than remote but less than likely." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). Contrary to Defendants' *ipse dixit* (Mem. at 26, 29), the AC pleads with exacting particularity that such a risk arose from facts *pre-dating* the *WSJ*'s reporting, which the text of Lumen's eleventh-hour disclosure confirms and must be accepted as true. AC ¶¶ 338-44.[3] That the loss is not alleged to be "quantifiable" (Mem. at 29) is inapposite. ASC 450 still demands disclosure. AC ¶¶ 249-51, 344; *see also* ASC 450-20-50-6 (Ex. 2) ("disclosure" required even if the "loss cannot be . . . estimated"). Indeed, the fact that Lumen has not quantified its belated loss contingency (Mem. at 29) puts the lie to that argument. In any case, disputes over the proper application of GAAP like this confirm that dismissal is "not appropriate." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005).[4]

---

[3] ASC-450-20-50-6 (cited at Mem. at 26) has no application because the losses alleged in the AC arise from several contingencies other than legal claims, including, for example, environmental remediation relating to lead-covered cables. But even if it did apply, disclosure is still required—contrary to Defendants' self-serving parenthetical—if a loss is "probable," *SAIC*, 818 F.3d at 93, which the AC also alleges. Defendants stray even further afield by citing Item 303 of Regulation S-K, codified at 17 C.F.R. § 229.303. *See* Mem. at 26. That rule requires disclosures in the "management's discussion and analysis" section of SEC filings, not the financial statements. 17 C.F.R. § 229.303(a).

[4] Equally unavailing is Defendants' assertion that the statements were audited and not restated (Mem. at 29). *See, e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (rejecting argument that audit and lack of restatement precludes GAAP violations); *see also In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *4, *8 (N.D. Ill. Nov. 4, 1998) (externally audited financials actionable for failing to account for loss contingency).

**EHS Contingencies and Risks**. In Lumen's SEC filings, Defendants repeatedly represented that Lumen's disposal of hazardous waste "could" expose it to claims that it violated applicable environmental or health regulations. AC ¶ 253-55. But by posing this as a mere possibility, investors were misled into believing that the risk was hypothetical when Lumen was actively engaged in activity that significantly increased the chance it would come to pass. *Id.*; *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 106 (D.C. Cir. 2015) (warning of "potential risk" in the abstract "implies that no such problems [are] on the horizon"). Other disclosures incorporating this warning or the inadequate "loss contingency" are likewise misleading. AC ¶¶ 256-59.

These disclosures are not inactionable because they warn of the "very risk" that came to pass. Mem. at 23. Cautionary language in which issues are "glossed over as a future risk" are misleading if they fail to warn about "certain dangers." *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021). This is especially true because the warnings here (¶¶ 256, 258) couch the risk as one of "*limited* magnitude." *Lormand*, 565 F.3d at 247. Were it otherwise, any issuer could insulate known risks from liability by merely claiming they are *possible*. That is not the law. *Id.* at 249 ("To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible . . . when they have already occurred is deceit.").[5]

This does not demand that Defendants "*predict* the precise manner in which the risks will manifest." Mem. at 24 (emphasis added). It only requires them to disclose "clearly present danger that was materializing." *Lormand*, 565 F.3d at 247.[6] By the time of these disclosures, Lumen had

---

[5] Unlike the authority cited by Defendants, this is not a case where the AC alleges that the issuer failed to disclose the risk altogether. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 844-45 (N.D. Tex. 2005) (warning "expressly addressed the very risk *that Plaintiffs allege was not disclosed*"); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 544, 555-56 (N.D. Tex. 2003) (warning addressed risks "*Plaintiffs contend were not disclosed*").

[6] *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492 (S.D. Tex. 2017), cited by Defendants (Mem. at 24) is inapposite. The warning there did not describe a "general risk that [the] vessel may require 'unplanned maintenance,'" as Defendants claim but, rather, a "'substantive' company-specific" risk that a specific ship would undergo maintenance for 45 to 60 days, which did not materially differ from the 64 days it took. *Id.* at 503-04, 513.

years of data indicating that the lead cables were harmful to frontline workers and that the lead on them was an "environmentally sensitive" material. *See In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) (warning company may not locate oil reservoirs misleading when "Defendants had years of data indicating" otherwise). Defendants' attempt to negate these facts by referring to the "studies" cited in the brief is unfounded. Mem. at 25. At best, their existence only establish that they were available publicly, not that *Lumen knew of them* when it made these disclosures. If anything, they create an issue of fact that cannot be resolved at this stage.

### 2.    Defendants' Efforts to Shield All of Their Misstatements As Inactionable As a Matter of Law Are Meritless

Given the above, Defendants attempt to argue that *all* the misstatements they issued during the five-year Class Period are exempt from liability as a matter of law by raising a series of baseless categorical challenges, one more misguided than the next. *See* Mem. at 29-33.

**Puffery**. Defendants first attempt to downplay many of their representations as inactionable "puffery." Mem. at 29-30. Puffery refers to statements that are so vague they are "immaterial" to investors as a matter of law. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). This principle affords no protection here.

First, statements that contain "concrete fact[s]" are not puffery. *Lormand*, 565 F.3d at 249 n.14. Defendants label nearly all conference call statements as such by improperly cherry-picking select words from surrounding text. But those statements are alleged to be false and misleading for touting the *cost savings* of reducing investment in copper wireline (AC ¶¶ 262, 264, 266, 268, 271, 274, 282), and such representations are plainly actionable. *See, e.g.*, *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 591 (W.D. Tex. 2014) (misleading to tout "very reasonable cost structure"). Similarly, the representations that Lumen was "actively making choices to lessen [its] impact on the environment" (AC ¶¶ 305, 328) are "objectively verifiable," *Carlton v. Cannon*, 184 F. Supp. 3d

428, 494 (S.D. Tex. 2016), as evidenced by its decision to discard toxic cables across the country.

Second, as a concept rooted in materiality (*supra* p. 14), whether a statement is puffery turns on the "context in which it was made." *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *8 (S.D. Tex. Apr. 13, 2021); *see also BP*, 843 F. Supp. 2d at 747 ("Materiality is not judged in the abstract, but in light of the surrounding circumstances."). Thus, a statement that may be seen as puffery "standing alone" can be material if "used to emphasize and induce reliance" as part of a broader pattern. *Simons v. Dynacq Healthcare, Inc.*, 2006 WL 1897270, at *2 (S.D. Tex. July 10, 2006); *see also BHP*, 276 F. Supp. 3d at 79 (same for topics "particularly important" to investors).

However immaterial similar phrases may be in other contexts, *e.g.*, Defendants' cases (Mem. at 30), cost containment and social responsibility were important to *Lumen* investors. Defendants stressed that reducing cost in Lumen's legacy network was a "key pillar" of its digital transformation plan. AC ¶ 382. That several of the cost statements (*id.* ¶¶ 271, 274, 276, 280) were made "in direct response to an analyst's inquiry" confirms it was material. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007); *see also Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *5 (M.D. Fla. Sept. 28, 2023) ("profitability" of turnaround plan not puffery given that the plan was "important" to business). Similarly, Lumen's pledge to employee safety and the environment was an integral part of its effort to rebrand as a modern-day company for the next "industrial revolution." AC ¶¶ 2, 43. By Defendants' count (Mot. App'x A), Lumen projected this message no fewer than *13 times*. *See BP*, 843 F. Supp. 2d at 759 (statement can become material through "repetition"); *see also SolarWinds*, 595 F. Supp. 3d at 587 (assuring that issuer was "focusing on cybersecurity 'hygiene'" not puffery when "repeated").[7]

---

[7] Reinforcing this conclusion, Lumen's SEC filings included a risk disclosure warning that even the "*perceived* failure to meet evolving [ESG] practices . . . could adversely impact our business, brand stock price or cost of capital." Ex. 3 at 16. This is notable because Item 105 of Regulation S-K required those disclosures to cover "the *material* factors that make an investment . . . speculative or risky." 17 C.F.R. § 229.105(a) (emphasis added).

**Purportedly "Accurate" Statements of Fact**. Perhaps most egregious of all, Defendants posit that their statements about Lumen's safety and environmental practices are not actionable because they are historically "accurate." Mem. at 30-31. Yet each statement they cite uses the *present*, not the past, tense. In any case, as demonstrated by the Fifth Circuit's recent decision in *Six Flags*, 58 F.4th at 218, there is no merit to this argument because historic statements can still *mislead* by omission. *See, e.g.*, *KB Partners I, L.P. v. Pain Therap., Inc.*, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015). These statements were misleading for all the reasons detailed in Point I.A.1. *See also Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) (rejecting argument that statements about having "extensive . . . safety programs" were not "literally false" because undisclosed facts made them misleading).

**PSLRA Safe Harbor**. Next, Defendants argue that several statements are protected by the PSLRA safe harbor. *See* Mem. at 31-32. By its terms, the safe harbor is limited to "forward-looking statement[s]," 15 U.S.C. § 78u-5(c), and, thus, does not protect any part of a "mixed present/future statement" that "refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014). Many of the statements Defendants capture are challenged for assertions of *present fact* embedded in them. AC ¶¶ 256, 258, 262, 264, 272, 274, 280. Indeed, the two excerpts they cite state that Lumen will "continue" to manage costs, communicating that it is currently doing so. *See Six Flags*, 58 F.4th at 217 (that "construction is continuing" toward opening date "concern[s] present information"). Regardless, the statements from AC ¶¶ 264, 274 were neither identified as "forward-looking" nor accompanied by *any* meaningful cautionary language (Exs. 4, 5), as they must for the safe harbor to apply under 15 U.S.C. § 78u-5(c)(2). *See Anadarko*, 514 F. Supp. 3d at 953 (no safe harbor when statements not "identified" as forward-looking); *Stone*, 26 F. Supp. 3d at 598-99 (same for call lacking a warning that "actual results may differ"). Those that referred to the risk factors

- 21 -

from Lumen's SEC filings fare no better because they were incomplete and misleading for all the reasons stated in Point I.A.1.  *See Apache*, 2022 WL 4277350, at *5 (misleading risk warnings are not "meaningful" under safe harbor).  Finally, the safe harbor offers no protection because these statements were known to be false or misleading (*see* Point I.B).

**Opinion Statements**.  Finally, Defendants label a handful of statements as "nonactionable" opinions.  Mem. at 32-33.  Far from being nonactionable, it is now settled that an opinion is "untrue" if it is not genuinely held by the speaker and "misleading" if it does not "fairly align[] with the information in the issuer's possession."  *Omnicare*, 575 U.S. at 185-89.  But this analytic framework applies only to statements of opinion, not fact.  *Id.*  One of the statements quoted by Defendants expressly offsets what is arguably an opinion to note that "we can take cost out faster on the legacy platforms," a statement of certain fact.  AC ¶ 272.  Similarly, the representation by an issuer (as opposed to an opinion letter by an auditor) that the financial statements adhere to GAAP expresses certainty.  *See Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) (collecting cases).[8]  In addition, the statements expressing views about minimizing costs in legacy assets were subjectively disbelieved (Point I.B), and fundamentally conflict with the undisclosed facts available to Lumen (Point I.A.1).  *See In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *10, *15 (S.D. Tex. Feb. 23, 2023) (statements that project would "maximize ultimate recovery" actionable when "Defendants knew their gamble was far riskier and subject to greater undisclosed costs"), *aff'd in part and rev'd on other grounds*, 2023 WL 4146278 (S.D. Tex. June 23, 2023).

**B.      The AC Raises a Strong Inference of Scienter**

Scienter is a state of mind embracing "intent to deceive, manipulate, or defraud" as well as

---

[8] As the Supreme Court explained in *Omnicare*, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Omnicare*, 575 U.S. at 183. *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *5 (D.N.J. May 18, 2020), relied on by Defendants (Mem. at 33 n.13), simply confirms that *quantifying* a future liability (which Lumen did not do) can qualify as an opinion under this standard, not that unqualified assertions confirming that financial statements were prepared according to GAAP do so.

"severe recklessness."  *Lormand*, 565 F.3d at 251; *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408-09 (5th Cir. 2001) (confirming recklessness survived passage of the PSLRA).  Severe recklessness arises when there is "a danger of misleading buyers or sellers which is either known . . . or is so obvious that the defendant must have been aware."  *Spitzberg*, 758 F.3d at 684.

As with their misstatements argument, Defendants attempt to recast the AC as turning on whether Defendants knew that Lumen faced "financial exposure" related to its lead cable practices. *See* Mem. at 1, 14-22.  Recklessness is satisfied when executives "knew facts or had access to information suggesting that their public statements were not accurate." *Apache*, 2022 WL 4277350, at *8 (collecting cases); *see also Lormand*, 565 F.3d at 252-53 (recklessness established by pleading knowledge of facts "contrary" to public statements).  For the avoidance of doubt, neither the employee safety nor the environmental stewardship statements involve an element of cost.

To qualify as "strong" under the PSLRA, the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged.  *Tellabs*, 551 U.S. at 324.  The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so.  *Id.* at 323.  Importantly, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'" *Id.* at 323.  In other words, "a tie" among competing inferences "favors the plaintiff."  *Six Flags*, 58 F.4th at 214; *see also Lormand*, 565 F.3d at 254-55 (same).  Here, the AC pleads an array of facts that, individually and in concert, raise an overwhelming inference of scienter for each Defendant.

### 1.    The AC's Allegations Offer Compelling Direct Evidence of Scienter

As detailed above, the AC pleads a litany of facts undermining Defendants' positive public statements, including, at the most basic level, that Lumen's workforce managed troves of cables in its legacy network infrastructure covered in a material that is highly toxic to human health and regulated as an environmental contaminant.  Importantly, Defendants *concede* that they were aware

of these cables and their dangers by erroneously contending that the public knew about them all along. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. 2005) (defendants "cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that Alstom's CEO and CFO were unaware of [them]"). Beyond that, the AC specifically alleges, and the Court must accept the intuitive truism, that practically any adult (much less the head of a telecommunications firm with ILEC assets) is acutely aware of the dangers of lead. AC ¶ 76.

If that were not enough, (1) Johnson visited a museum with a display showing that the cables Lumen inherited were made with lead when she joined the Company; (2) Sansbury performed a detailed review on the rate at which Lumen sunset its legacy wireline when he joined the Company; and (3) each of the Individual Defendants personally signed certifications acknowledging the dangers of lead in connection with their many real estate transactions. *Id.* ¶¶ 95-97, 374-81, 403-04.

To the extent Defendants acknowledge any of these facts, they struggle to muster a viable response. They assail the AC for not specifying if the museum Johnson visited offered information on the "health and environmental risks of lead-sheathed cables." Mem. at 19-20. But that elides the fact that Johnson learned about the use of lead cables at the museum, *i.e.*, the only type used in the Bell System for half a century. AC ¶¶ 95-97. Defendants' remaining rhetoric does not fill that gap.

Next, Defendants scoff at the property disclosures they signed because they claim that those materials only address lead *paint* and "say nothing about lead-sheathed *telecommunications cables*." Mem. at 19. At the risk of stating the obvious, the AC does not allege that the toxicology of lead somehow *changes* depending on the item it is released from. More fundamentally, Defendants grossly mischaracterize these materials. As its name suggests, the lead pamphlet Defendants seize on—which all Individual Defendants were required to acknowledge receiving (AC ¶¶ 375, 377, 378, 380)—is not limited to lead paint. To the contrary, it says in plain words that one source of lead is

- 24 -

"Your Job," explaining "[i]f you work with lead, you could bring it home on your body or clothes" in the form of dust. *Id.* ¶ 69. Storey and Johnson also had to declare if they knew about any lead on their property as an "environmental" matter. *Id.* ¶¶ 376, 379. This is irrefutable proof that Defendants knew lead was extremely dangerous and a potential environmental contaminant.

Notably, Defendants ignore that Lumen *itself* has repeatedly made representations to the government evincing its knowledge of the lead cables and their dangers. Lumen represented in a letter to Washington DOSH that "[o]ur technicians . . . perform work on lead casings." *Id.* ¶ 167. Lumen has also filed reports with the federal government for years designating the lead handled at its facilities as a hazardous waste under the RCRA. *Id.* ¶¶ 180-81. Lumen even entered into a settlement with OSHA in which it agreed to update internal policies for working with lead cables because they fell short of OSHA's occupational safety standards. *Id.* ¶ 154. Lumen reportedly did so because "CenturyLink [Lumen] *understood the seriousness of the issue*." *Id.* ¶ 158.

To be sure, the Fifth Circuit has indicated that courts should look to the state of mind of the individual who made a statement rather than "the collective knowledge of all the corporation's officers and employees" when deciding if a corporate defendant acted with scienter. *Southland*, 365 F.3d at 366 (cited in Mem. at 21). But the allegations described above are not inconsistent with that rule. Many misstatements were made *by Lumen* and the admissions described above were expressly made *by Lumen*. As a matter of policy, a company should not be permitted to issue statements contradicted by admissions it made to the government. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (representations in government filings contradicting public statement "strengthen[s]" inference that "IPaxess intended to deceive").

Try as Defendants may to suggest otherwise (Mem. 18), the financial exposure faced by Lumen would be evident to anyone endowed with these facts. Analysts warned that Lumen faced

- 25 -

billions in liability within *five days* of the *WSJ* article. AC ¶ 357. Even absent full-scale removal, Lumen faced many other obvious costs, including soil replacement, personal injury litigation, property damage claims, regulatory fines for mishandling hazardous waste, and precious reputational damage. Indeed, Lumen has admitted it is part of the EPA's Superfund investigation. AC ¶¶ 231, 237. It was also recently named in a class action by Louisiana homeowners for abandoning obsolete lead cables on property throughout the State. *See Blum v. AT&T Corp., et al.*, No. 6:23-cv-01748 (W.D. La.). To claim that Defendants did not appreciate this risk strains credulity.

Faced with these facts, Defendants insist that none can contribute to an inference of scienter by doubling down on their faulty assertion that the information was already "public." Mem. at 18. The flaws with that argument are legion. First, it "misses the point of the scienter inquiry." *In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*, 298 F. Supp. 2d 544, 558-59 (E.D. Tex. 2004). That the information is "publicly available may affect Plaintiffs' reliance on or the materiality of the information," not Defendants' knowledge of it. *Id.* In that regard, Defendants' argument—known as a "truth on the market" defense—is not even cognizable on the facts of this case.[9] What is more, even if investors knew that Lumen owned lead cables in the past (and they did not), none of the sources cited by Defendants evince (1) that Lumen *continued* to own them during the Class Period; (2) the *extent* of Lumen's lead-clad infrastructure remaining in Lumen's network; (3) that Lumen decided to *abandon* those cables across the country as it transitioned to fiber.

---

[9] The truth-on-the-market defense posits that "a misrepresentation [is] immaterial if the information is already known to the market." *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *5 (W.D. La. Aug. 17, 2007), *aff'd*, 2007 WL 4403548 (W.D. La. Oct. 1 ,2007). But the corrective information must be "conveyed to the public with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information" for the defense to apply. *Id.* Because that is a "fact-specific inquiry," it is rarely appropriate on a motion to dismiss. *Id.* As detailed above (pp. 5-7), most of the materials cited by Defendants—including esoteric research studies and court cases from over 100 years ago—do not even *mention* Lumen or, for that matter, any of its predecessors, and the only ones do are a notice posted to a website for *union members* and a state regulatory letter. It should therefore come as no surprise that, as pled, industry insiders had *no idea* about the lead cables in Lumen's network. AC ¶ 219. The final nail in the coffin is that Lumen's stock price sank when the news about the lead cables broke. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004) ("[A] stock's price will not change upon the release of confirmatory information, *i.e.*, information already known to the market."); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 668 (S.D. Tex. July 7, 2021) ("drop in share price" after the corrective disclosure is evidence that market perceived the it as "new information").

Finally, there is no merit to Defendants' "group pleading" argument. Mem. at 14-15. As Defendants' own authority makes clear, "[t]he fact that . . . allegations pertain to more than one person does not make them group pleading." *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 184 (5th Cir. 2019). The detailed party-specific allegations discussed above dispel any suggestion that the AC relies on impermissible "general allegations of scienter." *Id.*; *see also Owens v. Jastrow*, 789 F.3d 529, 538 n.4 (5th Cir. 2015). That the sole support cited for this point are the *introductory paragraphs* to the scienter allegations at AC ¶¶ 370-73 exposes the folly of Defendants' argument.

**2.      The AC Pleads Strong Circumstantial Evidence of Severe Recklessness**

"Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." *Nathenson*, 267 F.3d at 410. And because "[t]he PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter" *any* competent form of "circumstantial evidence" can support such an inference. *Id.*; *Wieland*, 2007 WL 2903178, at *5 (similar). The AC pleads such evidence in spades.

*First*, the inference that Defendants were aware not only of the lead cables in Lumen's legacy network but that they were being abandoned in place is supported by the "core operations" doctrine. As developed by the Fifth Circuit, a combination of four non-dispositive factors may "tip the scales" in favor of inferring that a company's top executives have culpable knowledge, including: (1) a company's size; (2) if the matter at issue was "critical to the company's continued vitality"; (3) if the omitted information would be "readily apparent" to the speaker; and (4) the internal consistency of the public statements. *Six Flags*, 58 F.4th at 219. No single favor is dispositive. *Id.*

Lumen is no doubt a large company, but other factors weigh heavily in its favor. From the start of the Class Period, Lumen pegged its future on a "digital transformation" initiative that involved transitioning to newer fiber optic technology and containing the cost of legacy services as it did so. AC ¶¶ 115, 382. By 2023, however, Lumen's legacy network still provided service to *85%*

- 27 -

of its customers and accounted for *more than 50%* of its revenues. *Id.* ¶ 407. Thus, the cost to continue providing legacy service at the *start* of the Class Period, and the savings to realize from discontinued copper plant, would be of great interest to any executive. *See In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (misstatements relating to "most significant asset" support core operation inference); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *12 (S.D. Tex. Mar. 27, 2019) (same for product that represented 50% of revenue). It is a virtual certainty that Defendants scrutinized the composition of those assets, and costs of removing them. Indeed, Storey and Dev decided to manage legacy wireline for cash only after finishing a detailed review of Lumen's copper assets. AC ¶ 408. In addition, the accounting group, headed by Dev and Sansbury, routinely reviewed copper retirement data to determine if those cables had any salvage value. *Id.* ¶¶ 394-96. As in *Six Flags*, 58 F.4th at 219, this "distinguishes the facts here from those in *Diodes*," the case relied on by Defendants (Mem. at 20-21).

It is wrong to suggest that this doctrine only "applies" when all factors are present. Mem. at 21. As explained *Diodes*, 810 F.3d 951 (5th Cir. 2016), all factors are necessary for the concept to give rise to a strong inference of scienter *on its own*. *Id.* at 958. *Six Flags* confirms that the core operations allegations can "contribute" to such an inference when the second and third factors weigh in favor, both of which are present here. 58 F.4th at 219; *see also Concho*, 2023 WL 2297425, at *20-22 (core operation doctrine "contributes" to inference of scienter with "two of the four" factors).

*Second*, Storey and Johnson held themselves out as the face of Lumen's all-important ESG reforms as it evolved into a "new era" of corporate citizenship. AC ¶¶ 400-02. Defendants misplace reliance on cases where the "scienter allegations . . . are unconnected to the subject matter of the case." Mem. at 20. This supports the inference that Storey and Johnson were aware that Lumen was littering its unused toxic hardware across the country or reckless in not knowing. *See BP*, 843 F.

- 28 -

Supp. 2d at 783 (acting as "spokesperson and champion for BP's reform efforts weigh[s] strongly in favor of the inference that [defendant] paid special attention to BP's process safety" or was "reckless in not doing so"); *see also SolarWinds*, 595 F. Supp. 3d at 584 (similar).[10]

*Third*, the Individual Defendants also signed SOX certifications attesting that they designed controls to *ensure* that material information was provided to them for each filing.  AC ¶¶ 411-12.  Although such certifications are not indicative of scienter on their own, the Fifth Circuit has held that they can be if "the officer who signed [them] had reason to know, or should have suspected" that the financial statements contained misleading information due to "red flags."  *Asar*, 768 F. App'x at 187.  As stated above, the Individual Defendants were aware of glaring red flags suggesting that Lumen's loss contingency was misleadingly incomplete.  *See City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *4-5 (W.D. La. Mar. 15, 2013) (SOX certifications contribute to scienter when "taken collectively" with other facts); *OCA*, 2006 WL 3747560, at *22 (similar).

*Fourth*, Lumen is now embroiled in the EPA's Superfund investigation relating to abandoned lead cables and the DOJ has opened a civil inquiry into the culpability of the telecommunications companies who left those cables behind.  AC ¶ 231.  The EPAs investigation remains ongoing and there is no indication the DOJ has closed its inquiry.  These investigations are probative of scienter.  *See Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 630 (S.D. Tex. 2022) (existence of ongoing government investigation is "relevant to the holistic view") (collecting cases).

### 3.    The AC Pleads a Strong Individualized Motive to Defraud

Try as Defendants may to argue otherwise (Mem. at 15), it is settled that a motive to defraud is *not* required to raise a strong inference of recklessness.  *See Spitzberg*, 758 F.3d at 685.  Still, this form of circumstantial evidence can "meaningfully enhance the strength of the inference of scienter"

---

[10] As the foregoing demonstrates, these facts add weight to a strong inference of scienter when combined with other facts.  Accordingly, the holding Defendants cite from *Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*, 2014 WL 6638793, at *23 (E.D. La. Nov. 21, 2014), is distinguishable because it was the *sole* fact alleged.

when "considered together with other allegations." *Owens*, 789 F.3d at 539-40. "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the . . . nondisclosures alleged." *Six Flags*, 58 F.4th at 215. In this regard, the Fifth Circuit has made clear that such benefits need not be "pecuniary" in nature to provide an adequate motive. *Id.* at 218.

Far from being "silent" (Mem. at 15), the AC pleads that the staggering cost to clean up the extensive amount of lead remaining in Lumen's nationwide legacy network (~$23 billion) provided ample motive to conceal this thorny topic. AC ¶¶ 382-87. That motive is reinforced by Defendants' repeated commitment to reduce costs in "legacy services" as part of Lumen's digital rebranding. *Id.*

This is not, as Defendants claim, a motive "universal to [all] corporations." Mem. at 16. It is uniquely specific to Lumen. Moreover, a motive, even a common one, is not generalized when facts show it is "more than routine" for the corporate defendant. *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017); *see also Owens*, 789 F.3d at 539 (need to raise capital was "not merely desirable, but necessary" for survival of business). Thus, courts have upheld the motive to "avoid a . . . write-down which would have erased the Company's entire annual profit." *Hall v. Rent-A-Center, Inc.*, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017).[11] Given the sheer scope of this issue, the cleanup costs here eclipsed Lumen's annual *revenue* (Mem. at 3-4), much less profit. In addition, a desire to stay consistent with Defendants' prior commitments is no different than the motive to "save face" on earlier representations recently affirmed by the Fifth Circuit in *Six Flags*, 58 F.4th at 218; *see also Spitzberg*, 758 F.3d at 686 ("pressure" to "substantiate" prior statements supported scienter).

It is also irrelevant that the AC does not allege unusual insider stock sales. *See* Mem. at 15-16. As one court put it, *other* motive allegations "fill[] the gap left by" the "lack of [such] activity." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194 (D.N.M. 2010); *accord Fla. St.*

---

[11] Neither of Defendants' cases (Mem. at 16) categorically refused to accept the desire to avoid an unusually large liability as a proper motive. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F. 3d 200, 213 (5th Cir. 2009) ("desire to complete a financially successful tender offer" too generic); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011) (same for "desire to maintain the company's credit ratings").

*Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001).  As explained in the opposition to Defendants' judicial notice motion, the SEC filings Defendants rely on do *not* establish that their holdings increased.  Even if they did, those filings confirm that the vast majority of the acquisitions reported therein (designated by an A)—including all by Johnson and Stansbury—were shares awarded *automatically* as incentive compensation for *no cost* (Defs.' Exs. 10-13), and thus do not "negate" scienter.  *In re Adv. Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *8-9 (D. Del. Feb. 7, 2020); *see also Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (same).  That Storey and Dev purchased a "small portion" on the open market "does not, by itself, give rise to an inference of nonfraudulent intent."  *Adv. Auto Parts*, 2020 WL 599543, at *9.[12]

### 4.    The Inference of Scienter Is Overwhelming

After nearly 10 pages of argument, Defendants offer no coherent competing inference, let alone one that is *more compelling* than the inference drawn from the facts alleged in the AC, as they must to prevail under *Tellabs*, 551 U.S. at 324.  Instead, they simply reiterate that the AC fails to plead any facts that support an inference of scienter.  *See* Mem. at 22.  But that conclusion requires the Court to adopt their premature and unsupported thesis that the market was already aware of the lead cables in Lumen's network, the extent of those cables, their abandonment by Lumen, and the harms they posed to workers and the environment.  Without it, the facts pled all point to the commonsense inference that Defendants knew about the lead cables and their dangers but chose to leave them in place as a cost cutting measure as Lumen invested heavily in new fiber optic technology and hid these facts from all stakeholders—investors, regulators, and the public at large— to avoid revealing a massive liability.  Indeed, it is difficult to conceive of *any* competing inference for why Defendants conceal these facts and make representations to the contrary publicly.

---

[12] Defendants insist that their stock acquisitions preclude Plaintiffs from alleging that "bonus compensation" served as a motive. Mem. 15-16. That is absurd. The inference of scienter can be *bolstered* when, as here, "stock is awarded based on achieving "predetermined performance conditions,'" *Adv. Auto Parts*, 2020 WL 599543, at *9, and Plaintiffs are prepared to amend to allege precisely how Lumen's executive compensation did so to the extent necessary.

### C.    The AC Pleads Loss Causation

Loss causation, as the name implies, refers to the "causal connection" between the misrepresentation and the losses suffered by plaintiffs. *Dura*, 544 U.S. at 342. Because it is not subject to any special pleading rules, *alleging* loss causation is "not meant to impose a great burden." *Id.* at 347. Consistent with Rule 8, a plaintiff need only allege that the stock price "depreciate[d]" after some "relevant truth" concealed by the fraud became known. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys*, 769 F.3d 313, 321 (5th Cir. 2014) (citing *Lormand*, 565 F.3d at 258); *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (disclosure need only "reflect part of the . . . truth obscured by the fraud[]").[13] Thus, such a disclosure need not "mirror an earlier misrepresentation" or "reveal that [it] was fraudulent." *Flowserve*, 572 F.3d at 230. As such, the relevant truth can leak out "in a series of partial disclosures." *Lormand*, 565 F.3d at 261 & n.31.

The AC pleads that Lumen's stock price fell in direct response to eight partial disclosures between July and October 2023, each of which gradually revealed the full extent of Defendants' fraud. AC ¶¶ 351-69, 414-18. The strained assertions and premature factual challenges that Defendants lodge in response do not compel a different conclusion.

*First*, Defendants' argument hinge on the faulty notion that a disclosure cannot be "corrective" unless it shows that a prior statement is "incorrect." Mem. at 34. The Fifth Circuit has expressly rejected that argument. *See Flowserve*, 572 F.3d at 230; *see also Spitzberg*, 758 F.3d at 688 (corrective disclosure need not "directly contradict the earlier misrepresentations"). Because a corrective disclosure can "take any form," the test is whether it discloses a new fact that "make[s] the existence of the actionable fraud more probable." *Amedisys*, 769 F.3d at 321-22 & 324 n.5.

The news articles from July 2023 plainly do so. The first, from July 9, 2023, revealed not

---

[13] Since *Lormand*, the Fifth Circuit has consistently articulated the pleading standard as such, including in the case that Defendants cite in their Memorandum. *See Emps.' Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 903 (5th Cir. 2018) (citing *Amedisys*, 769 F.3d at 320). Nevertheless, Defendants concoct their own standard for loss causation by selectively quoting *other* passages from that decision. *See* Mem. at 33.

only that those who succeeded the Baby Bells—including, by definition, Lumen—had large amount of lead cables in their legacy network but that many had retired them "in place." AC ¶¶ 105, 218. The article on July 11, 2023, reported that lawmakers were calling on those owners to take corrective action. *Id.* ¶ 354. The next, from July 12, 2023, cited evidence showing Lumen *knew* about these cables, and included a quote confirming so. *Id.* ¶ 355. The story from July 14, 2023, calculated that remediation could cost these owners, including "Lumen," $59 billion. *Id.* ¶ 357. On July 17, 2023, it was reported that EPA received a petition to use CERCLA to investigate the issue. *Id.* ¶ 359. On July 18, 2023, Lumen confirmed that it retained "outside experts" on the subject. *Id.* ¶ 361. On July 26, 2023, the market learned that the DOJ and EPA both launched formal investigations. *Id.* ¶ 363. As such, each is corrective. *See LHC*, 2013 WL 1100819, at *6 (report revealing involvement in Medicare fraud and subsequent announcement of Senate investigation was corrective).

The same goes for the disclosures on August 1, 2023, and October 31, 2023. On August 1, Stansbury divulged that Lumen still had *35,000 miles* of lead cable in its network. AC ¶ 365. In addition, the SEC filings that Lumen made on August 1 and on October 31 revealed that ASC 450 required Lumen to report a loss contingency for those cables and that it expected to incur certain "investigative costs" associated therewith. *Id.* ¶¶ 366, 368. Because these disclosures revealed new information about the "scope and magnitude" of the fraud they too are corrective. *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1049 (N.D. Cal. 2009); *see also Hall v. Johnson & Johnson*, 2019 WL 7207491, at *27 (D.N.J. Dec. 27, 2019) (articles that revealed "seriousness and extent" of known misconduct provided "new information" to market); *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019) (same).

*Second*, Defendants improperly scrutinize each disclosure in isolation even though *Amedisys*, 769 F.3d at 324-25, instructs that they must be assessed "collectively" as a "whole." Taken together,

- 33 -

it is more than plausible that the market became aware of the full extent of the fraud through this series of piecemeal events and reacted accordingly. *Id.*; *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 857-59 (N.D. Tex. 2018) (impact of climate change on business revealed through series of investigations, criticism by Senators, loss contingency, and ultimate write down).

*Third*, the corrective nature of the disclosures in July and August 2023 are not vitiated by Defendants' continued insistence that Lumen's use of lead cables was a matter of public record. *See* Mem. at 33-34. In *Amedisys*, the Fifth Circuit reversed a ruling that set aside a *WSJ* article simply because "the data it was based upon may have been technically available to the public." 769 F.3d at 323. As it explained, it is plausible that the market was not aware of the data or its meaning where, as here, it is disputed, especially when "the data itself is only available to a narrow segment of the public." *Id.*; *see also Nykredit Portefølje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at *29 (W.D. Tex. Sept. 13, 2021) (refusing to "ignore . . . reports that could serve as a corrective disclosure at the pleading stage simply because the raw data was technically available to the public"). Unlike Defendants' cases,[14] the *only* public source Defendants cite that refers to Lumen is an announcement made on a website for *union members* and a state regulatory letter. *Supra* pp. 5-7. Defendants' conjecture is also belied by the fact that industry insiders—including reporters, financial analysts, and four former FCC Chairs—were "unaware" of this lead sheathing until the news broke in July 2023 (AC ¶¶ 204, 219). *See Amedisys*, 769 F.3d at 323 (that analysts described *WSJ* article as "new news" plausibly "countered" argument that facts were already known); *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 149 (S.D.N.Y. 2021) (it is best for "jury" to decide if information is already public when it is a "close call" as that is a "fact-based inquiry").

*Fourth*, it is inapposite that the loss contingency reported on August 1, 2023 is framed in

---

[14] *See Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 315 (5th Cir. 2008) (relevant facts already "disclosed to the investing public" in prior "analyst report" and "Form 8-K" filed by the issuer itself); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *19 (S.D. Tex. Jul. 15, 2016) (disclosure that company paid for ads not corrective because ads had disclaimer that they were "paid" and use of "advertising" was reported by media outlets known to investors).

terms of future losses, and the "investigative costs" reported on October 31, 2023 related to "recent media coverage."  Mem. at 34-35.[15]  The loss contingency arose from Lumen's *ownership of lead cables* (AC ¶ 366)—cables it owned throughout the Class Period—and, thus, revealed that all *prior* SEC filings which failed to report it were inaccurate.  *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at \*32-33 (N.D. Ill. Apr. 18, 2022) ("reserve increases" related to class period events revealed that earlier loss reserves were not "adequate").[16]  Similarly, the media coverage arose from the "*lead-sheathed copper cables*" in "*our network.*"  AC ¶ 368.  The two cannot be disentangled.

*Finally*, Defendants' attempt to offer their own reasons for the stock drops on August 1, 2023 and October 31, 2023 (Mem. at 11 n.7) is wholly "inappropriate" at this stage.  *Lormand*, 565 F.3d at 267 n.35.  That is "a factual inquiry better suited for determination on summary judgment or trial."  *ProPetro*, 2021 WL 9037758, at \*29; *see also Elec. Data Sys.*, 298 F. Supp. 2d at 561 (rejecting "attempts to raise a fact issue on causation in a Rule 12 motion").  Similarly, requiring the AC to rule out other factors is "directly contrary to this circuit's precedent."  *Spitzberg*, 758 F.3d at 686-87.

## II.  PLAINTIFFS STATE A CONTROL PERSON CLAIM

A claim under Section 20(a) of the Exchange Act requires a primary violation and control over such person(s).  *Ramirez*, 344 F. Supp. 3d at 859.  Plaintiffs plead a primary violation as set forth in Point I, and the Individual Defendants *made* the misstatements, showing they had control over the transactions giving rise to primary liability.  *See ProPetro*, 2021 WL 9037758, at \*30.

### CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motion in its entirety.

---

[15] Far from being "ridiculous," there is nothing improper about pleading that a disclosure after the date of initial complaint is corrective.  Mem. at 35.  It would be plain error to hold that no additional truth about a fraud can continue to leak out after then *as a matter of law*.  The court in *Alich v. Opendoor Technologies Incorporated*, 2024 WL 839146, at \*15 (D. Ariz. Feb. 28, 2024), only said so to reinforce that the post-filing disclosure contained no new facts.  *Id.*  It later granted reconsideration of its decision.  *See Alich v. Opendoor Techs. Inc.*, 2024 WL 2153529 (D. Ariz. May 14, 2024).

[16] Neither of the cases Defendants rely on (Mem. at 34) involved similar disclosures.  Indeed, *Temple-Inland*, 936 F. Supp. 2d at 763, stated that "nothing in these disclosures indicates that . . . Guaranty should have recorded an [impairment] in *prior* SEC filings."  *Id.*

Dated:  June 25, 2024

O'BELL LAW FIRM, LLC

 */s/ Eric J. O'Bell*
Eric J. O'Bell (La. Bar #26693)
3500 North Hullen Street
Metairie, Louisiana  70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8653
ejo@obelllawfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

Respectfully submitted,

POMERANTZ LLP

 */s/ Justin D. D'Aloia*
Jeremy A. Lieberman (admitted *pro hac vice*)
Justin D. D'Aloia (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*