**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| In re: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION II | Case No. 3:23-cv-01290-TAD-KDM<br><br>Judge: Terry A. Doughty<br><br>Magistrate Judge: Kayla D. McClusky |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**MAY IT PLEASE THE COURT:**

Defendants Lumen Technologies, Inc. ("Lumen" or "the Company"), and Kate Johnson, Chris Stansbury, Jeffrey K. Storey, and Indraneel Dev (the "Individual Defendants" and, together with Lumen, "Defendants") submit this reply memorandum in further support of their motion to dismiss Plaintiffs' Amended Class Action Complaint (the "Complaint" or "CAC") (ECF No. 35). For the reasons set forth below and in Defendants' moving papers, the Court should grant Defendants' motion and dismiss Plaintiffs' claims with prejudice. *See* ECF Nos. 36-37, 40.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 3

I.     Plaintiffs' Opposition Confirms Their Failure To Plead Securities Fraud ........................ 3

     A.     No Material Facts About Lumen's Lead-Sheathed Cables Were Hidden From Investors ................................................................................................ 3

     B.     Plaintiffs Fail To Adequately Plead The Key Elements Of Securities Fraud ......... 6

          1.     Scienter ................................................................................................ 7

          2.     Falsity ................................................................................................ 13

          3.     Loss Causation ................................................................................... 18

II.     Plaintiffs' Derivative Section 20(a) Claims Should Be Dismissed ................................ 20

CONCLUSION ...................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Alich v. Opendoor Techs. Inc.*,
   2024 WL 2153529 (D. Ariz. May 14, 2024) ..............................................................................20

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
   2013 WL 1100819 (W.D. La. Mar. 15, 2013) ............................................................................11

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
   620 F. Supp. 3d 603 (S.D. Tex. 2022) .......................................................................................12

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020) .......................................................................................19

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
   147 F. Supp. 3d 493 (E.D. La. 2015) .........................................................................................17

*In re Franklin Bank Corp. Sec. Litig.*,
   782 F. Supp. 2d 364 (S.D. Tex. 2011) .......................................................................................16

*Hall v. Rent-A-Ctr., Inc.*,
   2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)..............................................................................8

*Heck v. Orion Grp. Holdings, Inc.*,
   468 F. Supp. 3d 828 (S.D. Tex. 2020) .......................................................................................19

*Heck v. Triche*,
   775 F.3d 265 (5th Cir. 2014) .....................................................................................................20

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020).........................................................................................................6

*In re KBR, Inc. Sec. Litig.*,
   2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) ...........................................................................12

*In re Key Energy Servs., Inc. Sec. Litig.*,
   166 F. Supp. 3d 822 (S.D. Tex. 2016) .........................................................................................7

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) ...............................................................................................10, 11

*Magruder v. Halliburton Co.*,
   359 F. Supp. 3d 452 (N.D. Tex. 2018) ................................................................................13, 14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..........................................................................................................6

*In re OCA, Inc. Sec. & Derivative Litig.*,
  2006 WL 3747560 (E.D. La. Dec. 14, 2006)...................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ........................................................................................17

*Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
  935 F.3d 424 (5th Cir. 2019) ......................................................................................2, 8

*SEC v. Blackburn*,
  2015 WL 5307424 (E.D. La. Sept. 10, 2015)...................................................................8

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) .......................................................................................20

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) .........................................................................................7

*Stephens v. Uranium Energy Corp.*,
  2016 WL 3855860 (S.D. Tex. Jul. 15, 2016)............................................................18, 19

*Stratte-McClure v. Morgan Stanley*,
  784 F. Supp. 2d 373 (S.D.N.Y. 2011)............................................................................18

*Welch v. Meaux*,
  2022 WL 3273951 (W.D. La. June 15, 2022) ................................................................16

**Statute**

15 U.S.C. § 78u-4(b)....................................................................................................2, 7

**Rules and Regulations**

Federal Rule of Civil Procedure 9(b)..................................................................................7

Financial Accounting Standards Board
  ASC-450-20-50-3 .......................................................................................................15
  ASC-450-20-50-6 .......................................................................................................15

iii

## PRELIMINARY STATEMENT

Plaintiffs' brief in opposition to Defendants' motion to dismiss (ECF No. 52) (the "Opposition" or "Opp.") fails to rebut the fatal pleading defects established in Defendants' Opening Brief, and instead confirms that Plaintiffs never should have brought this action.[1]  Indeed, the Opposition makes it clear that Plaintiffs' entire theory of securities fraud is premised on three core "facts" that Plaintiffs appear to have simply invented.

*First*, the Opposition asserts that lead-sheathed cables pose a significant health and environmental risk to the public.  Opp. at 1, 9, 25-26.  Yet the studies about the potential impact of lead-sheathed cables that were available before and during the class period do *not* establish any such risk.  Br. at 1, 5-7, 9.  To distract from this inconvenient record, the Opposition resorts to touting an inapposite study from the 1990s concerning potential safety risks for *workers* if they do not properly handle the cables.  Opp. at 6.  *Second*, the Opposition doubles down on Plaintiffs' contention that Lumen is *currently required* to pay billions of dollars to remove all of its existing lead-sheathed cables and remediate other supposed harms.  Opp. at 1-2, 9, 30, 33.  But the Complaint does not contain *any* well-pleaded facts to support that assertion.  Tellingly, Plaintiffs do not point to any relevant regulation or even a single instance—during the class period, or before or after it—in which a government agency has determined that Lumen (or any other telecommunications company) needs to remediate its lead-sheathed cables.  *Finally*, the Opposition contends that Lumen has acknowledged in certain post-class period disclosures that it may face "extraordinary liabilities" related to its lead-sheathed cables.  Opp. at 2.  Wrong again— as shown by the actual disclosures properly before the Court.

---

[1] Unless otherwise specified, capitalized terms used herein have the same meaning as in Defendants' Opening Brief (ECF No. 40) ("Opening Brief" or "Br."), and the cited appendices ("App.") and exhibits ("Ex.") refer to those filed therewith (ECF No. 36-1; ECF No. 36-2 *et seq.*).

Stripped of their hyperbole, Plaintiffs' claims rely on a chain of—at most—speculative assumptions about (a) a *hypothetical* health and environmental risk from lead-sheathed cables that was not confirmed or documented during the class period and may never materialize; and (b) a *hypothetical* possibility that this potential health and environmental risk, if it ever materializes, could lead to a large financial exposure for Lumen. Tellingly, the Opposition does not cite a single case sustaining a securities fraud claim based on hypotheticals of this kind—nor could it, as it is well settled that companies are not required to disclose unknown and unrealized risks and therefore cannot be subject to securities fraud liability for failing to do so. In short, there are no well-pleaded factual allegations supporting any of Plaintiffs' key assertions and their theory of fraud is all smoke and mirrors.

Given this fundamental deficiency, it is unsurprising that Plaintiffs cannot satisfy the heightened pleading burden for their claims under the PSLRA. Plaintiffs admit "[t]his is not an environmental case." Opp. at 14. It is not a federal securities claim, either. Plaintiffs assert that WSJ articles in 2023 revealed that Lumen had been defrauding investors about lead-sheathed cables last installed decades ago. In reality, the articles barely mention Lumen, never mind establish some kind of fraudulent scheme. Plaintiffs' contention that they have adequately pleaded scienter (*i.e.*, fraudulent intent) is particularly absurd. Plaintiffs do not establish a cognizable motive for any Defendant to have committed the alleged fraud, ignoring the Fifth Circuit's warning that well-pleaded motive allegations are "critical" for a plausible claim. *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 430-31 (5th Cir. 2019). Plaintiffs cannot point to any allegations showing that their confidential witnesses, or anyone else, provided information to any Defendant contradicting their public statements. And Plaintiffs' trumpeted allegations about paperwork in personal property transactions, a museum tour, and a review of revenue disclosures

2

cannot possibly establish an inference that Defendants knew, or should have known, that the small portion of lead-sheathed cables in Lumen's copper network (less than 5%—which is not "35,000 miles" as Plaintiffs repeatedly claim) posed a significant health and environmental risk that would someday require the Company to pay billions of dollars to address (which has never happened). *See* Opp. at 1-2, 5, 10, 24-25, 33. When viewed holistically, the facts properly before the Court support only the compelling nonfraudulent inference that Defendants had no reason to believe that lead-sheathed cables posed anything other than ordinary risks, related to worker safety, that could be and were managed in the normal course. Nor do Plaintiffs adequately allege that any of Lumen's statements were materially false or that they caused investors any losses.

At the end of the day, this case—as shown by Plaintiffs' Opposition—amounts to an improper attempt to convert sensationalistic newspaper articles about lead-sheathed cables owned by other telecommunications companies into a four-year securities fraud by Defendants. There is no basis in fact or law for Plaintiffs' claims, and the Court should dismiss them with prejudice.

## ARGUMENT

### I.     Plaintiffs' Opposition Confirms Their Failure To Plead Securities Fraud.

The Opposition demonstrates that Plaintiffs' theory of fraud is fatally deficient and does not come close to satisfying their pleading burden as to scienter, falsity, and loss causation.

### A.     No Material Facts About Lumen's Lead-Sheathed Cables Were Hidden From Investors.

The Opposition asserts that Lumen failed to tell investors during the alleged four-year class period that the Company had "a massive liability," in the "billions," for health and environmental harms related to its lead-sheathed cables. Opp. at 14, 25-26, 31. Plaintiffs then argue that dozens of statements not addressing lead-sheathed cables were actionable falsehoods because they do not mention this "massive liability." *Id.* at 31. Plaintiffs' theory, however, relies upon "facts" that the

3

Complaint has not adequately pleaded and which Plaintiffs cannot establish.

Lead-Sheathed Cables Were Not Known to Pose Significant Health and Environmental Risks.  Public studies available before and during the class period—including an independent study from EPRI in 2004—concluded that lead-sheathed cables did *not* "present a significant risk to human health or the environment" and that there was no reason to remove or replace such cables "for reasons of environmental protection."  Ex. 19 at Abstract, 7-1; *see also* Br. at 6-7; Exs. 20-21. Plaintiffs' response is to insist that these studies are not the "unanimous consensus view" and that there are other contrary studies.  Opp. at 6.[2]  But Plaintiffs' sole basis for asserting that there are contrary studies is a *single* 1996 study (not referenced in the Complaint) that addressed safety risks for workers who remove lead-sheathed cables without "appropriate exposure control technology"—and does not purport to reach *any* conclusions about public health or environmental risks.  Opp. Ex. 1 at 5.  In other words, this belatedly cited study does not support the supposed "massive liability" invented by Plaintiffs (Opp. at 31), and Plaintiffs' insistence that it was fraud for Defendants to not have disclosed this hypothetical, unsubstantiated risk is nonsensical.

Lumen is Not Required to Pay Billions of Dollars to Remediate Lead-Sheathed Cables. Plaintiffs' insistence that Lumen has "enormous" and "massive" financial liabilities for lead-sheathed cables (Opp. at 31; CAC ¶ 8) is pure conjecture.  *First*, no government agency has determined that Lumen (or any other telecommunications company) must remediate its lead-sheathed cables, and Lumen has never announced plans to do so.  *Second*, Plaintiffs' supposed

---

[2] That the studies discussed in the Opening Brief did not mention Lumen or discuss aerial cables (Opp. at 6) is of no significance.  Neither does Plaintiffs' new study.  The point is that the studies failed to identify any significant health or environmental risk related to lead-sheathed cables, a conclusion that applies equally to *all* telecommunications companies.  And given that Plaintiffs have alleged that the majority of Lumen's lead-sheathed cables are buried in protective conduit-based infrastructure (CAC ¶ 234), aerial cable is less relevant—and, of course, the Complaint offers no factual allegations to support Plaintiffs' speculative assertions about aerial cable risks.

4

"analyst estimates" that remediation would cost Lumen "$6 billion to $23 billion" are actually Plaintiffs' *own* back-of-the-napkin calculations using "per-foot" calculations from an old case and an electric company's EPA submission. CAC ¶¶ 384-85; *see also id.* ¶¶ 195, 386. Made-up liability for a made-up legal obligation yields obviously deficient allegations. In sum, Plaintiffs have provided no well-pleaded factual allegations establishing that Lumen must remediate its lead-sheathed cables or what the hypothetical financial impact would be.

Lumen Never Admitted It Has Extraordinary Liabilities for Lead-Sheathed Cables. Plaintiffs' suggestion that Lumen has "admitted" that it faces "extraordinary liabilities" related to its lead-sheathed cables (Opp. at 2) is demonstrably false. Plaintiffs do not deny that Lumen has long warned investors that its "use, handling and disposal of environmentally sensitive materials, or the prior operations of [its] predecessors, could expose [Lumen] to claims or actions that could potentially have a material adverse effect on [the Company's] business, financial condition and operating results"—the very risk alleged to have occurred here. CAC ¶ 253; *see also id.* ¶ 254 (similar); Ex. 3 at 36 (similar). After the WSJ articles, Lumen also included two new disclosures concerning lead-sheathed cables to specifically warn investors that the Company: (1) could face legal proceedings related to the fact that "in the past [the Company] acquired companies that installed lead-sheathed cables several decades ago," such that the Company "could be responsible for environmental liabilities arising from the historical operations of [its] predecessors" (Ex. 6 at 35, 37); and (2) could be exposed to "governmental actions, removal costs, litigation, compliance costs, penalties or reputational damage" arising from "[r]ecent media reports alleg[ing] that certain lead-sheathed cables that are part of [its] copper-based network infrastructure pose public health and environmental risks" (*id.* at 63). *See* Br. at 10-11, 25-26. Rather than "admitt[ing]" that its lead-sheathed cables could lead to "extraordinary liabilities" (Opp. at 2), however, Lumen's new

5

disclosures made it clear that the Company did *not* believe that the "ultimate resolution" of any proceedings related to environmental liabilities would have "a material adverse effect" on the Company.  Ex. 6 at 37; *see also* CAC ¶¶ 256, 258.  And, as of December 31, 2023—after the class period—Lumen still had not accrued any potential costs.  Ex. 2 at 62.

In short, there are no well-pleaded factual allegations showing that during the class period there were confirmed significant health and environmental risks associated with Lumen's lead-sheathed cables, let alone that Lumen was required to remediate these supposed risks or faced "enormous" financial exposure relating to them.  The federal securities laws do not hold companies liable for failing to disclose unknown and unrealized risks.  *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *see also Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020) ("[A] cause of action for failing to disclose a material risk naturally requires an allegation that a known risk factor existed at the time of the offering.").  Tellingly, the Opposition does not identify *any* case in which a court has allowed securities fraud claims to proceed past the motion to dismiss where the purported risk associated with alleged misstatements was speculative and never actually materialized.[3]  The Court need go no further to find that the Complaint should be dismissed.

**B.    Plaintiffs Fail To Adequately Plead The Key Elements Of Securities Fraud.**

Given the fundamental deficiencies discussed above, it is unsurprising—and Plaintiffs' strained arguments in the Opposition only confirm—that the Complaint does not satisfy the

---

[3] Moreover, Plaintiffs' arguments are not even internally consistent.  Plaintiffs assert that it "should be apparent to any casual observer . . . that the lead wrapped around this ancient hardware posed serious dangers to health and human environment."  Opp. at 1.  If that was "apparent to any casual observer," then it was apparent to Lumen's investors and they could not have been misled by the Company failing to specifically disclose this supposed risk.

heightened pleading standards of the PSLRA and Rule 9(b).  The Complaint should be dismissed.

### 1.    Scienter

As the Opposition demonstrates, the Complaint does not even come close to pleading the required "strong inference" that each Defendant individually acted with knowing intent or at least "severe recklessness," *i.e.*, where the danger of misleading investors was "so obvious that the defendant must have been aware" of it.  *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014).  While Plaintiffs assert that there is a "litany of facts undermining Defendants' positive public statements," these "facts"—which are not even specific to Lumen or its lead-sheathed cables—establish nothing more than a general background "aware[ness] of the dangers of lead."  Opp. at 23-24.  These "facts" say nothing about whether each Defendant had specific knowledge or awareness during the class period of any supposed "enormous" financial exposure resulting from potential liabilities related to lead-sheathed cables.  *See* Br. at 17-19.[4]

As a threshold matter, Plaintiffs fail to refute Defendants' showing that the Complaint alleges no cognizable motive or any other reason for Defendants to have hidden from investors information about the Company's lead-sheathed cables.  Br. at 15-16.  Plaintiffs concede they cannot "allege unusual insider stock sales," but wrongly assert that their inability to do so is "irrelevant."  Opp. at 30.  As a matter of law, the failure to plead any personal pecuniary motive or concrete benefit for committing the alleged fraud "undermin[es] any inference of scienter."  *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 866-67 (S.D. Tex. 2016); Br. at 15-16.

---

[4] Plaintiffs do not meaningfully address Defendants' group-pleading argument, simply claiming in conclusory fashion that "[t]he detailed party-specific allegations discussed [in the Opposition] dispel any suggestion that the AC relies on impermissible 'general allegations of scienter.'"  Opp. at 27.  Plaintiffs' *ipse dixit* provides no justification for, and does not cure, the Complaint's constant reliance on impermissible monolithic terms like "Defendants," the "Individual Defendants," "senior leaders," and "management," which cannot—as a matter of law— serve as a basis for pleading scienter.  *See* Br. at 14-15.

To the extent that Plaintiffs attempt to plead any motive at all, it is a generalized economic motive to avoid costs—but, under Fifth Circuit law, avoiding costs is a "universal" corporate motive that cannot contribute to an inference of scienter. *See, e.g.*, *SEC v. Blackburn*, 2015 WL 5307424, at *6 (E.D. La. Sept. 10, 2015) (citations omitted); *see also* Br. at 15-16.  Plaintiffs cannot avoid this controlling law by describing the alleged costs at issue as "staggering" and "uniquely specific to Lumen." *Contra* Opp. at 29-30 & n.11.  Indeed, the existence of such alleged costs is not supported in the Complaint by any well-pleaded allegations—the asserted "costs" are merely the product of Plaintiffs' own self-serving calculations based on misstating the amount of Lumen's lead-sheathed cable (*see supra* at 4-5).  Plaintiffs' allegations are nothing like the tangible and seemingly undisputed costs referenced in the only case they cite.  Opp. at 30 (citing *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017)).  Moreover, unlike the group-pleading allegations here, *Hall* involved particularized allegations of individual knowledge and specific "additional factors or motives," including to avoid a "$175 million write-down" that "would have erased the Company's entire annual profit."  2017 WL 6379334, at *9-12 & n.8.

Plaintiffs do not (nor could they) dispute that, as a matter of Fifth Circuit law, "the circumstantial evidence of scienter must be correspondingly greater" where, like here, no cognizable motive has been pleaded.  *Pier 1*, 935 F.3d at 431 (citations omitted).  As to Plaintiffs' assertion of purportedly "compelling direct evidence of scienter" (Opp. at 23), however, it all boils down to allegations that Defendants must have known three "facts":

(i)    Lumen has lead-sheathed cable.  For this, Plaintiffs merely allege that Ms. Johnson posted online that she "learn[ed]" about Lumen's history at a company museum and that Mr. Stansbury was described on an earning call as "thinking" about "legacy revenue."  CAC ¶¶ 97, 403-04.

(ii)   Lead poses potential health risks.  For this, Plaintiffs allege it is an "intuitive truism" to "practically any adult" that lead is dangerous, and that in personal real estate transactions the Individual Defendants "signed" paperwork about the "dangers" of lead paint and may have received a standard "pamphlet" saying "Your Job" could be a

8

source of lead.  Opp. at 24-25.

(iii)   <u>Workers who interact with lead must take various safety measures</u>.  For this, Plaintiffs allege various government and regulatory correspondence and materials.  *Id.* at 25.

But these three asserted facts were public information that cannot contribute to any inference of scienter (Br. at 18-19), and Plaintiffs' Opposition does not argue otherwise.

Instead, Plaintiffs try to recast the Opening Brief as relying on a "truth on the market" defense.  Opp. at 26.  This is a straw man.  Defendants do *not* argue that scienter is somehow negated because investors already knew all of the information necessary to predict the "enormous" financial exposure that Lumen supposedly faced.  Rather, the argument is that Plaintiffs do not adequately allege that Defendants had any additional or contrary information apart from what was already known by the public, the sum total of which was patently insufficient for *anyone* to "know" the alleged financial exposure that Plaintiffs now assert based on unfounded conjecture.

Even more critically, *even if* Plaintiffs had adequately pleaded that each Individual Defendant had knowledge of the three above items, it *still* would not provide the requisite compelling inference that each Individual Defendant knew, or was severely reckless in not knowing, that Lumen faced "enormous" financial exposure relating to its lead-sheathed cables during the class period.  There is a very wide gap—fatally wide for Plaintiffs' attempt to plead scienter—between (1) allegedly possessing the general knowledge that lead has health impacts and must be handled appropriately, and (2) allegedly knowing or being aware that the Company faces "enormous" financial exposure arising from some yet-to-occur requirement (that may never occur) to remediate all of its lead-sheathed cables.  Plaintiffs cannot point to any allegations showing that their confidential witnesses, or anyone else, provided information to any Defendant contradicting their public statements.  Further undermining any inference of scienter are the studies before and during the class period stating that lead-sheathed cables did *not* "present a significant risk to human

9

health or the environment" and that there was no reason to remediate them. *See supra* at 4. The EPA *still* has found no "immediate threats to the health of people nearby" the sites that it has studied.[5] It is thus nonsensical—and certainly not cogent or compelling—for Plaintiffs to assert that the alleged massive "financial exposure faced by Lumen" was somehow "evident to anyone endowed with these facts." Opp. at 25.

Plaintiffs' additional scattershot theories of scienter (*id.* at 27-29) cannot possibly overcome the fatal flaws in their case. *First*, contrary to Plaintiffs' assertion, lead-sheathed cables—which were part of the legacy network that has not been an investment priority at Lumen for years (*see* CAC ¶¶ 111, 234)—were hardly a "core operation" of the Company during the class period. Opp. at 27-28. With respect to the second *Diodes* factor, while the Complaint alleges that 85% of the Company's customer locations *could* be served by copper wire and that over half of its revenue "is in legacy products" (CAC ¶ 407), those strained allegations are beside the point, because it is an undisputed fact that *less than 5%* of Lumen's copper network even contains lead sheathing. *See id.* ¶¶ 234, 236. Like in *Diodes*, Plaintiffs simply have no basis to allege that "the extent" of harm associated with lead in a *de minimis* percentage of Lumen's lower-priority copper network somehow "jeopardize[s] the company's existence" or would be critical to its "continued vitality." *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016). While the Opposition contends that "[i]t is a virtual certainty that Defendants scrutinized the composition" of Lumen's legacy assets and the "costs of removing them" (Opp. at

---

[5] Plaintiffs conveniently omit that the EPA's own review of areas that the WSJ articles identified indicate "*no threats to the health of people nearby that would warrant an immediate EPA response action.*" EPA, On-Scene Coordinator, *California and Coal Center Lead* (emphasis added), https://response.epa.gov/site/site_profile.aspx?site_id=16127 (last visited Aug. 9, 2024); *see also* EPA, On-Scene Coordinator, *West Orange Lead Sampling*, https://response.epa.gov/site/site_profile.aspx?site_id=16176 (last visited Aug. 9, 2024) (similar).

10

28), Plaintiffs provide *no Complaint citations in support of that statement*—because none exist. And, of course, Plaintiffs concede (as they must) the other two *Diodes* factors—that Lumen is an enormous company and its statements were internally consistent—which also cuts against applying the "core operations" theory.

*Second*, Plaintiffs contend that their allegations that Mr. Storey and Ms. Johnson "held themselves out as the face of Lumen's all-important ESG reforms" as it evolved into a "new era" of corporate citizenship "supports the inference that Storey and Johnson were aware that Lumen was littering its unused toxic hardware across the country or reckless in not knowing." Opp. at 28-29. But again, allegations of general knowledge of ESG topics does not contribute to the requisite strong inference of scienter concerning lead-sheathed cables, especially given the absence of well-pleaded allegations in the Complaint demonstrating that there were significant health and environmental risks associated with lead-sheathed cables, and that there also would be significant liabilities and "enormous" financial exposure as a result of those supposed risks. *Supra* at 4-6.

*Third*, although Plaintiffs concede that SOX certifications "are not indicative of scienter on their own," they argue that the SOX certifications here are probative because "the Individual Defendants were aware of glaring red flags suggesting that Lumen's loss contingency was misleadingly incomplete." Opp. at 29. Rather than cite specific allegations in the Complaint that identify these "red flags"—because, in fact, the Complaint contains no "red flag" allegations— Plaintiffs instead resort to citing inapposite cases where individuals were directly involved in the alleged wrongdoing. *See City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *4 (W.D. La. Mar. 15, 2013) (SOX signatory was involved in a conference call where employees were urged to engage in illegal conduct and also personally sold $20 million of stock at inflated prices); *In re OCA, Inc. Sec. & Derivative Litig.*, 2006 WL 3747560, at *13 (E.D. La.

11

Dec. 14, 2006) (SOX signatories "falsely" certified they "had disclosed all material weaknesses and significant deficiencies in OCA's internal financial reporting controls to the company's auditor and to its audit committee").

*Finally*, the Opposition dramatically claims that Lumen is "now embroiled" in "the EPA's Superfund investigation relating to abandoned lead cables" and "the DOJ has opened a civil inquiry." Opp. at 29. But the Complaint pleads no facts establishing that Lumen is "embroiled" in an EPA investigation or even a specific target of any government investigation or inquiry. *See* CAC ¶ 237 (merely noting that Lumen has answered some EPA questions). Besides that, Plaintiffs fail to show how a government inquiry is at all probative of scienter here, given the Complaint's failure to plead the existence of *any* information known to Defendants during the class period concerning any confirmed significant health and environmental risk, or related "enormous" financial exposure. *See, e.g.*, *In re KBR, Inc. Sec. Litig.*, 2018 WL 4208681, at *12 (S.D. Tex. Aug. 31, 2018) ("[A] decision by government agencies to investigate a company is not sufficient to meet the heightened *Tellabs* standard on its own."). In the single case Plaintiffs cite, the company was subject to *criminal charges for environmental violations during the alleged class period*. *See Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 630 (S.D. Tex. 2022) (company received hundreds of notices of environmental violations and was criminally charged with knowing violations of Pennsylvania environmental law). There are no remotely similar allegations here.

In the end, and as the Opposition confirms, Plaintiffs do not present factual allegations to support an inference of scienter (never mind the requisite "strong inference") as to any Defendant. When viewed holistically, the record supports only one compelling inference: the nonfraudulent inference that during the class period Defendants had no reason to believe that lead-sheathed cables

12

posed anything other than ordinary risks, related to worker safety, that Lumen could manage in the normal course and without any significant financial exposure.  That is not fraud.

### 2. Falsity

Plaintiffs fare no better in pleading falsity, which provides an independent basis for dismissal.  Br. at 22-33.  Plaintiffs agree that this is an omissions-based case.  *See* Opp. at 12.  "An omission is material only if it alters the meaning of an allegedly misleading statement" and renders the statement misleading when made.  *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 464 (N.D. Tex. 2018) (citing *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp. Inc.*, 537 F.3d 527, 541 (5th Cir. 2008)).  Plaintiffs cannot satisfy their pleading burden by summarily "repeat[ing] the same set of omitted facts for each statement, without explaining why the omission rendered the statement misleading or why Defendants had a duty to disclose the omitted fact," or relying upon the bare suggestion "that an omission is so significant that any statement not disclosing the omission is misleading."  *See id.* at 464-65 (citations omitted).  But, of course, that is all Plaintiffs have done.

Plaintiffs' theory of falsity is sweeping: every public statement Defendants made during the class period that was even tangentially related to the environment, health, safety, or telecommunications cables was false because Defendants failed to disclose that Lumen was in fact facing a "massive liability" in the form of "enormous" potential financial exposure relating to lead-sheathed cables.  *See* Opp. at 22; CAC ¶¶ 6-8, 337, 344.  As set forth above, however, Plaintiffs have failed to plead any facts demonstrating that this supposed financial exposure existed during the class period (or at any time since).  *Supra* at 4-6.  Plaintiffs' unfounded conjecture is no substitute for well-pleaded allegations about contemporaneous contrary information.

Even if there had been a known significant financial exposure during the class period (which Plaintiffs do not adequately plead from their confidential witnesses or otherwise), dismissal

13

would still be warranted. There is simply "too attenuated a relationship between the allegedly misleading statements"—about (1) environmental, health, and safety ("EHS") contingencies and risks; (2) employee health and safety; (3) environmental stewardship; (4) prioritizing investment in fiber over copper and associated cost savings; and (5) GAAP compliance—and the alleged omission of Lumen's supposed significant financial exposure for lead-sheathed cables. *Magruder*, 359 F. Supp. 3d at 465. Plaintiffs never "bridge this analytical gap." *Id.*

For example, Plaintiffs suggest that statements about how Lumen was "replacing" its old copper-based services "with new fiber technology" are all actionable because they supposedly "gave the false impression that Lumen's legacy services . . . would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm" and failed to disclose "costly exposures created by" its practices. Opp. at 13-14. Those "costs" and "exposures," however, are the same unrealized costs that Plaintiffs do not adequately plead existed during the class period and which have *still* not come to pass (and may never). *See supra* at 4-6. So too for the alleged statements regarding Lumen's environmental stewardship and EHS contingencies and risks, including that Lumen "was 'actively making choices to lessen [its] environmental impact'" and "recycles" "copper wire" and many other things. Opp. at 15 (citing CAC ¶¶ 305-35). Plaintiffs insist that these statements are actionable because Lumen purportedly failed to disclose *additional* detail about the existence or extent of potential health and environmental risks arising from Lumen's lead-sheathed cables, some of which—when no longer in use—Lumen has elected to leave in place rather than recycle (just as others do in the industry). *See id.*; Br. at 7, 27-28. Again, however, Plaintiffs do not even show that any substantial health and environmental risk to the public exists as the result of Lumen's lead-sheathed cables, never mind the relationship of this supposed risk to items like recycling copper wire.

14

For similar reasons, Plaintiffs cannot establish the alleged falsity of Lumen's GAAP compliance statements. The Company obviously was not required to disclose specific risks or loss contingencies related to lead-sheathed cables that were *unknown* and *unrealized* during the class period—because they were by definition not "a reasonable possibility," "probable," or "reasonably estima[ble]" at that time. *See* ASC 450-20-50-3; *see also* ASC 450-20-50-6 (unasserted claim must be "probable" with "reasonable possibility" of "unfavorable" outcome); Br. at 23-26, 29; *supra* at 4-6. And Plaintiffs have no answer for the fact that Lumen's financial statements were independently audited. Br. at 3-4, 29. As for statements regarding employee health and safety— and Plaintiffs concede Lumen had "safety training" and "guidelines" for lead (Opp. at 16)—the general accuracy of those statements is not undermined by claims from a few unnamed former employees that they did not follow the safety procedures or had concerns about procedure enforcement. *See* Br. at 27.

On top of Plaintiffs' general failure to adequately plead falsity, the Opposition fails to overcome Defendants' showing that the alleged misstatements are nonactionable as statements of corporate optimism or "puffery," accurate statements of historical fact, protected forward-looking statements, or sincere opinion statements. *See* Br. at 29-33.

Puffery. The Opposition does not address 14 of the misstatements that Defendants identified as nonactionable because they contain statements of corporate optimism or "puffery." CAC ¶¶ 284, 286, 289, 291, 296, 299, 302, 309, 312-13, 319, 326, 331, 334. Plaintiffs therefore have conceded the immateriality of those statements, and any claims based on them must be dismissed. As to the alleged puffery statements that the Opposition does address, they are limited to statements "touting the *cost savings* of reducing investment in copper wireline," other "cost statements," or "representations that Lumen was 'actively making choices to lessen [its] impact on

the environment.'"  Opp. at 19-20.  Plaintiffs argue that the statements are not puffery because they "contain 'concrete fact[s],'" were "objectively verifiable," and "were made 'in direct response to an analyst's inquiry."  *Id.* (citations omitted).  But the Opposition fails to identify any "concrete fact[s]" in the statements or explain how nonspecific statements about "cost savings" or "impact on the environment" might be "objectively verifiable."  *See* CAC ¶¶ 262, 264, 266, 268, 271, 274, 276, 280, 282, 305, 328.  And it is well established that responses to analyst questions can still be puffery.  *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 385-87 (S.D. Tex. 2011) (statements responding to analyst questions during conference call were "non-actionable puffery"), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).

Historical statements.  The Opposition does not meaningfully dispute that Defendants' identified statements of historical fact were, in fact, accurate.  Br. at 30-31.  Instead, Plaintiffs argue that the example statements in the Opening Brief use "the present, not the past, tense," and insist that "historic statements can still mislead by omission."  Opp. at 21.  But the point here is not what tense is used or that historic statements theoretically can mislead by omission, but that these particular statements involve statements of historical fact that Plaintiffs *do not adequately allege were false when made*.  Br. at 30-31 & App. B.  For example, Lumen's statements that it "recycles telecommunications equipment" (*see, e.g.*, CAC ¶¶ 307, 315) are objectively true— Plaintiffs do not claim that Lumen did not recycle equipment—and these statements obviously are not rendered false by the failure to disclose completely unrelated information about the supposed health and environmental risks of lead-sheathed cables.  *Welch v. Meaux*, 2022 WL 3273951, at *32 (W.D. La. June 15, 2022) (no falsity if statements "were objectively true when made").

Forward-looking statements.  The Opposition challenges only seven statements Defendants identified as forward-looking (Br. at 31-32 & App. C), so Plaintiffs have conceded the other two

16

(CAC ¶¶ 253, 276) are non-actionable as a matter of law.  As to the challenged statements, Plaintiffs argue that a statement "that Lumen will 'continue' to" do something (*e.g.*, to "manage costs") may be actionable insofar as it "communicat[es] that [Lumen] is currently doing so."  Opp. at 21.  In support, Plaintiffs rely upon the Fifth Circuit's *Six Flags* decision, which suggests that a statement that "construction is continuing" "concern[s] present information."  *Id.* (citing *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023)).  That case, however, does not create a blanket rule that all statements about what a company says it "will continue" or "is continuing" to do are categorically not forward-looking.  In *Six Flags*, the disclosures about the company's progress toward a theme park's opening date also included present-focused statements that the company's "financing *is* in place" and that its corporate partner "*remains* fully committed to developing and opening these parks," suggesting that all of its statements on the topic should be understood as providing only contemporaneous—rather than forward-looking—information.  *See Six Flags*, 58 F.4th at 217 (emphases added).  Plaintiffs point to no analogous accompanying statements here.[6]

Opinion statements.  The Opposition asserts that one of the five opinion statements includes "a statement of certain fact" and thus should fall outside *Omnicare*'s analytic framework for statements of opinion.  Opp. at 22.  But Plaintiffs ignore that the entire statement plainly is couched as an opinion: "*I think* . . . we can take cost out faster on the legacy platforms," CAC

---

[6] Plaintiffs' argument that two statements (CAC ¶¶ 264, 274) "were neither identified as 'forward-looking' nor accompanied by any meaningful cautionary language'" (Opp. at 21) is false: both used the forward-looking words "we'll continue to," which is all that is necessary.  *See, e.g.*, *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 526 (E.D. La. 2015) ("the forward looking nature of defendants' statements renders them subject to the PSLRA's safe harbor provision"), *aff'd sub nom. Neiman v. Bulmahn*, 854 F.3d 741 (5th Cir. 2017).  And both were accompanied by meaningful cautionary language.  *See* Ex. 4 at 4 (opening safe harbor disclosure and cross-reference to published risk factors); Ex. 5 at 4 (same).

¶ 272 (emphasis added).  Plaintiffs also insist that all of the opinion statements "were subjectively disbelieved" (Opp. at 22), but that assertion relies solely upon their invented claim of a "known" significant health and environmental risk and a large financial exposure unconnected to the subject of the statement (*see supra* at 4-6).  And while Plaintiffs rely on a single case to claim that an issuer's representation that its financial statements adhere to GAAP somehow "expresses certainty" (*see* Opp. at 22), other courts have correctly explained that GAAP representations are opinion statements because they are "broad provisions that 'tolerate a range of "reasonable" treatments [in financial reporting], leaving the choice among alternatives to management.'" *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 386 (S.D.N.Y. 2011) (citation omitted).

### 3.    Loss Causation

Plaintiffs fail to adequately plead loss causation because the alleged corrective disclosures (1) revealed no new information to the market, or (2) are entirely untethered from the alleged misrepresentations.  Br. at 33-35.  The Opposition provides no viable response.

*First*, Plaintiffs assert that the July 2023 articles and August 1, 2023 earnings call constitute partial corrective disclosures because they "make[] the existence of the actionable fraud more probable."  Opp. at 32 (citation omitted).  But courts recognize that the existence of securities fraud cannot be made more probable by the disclosure of information about the corporate defendant that already is known to the market—which the information here clearly was.  Br. at 33-34; *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *19-20 (S.D. Tex. Jul. 15, 2016) (finding no loss causation where information in an article "ha[d] already been revealed to the market").  Plaintiffs also contend that the information in the July 2023 articles and August 1, 2023 earnings call was "only available to a narrow segment of the public" (Opp. at 34), but that argument has no factual or legal merit.  Information about lead-sheathed cables has been widely known and publicly debated for decades—even in the 1996 study now cited by Plaintiffs.  Br. at 4-9, 33-34; Opp. Ex.

1. Courts routinely find that disclosures are not "corrective" if they are based on publicly available information, even if an investor would have had to take affirmative steps to obtain that public information. *See, e.g.*, *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 772 (N.D. Cal. 2020) (FDA FOIA requests, CMS Open Payments data, and Medicare Part D data were "publicly available" and could not form the basis for a "corrective" disclosure).

As for the supposed "new information about the 'scope and magnitude'" of Lumen's potential financial exposure contained in these disclosures, it is far afield from the information about "known misconduct" referenced in the cases cited by Plaintiffs. Opp. at 33 (citations omitted). Lumen merely stated that there was lead sheathing in less than 5% of its copper network and made additional disclosures about possible litigation and investigative costs. CAC ¶¶ 234, 365-68. In any event, courts in the Fifth Circuit have rejected Plaintiffs' "scope and magnitude" argument. *See, e.g.*, *Stephens*, 2016 WL 3855860, at *19-20 (allegations that disclosure "alerted investors 'for the first time . . . to the size and scope" of the supposed fraud were insufficient to establish that it was "corrective") (citation omitted).

*Second*, the Opposition does not address the clear disconnect between (i) the August 1, 2023 and October 31, 2023 Form 10-Qs, and (ii) the numerous alleged misrepresentations. *See* Br. at 34-35; *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 860 (S.D. Tex. 2020) (no loss causation where "Lead Plaintiff fail[ed] to connect" alleged corrective disclosure to alleged misrepresentations made previously). The Opposition claims "it is inapposite" that the alleged corrective disclosure on August 1, 2023 related only to potential future risks. Opp. at 34-35. But disclosures about *future* risks cannot serve to reveal a *prior* fraud. *See* Br. at 34-35 (citing cases). The Opposition similarly argues that the "investigative costs" reported in the October 31, 2023 Form 10-Q "arose from Lumen's ownership of lead cables," and the announcement of those costs

19

therefore forms the basis for a corrective disclosure. Opp. at 35. Plaintiffs are wrong. Clearly, if Plaintiffs themselves knew enough about Lumen's ownership of lead cables to file this lawsuit *before* October 31, 2023, the Form 10-Q cannot have revealed new information. *See* Br. at 35. Plaintiffs' attempt to distinguish Defendants' key authority on this point as having "granted reconsideration" (Opp. at 35 n.15) fails to note that the court granted reconsideration *on a different issue*. *See Alich v. Opendoor Techs. Inc.*, 2024 WL 2153529, at *1-2 (D. Ariz. May 14, 2024) (granting reconsideration and modifying prior order only "in part," without disturbing underlying loss causation analysis). Moreover, the Complaint itself confirms that the disclosed potential "investigative costs" were "*not due* to [Lumen's] ownership of lead-sheathed cables"—but instead to "recent media coverage." Br. at 35; CAC ¶ 238. Plaintiffs do not and cannot cite any cases where a court has found that a disclosure affirmatively denying the existence of something can act as a "corrective" disclosure as to the existence of that same item.

## II.    Plaintiffs' Derivative Section 20(a) Claims Should Be Dismissed.

Plaintiffs' Section 20(a) claims fail on multiple grounds. *See* Br. at 35. The Opposition does not refute that Plaintiffs' failure to sufficiently plead underlying violations of the securities laws precludes liability under Section 20(a). *See id.* An Individual Defendant "obviously can have no section 20(a) liability for his [or her] own statements." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 384 (5th Cir. 2004). And Plaintiffs' allegations clearly do not support the notion that each Individual Defendant had the requisite "ability to control the specific transaction or activity upon which the primary violation is based." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) (citation omitted).

## CONCLUSION

For all of the foregoing reasons, as well as those in Defendants' Opening Brief, Defendants respectfully submit that the Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,


/s/ *Claire Elizabeth Juneau*

Claire Elizabeth Juneau (#33209)
**KEAN MILLER LLP**
First Bank and Trust Tower
909 Poydras Street, Suite 3600
New Orleans, LA 70112
(504) 585-3050
claire.juneau@keanmiller.com

Mallory Tosch Brennan (*pro hac vice*)
**ALLEN OVERY SHEARMAN
STERLING US LLP**
800 Capitol Street, Suite 2200
Houston, TX 77002
(713) 354-4900
mallory.brennan@aoshearman.com

Lyle Roberts (*pro hac vice*)
**ALLEN OVERY SHEARMAN
STERLING US LLP**
401 9th Street NW, Suite 800
Washington, DC 20004
(202) 508-8108
lyle.roberts@aoshearman.com

*Counsel for Defendants Lumen Technologies, Inc., Kate Johnson, Chris Stansbury, Jeffrey K. Storey, and Indraneel Dev*

Dated: August 9, 2024

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 9, 2024, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ *Claire Elizabeth Juneau*
Claire Elizabeth Juneau

22