**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

|  |  |
|---|---|
| **IN RE: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION II** | **CIV. ACTION NO. 3:23-1290**<br><br>**JUDGE: TERRY A. DOUGHTY**<br>**MAG. JUDGE: KAYLA D. MCCLUSKY** |

**PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS**

*May It Please the Court*:

Lead plaintiff Christine Glauber ("Lead Plaintiff") and additional plaintiff John McLemore (together with Lead Plaintiff, "Plaintiffs") respectfully submit these objections to the Magistrate Judge's Report and Recommendation to grant Defendants' Motion, entered on March 14, 2025 [Doc. No. 63] (the "Report"). Unless otherwise noted, all capitalized terms have the same meaning ascribed to them in Plaintiffs' Opposition to the Motion [Doc. No. 52] (the "Opposition"), as reproduced in the Table of Defined Terms included below. Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia. For the reasons set forth below, the Court should decline to adopt the Report and deny Defendants' Motion in its entirety.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

STANDARD OF REVIEW .........................................................................................................4

OBJECTIONS...............................................................................................................................5

I.      THE REPORT RESTS ON A SERIES OF UNWARRANTED INFERENCES AND
        FINDINGS THAT DISREGARD PLAINTIFFS' WELL-PLED ALLEGATIONS...........5

II.     THE AC ADEQUATELY PLEADS THE ELEMENTS OF A RULE 10B-5 CLAIM ......9

        A.      The AC Pleads Misstatements and Omissions of Material Fact ..............................9

        B.      The AC Raises a Strong Inference of Scienter .......................................................18

        C.      The AC Adequately Alleges Loss Causation..........................................................22

III.    PLAINTIFFS DO NOT ALLEGE FRAUD BY HINDSIGHT .......................................23

IV.     DISMISSAL IS NOT WARRANTED BUT SHOULD BE WITHOUT
        PREJUDICE .....................................................................................................................24

CONCLUSION............................................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**


**Statutes**

**Rules and Regulations**

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | ECF No. 35 |
| ASC | Accounting Standards Codification | AC ¶ 248 |
| AT&T | AT&T Inc. | AC ¶ 32 |
| Bell System | The monopoly of local telephone operating companies operated by AT&T's predecessor | AC ¶ 35 |
| Brightspeed | Cable company formed by Apollo Global Management, Inc. | AC ¶ 50 |
| Class Period | November 8, 2018 to October 31, 2023, both dates inclusive | AC ¶ 1 |
| Company | Lumen Technologies, Inc. | AC at 1 |
| CW | Confidential Witness | AC ¶¶ 24-31 |
| Defendants | Lumen and the Individual Defendants | AC at 1 |
| Dev | Defendant Indraneel (Neel) Dev | AC ¶ 23 |
| EHS | Environmental, health, and safety | AC ¶ 51 |
| ESG | Environmental, Social, and Governance | AC ¶ 53 |
| EPA | Environmental Protection Agency | AC ¶ 125 |
| Ex. | Exhibits attached to the accompanying Declaration of Justin D. D'Aloia | Mem. preface |
| FCC | Federal Communications Commission | AC ¶ 182 |
| GAAP | Generally accepted accounting principles | AC ¶ 248 |
| Lead Plaintiff | Christine Glauber | Mem. preface |
| Individual Defendants | Johnson, Stansbury, Storey and Dev | AC at 1 |
| Johnson | Defendant Kate Johnson | AC ¶ 20 |
| Lumen | Lumen Technologies, Inc. | AC at 1 |
| Memorandum | Defendants' Memorandum In Support of Their Motion to Dismiss | ECF No. 37-2 |
| Motion | Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint | ECF No. 36 |
| Opposition | Plaintiffs' Opposition to the Motion to Dismiss | Mem. preface |
| OSHA | Occupational Safety and Health Administration | AC ¶ 78 |
| OSHA Lead Standard | OSHA's final rule establishing standards for lead exposure in general industry, codified at 29 C.F.R. § 1910.1025. | AC ¶ 80 |
| Plaintiffs | Michael Glauber and John McLemore | AC at 1 |
| RCRA | The Resource Conservation and Recovery Act of 1976 | AC ¶ 88 |
| Report | Magistrate Judge's Report and Recommendation | Mem. preface |
| SEC | U.S. Securities and Exchange Commission | AC at 1 |
| SOX | Sarbanes-Oxley Act of 2002 | AC ¶ 409 |
| Stansbury | Defendant Chris Stansbury | AC ¶ 21 |
| Storey | Defendant Jeff K. Storey | AC ¶ 22 |
| Superfund | The Comprehensive Environmental Response, Compensation, and Liability Act of 1980. | AC ¶ 91 |
| Tahoe Action | *Cal. Sportfishing Protection Alliance v. Pac. Bell Tel. Co.,* | AC ¶ 197 |

| | 2:21-cv-00073 (E.D. Cal.) | |
|---|---|---|
| Texas Action | *Cook v. AT&T Corp.*, 4:16-cv-00542 (S.D. Tex.) | AC ¶ 194 |
| Verizon | Verizon Communications Inc. | AC ¶ 32 |
| WSJ | Wall Street Journal | Opp. at 9 |

## PRELIMINARY STATEMENT

This is a class action arising from Lumen's undisclosed practice of leaving old telephone cables covered in highly toxic and federally regulated lead scattered across the country as they were replaced by newer, and more lucrative, fiber optic cables. When the market discovered this, investors lost nearly $1 billion. The Court should not adopt the Report as its own because it rests on a series of impermissible findings that directly contradict the well-pled allegations of the AC and, contrary to established law, resolves against Plaintiffs questions of fact that the law commits to the finder of fact—errors which infect the entirety of the Report. In addition, the Report improperly recommends dismissing the claims with prejudice, despite affording no previous opportunities to amend after dismissal and the instruction in Rule 15(a) to grant leave to amend "freely."

At its core, the Report finds, as incontrovertible fact, that it was common knowledge that Lumen not only used lead-covered telecom cables but chose to discard them across the country as it transitioned to more lucrative fiber technology, and that Lumen's executives had "good reason" to do so based on post-hoc statements by unnamed telecom executives in a corrective disclosure. But these conclusions are directly contradicted by other statements in the *same* disclosure as well as an array of well-pled facts in the AC. The AC confirms that industry insiders, investors, and the public at large had *no idea* that these cables were still in use, much less being discarded across the country, including in densely populated communities where Lumen operates. The AC also pleads that Lumen was aware that abandoning these cables was environmentally hazardous and legally impermissible.

Drawing on its foundational findings, the Report incorrectly concludes that none of the statements were false or misleading when issued. However, as detailed more fully below, Defendants' claims to make choices to *lessen* environmental impact and to recycle telecom cables properly were misstatements of objectively verifiable fact. Further, no reasonable investor would conclude that discarding tens of thousands of miles of hazardous waste across the country accords

with these statements.  Similarly, Defendants' specific statements touting "risk-based" approaches to employee safety and continuous review of "safety performance" cannot be squared with the interlocking testimony of CWs who worked first-hand with Lumen's lead cables and confirm that there were no controls in place to protect workers from lead exposure, much less monitor performance to identify areas for improvement.  Defendants' statements describing EHS risks, the benefits of switching to fiber, and GAAP compliance hid that Lumen could face substantial costs for its undisclosed practice.  Absent the impermissible inferences and factual findings drawn in the Report, the AC adequately pleads that these statements were false and misleading.

Expanding on these holdings, the Report dismisses Plaintiffs' allegations of scienter by recasting the AC as relying on impermissible "should have known" allegations.  As explained below, the law does not require Plaintiffs to plead "smoking-gun" evidence at the pleading stage and the AC pleads a wealth of direct and circumstantial evidence from which it can be properly inferred that Defendants knew that Lumen was abandoning the lead-covered cables in its legacy network as they were replaced with fiber and that their sheathing was perilous to humans and dangerous to the environment.  Furthermore, the transition from copper to fiber was a key focus for Lumen, regularly discussed with investors, and the high cost of proper disposal provided strong motive for Individual Defendants to conceal the practice of dumping these toxic cables throughout the country.

Equally unfounded are the Report's recommendations that the AC fails to plead loss causation for several of the misstatements because there was no disclosure revealing the alleged fraud.  The Fifth Circuit has repeatedly held that a corrective disclosure need not be a mirror image of a misrepresentation tantamount to an admission of wrongdoing.  Rather, it need only reveal a new "truth" that makes the fraud more probable under the notice pleading standard of Rule 8.  The AC identifies corrective disclosures for each alleged misstatement category that clearly do so.

The Report also incorrectly concludes that this is a case of fraud by hindsight that attempts to recoup losses stemming from years of declines in Lumen's stock. However, a prolonged stock decline does not foreclose a company from defrauding investors—if anything, it provides compelling reason to do so—much less insulate it against claims for securities fraud. Furthermore, Plaintiffs' claims are supported by *contemporaneous* facts, negating any suggestion that this is a case in which the claim of fraud has been reverse engineered.

Finally, should the Court overrule Plaintiffs' objections and grant any part of the Motion, any dismissal should be without prejudice. Dismissal with prejudice is inappropriate under governing law unless it is clear that the defects are uncurable. This is particularly true in cases, like this one, with claims that are subject to a heightened pleading standard. The Report primarily recommends dismissing the claims for failure to plead *sufficient facts*. As such, Plaintiffs should be afforded the opportunity to address any defects identified by the Court for the benefit of the class.

## STATEMENT OF FACTS

Plaintiffs respectfully refer to the Statement of Facts included in Plaintiffs' Opposition to the Motion, which comprises part of the record before the Court. *See Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983); *see also Blanton v. Newton Assocs., Inc.*, 2013 WL 5719479, at *1 (W.D. Tex. Oct. 21, 2013) (*de novo* review requires the court to "examine the entire record" and "make an independent assessment of the law"). For present purposes, however, several facts bear emphasis.

Lead—in any form—is subject to the EPA's waste disposal law, the RCRA, because it is classified as a "toxic" waste, a highly harmful material that "may be able to leach from waste and pollute groundwater." AC ¶¶ 88-89. Lead has been classified as such since the inception of that list in 1980. *See* 45 Fed. Reg. 33084, 33122 (May 19, 1980) (40 C.F.R. § 261.24). As a toxic waste, lead must be disposed of in accordance with the RCRA's strict standards, which prohibit land disposal. AC ¶¶ 339, 373; *see also* 40 C.F.R. § 268.34 (prohibiting land disposal of lead, *i.e.*, D008).

- 3 -

Lumen understood from past practice that lead is a regulated waste that must be disposed in accordance with specialized RCRA protocols and reporting requirements. AC ¶¶ 174-81. Nevertheless, it chose to simply abandon the lead cables remaining in its "legacy" network of copper telecom cables across the country once it had no more use for them to save money as it invested heavily in a new fiber network. *Id.* ¶¶ 115-23. These cables not only sit in underground conduit but lie exposed above busy city streets and in public waterways. *Id.* ¶¶ 106-11, 116-23. Whether they represent 5% or a fraction of 1% of Lumen's legacy network, there are still some **35,000 miles** of these toxic cables remaining—and that is *after* the sale of network assets to Brightspeed. *Id.* ¶111.

Above all else, the AC unmistakably pleads that the investment community was *unaware* that Lumen had lead cables in its legacy network during the Class Period completely caught off guard by the news when the *WSJ* broke the news in July 2023. *Id.* ¶¶ 3, 9, 202, 218-19. Indeed, the *WSJ* launched an expensive two-year investigation into that decaying infrastructure because an experienced telecom correspondent "never heard of lead cables" before. *Id.* ¶ 204. Veteran industry reporters and analysts agreed that the issue "fl[ew] under the radar" until July 2023. *Id.* ¶ 219. Even four former Chairs of the FCC—the nation's telecom regulator—said they were completely "unaware" legacy copper networks had any lead in them. *Id.* For this reason, the *WSJ* itself said "[t]he telecom industry's lead-covered cables have been largely unknown to the public." *Id.* ¶ 220.

## STANDARD OF REVIEW

Dismissal for failure to state a claim is dispositive and, thus, any objections to proposed findings or rulings on such a motion are subject to *de novo* review under 28 U.S.C. §636(b)(1) and Rule 72(b)(3). *See Davidson v. Georgia-Pac., L.L.C.*, 819 F.3d 758, 762 (5th Cir. 2016). After such a review, the Court may "accept, reject, or modify the recommended disposition" or "return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

**OBJECTIONS**

### I.   THE REPORT RESTS ON A SERIES OF UNWARRANTED INFERENCES AND FINDINGS THAT DISREGARD PLAINTIFFS' WELL-PLED ALLEGATIONS

On a motion to dismiss, all well-pled facts are accepted as true and viewed in a light most favorable to the non-moving party.  *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022).  As such, "[a]ll questions of fact" raised by the pleading "must be resolved in the plaintiff's favor."  *Id.*; *see also Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) (courts must "resolve doubts as to the sufficiency of the claim in the plaintiff's favor").  Because a 12(b)(6) motion tests the sufficiency of such allegations, the court may not address facts outside the complaint, particularly those contradicted by its well-pled allegations.  *Biggers v. Massingill*, 2025 WL 429974, at *2 n.2 (5th Cir. Feb. 7, 2025).  The Report, however, rests on a series of foundational findings that flout these well-established principles and negate the AC's well-pled allegations.

To begin its legal analysis, the Report drew a series of findings in an effort to frame "who knew what and when" in response to merits arguments raised by Defendants in their Motion.  Rep. at 38-41.  While Plaintiffs do not disagree that, as pled, there was "universal public consensus" that exposure to lead is extremely harmful,[1] the Report's remaining findings are highly improper.

*First,* the Report concluded, as a matter of fact, that it was known that telecommunication companies, including Lumen, used and abandoned lead cables because the Texas and Lake Tahoe Actions described in the AC were "in the public domain," even if their content "may not have been widely known."  Rep. at 38-39.[2]  But none of the papers filed in those matters—and certainly no

---

[1] The Report stated that there is universal consensus that *at a certain level* exposure to lead *may* be harmful. But AC ¶ 76, the paragraph the Report relies on for this statement of fact, says there is "***no safe level***" of lead exposure.

[2] To discredit the Texas Action, the Report surmises that the plaintiffs likely dismissed the case after surviving summary judgment because AT&T submitted expert evidence at summary judgment finding that the amount of lead in field samples was "orders of magnitude" below protective concentration levels ("PCL").  Rep. at 41.  But summary judgement is only proper if there is "no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Thus, the entry of an order denying summary judgment confirms that there were genuine issues of fact for trial.  While the plaintiffs' summary judgment papers are sealed, the docket confirms that they submitted evidence from an expert who found that

allegations in the AC—say anything about lead cables owned by anyone other than *AT&T*, much less at sites other than those in *Texas* and *Lake Tahoe*, respectively.  AC ¶¶ 193-201.  Furthermore, filings in those matters confirm that AT&T *denied* those allegations.  Exs. A-D.  Simply put, those allegations in no way, shape, or form support a finding that *Lumen* used lead cables in its network and actively abandoned them *throughout the country* during *the Class Period*.

Further, the fact that a matter is *public* does not mean it is *known* by investors.  Rather, the inquiry is if the information is "conveyed to the public with a degree of intensity and credibility" such that investors should be charged with knowledge.  *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007), *aff'd*, 2007 WL 4403548 (W.D. La. Oct. 1, 2007); *see also Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *19 (N.D. Tex. Aug. 21, 2023) (facts must be "so widely known that it had become an integral part of the total mix of information available to investors").  Because this is "intensely fact-specific," it is rarely appropriate to resolve on a motion to dismiss.  *Wieland*, 2007 WL 2903178, at *11.  Unsurprisingly, disputed allegations in an unresolved lawsuit fail to provide such notice.  *See In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *4 (S.D. Tex. June 15, 2017) (allegations in disputed proceeding insufficient to put investors on notice); *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (there are "serious limitations" on ability to charge stockholders with knowledge of information made by sources other than the issuer).  Beyond that, the Report's observation that the information was *not* "widely known" and came as a "surprise" to a cross section of industry insiders dispels any suggestion that the finding is proper at this stage.  Rep. at 38.

*Second*, the Report further justifies the finding that Lumen investors must have known of the cables and their abandonment by reasoning that "after the initial [*WSJ*] story broke, Lumen's stock

---

lead levels *exceeded* the PCL.  Texas Action [Doc. No. 53-2 at 14].  In fact, the court twice rejected AT&T's request to exclude the expert, concluding that his testimony was "a matter for trial."  *Id.* [Doc. No. 75, 96].  Thus, drawing the inference that plaintiffs believed that their expert evidence was insufficient—rather than the multitude of other reasons they might withdraw their case, including settlement—is unsupported and improper.

- 6 -

fell – even though the article made no mention of Lumen." Rep. at 39. That is wrong as a matter law and fact. Legally, "a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004); *see also In re Venator Materials Plc Sec. Litig.*, 547 F. Supp. 3d 624, 668 (S.D. Tex. July 7, 2021) (similar). Factually, the AC alleges in plain words that Lumen's stock price fell because the story specified there were large amounts of lead remaining in the copper networks owned by telecom companies that succeeded the Bell System, which necessarily includes Lumen. AC ¶¶ 105, 352. The Report's resort to a contrary conclusion cannot be countenanced on a motion to dismiss. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 265 (5th Cir. 2009) (the "district court erroneously failed to accept all of the facts alleged as true" when it "passed over the other relevant alleged facts in silence" that were "[c]ontrary to the district court's conclusion").

*Third*, the Report found that "there was every good reason for Lumen . . . to believe that the lead would remain contained in conduits or otherwise within a few inches of the cables" based on AC ¶ 218, which excerpts parts of the first *WSJ* article. Rep. at 40. To be sure, that article said that AT&T, Verizon, and other unidentified telecom companies provided a statement that they did not believe their lead cables are an environmental hazard. AC ¶ 218. But that statement was made "[i]n *response* to the Journal's reporting," likely for litigation reasons, and in no way reflected their prior thinking. *Id.* (emphasis added). The article also said that former telecom executives believed, at some unspecified time, that it was safer to leave lead cables in place than remove them. *Id.* Even accepted as true, that by no means compels the conclusion that abandoning them in place was environmentally *sound*. Indeed, the same article reported that "[f]or many years, telecom companies have known about the lead-covered cables" and were "aware that lead was potentially leaching into the environment." *Id.* The AC also pleads an array of facts showing that abandoning lead cables in

place was environmentally harmful and not permissible under the RCRA.  AC ¶¶ 86-93, 135, 174-81, 194, 198, 203-17, 242, 339, 373.[3]  The decision to credit one fleeting statement over others in the same article, in disregard of detailed allegations in the AC, is unjustifiable.

Compounding this error, the Report asserts, as fact, that leaving cables in place "limited the further spread of toxic lead to workers and the environment at large."  Rep. at 40.  But the fact lead could be released using *standard* removal procedures hardly means abandonment was the least hazardous option.  Fully consistent with the allegation that Lumen chose to abandon its lead cables solely for financial reasons, Plaintiffs submit—and are prepared to amend to so allege if necessary—that any potential for disturbing lead particles during removal can be controlled using appropriate, but costly, remediation procedures.  But the Report has deprived Plaintiffs of the ability to submit proof on that score by predetermining the issue in Defendants' favor.

Nor is this conclusion somehow supported by the fact that the EPA has not "taken a definitive stance on the matter."  Rep. at 40.  All else being equal, its inaction says nothing one way or the other.  But that is not all Plaintiffs allege.  The EPA has since decided to move forward with a multi-step Superfund review after its initial environmental testing, strongly suggesting the decision to abandon in place was not proper.  AC ¶ 242.  Lest there be any doubt, EPA has asked companies subject to its investigation to develop a "long-term remediation solution."[4]  Defendants will have the opportunity to prove their case that abandonment was a proper choice but that is an issue for another day.  For present purposes, Plaintiffs allege that it was not, which must be accepted as true.

For the avoidance of doubt, the errors described above are not limited to trivial or ancillary facts.  Rather, they go to the heart of Plaintiffs' claims.  Worse still, these predicate findings permeate the Report's ensuing analysis of misstatements and scienter.  As such, it would be a grave

---

[3] Although the *WSJ*'s scientific findings were not published until July 2023, they establish that abandoned lead telecom cables are, in fact, an environmental contaminant.

[4] https://www.westorange.org/DocumentCenter/View/11857/EPA-Statement-Final.

miscarriage of justice and constitute plain error for the Court to adopt any of these findings.

## II.    THE AC ADEQUATELY PLEADS THE ELEMENTS OF A RULE 10B-5 CLAIM

The elements of a Rule 10b-5 claim are: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023). The Report concluded that elements (1) and (2) were inadequately pled. However, it also found that element (6) was lacking for several of the challenged misstatements. As explained below, this Court would be in error to adopt these holdings as its own.

### A.    The AC Pleads Misstatements and Omissions of Material Fact

**Environmental Stewardship**. After rebranding itself as Lumen, Defendants began issuing robust disclosures about the Company's environmental stewardship, which generally fall into three categories. The Report incorrectly found that none of these statements were false or misleading.

*First*, Lumen repeatedly told investors that it made choices to lessen or reduce its impact on the environment. AC ¶¶ 305, 321, 324, 328, 333-34. The Report found that these representations were not false or misleading because (i) Lumen "had reasonable grounds to believe (and still does) that leaving the lead-sheathed cables where they lay has less of an impact on the environment than disturbing and removing the lead"; and (ii) the statements amount to "non-actionable corporate cheerleading, puffery, or vague statements of optimism." Rep. at 71.[5] Neither withstands scrutiny.

As explained above, the finding that Lumen believed it was safer to abandon lead cables than remove them rests a tortured reading of the AC contradicted by its allegations. More fundamentally, the sweeping and unsupported conclusion about what *Lumen* believed turns Rule 10b-5 on its head. Whether a statement is misleading is assessed from the perspective of a "reasonable investor."

---

[5] The Report found that the statements in AC ¶ 321, 324, 328, and 333-34 were inactionable for the reasons stated in response to other statements in AC ¶¶ 307, 309-10 or 312-13. Rep. at 77-81. However, the statements in AC ¶ 321, 324, 328, and 333-34 are substantially similar in substance to AC ¶ 305, and, thus, analyzed together with it.

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Here, the AC leaves makes clear that—irrespective of what Lumen thought—no reasonable investor understood these statements to mean that Lumen was actively leaving thousands of miles of regulated waste scattered across the country.  AC ¶¶ 202, 204, 219, 351-58.

Equally unwarranted is the conclusion that these statements are inactionable puffery. Puffery refers to statements that are immaterial as a matter of law because they "contain no concrete fact[s]." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004).  But the representation that Lumen was actively making choices to decrease its impact on the environment is "objectively verifiable," *Carlton v. Cannon*, 184 F. Supp. 3d 428, 494 (S.D. Tex. 2016), as evidenced by its decision to discard regulated waste scattered across the communities it serves. *See In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*24 (S.D.N.Y. Mar. 23, 2017) (disclosures claiming that operations are designed to "cause the least possible environmental impact" were actionable).

*Second*, Lumen repeatedly represented in each of its ESG reports and on its ESG website that it "recycles telecommunications equipment" at the end of its life, including, specifically, its "copper wire."  AC ¶¶ 307, 315 317, 322, 329, 331.  Several of these representations were accompanied by disclosures that these policies are designed to ensure "the appropriate disposition of hazardous wastes," *i.e.*, waste governed by the RCRA.  AC ¶¶ 315, 317, 322, 329.  The Report maintains that these statements were not false because (i) "more than 95 percent of Lumen's legacy copper wire was not lead-sheathed, and there was no indication, and certainly no public disclosure, that Lumen was not recycling non-lead-sheathed copper," and (ii) Lumen did not represent that it was recycling *all* of its copper wire.  Rep. at 72, 75-78.  That analysis is flawed on many levels.

It is no defense that a statement may be *partially* accurate because Rule 10b-5 prohibits "half-truths" that are misleading by omission.  *Macquarie Infrastructure Corp. v. Moab Partners,*

- 10 -

*L.P.*, 601 U.S. 257, 263-64 (2024); *see also In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D. Tex. May 11, 2023) (collecting cases explaining that "literal truth" is no defense); *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 432 F. Supp. 3d 131, 165-66 (D. Conn. 2019) (defendants cannot avoid liability on ground that a statement was "partially accurate"). Indeed, half-truths are arguably "more misleading" because they give the appearance of accuracy. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 702 (5th Cir. 2005) (Illinois law). Similarly, it is irrelevant that these statements do not specify that *all* copper wire was recycled. They do not specify that only *some* was recycled either. And the choice to "boast sweepingly does not operate to truncate [the] duty to disclose" but rather "extends it." *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *7 (S.D. Cal. June 20, 2024). As pled, these statements "gave the false impression that Lumen properly disposed of its copper wire cables upon retirement." AC ¶¶ 308, 316, 318, 323, 330. Understandably, no reasonable investor would read them to mean that Lumen was actively discarding thousands of miles of hazardous waste across the country instead of recycling it, as stated. This is particularly true in light of the accompanying representation in the same disclosure about properly disposing of hazardous waste (AC ¶¶ 315, 317, 322, 329). *See Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 202 (5th Cir. 1988) (whether statement is misleading depends on "context" of surrounding disclosures).

*Third,* Defendants stressed that Lumen was focused on corporate citizenship. AC ¶¶ 309, 312-13, 319, 334. The Report incorrectly labels these statements as inactionable puffery based on holdings in other cases. Rep. at 71, 74-77, 81. As a concept rooted in materiality, whether a statement qualifies as puffery turns heavily on the "context in which it was made." *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *8 (S.D. Tex. Apr. 13, 2021); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011) (materiality requires consideration of "source, content, and context"). However immaterial similar statements may be in other contexts, such as in

the case cited in the Report at 71, Lumen's environmental stewardship was an integral part of its effort to rebrand as a socially responsible digital-era company.  AC ¶¶ 2, 43, 51-52.[6]  That this message was repeated, year after year, and prominently displayed on its website, confirms its importance.  *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (assurance that issuer was "focusing on cybersecurity 'hygiene'" not puffery when "repeated").  It is also notable that Lumen's SEC filings included a risk disclosure on the "*perceived* failure to meet evolving [ESG] practices."  Opp. at 20 n.7.  Item 105 of Regulation S-K required that disclosure to address "the *material* factors that make an investment . . . speculative or risky."  17 C.F.R. § 229.105(a) (emphasis added).  These facts preclude finding as a matter of law that the issue was "so obviously unimportant to a reasonable investor that reasonable minds could not differ" as to their importance.  *McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001).

**Employee Safety**.  In the same ESG disclosures as its environmental representations, Lumen proclaimed that it was committed to providing a workplace free from hazards and, as such, continuously reviewed "safety performance" to identify areas for improvement.  AC ¶¶ 284, 286-87, 289, 291, 296-97, 299-300, 303.  Lumen later updated the performance review disclosures to provide that it did so by incorporating "risk-based thinking" into its policies.  *Id.* ¶¶ 286, 291, 296, 299.[7]  Because the CWs provided ample facts to establish that the statement in AC ¶ 284 was false or misleading, the Report recommended dismissing that statement on loss causation grounds.  Report at 63-64.[8]  As such, AC ¶ 284 is addressed in Point II.C, *infra*.  As for the remaining statements, the

---

[6] Because materiality is case-specific, substantially similar statements to that cited as an example by the Report at 71 have been held to be actionable.  *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (actionable to claim adequate controls were in place "to monitor, evaluate, and manage the risks").

[7] The AC also took issue with statements in AC ¶¶ 293-94, 302 that Lumen assessed how to support employees through benefits and resources.  Plaintiffs do not challenge the Report's recommendations regarding these statements.

[8] The Report also addressed AC ¶ 284 "[i]nsofar as Plaintiffs contends [sic] that the statement is inconsistent with the 2013 MNOSHA Settlement."  Rep. at 63.  But Plaintiffs do not challenge AC ¶ 284 on that ground.  AC ¶ 285.

Report reasoned that all qualify as puffery and those that reference risk-based thinking were neither false nor misleading because they were "consistent with certain allegations in the FAC that there was a reasonable basis for the Company to believe that leaving the cables in place would reduce further exposure to workers." Rep. at 62-70. These recommendations misunderstand the law and the facts.

These statements are not puffery for the reasons stated above. Lumen's pledge to employee well-being was a key pillar of its newly minted corporate image and, like the environmental disclosures, their repeated utterance confirms they were not immaterial as a matter of law. *See supra* p. 12. Moreover, the claim that Lumen performed regular reviews to enhance its safety protocols is a far cry from the type of corporate cheerleading that is immaterial as a matter of law. On the contrary, they are "specific statements of fact" subject to objective verification. *SolarWinds*, 595 F. Supp. 3d at 587 (assertion that issuer maintained written security policy is not puffery); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (actionable assertions include "ongoing monitoring and regular review" of compliance processes).

In addition, Lumen's decision to abandon cable at the end of its life—for justifiable reasons or, as pled, improper ones—is *untethered* to the "risk-based" policy statements about employee safety. Once a lead cable is abandoned, it is obsolete, and employees no longer perform work on it. AC ¶ 116. Rather, employees are alleged to perform work on the lead cables remaining in Lumen's network *prior to retirement* and, thus, abandonment. AC ¶¶106-13. As alleged, Lumen had no system to check if employees who worked with lead followed the OSHA Lead Standard, much less evaluate their performance to improve protocols. AC ¶¶ 113-14. Accordingly, it was misleading, if not false, to suggest that Lumen regularly reviewed risk-based activities, such as working directly with a toxic material like lead. *See SolarWinds*, 595 F. Supp. 3d at 585, 588 (falsity of protocols pled through CW testimony establishing lack of training and lack of enforcement of policies).

- 13 -

**Benefits of Conversion**.  In call after call, Defendants told investors Lumen was sunsetting its legacy network as it shifted to fiber and taking costs out of the business as it did so.  AC ¶¶ 260-83.  The Report incorrectly concludes that none of these statements are false or misleading because: (i) they either do not specifically mention copper or simply refer to Lumen's overall copper network, rather than the 5% that is lead-sheathed; (ii) they are limited to operating, as opposed to other types of, "fixed" costs; and (iii) there was no reason to believe that abandoning in place would give rise to any costs before the *WSJ* article was released in July 2023.  Rep. at 48-62.  Again, these rulings fundamentally misread Lumen's disclosures and misconstrue, if not defy, the facts alleged in the AC.

None of the statements can fairly be read to *exclude* Lumen's lead-encased copper cables. To the extent any do not specifically use the word "copper," they directly refer to or address Lumen's "legacy" services, which the AC pleads are delivered through its network of old copper telecommunication wires.  AC ¶¶ 94-105.  Nor do Plaintiffs improperly "equate" copper cables with lead-sheathed copper cables.  Rep. at 54.  Lumen's lead cables are expressly alleged to be *part* of its copper network.  AC ¶ 111.  If anything, the fact that the lead cables comprised approximately 5% of the copper network confirms that they are captured by these statements.[9]

For similar reasons, it is incorrect to read these statements as restricted to *operating* costs— an argument Defendants did not even make.  Most are not so limited.  For example, in AC ¶ 262— the paragraph that the Report used to fashion this distinction—Storey simply said that Lumen's "operational model" relies on its old copper network but then stated that moving away from it can "greatly improve the cost structure" for the business without qualification.  This is confirmed by the fact that Storey then referred to free cash flow, which reflects cash on hand after deducting *all* costs.

---

[9] To the extent the Report repeatedly refers to the fact that lead cables comprise 5% of Lumen's copper network to suggest that its omission was not material, the AC leaves no room for doubt that this information was highly important to investors.  Indeed, the market's severe reaction and the precipitous decline in Lumen's stock price in response to the truth negates the conclusion that the information was *unimportant* to investors.  *Cassava Scis.*, 2023 WL 3442087 at *8 ("materiality" of omitted facts was "supported by the drops in stock price" when truth came out).

*Id.*  In another, Storey was asked about "your ability to take legacy costs out," not just operating costs.  *Id.* ¶ 271.  Dev added that Lumen's ability to "take cost out faster on the legacy platforms . . . helps in terms of how we right-size our real estate portfolio," which is a fixed cost.  *Id.* ¶ 272.  Indeed, the Report concedes that one statement expressly refers to "legacy fixed costs."  *Id.* ¶ 280.  Other statements do no qualify the word "cost" at all.  *Id.* ¶¶ 264, 268, 274, 282.  That the Report must read words into these disclosures to reach a contrary conclusion highlights its error.[10]  Properly viewed, particularly when set in a light most favorable to Plaintiffs, these statements spoke broadly about the *overall* cost benefits of decommissioning Lumen's copper network as it moved to fiber.

As pled, these statements gave the false impression that Lumen's legacy services would not be phased out in a manner that would cause it to incur costly exposures.  AC ¶¶ 265, 267, 270, 273, 275, 277, 279, 281, 283.  This does not mean, as the Report suggests, that Defendants were required to disclose "speculative fixed costs."  Rep. at 55.  Rather, once Defendants chose to speak about the "benefits" of this proposed plan, they became obligated to disclose "firm-specific adverse facts that affect the validity or plausibility of that prediction."  *Lormand*, 565 F.3d at 249; *see also Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 595-96 (W.D. Tex. 2014) (weaknesses in actuarial calculation are "firm-specific adverse facts" because a reasonable investor "would take into consideration information . . . used in calculating the value" of its products); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 715-16 (W.D. Tex. 2010) (adverse facts include warnings of illegal practices that would indicate that financial statements were incorrect).  Lumen's decision to abandon thousands of miles of regulated waste across the country in a manner inconsistent with how it otherwise handled that same material plainly falls within that standard.

Equally unfounded is the conclusion that there are no facts suggesting the potential for such costs until the *WSJ* article broke in July 2023.  Lead has long been classified as a "toxic waste" by

---

[10] In contrast to the statements discussed above, AC ¶ 266 expressly addresses "our cost to operate."

- 15 -

the EPA because it is known to "leach" into the surrounding materials and pose health hazards to humans. AC ¶¶ 88-93. Long before the *WSJ* broke, preeminent experts warned that the very type of lead cables abandoned by Lumen were leaching toxic particles in just that way. *Id.* ¶ 135. Lumen knew from past experience that, as a regulated waste, lead was subject to the RCRA's strict disposal requirements. *Id.* ¶¶ 174-81. And, not least of all, abandoning lead in place is inconsistent with the RCRA. *Id.* ¶¶ 88-89, 174-81, 339, 373. Taken together, and drawing all inferences in Plaintiffs' favor, there is no room for debate that the decision to leave extensive amounts of regulated waste scattered across the country—not only in conduit, but laying bare above busy city streets and in public waterways—in a manner inconsistent with the RCRA gave rise to the potential for substantial liabilities and costly regulatory scrutiny, especially given the scope of the sprawl. These facts were germane to the market's assessment of the claim that Lumen was taking costs "out" of the business as it retired copper and, thus, the risk of investing in Lumen when it was engaged in this practice.

**GAAP Compliance**. Each periodic SEC filing that Lumen made before August 1, 2023, stated that it was prepared in accordance with GAAP, which requires, among other things, the disclosure of any losses arising from contingencies that are "reasonably possible" under ASC 450. AC ¶¶ 250, 336, 347-50. The Report determined that Lumen was not required to disclose any loss contingency for its abandoned lead cables in those filings because ASC 450 only requires disclosure of a loss contingency for an *unasserted* claim when such a claim is "probable," and Lumen had no reason to believe any claims would be asserted until the *WSJ* published its stories. Rep. 83-85. But that conclusion draws a distinction without a difference. The *WSJ* articles did not reveal any facts that Lumen did not *already* know. In any case, Lumen knew that the decision to abandon lead was inconsistent with the specialized protocols it used to dispose of spent lead generated by its other operations and, thus, inconsistent with the RCRA, which is regulated by the EPA. AC ¶¶ 88-90,

- 16 -

174-81. That is more than enough to meet the "probable" standard of ASC 450-20-50-6.

**Loss Contingencies**. In Lumen's SEC filings, Defendants repeatedly stated that Lumen's disposal of hazardous waste "could" expose it to claims that it violated environmental, safety, or health regulations but assured that "[w]e monitor our compliance with applicable regulations." AC ¶¶ 253-54; *see also* AC ¶¶ 256-58 (incorporating this disclosure). According to the Report, these disclosures were not misleading because (i) it is not "clear" that the statement refers to lead-sheathed cables; (ii) Lumen warned of the very risk that exists; and (iii) a company has no duty to charge itself with unadjudicated wrongdoing. Rep. at 43-45. As explained below, these recommendations misapprehend the disclosure at issue and are contrary to law.

The plain text of the disclosure belies any suggestion that it does not encompass lead-covered cables. It expressly addresses Lumen's use, handling, and disposal of "hazardous . . . wastes," a term of art alleged to include all forms of lead, including lead sheathing. AC ¶¶ 88-89, 339. It is of no moment that the disclosure also refers to "manufacturing businesses" from prior decades. Rep. at 43. That mid-disclosure reference is a mere example of the circumstances in which Lumen has been notified that it had environmental liabilities, which in no way changes the overall focus of the disclosure, *i.e.*, Lumen's use, handling, and disposal of "hazardous waste."

Nor are these disclosures inactionable because they warn about the same risk that ultimately came to pass. Warning of a "potential risk" in the abstract "implies that no such problems [are] on the horizon." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015). Accordingly, cautionary language in which issues are "glossed over as a future risk" is misleading if it fails to warn of a present danger that is beginning to materialize. *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) ("risks that 'could' or 'may' occur" misleading

- 17 -

when disclosure of omitted facts "would have wide-ranging effects, including erosion of consumer confidence and increased regulatory scrutiny.").

This does not require Lumen to accuse itself of unadjudicated wrongdoing. Lumen need only disclose the "specific" facts giving rise to the present danger that the risk was not merely theoretical. *Lormand*, 565 F.3d at 247; *see also In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *17 (S.D. Tex. Feb. 23, 2023) (rejecting argument that duty to disclose facts needed to make statements not misleading requires issuer to engage in "self-flagellation"), *aff'd in part and rev'd in part on other grounds*, 2023 WL 4146278 (S.D. Tex. June 23, 2023). Here, Lumen acknowledged for years that lead was a hazardous waste regulated by the RCRA but actively disposed of its lead sheathing in a manner inconsistent with all other forms of lead it handled. AC ¶¶ 174-81, 373. In addition, by then, Lumen had already received a citation from OSHA for failing to adhere to the OSHA Lead Standard and received notice that there continued to be widespread noncompliance with the OSHA Lead Standard in "numerous states." *Id.* ¶¶ 151, 173. In short, it would be plain error to adopt the recommendation of the Report that "Plaintiffs do not allege any facts to show that, at the time the statements were issued, any 'untoward' or 'unfavorable' event had occurred." Rep. at 44 n.21.

### B.    The AC Raises a Strong Inference of Scienter

Scienter is a state of mind embracing "intent to deceive" as well as "severe recklessness." *Lormand*, 565 F.3d at 251 (citation omitted). Severe recklessness exists when executives "knew facts or had access to information suggesting that their public statements were not accurate." *In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *8 (S.D. Tex. Sept. 15, 2022) (collecting cases), *R. & R. adopted sub nom. Plymouth Cnty. Ret. Ass'n v. Apache Corp.*, 022 WL 17324439 (S.D. Tex. Nov. 29, 2022); *see also Lormand*, 565 F.3d at 252-53 (knowledge of facts "contrary" to public statements establishes recklessness). Based on the faulty findings about "who knew what and when," the Report reasons, repeatedly, that the AC does not allege "any facts" to raise a strong

- 18 -

inference of recklessness before the *WSJ* articles broke or otherwise relies on prohibited "should have known" allegations. Rep. at 38, 42-86. It also found that scienter cannot be pled for the loss contingency disclosures in Lumen's periodic reports (AC ¶¶ 253-54, 256, 258) because the AC does not "attribute" them to any Defendants and the Fifth Circuit has rejected "group pleading" for scienter. Rep. at 46-48. These conclusions cannot stand.

To begin, the AC does not rely on the type of "should have known" allegations rejected by the Fifth Circuit. As stated in the Report, "scienter may not rest on the inference that defendants must have been aware of the misstatement[s] based on their positions [in] the company." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citation omitted). But none of the allegations collected by the Report at 46 n.24 attempt to infer scienter based on Defendants' *executive positions*. Rather, they present "circumstantial evidence" from which scienter can properly be inferred. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001) (the PSLRA "plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence"). Indeed, "Plaintiffs are not required to present direct evidence of scienter in order to avoid dismissal." *Wieland*, 2007 WL 2903178, at *5.

Consistent with these standards, the AC pleads numerous facts from which it can be inferred that Defendants were aware of that Lumen was abandoning the lead cables in its legacy network as it was replaced by fiber. For example, Storey and Dev participated in a strategic review of Lumen's copper wire infrastructure before deciding to replace it in certain locations with fiber, during which the composition of the legacy assets and the manner in which to retire them would invariably be discussed. AC ¶ 408. Similarly, Stansbury performed a detailed review of the rate at which Lumen sunset its legacy wireline assets when he joined the Company. *Id.* ¶¶ 403-04. In addition, Dev and

Stansbury's group regularly reviewed copper retirement data to determine if those cables had any salvage value to recognize on Lumen's balance sheet. *Id.* ¶¶ 394-96. Last but not least, Johnson visited a museum with a display showing that the cables Lumen inherited were made with lead soon after she joined the Company. *Id.* ¶ 97. Inexplicably, the Report dismisses this allegation as an example that underscores the "lack of facts regarding scienter," adopting an argument advanced by Defendants, rather than credit this well-pled fact as true, as it must on the Motion. Rep. at 46 n.23.

This inference is further reinforced by the core operations doctrine. Far from continuing to "mix the cost of removing the lead-sheathed cables with the cost of operating them" (Rep. at 87), the AC pleads that Lumen's network infrastructure was one of Lumen's most "critical assets," the copper portion of which accounted for over half of Lumen's revenue. AC ¶ 406-07. Because of this, Defendants were intensely focused on controlling *all* costs associated with that network—not just those to operate it—as Lumen replaced it with fiber technology, and that is precisely why the lead-covered cables were left in place. *Id.* ¶¶ 115, 382. The composition of these assets would also be "readily apparent" to Defendants from the facts outlined above. Although Lumen is a large company, these facts satisfy two of the factors supporting the core operation theory, which the Fifth Circuit has held can help "contribute" to a strong inference of scienter. *Six Flags*, 58 F.4th at 219.

The AC also pleads facts from which it can inferred that Defendants were well-aware of dangers associated with lead-covered cables. As even the Report accepts, the AC alleges that it is universally accepted, as public knowledge, that exposure to lead is extremely harmful. AC ¶ 76. Defendants also acknowledged in their property disclosures that they received a notice warning that "[i]f you work with lead," not just lead paint, "you could bring it home on your body or clothes" in the form of dust. *Id.* ¶¶ 69, 375, 377, 378, 380. Moreover, Storey and Johnson both signed certifications describing lead as an "environmental" contaminant. *Id.* ¶¶ 376, 379. Taken together, it

- 20 -

is inconceivable that anyone in those circumstances would believe retiring lead cables in place was *safe*.

The overall inference of scienter is further bolstered by the powerful motive Defendants had to conceal the outsized costs to remove the lead cables at a time when Lumen was committed to reducing costs across its legacy services to make way for its new fiber network. AC ¶¶ 382-87. According to the Report, this motive is not cognizable because there are no "facts to suggest that any individual Defendant was aware of a potential need to remove lead-sheathed cables." Rep. at 89. But the Report itself concedes that "one would have to be naïve not to suspect that cost played a role in Lumen's . . . decision[] to leave cables in place" based on the facts alleged. Rep. at 39. Indeed, Lumen *salvaged* its retired copper wireline during this time because its salvage value directly benefited the Company's balance sheet and Defendants therefore had every reason to salvage as much as possible unless, of course, it was prohibitively expensive to do so. AC ¶¶ 394-96.

In addition, the Report fails to consider Lumen's culpability can be inferred without resort to the concept of "corporate scienter," which involves looking at "the collective knowledge of all the corporation's officers and employees" as opposed to the state of mind of the one who made the statements. *Southland*, 365 F.3d at 366. Here, Lumen *itself* made representations to the government admitting that it owned lead cables, lead was a form of hazardous waste regulated by the RCRA, and that it was a serious toxin that was harmful to workers. AC ¶¶ 154, 158, 167, 180-81. Notably, many of the misstatements here were also made *by Lumen*. Accordingly, there is no need to look to the state of mind to any other actors to establish Lumen's scienter.

Separately, the loss contingency disclosures in Lumen's periodic reports are not unattributed. The AC expressly alleges that that Lumen's 2018 Form 10-K and 2019 Form 10-K were signed by Storey and Dev. AC ¶¶ 256, 258. In addition, both Storey and Dev signed the SOX certifications

- 21 -

for the 3Q 2018 Form 10-Q. *Id.* ¶¶ 253, 411.

> **C.     The AC Adequately Alleges Loss Causation**

The Report stated that the legal analysis addressed "the alleged misstatements and omissions identified by Plaintiffs" and "whether Plaintiffs allege facts to show scienter" for each and, as such, disclaimed addressing any of the loss causation issues raised by Defendants. Rep. at 42, 89. However, the Report's legal analysis expressly recommended dismissing claims arising from several misstatements for failing to satisfy loss causation. Rep. 63-64, 67, 72. As explained below, these recommendations are incompatible with controlling law and the AC's allegations.

*First*, the Report suggests loss causation is lacking for the statements in AC ¶¶ 284 and 294, concerning the failure to provide training and monitoring for employees who handled Lumen's lead cables, because the AC does not allege that "there was a public disclosure regarding these alleged practices from that period" and "until the fraud is disclosed, defendants cannot be held liable for a decline in the stock price." Rep. 63-64, 67. However, it is well-established that a corrective disclosure need not "mirror an earlier misrepresentation" or "reveal that [it] was fraudulent." *Alaska Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230-31 (5th Cir. 2009); *see also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014) (similar). Rather, the relevant test, as even the Report at 37 recognizes, is whether it reveals a new fact that "make[s] the existence of the actionable fraud more probable." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys*, 769 F.3d 313, 321 (5th Cir. 2014). Here, the *WSJ* revealed that (1) telecom companies had known for decades that their workers were exposed to unsafe levels of lead; and (2) Lumen received nine citations from OSHA for failing to provide employees who worked with lead adequate training and protection. AC ¶ 220. In fact, that article concluded from Lumen's citations that workers "still face[] exposure to lead in the modern era." *Id.* Taken together, these facts certainly make the alleged fraud more probable, particularly under the notice pleading standard that applies for purpose of loss causation.

*Second*, the Report concludes that loss causation is inadequately pled for the statement in AC ¶ 307 representing that Lumen recycled its retired copper wires because "there is no indication, and certainly no public disclosure, that Lumen was not recycling non-lead-sheathed copper." Rep. at 72. As noted, however, controlling only requires allegations of a disclosure that "make[s] the existence of the actionable fraud more probable." *Amedisys*, 769 F.3d at 321. But the fraud here does not arise from non-lead-sheathed copper wire. Rather, Plaintiffs allege that Lumen defrauded investors by failing to disclose that it was not recycling the copper wire *covered in lead*. AC ¶¶ 8, 143, 306. And the *WSJ* articles undeniably revealed that the telecom companies that succeeded the Bell System, including Lumen, had abandoned—not recycled—such cables across the country. AC ¶¶ 351-69.

## III.   PLAINTIFFS DO NOT ALLEGE FRAUD BY HINDSIGHT

Ultimately, the Report concludes that this is a case of fraud by hindsight in which Plaintiffs have attempted to "potentially recoup some losses in the wake of Lumen's years long stock price decline," as demonstrated by another unsuccessful securities suit against Lumen. Rep. at 1-2, 91. None of these determinations are legally sustainable.

As the Fifth Circuit has explained, fraud by hindsight is the use of subsequent events to establish that those conditions existed earlier in time. *Lormand*, 565 F.3d at 254; *see also Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019). The AC does no such thing. Rather, as demonstrated above, Plaintiffs' claims are supported by a constellation of *contemporaneous* facts and circumstances, which precludes a finding of fraud by hindsight. *Lormand*, 565 F.3d at 254.

While the Court can, of course, take judicial notice of Lumen's stock price and the outcome of collateral proceedings, those matters are legally irrelevant to the case at hand. That a stock may have been on the decline does not foreclose that a fraud can take place or introduce inflation that slows the decline, and Plaintiffs allege that Lumen's stock price fell in direct response to new,

- 23 -

previously undisclosed information about its improper practice of abandoning lead cables in place as they were replaced by fiber, not market-wide phenomenon. AC ¶¶ 351-69, 414-18. In fact, the AC pleads that investors were lulled into a false sense of security during this time because many of the misstatements here were part of a broader effort by Lumen to break free from its languishing legacy services and pivot to a more sustainable business model. *Id.* ¶ 2. Similarly, the outcome of a different lawsuit with different class members challenging a different set of disclosures based on a different course of conduct sheds no light on the merits of the claims here.

At bottom, this is a serious $1 billion class action that seeks redress for investors who suffered real harm when details about Lumen's undisclosed practices came to light, which does not deserve to be swept under the rug because another opportunistic suit was unsuccessful.

## IV.    DISMISSAL IS NOT WARRANTED BUT SHOULD BE WITHOUT PREJUDICE

Without explanation, the Report recommends dismissing Plaintiffs' claims with prejudice. While Plaintiffs respectfully submit that dismissal is not warranted for all the reasons stated above, any dismissal should be without prejudice.

Consistent with the liberal amendment standard set forth in Fed. R. Civ. P. 15(a)(2), an initial dismissal for failure to state a claim should be without prejudice "unless it is clear that the defects are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). As such, district courts should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case" for good. *Id.* This is especially true for claims, like those here, subject to heightened pleading requirements. *See Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (failure to satisfy Rule 9(b) "should not automatically or inflexibly result in dismissal of the complaint with prejudice" unless "the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities"). As such, most courts "allow plaintiffs at least one opportunity to replead" in PSLRA cases absent a legal bar to the

- 24 -

contrary.  *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 816 (N.D. Tex. 2006); *see also, e.g.*, *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 519-20 (S.D. Tex. 2017) (dismissing without prejudice to allow an opportunity to cure pleading defects).

The AC is the first complaint filed by Lead Plaintiff, and no previous complaint has been dismissed.  In addition, there is ample reason to believe that Plaintiffs can plead additional facts to state a viable claim.  For example, the recommendations detailed in the Report largely hinge on the faulty notion that the AC effectively concedes that there was a reasonable basis to believe that it was safer to abandon lead cables in place rather than remove them.  Should the Court be inclined to adopt that finding as its own—unjustified as it may be—Plaintiffs could overcome that pleading defect by alleging facts establishing that Lumen and its senior executives did *not* have a reasonable basis to believe that it was safer to abandon lead cables in place rather than remove them.  Accordingly, it would be plain error to deny Plaintiffs the opportunity to cure the defects identified by the Court under these circumstances.  *See In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 WL 3257369, at \*28 (E.D. Tex. Aug. 17, 2010) (dismissing without prejudice because "the Fifth Circuit has limited district courts' discretion in dismissing cases with prejudice" and "[t]his is certainly not a case where Plaintiffs have been given multiple chances to correct pleading deficiencies and have failed to do so" because "the lead plaintiff has filed only one complaint"); *see also Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (reversing dismissal with prejudice as abuse of discretion because the PSLRA requires "an unprecedented degree of specificity").

### CONCLUSION

For the foregoing reasons, the Court should reject the Report and deny Defendants' Motion.

Dated:  March 28, 2025

O'BELL LAW FIRM, LLC

 */s/ Eric J. O'Bell*
Eric J. O'Bell (La. Bar #26693)
3500 North Hullen Street
Metairie, Louisiana  70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8653
ejo@obelllawfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

Respectfully submitted,

POMERANTZ LLP

 */s/ Justin D. D'Aloia*
Jeremy A. Lieberman (admitted *pro hac vice*)
Justin D. D'Aloia (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Christine Glauber*

- 26 -