## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

|  |  |
|---|---|
| **IN RE: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION II** | **CIV. ACTION NO. 3:23-1290**<br><br>**JUDGE: TERRY A. DOUGHTY**<br>**MAG. JUDGE: KAYLA D. MCCLUSKY**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

NATURE OF THE ACTION ............................................................................................ 1

JURISDICTION AND VENUE ...................................................................................... 7

PARTIES ......................................................................................................................... 8

NON-PARTY CONFIDENTIAL WITNESSES .......................................................... 9

FACTS ........................................................................................................................... 12

    A.   Relevant Background ........................................................................................ 12

        1.   Overview of Lumen and Its Corporate History .................................... 12

        2.   Lumen's Two Nationwide Wireline Networks ..................................... 16

        3.   Lumen's Environmental and Sustainability Infrastructure ................... 19

    B.   Lead Is a Heavily-Regulated Highly Toxic Material ...................................... 20

        1.   Lead Is a Brittle Heavy Metal Extremely Harmful to Human Health .... 20

        2.   History of Lead Use and Regulation in the United States ..................... 23

        3.   Individuals Who Work With Lead Face the Prospect of Lead Poisoning .............. 28

        4.   Lead Poses Significant Threats to the Environment ............................. 31

    C.   Lumen Owns an Extensive Network of Old Copper Telecommunication Cables Are Covered In Thousands of Miles of Decaying Lead .......................... 36

        1.   Origins of Lead in the National Telecommunications Network ............ 36

        2.   Lumen's Acquisition of Lead-Covered Cables .................................... 39

        3.   Vast Amounts of Old Lead Cased Cables Remained in Lumen's Legacy Copper Network During the Class Period .............................................. 40

        4.   Lumen Abandoned Obsolete Lead Cable In Place As a Matter of Standard Practice To Decompose Over Time As It Remained Unused ............... 45

    D.   Lumen and Its Senior Leaders Have Known for Years That The Lead Cables In Its Vast Network Were Harmful to Employees and the Environment .............. 48

        1.   Lumen EHS Leaders Formally Reported the Company's Disposal of Lead to the Government As a Hazardous Waste Under the RCRA ............... 48

        2.   Lumen's Internal Documents Recognized That Lead Sheathing Is a Hazardous Material Subject to the RCRA .......................................... 50

        3.   EHS Insiders Openly Discussed the Dangers Associated with Decaying Lead Cables at Industry Meetings Attended by Senior Lumen Officials ... 52

        4.   Lumen Officials Opposed New EPA Regulations That Would Create Additional Burdens For Owners of Lead-Sheathed Cables .................... 58

        5.   Lumen Agreed to a Nationwide Lead Abatement Program to Settle Ten "Serious" OSHA Violations Arising from Lead Cable Exposure ........... 61

        6.   Lumen Officials Monitored and Opposed Proposed Changes to OSHA Regulations That Would Impose Tighter Lead Exposure Restrictions ... 69

7.    The CWA Informed Lumen EHS Leadership That Supervisors Are Violating Its Lead Abatement Safety Policies ................................................................ 72

8.    Storey and Dev Authorized the Abandonment of Lead Cables As Lumen Sought to Aggressively Cut Costs as It Invested in Fiber ...................................... 73

9.    Lumen Was Required to Report Its Retirement of Copper Cables, Including Lead Sheathed Cables, to the FCC Under Rules It Opposed ........................................ 75

10.   Other FCC Proceedings Put Lumen On Notice That Its Own Workers Believed That It Failed to Properly Maintain Its Legacy Copper Lines ............................... 77

11.   Lumen Management Was Aware That AT&T Faced Liability for Openly Abandoning Lead-Covered Cables in California and Texas .................................. 78

E.    The Public Learns That Telecom Companies, Including Lumen, Have Vast Networks of Decaying Lead Cables That Are Leaching Into the Environment ................................. 82

1.    The *WSJ*'s Thorough Eighteen-Month Investigation ............................................. 82

2.    Publication of the *WSJ*'s Series on Lead Telecom Cables .................................... 87

3.    Lumen's Immediate Response ................................................................ 93

4.    Government Response and Related Fallout ............................................. 94

5.    Lumen Finally Discloses the Risk of Loss Related to Its Lead Cables and Refutes the Accuracy of the Reporting ............................................... 98

6.    The EPA Decides to Move Ahead with Its Superfund Investigation .................... 100

F.    Post Class-Period Developments ............................................................. 102

1.    Continued Interest by Regulators and Lawmakers ............................... 102

2.    Mass Liability Lawsuits Arising from Lumen's Abandonment of Lead Cables .. 103

RELEVANT FINANCIAL REPORTING AND ACCOUNTING RULES ............................... 105

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .................. 107

A.    Statements About Recycling Retired Copper Wireline .............................................. 107

B.    Statements About Converting Legacy Copper Cables to Fiber and the Associated Cost Savings ............................................................................... 111

C.    Statements About EHS Contingencies and Risks ......................................... 118

D.    Statements About GAAP Compliance ......................................................... 121

LUMEN'S STOCK PRICE DECLINES AS THE TRUTH EMERGES .................................. 122

A.    July 9, 2023 ............................................................................... 123

B.    July 11-12, 2023 ............................................................................ 124

C.    July 14, 2023 ............................................................................. 126

D.    July 17, 2023 ............................................................................. 126

E.    July 18, 2023 ............................................................................. 128

F.    July 26, 2023 ............................................................................. 128

ii

G. August 1, 2023 ............................................................................................. 129

H. October 31, 2023 ........................................................................................... 130

I. January 11, 2024 ........................................................................................... 130

ADDITIONAL FACTS PROBATIVE OF SCIENTER .......................................................... 131

A. Defendants Had An Affirmative Legal Obligation to Protect Workers and the Environment from Lead Contamination ...................................................... 132

B. The Individual Defendants Were Repeatedly Made Aware Of the Dangers of Lead Through Their Lead Paint Disclosure Obligations ...................................... 132

C. Defendants Had Powerful Economic Incentive to Hide Lumen's Widescale Abandonment of Highly Toxic Hazardous Waste Across the Country ...................... 137

D. Defendants Had Additional Motivate to Suppress Information about Lumen's Network of Abandoned Lead Cables from Becoming Public ...................................... 141

E. Stansbury Engaged In a Close, Month-Long Review of Lumen's Legacy Assets Upon Joining the Company for the Purpose of Enhancing Its Disclosures .......................... 142

F. The Company Regularly Reviewed Data on Cable Retirement ................................... 143

G. Defendants' Denials Support an Inference of Scienter ................................................ 144

H. Storey and Johnson Repeatedly Professed To Be Tuned In To Sustainability, the Environment, and Employee and Community Health ................................................... 144

I. Lumen Maintained Sophisticated Information Systems That Provide Detailed Information on the Lead In Its Copper Cable Network ................................................ 145

J. Lumen's Telecommunications Network Is Admittedly At the Core of Its Business ... 147

K. Defendants' SOX Certifications Support An Inference of Scienter ........................... 148

LOSS CAUSATION .................................................................................................................. 149

PRESUMPTION OF RELIANCE ............................................................................................ 151

NO SAFE HARBOR ................................................................................................................. 153

CLASS ACTION ALLEGATIONS ......................................................................................... 154

COUNT I .................................................................................................................................... 156

COUNT II ................................................................................................................................... 158

PRAYER FOR RELIEF ............................................................................................................ 159

DEMAND FOR TRIAL JURY ................................................................................................. 160

Court-appointed lead plaintiff Christine Glauber ("Lead Plaintiff") and additional plaintiff John McLemore (collectively, with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendant Lumen Technologies, Inc. ("Lumen" or the "Company"), and defendants Kate Johnson, Chris Stansbury, Jeffrey K. Storey, and Indraneel Dev (collectively, the "Individual Defendants," and, with Lumen, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, and other publicly available information issued by or about Lumen or the industry in which it operates, interviews with persons knowledgeable about relevant events, including former employees of Lumen, and expert consultation. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action against Lumen and its top officials for violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Lumen securities between November 8, 2018, and January 11, 2024, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. Lumen is a large telecommunications company that was attempting to break free from an outdated business model and transform into a new company for the digital era. Through a series of acquisitions, Lumen grew from a regional local exchange carrier into the third largest telecommunications company in the United States, with a significant presence in in the Midwest

and West Coast.  But as peers moved to new technologies like wireless and high-speed internet, demand for services provided over its nationwide network of old telephone cables at the center of its traditional business strategy were on the decline.  By the start of the Class Period, Lumen had acquired one of the largest networks of fiber optic cables in the United States and began to move forward with a new plan to shift away from its old copper wireline services and, instead, grow its new network of fiber optic cables.  By all accounts, this appeared to present an opportunity for significant growth, and the Company did not appear to be saddled with environmental, regulatory, or market risks that many other high-yield investments face.  But Lumen's deceptive conduct underlying this lawsuit lulled investors into a false sense of security, which was shattered during the second half of 2023.

3.      In July of 2023, a series of articles by *The Wall Street Journal* ("*WSJ*") revealed that the nation is covered in tens of thousands of miles of toxic, lead-leaching copper telephone cables left behind by telecommunications companies who previously used them for standard telephony services, like voice transmission, the heart of Lumen's historic business model.  As the *WSJ* reported following a detailed two-year investigation, copper telephone cables were historically covered, or "sheathed," in lead during the first half of the 20th century, as the nation's telephone network was being built, until the severe health consequences associated with lead became better understood and the industry phased it out in the 1950s.  But the lead cables already in the network remained in use, and they were eventually passed down to today's modern day telecommunication companies, including Lumen.

4.      Today, these lead-sheathed cables snake across the country in myriad locations. They are buried underground and entrenched in manholes.  They line riverbeds and lakes.  They dangle just feet above the ground, drooping from old utility poles above densely populated

metropolitan communities where families with children live. Incredibly, these lead-sheathed cables are, for the most part, no longer in use. As Lumen transitioned to more advanced technologies, including fiber optic wires, it simply left the old lead cables in place, abandoning them with little to no care for the environmental and human health dangers they created by doing so. Still, they are owned by Lumen, and therefore, any liability associated with environmental remediation, regulatory compliance, personal injuries, or other consequences resulting from the lead cables belongs to Lumen.

5.      This is no small matter. Since the story first broke, Lumen admitted that there were **35,000 miles** of lead-covered cables remaining in its nationwide "legacy" network, including aerial lead cables that lay exposed to the elements on utility poles. To put this into perspective, that is enough lead cable to wrap around the ***entire Earth*** almost one and a half times. Worse still, that figure does not even include the 371,000 miles of copper wireline infrastructure that the Company recently sold in 2022 to the company now known as Brightspeed, which it could be liable for under applicable environmental laws if they too contain lead, which numerous former employees detailed herein confirm. Based on expert testimony and real-world examples from peer utility companies, the cost to remove and remediate just the 35,000 miles of lead cable that Lumen currently owns could cost anywhere from $6.2 billion, on the low end, to a staggering $23.3 billion, on the high end. Accordingly, even if the overhead cables—those that present the most obvious risk to human health—comprise a fraction of those that remain in Lumen's copper network, the cost to properly remove and remediate those cables is still staggering.

6.      Lumen cannot defend its failure to disclose the extent of its abandoned lead-sheathed cables to investors. Its longstanding knowledge of the enormous risks at play is beyond dispute, as a few examples show:

3

- Internal Lumen documents recognized that the lead sheathing on its lead cables is a "hazardous waste" subject to exacting environmental laws due to its severe toxicity.

- Preeminent environmental executives from major telecommunications companies warned peers at Lumen about the environmental and occupational safety dangers associated with lead telephone cables for years as they realized the mess they had on their hands.

- The Company entered into a nationwide lead abatement program after the federal government issued it ten "serious" citations for exposure to excessive levels of lead by its frontline workers.

- Lumen's CEO ordered that all unused copper cables be left in place as a cost-cutting measure as the Company invested in fiber and was aware that the network contained cables wrapped in lead.

- Like almost any homeowner, the Individual Defendants have routinely certified, acknowledged, signed, and reviewed disclosures in connection with their purchase and sale of real property which described lead as a regulated contaminant.

7.     Despite the steady drum beat of known risks posed by Lumen's vast network of obsolete toxic lead cables, Lumen elected to simply abandon this ancient hardware in place to decompose over time in areas where people live, work, play, or go to school, including in the air above schools where children play or underground in manholes and conduits that sometimes exit into public water bodies because, simply put, it was the cheapest thing to do.

8.     Consistent with its ostrich-like approach to decommissioning its lead-sheathed cables, Lumen has publicly swept this issue under the rug.  It has concealed its extensive web of lead cables, while proclaiming that it was saving money by transitioning its customer base away from copper lines to fiber optic networks.  Without knowing the true sprawl, condition, and extent of its lead cables, Lumen's stockholders were misled about the enormous risks and financial exposure that the Company faced.  Lumen also told investors that it "***recycles . . . copper cables***" upon retirement, as one might expect for a sustainably-minded company transitioning to fiber. That could not be further from the truth.  Lumen actively discarded thousands of miles of copper

cables encased in a heavily regulated and highly toxic material across the United States in a manner prohibited by federal law.

9.      The first bombshell dropped on July 9, 2023, when the *WSJ* published the first in a series of investigative reports and articles, which revealed that: (1) modern-day telecommunications companies, including Lumen, inherited the lead cables, some dating to the late 1800s, through a series of acquisitions of the former "Baby Bell" companies after the Bell System was broken up by the federal government in the 1980s; (2) the lead cables are leaching lead into the environment, resulting in lead levels far in excess of the EPA's acceptable levels, including at schools and bodies of water used by the general public; (3) Lumen, like its peer companies, has known not only about these lead cables but also about the potential harm they pose for over a decade; and (4) telecommunication companies have largely abandoned their network of lead cables across the United States, notwithstanding these known risks. The market learned more as the *WSJ* released new stories as part of its series.

10.     Numerous government bodies launched investigations into the environmental and human health hazards resulting from Lumen's lead-sheathed cables, including the Environmental Protection Agency ("EPA")  Lumen has since confirmed that it "engaged" with the EPA on this issue. Congress, the Department of Justice ("DOJ"), and several other federal and state agencies also launched investigations.

11.     In the face of mounting pressure, Lumen eventually fessed up. On August 1, 2023, Chris Stansbury, Lumen's current CFO, admitted that lead was used in its network before the "1950s" and confirmed that "5% of our approximately 700,000-mile copper network" still "contained lead." Lumen also acknowledged that it should have disclosed the risks associated with its toxic lead cables earlier. That same day, Lumen made a filing with the SEC which revealed

that the lead cables it owned all along, for decades, gave rise to a "loss contingency" that it never previously disclosed to investors during the Class Period. Subsequent filings confirm that Lumen has incurred costs investigating the matter and anticipates that it will continue to incur such costs going forward.

12.    Lumen's stock price dropped precipitously in response to the *WSJ*'s reporting and related developments. Indeed, by the end of the Class Period, Lumen's stock price traded down to its lowest level ***since 1982***. To be clear, Plaintiffs do not seek to recover for the entire decline in Lumen's stock price from peak to trough during this period or any other period but, rather, only those drops attributable to the disclosures revealing the fraud, including those that led to its lowest price in 40 years.

13.    Nor is it fair to characterize this as a case about speculative or unrealized risks. Lumen failed to disclose existing ***facts***—*i.e.*, that it chose to abandon thousands of miles of obsolete hazardous material across the country—and those ***facts*** exposed it a far greater risk of costly regulatory scrutiny, lawsuits, and remediation than a company not subject to those facts. Indeed, unused lead is classified as a "toxic" waste by the EPA because it can leach harmful particles from its surface and, as such, the abandonment of toxic waste, like lead, is prohibited by federal law. In addition, the risks are still unfolding, and will continue to do so for years to come. By January 2024, the EPA found "more than 100 soil and sediment readings with lead above the regulator's safety guideline for children" at some lead cable sites identified by *WSJ* and decided to invoke its powers under the "Superfund" law to initiate a multistage review of abandoned lead cables. What is more, Superfund reviews are extraordinarily long, and it can take a decade or more before a responsible party, like Lumen, is called upon to pay for the cleanup. To be sure, EPA officials told the *WSJ* it was discussing "remediation actions" with cable owners as recent as

6

September 2024.  Further, Lumen's most recent annual report, filed in February 2026, confirms that the matters uncovered by the *WSJ* have led to "regulatory inquiries" that it is still managing.

14.    Further, these risks, and related disclosures, are precisely what led to the precipitous decline in Lumen's stock price.  An article published on July 18, 2023 rejected the notion that the sharp sell-off of Lumen's stock was an "overreaction," considering "how little is known about the true extent of the problem, or what the ultimate financial exposure may be for telecom carriers holding legacy networks that are more than a century old in some cases."  That same article continued, "Wall Street is so far unanimous on one thing: No one really knows anything yet" and, if anything, "[i]t seems unlikely that the matter will be resolved quickly—or cheaply."

15.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

17.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  Lumen is a corporation organized under the laws of the state of Louisiana and, at all relevant times, maintained its principal executive offices at 100 CenturyLink Drive, Monroe, Louisiana, located in this judicial district.  Defendants therefore transact business in this judicial district and a substantial part of the events or omissions

7

giving rise to the claims asserted herein, including the dissemination of materially false and misleading statements to the investing public, occurred in this judicial district.

18.     In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

**PARTIES**

19.     Plaintiffs acquired Lumen securities at artificially inflated prices during the Class Period, as set forth in the Certifications previously filed with the Court (ECF Nos. 1-2, 13-6), and were damaged thereby, as set forth herein.

20.     Defendant Lumen is a corporation organized under the laws of Louisiana.  Its principal executive offices are located at 100 CenturyLink Drive, Monroe, Louisiana.  During the Class Period, Lumen's securities traded on the New York Stock Exchange ("NYSE") under the ticker symbol LUMN and, prior to September 18, 2020, when it rebranded itself as Lumen, CTL.

21.     Defendant Kate Johnson ("Johnson") has served as Lumen's President and Chief Executive Officer ("CEO") and as a member of Lumen's Board of Directors (the "Board") since November 7, 2022.  Previously, Johnson was President of Microsoft U.S., a division of Microsoft Corporation.  From 2013 to 2017, she held various positions at GE Digital, including Executive Vice President and Corporate Officer.  Before that, Johnson was Senior Vice President for North America Technology and Government Consulting at Oracle from 2007 to 2013.

22.     Defendant Chris Stansbury ("Stansbury") has served as Lumen's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 4, 2022.  Before that, he was CFO for Arrow Electronic and CFO for the Networking Group of Hewlett Packard.  Before that he held several financial positions at PepsiCo and Seagram Beverage Co.

8

23.     Defendant Jeff K. Storey ("Storey") served as Lumen's President, CEO, and a member of the Board from before the start of the Class Period to November 7, 2022.  Previously, he was CEO of Level 3 Communications, before it merged with Lumen.  Before that, he held roles of increasingly responsibility at Cox Communications and WilTel Communications.

24.     Defendant Indraneel (Neel) Dev ("Dev") served as Lumen's EVP and CFO from before the start of the Class Period / November 6, 2018 to April 1, 2022.  Before his position as CFO, he held various positions at Level 3 Communications, MCI, and MFS Communications.

**NON-PARTY CONFIDENTIAL WITNESSES**

25.     CW1 worked at Lumen and its predecessor companies from February 2000 to January 2023.  From February 2000 to 2016, CW1  worked as a Cable Splicer in the Denver metropolitan area and frequently encountered lead cables.  From 2016 to January 2023, CW1  took a position as a Network Technician with responsibility for fiber optic cable.   In these roles, CW1 reported to Harry Jackson, Rich Mayhen, Mike Hallisey and Dave McLoud, all of whom reported to Vice President of Network Engineering & Construction for the Mountain Region.

26.     CW2 was the National Director of Operational Safety and Health at the Communications Workers of America (the "CWA") from 1979, when CW2 created the department, to 2018.  CWA is the primary labor union for employees of Lumen and its predecessor companies, including technicians who work with lead cables.  In this role, CW2 interfaced with telecommunications companies on occupational safety issues, including Lumen.

27.     CW3 worked in various roles Lumen its predecessors from 2005 to 2022 with responsibility for its wireline network in North Carolina and Virginia.  From August 2005 to October 2009, CW3 worked as a Lineman and Cable Maintenance Technician.  From October 2009 to January 2013, CW3 worked as a Network Engineer, Network Analyst, and Supervisor for Regional Operations.  From January 2013 to March 2018, CW3 served as Manager of Network

9

Joint Use for Lumen's East Region.  CW3 was promoted to Manager for Network Joint Use with coverage for all of the United States in March 2018 and remained in that position until leaving the Company in October 2022.  Among other things, CW3 performed repair work on Lumen's copper cable lines in North Carolina as a Lineman and supervised or worked with other Lineman between 2009 and 2013.  In the Network Joint Use positions, CW3 managed the parts of Lumen's copper line network that other companies had the right to use through contractual relationships, including how to address disruptions or repairs in those parts of the network.  In addition, CW3 was responsible for Lumen's nationwide utility pole maintenance program in each of the 38 states in which it maintained aerial cables.

28.    CW4 worked as a Broadband Technician for Lumen from October 2013 to May 2020.  As a Broadband Technician, CW4 worked out of several Lumen "garages" in and around Denver, Colorado and St. Louis, Missouri and was responsible for outside plant maintenance and construction, including copper and fiber splicing and cut cable repair.  Most recently, CW4 reported to Operations Manager, Lucas Montano.

29.    CW5 worked as a Network Technician for CenturyLink and its predecessors and, later, Lumen from April 2001 to June 2021 in Salt Lake County, Utah, which includes Salt Lake City.  As a Network Technician, CW5 worked in the cable repair department, the group responsible for handling lead cables in Lumen's network in that area.  CW5 personally worked on lead cables for Lumen.  In this role, CW5 reported to various supervisors under Area Manager Sheri Williams.

30.    CW6 worked for Lumen as an Outside Plant Facilities Engineer from October 2017 to February 2023 in Michigan.  In this position, CW6 reported to Senior Engineering Manager, Brad Warren, who, in turn, reported to Network Capacity Management Engineer, Bobby Walters.  CW6 was responsible for maintaining all wireline facilities outside the plant in Michigan and

10

designing appropriate repair plans as necessary.  Part of this job entailed physically inspecting network cable sites that required repair.

31.    CW7 was a Broadband Technician for CenturyLink and, then, Lumen from April 2016 to June 2022 in Seattle, Washington.  In this role, CW7 was a customer-facing representative responsible for getting cable up and running when it was down, which on occasion involved inspecting the cable lines attaching to the residence or building being serviced.  CW7 reported to Lumen Supervisor, Region Operations, Trevor McHenry.

32.    CW8 worked in several frontline and management roles at Lumen and its predecessors from 2003 to August 2022 in Minnesota.  From 2003 to 2005, CW8 worked as a Cable Splicer.  From 2005 to 2007, CW8 worked as a Supervisor overseeing a team of Cable Splicers.  From 2007 to the end of 2009, CW8 returned to working as a Cable Splicer.  From 2010 to June 2015, CW8 worked as a Construction Project Administrator, overseeing cable work performed by contractors.  From June 2015 to August 2022, CW8 worked as Senior Regional Contract manager performing the same function as CW8's previous role but with responsibility for Idaho, Montana, North Dakota, and South Dakota.  In these final two positions, CW8 learned about lead cables that were part of Lumen's network in other states by discussing assignments and ongoing work with contractors.  Since leaving the Company, CW8 has worked for a splicing contractor that occasionally performs work for Lumen.

33.    CW9 held various network and engineering roles of increasing responsibility at US WEST, Qwest, CenturyLink and Lumen between 1995 and November 2023.  From October 2018 to October 2020, CW9 served as an Engineering Associate.  From October 2020 to November 2023, CW9 served as a Senior Network Implementation Program Manager.  In both roles, CW9

11

was responsible for managing projects involving the placement of new wireline and replacing old wireline, including lead-sheathed copper cable.

34.    CW10 was a Regional EHS Manager for Lumen from 1997 to April 2022, with responsibility for numerous states in the Western half of the United States.  CW10 reported to Senior Regional EHS Manager Gerard Breen, who reported to the Director of Global EHS, Mike Beekman.  As EHS Manager, CW10 was responsible for EHS compliance, including compliance with lead safety rules.

35.    CW11 held several roles in network operations at CenturyLink and Lumen from March 2013 to November 2023, most recently serving as Senior Engineer and Senior Network Engineer from December 2020 to November 2023.  In these roles, CW11 managed fiber projects across Lumen's national footprint.

36.    CW12 held numerous roles in network operations at CenturyLink and Lumen from March 1998 to June 2024.  From November 2017 to June 2024, CW12 was Vice President of Network Operations, in which capacity CW12 was responsible for managing the entirety of Lumen's network assets.

## FACTS

### A.    Relevant Background

#### 1.    Overview of Lumen and Its Corporate History

37.    Lumen is a global telecommunications company headquartered in Monroe, Louisiana, which, unlike peer telecommunication companies AT&T Inc. ("AT&T") or Verizon Communications Inc. ("Verizon"), has primarily focused on wireline services, *i.e.*, services based on physical cable plant as opposed to mobile or wireless technology.  For this reason, Lumen describes itself as a "facilities-based" communications company.  As of the start of the Class

12

Period, Lumen was the third largest wireline telecommunications company in the United States, based on the number of access lines served.

38.    Lumen, as it now stands, was originally incorporated in April 1968 under the name Central Telephone & Electronics Corporation as a holding company for 15 rural telephone businesses owned and operated by Clarke Williams which he amassed through piecemeal acquisitions after receiving his first as a wedding gift in 1946.  By the time the Company was formed, the businesses in its portfolio served three states with approximately 10,000 access lines.

39.    On or around October 30, 1970, the Company changed its name to Century Telephone Enterprises, Inc. ("Century Telephone").  On October 24, 1978, Century Telephone gained listing on the NYSE and its shares began trading under the ticker symbol CTL.  By that time, the Company had telephone services in 14 states through additional acquisitions.

40.    Over the next twenty years, Century Telephone continued to expand its customer base through a series of acquisitions focused on gaining market share in fast-growing rural areas adjacent to its existing network, including companies that acquired wireline assets from regional telephone companies formed as a result of the antitrust breakup of the Bell System in 1984.  Among other transactions, Century Telephone doubled its size in 1997 when it acquired Pacific Telecom, Inc. ("Pacific Telecom"), based in Portland, Oregon, for $2.2 billion in cash and assumed debt.  In 1995, before it was acquired by Century Telephone, Pacific Telecom completed several transactions to acquire exchanges serving over 85,000 telephone lines from US WEST Communications, Inc. ("US WEST"), one of the regional operating companies formed from the breakup of the Bell System.

41.    With diverse holdings in 21 states, in 1999, Century Telephone carried out a national rebranding strategy to unify its various business divisions and changed its name to

13

CenturyTel, Inc. ("CenturyTel").  In the years that followed, CenturyTel continued to complete acquisitions for wireline assets in strategic rural locations, including 133,000 additional lines and 70,500 access lines in Wisconsin from Verizon for $364 million in 2000 and over 650,000 access lines in Alabama and Missouri from Verizon for over $2 billion in 2002.

42.     By 2008, CenturyTel had grown to become one of the largest providers of rural telephone and internet services in the United States, with a heavy concentration of access lines in the Midwest, Northwest, and Southeast parts of the United States.  Between 2008 and the start of the Class Period, CenturyTel completed a series of even more ambitious acquisitions which substantially changed its customer base, geographic footprint and mix of products and services.

43.     On July 1, 2009, the Company completed the acquisition of Embarq Corporation ("Embarq"), the largest rural telephone company in the United States which formed when Sprint spun off its landline division in 2006, in a transaction valued at $11.6 billion, including the assumption of debt.  The acquisition provided the Company with almost 6 million telephone access lines, and broadband internet service to 1.4 million subscribers, and expanded its geographic footprint into new territories, such as Florida, North Carolina, and Virginia.  In connection with this transaction, the Company decided to change its name to CenturyLink, Inc. ("CenturyLink"), effective May 21, 2010.  The Company chose the name CenturyLink because it reflected a company that is "forward-looking and committed to linking the country together."

44.     On April 1, 2011, CenturyLink completed the acquisition of Colorado-based Qwest Communications International Inc. ("Qwest"), which previously acquired US WEST in 2000, in a transaction valued at $22.4 billion, including the assumption of $11.8 billion in debt.  On a combined basis, the transaction provided CenturyLink with 17 million access lines in in 37 states, 5 million broadband customers, and 173,000 miles of fiber optic wireline, making CenturyLink

14

the third largest telecommunications company in the United States and the largest landline phone provider in Colorado. The only larger landline phone companies remaining in the United States were AT&T and Verizon. Many viewed the acquisition as a response to the steady decline in demand for landline services as many homes switch to mobile or cable phone services.

45. By 2017, CenturyLink's profits were declining due to the growing number of increasingly affordable wireless and fiber optic services offered by other companies as businesses and consumers shifted away from slower and less reliable broadband services that utilize copper wireline, including digital subscriber line ("DSL") technology. CenturyLink was working to grow its fiber optic network for some time, but it still had twice as much copper wire planted than it did fiber optic wire and, accordingly, the majority of its revenues were derived from those "legacy" assets. Accordingly, Lumen's annual revenues decreased from approximately $18 billion to $17.9 billion to $17.5 billion in 2014, 2015, and 2016, respectively.

46. On November 1, 2017, CenturyLink completed the acquisition of Level 3 Communications, Inc. ("Level 3"), the second largest provider of ethernet services for business customers behind only AT&T, in a transaction valued at approximately $34 billion, including the assumption of $9 billion in debt. By purchasing Level 3, CenturyLink gained an additional 200,000 route miles of fiber plant, including 64,000 miles in 350 metropolitan areas and 33,000 subsea route miles connecting multiple continents, nearly doubling CenturyLink's fiber footprint. Following this transaction, over 70% of the Company's revenues have been derived from business, or "enterprise," accounts, as opposed to residential customers.

47. In response to demands by activist shareholders, CenturyLink announced before the transaction with Level 3 closed that the CEO of Level 3, Jeff Storey, would join CenturyLink as its President and Chief Operation Officer ("COO") when the transaction closed and ultimately

become CEO of CenturyLink.  Storey assumed the role of President and CEO on May 23, 2018, upon the retirement of the Company's previous CEO.

48.    On September 14, 2020, CenturyLink announced that it was rebranding itself as Lumen in connection with broader plan to "transform" into a leader for the so-called "4th Industrial Revolution" in which "smart, connective devices are everywhere."  Among other elements in this plan, Lumen announced that it planned to offer residential and small business customers fiber optic access through a new product branded as "Quantum Fiber."  Despite the name change, and the addition of the "Quantum Fiber" brand for residential customers and small businesses, the Company still uses the CenturyLink brand as the face for its legacy copper line services.  Effective as of the market open on September 18, 2020, the Company's ticker symbol changed to LUMN.

49.    Through its many acquisitions over the years, Lumen operates an extensive number of subsidiaries throughout the world, including a number that operated under the brand names CenturyTel, CenturyLink, Embarq, Level 3, and Qwest.  As of December 31, 2018, it owned over 400 entities that it identified as subsidiaries.  For ease of reference, this Complaint uses the term "Lumen" to refer to Lumen and its consolidated subsidiaries, as well as its predecessors, including, but not limited to, CenturyLink, and their consolidated subsidiaries, unless the name of a specific predecessor or subsidiary is helpful for clarity.

### 2.    Lumen's Two Nationwide Wireline Networks

50.    During the Class Period, Lumen offered its enterprise and retail customers a mix of integrated products and services, including local and long-distance calling, internet access, and various network services.  As explained above, most of the products and services offered by Lumen are provided using its vast network of telecommunications cables.

51.    By the start of the Class Period, Lumen's cable infrastructure included a network of copper cables and a network of fiber optic cables.  Copper wire was the material traditionally

16

used in telecommunications cables for the bulk of the twentieth century and, as such, it is often referred to as Lumen's "legacy" network. Unlike copper cable, which transmits information through electrical pulses, fiber optic cable is a newer technology that uses glass to transmit data close to the speed of light. Fiber is not only faster and more reliable, it also generally offers equal upload and download speeds. Since 2000, Lumen has steadily grown its fiber optic network through a series of acquisitions, most notably that of Qwest in 2011 and Level 3 in 2017, and thereafter embarked on a "digital transformation" to convert its products from copper to fiber.

52. The following map, published by Lumen, shows the layout of its two nationwide cable networks overlayed on top of one another after gaining Level 3's fiber optic assets:



In this map, the shaded green areas represent local territories serviced by traditional copper wire cable lines whereas the orange and blue lines represent the fiber optic cable lines owned by CenturyLink and Level 3, respectively.

53. Despite the consumer shift toward fiber optic, Lumen was required by law to maintain its copper wire assets in certain locations. To introduce competition to the

telecommunications market following the breakup of the Bell System in 1994, Congress passed the Telecommunications Act of 1996 (the "Telecommunications Act"), which substantially amended the Communications Act of 1934, the primary federal law governing telecommunications in the United States. Among other things, the Telecommunications Act required incumbent wireline companies, each referred to as an incumbent local exchange carrier ("ILEC"), to not only maintain their copper wireline network, but also open it to any other companies wishing to use it, each a competitive local exchange carrier ("CLEC"), through interconnection agreements. Though its many acquisitions, Lumen owned ILEC assets in each of the 37 states in which it operated.

54.    On August 3, 2021, Lumen announced that it agreed to sell its legacy ILEC assets in 20 states to the private equity firm Apollo Global Management, Inc. ("Apollo") for $7.5 billion, including the assumption of debt, as reflected in the following map published by Lumen:



Doing so allowed Lumen to abandon its "legacy" copper wire network in rural areas where it did not plan to install its newly-devised Quantum Fiber product, including its home state of Louisiana.

As Defendant Storey explained on a call with analysts later on August 3, 2021, in each state included in the sale, "we knew that we were unlikely to prioritize investments in these markets ahead of our other opportunities in the enterprise and Quantum Fiber" and "approximately 70% of our remaining mass-market [legacy]" in the 16 states that Lumen retained "is well suited for Quantum Fiber investment."

55.     Lumen completed the sale of the ILEC assets described above to Apollo on October 3, 2022, after which Apollo began operating those assets under the brand name Brightspeed. Following its acquisition of the ILEC assets from Lumen, Brightspeed has publicly advertised that it now owns "371,000 route miles of copper."

### 3.     Lumen's Environmental and Sustainability Infrastructure

56.     "ESG" is an umbrella term that refers to a management and analysis framework to understand and/or assess the robustness of a company's governance mechanisms and its ability to effectively manage its environmental and social impacts.  ESG has become an increasingly important topic for investors.  Indeed, the SEC recently proposed a new rule that would ***require*** companies to include certain climate-related disclosures in their registration statements and periodic reports because of investor interest in securing more information related to climate risks that affect the public companies they own.  *See* 87 Fed. Reg. (2022).  Indeed, Lumen has included a statement in the "Risk Factors" section of its periodic reports since the start of 2021 that it faces the risk that "a perceived failure to meet evolving environmental, social and governance ('ESG') practices or benchmarks could adversely impact our business, brand, stock price or cost of capital."

57.     Since before the start of the Class Period, Lumen has proclaimed that being a good "corporate citizen" is one of its top priorities and, to that end, has maintained an Environment, Health & Safety and Sustainability framework as part of its ESG program.  This framework focuses

on six key areas, including, among others, "environmental compliance and management," "occupational health and safety," and "waste."

58.    Lumen's Environmental, Health & Safety ("EHS") department is the business unit charged with responsibility for carrying out each of the elements of the Company's Environmental Health & Safety and Sustainability framework, including, among others, "environmental compliance and management," "occupational health and safety," and "waste."

59.    Since at least 2015, Lumen has published an annual ESG report highlighting its ESG efforts for its stakeholders and the communities in which it operates.  Before 2019, the report was known as the Corporate Social Responsibility (CSR) report.  Lumen has admitted in its SEC filings that "[o]ur CEO and others members of senior management provide leadership and guidance around Lumen's sustainability efforts."

### B.    Lead Is a Heavily-Regulated Highly Toxic Material

60.    Lead has been heavily used in industry for more than a century and its dangers were well-understood long before the start of the Class Period, as evidenced by its extensive regulation and the science on which those regulations are based.

### 1.    Lead Is a Brittle Heavy Metal Extremely Harmful to Human Health

61.    Lead is a naturally occurring blue-grey heavy metal that has several unique physical properties.  Despite its heavy density, lead is relatively soft and malleable.  In addition, lead has a low melting point compared to other metals at approximately 621.5 degrees Fahrenheit.  Finally, lead is orders of magnitude more resistant to electrical current than other common metals, like aluminum, copper, or steel.  Accordingly, lead can be easily fabricated into different shapes and acts as an effective shield against electrical interference in a range of environments.

62.    Because lead is soft and brittle at room temperature, lead-bearing objects can shed undetectable and odorless lead particles when they are subject to friction, which become airborne

20

or deposit on surrounding surfaces.  These particles enter the body primarily through inhalation or inadvertent ingestion of contaminated food or consumables, or by touching contaminated surfaces.  According to studies accepted by the Centers for Disease Control and Prevention (the "CDC"), anywhere from 20% to 70% of ingested lead is absorbed into the body, depending on a variety of factors, including particulate size, nutritional status, health, age, and stomach content.  However, almost all inhaled lead is absorbed into the body in the lower respiratory tract, including the lungs.

63.      Once in the human body, lead can cause irreversible brain damage and adversely affect nearly every other major system in the body.  Lead particles pass through the lungs or stomach into the bloodstream, which carries them to other parts of the body where they accumulate in bone and soft tissues, including organs.  These lead particles interfere with the function of innate enzymes which mistake them for other metals that take part in natural biologic processes, like calcium, iron, and zinc, and prevent them from catalyzing normal reactions.  Because lead mimics calcium, it is also able to cross the blood-brain barrier.  Once in the central nervous system, lead particles destroy neurons and interfere with neurotransmission, especially in the parts of the brain responsible for emotional regulation, impulse control, attention, and verbal reasoning.

64.      Lead stored in soft tissues can remain in the body for several months or more but bones can store lead for decades.  Under certain circumstances, lead from these inert stores will sporadically leave bone tissue and reenter the bloodstream, where it can be redistributed to other soft tissues.  Consequently, these long-term reserves pose special risk because they are a potential endogenous source of lead that can continue to harm the body long after exposure has ended.

65.      The effects of lead exposure are myriad due to the manner it is dispersed throughout the body and can depend on many individualized factors, including, most notably, age, source of exposure, amount of exposure, and length of exposure.  Ailments range from acute to chronic and

21

from minor to severe, including severe abdominal pain, vomiting, convulsions, coma, anemia, interstitial kidney fibrosis, reproductive toxicity, hypertension, and a variety of neurological issues, such as decreased cognition, impaired concentration and memory, impulsiveness, behavioral and emotional disorders, fatigue, and an overall reduction in reaction time and fine motor skills. Lead has been linked to lung and stomach cancer. Lead can cause birth defects and miscarriages in pregnant women. At high concentrations, exposure to lead can be lethal. Indeed, exposure to levels of 100 micrograms per cubic meter of air ($\mu g/m^3$) is considered immediately dangerous to life and health (IDLH), a designation developed by the National Institute for Occupational Safety and Health ("NIOSH") to refer to an airborne contaminant that is "likely to cause death or immediate or delayed permanent adverse health effects or prevent escape from such environment."

66.    Children are particularly vulnerable. Their bodies absorb more lead than adults do and their nervous systems are more sensitive to the pernicious effects of lead. Even low levels of lead can inhibit brain development, leading to long-lasting issues that can curtail academic and socio-economic advancement, including lower IQ, decreased attention, aggression, and impulsivity, among many others. Infants and small children are also at higher risk for lead exposure because they often put their hands and other objects that can carry lead particles in their mouth.

67.    Because many of the health problems described above appear slowly or can be caused by a number of other reasons, lead poisoning may go undiagnosed for a prolonged period of time, if at all. Similarly, the effects of lead can go unnoticed in children until years after exposure, when academic performance and learning disabilities become more pronounced in later stages of school and life. For this reason, lead is often referred to as a silent killer.

**2.    History of Lead Use and Regulation in the United States**

68.    Due to its unique physical properties and ready supply, lead became a popular material during the Industrial Revolution and its use continued to increase thereafter as an everyday industrial and domestic commodity.  By the start of the 1900s, the global production of lead reached an all-time high and the United States, in particular, was the global leader in lead production and use.  During this time, lead was used extensively in construction, plumbing, soldering, and a range of industries as a barrier against electrical interference and radiation (*e.g.*, x-rays).  Lead or lead compounds were also used extensively as an additive to enhance the performance or appearance of various products, including, most notably, as an anti-knocking agent in gasoline and as a pigment supplement in residential paint to accelerate drying, increase durability, and inhibit corrosion.  Lead was also commonly used as the primary material for piping in many municipal water systems throughout the United States.

69.    .

70.    Through its ubiquitous use, humans became exposed to increasingly elevated levels of lead, and research began into the effect of lead intake on the human body.  Over time, consensus grew that it was highly toxic even in small concentrations.  Reports of widespread lead poisoning were made throughout the 1950s.  By the mid-1960s, research showed that the average blood lead level in the United States was extremely elevated, suggesting that the average citizen was subject to chronic exposure, and many industries began to voluntarily phase lead out of use.  However, the countless sources of lead already in commercial use remained outstanding, including lead paint in residential houses and lead piping in municipal water systems.

71.    Growing concern over lead poisoning in children from repeated ingestion of lead paint prompted the federal government to take action.  In 1971, Congress passed the Lead-Based Poisoning Prevention Act ("LBPPA"), which directed the U.S. Department of Housing and Urban

23

Development ("HUD") to prohibit the use of lead-based paint in federally-sponsored residential structuresIn 1976, Congress amended to LBPPA to direct the newly-formed U.S. Consumer Product Safety Commission ("CPSC") to take steps to regulate lead-based paint more broadly. *See* Pub. L. No. 94-317 (1976). In 1977, the CPSC notoriously banned the use of lead paint by decreasing the acceptable limit of lead in paint to 0.06%, effective February 1978. *See* 42 Fed. Reg. 44193 (1977). This was further reduced by the CPSC in 2008 to 0.009%. *See* 73 Fed. Reg. 77492 (2008).

72.    While the CPSC's efforts effectively banned the use of lead paint moving forward, the federal government remained concerned that over 80% of all residential houses built before 1978 still contained lead paint. To further protect families from lead exposure, Congress passed the Residential Lead-Based Paint Hazard Reduction Act of 1992 as Title X of the Housing and Community Development Act of 1992, commonly referred to as "Title X." Pub. L. No. 102-550 (1992) § 1001 *et seq.* Title X directed HUD and the EPA to promulgate regulations requiring sellers of residential properties built before 1978 to disclose if the property has any lead paint hazards. *Id.* In March 1996, HUD and the EPA jointly promulgated the new rule, known as the "Lead Disclosure Rule." *See* 61 Fed. Reg. 9064 (1996). As codified in 24 C.F.R. §§ 35.80-35.1355 (HUD) and 40 C.F.R. §§ 745.100-745.119 (EPA), the Lead Disclosure Rule required sellers of such properties to, among other things, (i) disclose if the property has any lead paint or lead paint hazards; (ii) provide purchasers with a lead paint hazard pamphlet approved by the EPA; and (iii) include and a lead warning statement as an attachment to any property sale contract to be signed by the seller and purchaser and certified as true and accurate. Purchasers, in turn must, acknowledge receipt of the lead disclosure and EPA-approved pamphlet in the lead warning statement before signing it.

24

73.    Among other things, the EPA-approved pamphlet, *Protect Your Family from Lead in Your Home*, warns that lead can be extremely harmful to children and adults and further cautions that anyone who works with lead as part of their job can be exposed and bring it home:



In addition, the lead warning required by HUD and the EPA to be included as an addendum to any sale contract subject to the Lead Disclosure Rule must include the following language:

> Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. ***Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women.***

24 C.F.R. § 35.92, 40 C.F.R. § 745.113(a)(1) (emphasis added).

74.    The EPA and HUD have developed a form addendum to use in sale contracts that satisfies the elements described in ¶¶ 72-73 titled *Disclosure of Information on Lead-Based Paint*

25

*and/or Lead-Based Paint Hazards*.  Among other things, this form must be signed by all sellers and purchasers, includes the language excerpted in ¶ 73 under the heading "Lead Warning Statement," and requires: (i) the sellers to disclose any known lead paint hazards; (ii) the purchasers to acknowledge receipt of the EPA-approved pamphlet; and (iii) all parties to state that they "have reviewed the information above and certify, to the best of their knowledge, that the information that they have provided is true and accurate."

75.    At around the same time as its lead paint measures, the federal government also took steps to remove lead from gasoline.  In response to public concern over visible smog in many of the nation's cities and industrial centers, Congress passed amendments to the Clean Air Act (the "CAA") in 1970.  *See* Pub. L. No. 91-604 (1970).  These amendments (1) effectively required cars to use of catalytic converters by no later than 1975 to reduce exhaust emissions; and (2) authorized the EPA to regulate pollution from cars.  Because lead was corrosive to catalytic converters, the EPA promulgated regulations requiring gas stations to offer at least one grade of unleaded gasoline and car manufacturers to affix permanent labels reading "Unleaded Gasoline Only" on all cars made after 1974, including one on the dashboard.  *See* 38 Fed. Reg. 1254 (1973).  In addition, the EPA issued regulations requiring a phased reduction in lead from gasoline for cars by 1980.  *See* 38 Fed. Reg. 33734 (1973).  The EPA further reduced the acceptable limit in 1985.  *See* 50 Fed. Reg. 9386 (1985).  At the time of this rule, EPA Administrator, Lee M. Thomas, said "[t]here is no doubt in my mind that lead in the environment is still a major public health problem."  In 1990, Congress amended the CAA to permanently ban the use of lead in motor vehicle fuel beginning in 1996.  *See* Pub. L. No. 101-549 (1990).  The EPA subsequently eliminated the need for the "Unleaded Gasoline" label in cars.  *See* 61 Fed. Reg. 3832 (1996).

26

76.     The phase-out of lead in motor vehicle fuel was a major success.  According to the EPA, air lead levels further decreased by 94 percent between 1980 and 1999.  By the time the ban took effect in 1996, the average blood lead level in adults declined by approximately 80% and the average blood level in children declined by approximately 70%.  In a press release announcing the EPA's final rule on the ban, EPA Administrator Carol M. Browner declared that, in the United States, "[t]he elimination of lead from gas is one of the *greatest environmental achievements of all time*."

77.     The federal government also took steps to eliminate the use of lead in household plumbing and public water supplies.  By the 1980s, there was sufficient evidence that lead-bearing materials in public water supply systems were leaching lead into drinking water due to corrosion, particularly when exposed to "soft" water with high acidity or low mineral content.  In 1986, Congress passed amendments to the Safe Drinking Water Act of 1974, which, among other things, (1) prohibited the use of pipes, solder, or flux for any public water system or plumbing connected thereto, including schools, that is not "lead free," and (2) directed the EPA to establish a maximum contaminant level goal ("MCLG") for lead in drinking water.  *See* Pub. L. No. 99-339 (1986).  The ban on lead-bearing pipes and fittings became effective in June 1988.  In 1991, the EPA published a rule setting the MCLG for lead and copper, known as the Lead and Copper Rule.  *See* 56 Fed. Reg. 26460 (1991).  As codified in 40 C.F.R. § 141.51, the Lead and Copper Rule established a MCLG for lead of zero.  *Id.*  The EPA set the MCLG at zero in part due to lead being a probable carcinogen and there being no clear threshold for some non-carcinogenic health effects.  *Id.*

78.     Through these measures, and related efforts, the dangers of lead have become widespread public knowledge in the United States and there is almost universal public consensus that lead is extremely harmful to human health.  Numerous government agencies responsible for

27

public health, including EPA, the Centers for Disease Control and Prevention ("CDC"), and the U.S. Food and Drug Administration ("FDA"), as well as a variety of preeminent independent health organizations, including the World Health Organization ("WHO") and the American Medical Association ("AMA"), have all independently advised that there is *no safe level of lead in a human body*. As recently as March 28, 2023, EPA Administrator, Michael S. Regan, emphatically stated in a joint press release with the United States Department of Health and Human Services that "[t]he science is clear: there is no safe level of lead exposure, especially for children."

### 3. Individuals Who Work With Lead Face the Prospect of Lead Poisoning

79. Despite the efforts by the federal government to reduce and/or eliminate the use of lead, workers in certain industries continue to encounter lead-based materials in the normal course of business. As explained above, there remains an extensive amount of lead-bearing objects in industry due to its widespread use during the 19th century and early 20th century, especially in construction. Indeed, the federal government estimated that, as of 1978, there were *at least* 120 occupations in which workers are exposed to lead. Workers in these positions are at heightened risk for lead poisoning due to the manner in which lead particles are often unknowingly dispersed into the air and surrounding surfaces from lead-bearing objects (¶ 62). Accordingly, the CDC has indicated that occupational exposure continues to be one of the leading sources of lead poisoning.

80. The Occupational Safety and Health Administration ("OSHA") is the government agency that is charged with responsibility for setting and enforcing workplace health and safety standards for the private sector and federal government. It was established by the Occupational Safety and Health Act of 1970 (the "OSH Act"), during a time when workplace accidents were soaring in the absence of national workplace health and safety standards. *See* Pub. L. No. 91-596 (1970). The purpose of this legislation was to ensure that employers provide employees with an environment free from recognized hazards, including toxic substances and unsanitary conditions.

28

Among other things, OSHA enforces the workplace standards that it sets by allowing workers to file confidential complaints and carrying out inspections at workplaces within its jurisdiction, including in response to such a complaint.

81.     Section 18 of the OSH Act encourages individual states to develop and operate their own worker safety and health program for private sector and state or local government employees within their jurisdiction (each a "State Plan").  OSHA approves and monitors each State Plan and provides up to 50% of the funding for each such program.  However, any State Plan must be at least as effective as OSHA's federal guidelines.  Most OSHA-approved State Plans therefore adopt the OSHA federal standards into their own rules and provide additional protections or cover additional hazards addressed by federal OSHA guidelines.  There are currently 29 states or territories with OSHA-approved State Plans that cover private sector and/or state or local government employees, including California, Michigan, Minnesota, Oregon, and Washington.

82.     In November 1978, OSHA issued a final rule establishing standards for lead exposure in general industry (the "OSHA Lead Standard").  *See* 43 Fed. Reg. 52951 (1978) (Parts I-V), 43 Fed. Reg. 54353 (1978) (Part VI).  As codified in 29 C.F.R. § 1910.1025, the OSHA Lead Standard established, among other things, a permissible exposure limit ("PEL") of 50 $\mu g/m^3$ of lead over an eight-hour time weighted average as well as an "action level" of 30 $\mu g/m^3$, at which an employer must begin specific compliance activities, including free medical surveillance for exposed workers.  *Id.* § 1910.1025(c), (j).  Employers are required to ensure compliance with these airborne concentration levels through regular monitoring, *i.e.*, sampling, while the employee is exposed to lead.  *Id.* § 1910.1025(d).  The PEL was set at 50 $\mu g/m^3$ based on available evidence that workers exposed to concentrations above that amount suffer severe adverse health effects.

29

83.     The OSHA Lead Standard also requires the employer to carry out a comprehensive program to reduce or maintain worker exposure within the PEL, including, among other things, training and education on the hazards of exposure to lead, the establishment of a written compliance program, the use of engineering controls (*e.g.*, mechanical ventilation) and administrative controls (*e.g.*, recordkeeping), as well as the use of personal protective equipment ("PPE"), such as a respirator and other full-body coverings. *Id.* § 1910.25(e), (f), (g), (l).  Notably, the written compliance program required by the OSHA Lead Standard requires each employer to include "[a] description of ***each operation in which lead is emitted***, e.g. machinery used, material processed, controls in place, crew size, employee job responsibilities, operating procedures" and the like.  *Id.* 1910.25(e)(3)(ii)(A) (emphasis added).  In addition, each employer who has a workplace where there is a potential exposure to lead ***at any level*** must ensure that each employee is informed about the contents of the OSHA Lead Standard, including Appendices A and B, which specifically advises that "[c]hronic overexposure to lead may result in severe damage to your blood-forming, nervous, urinary and reproductive systems" and can be "fatal." *Id.* § 1910.25(l)(1), App'x A-B.

84.     Pursuant to their inherent power to issue standards more protective than those afforded by OSHA at the federal level, several states have initiated proceedings to consider revisions to the occupational lead standards set forth in their State Plan based on emerging scientific evidence that exposure to lead at levels below 50 $\mu g/m^3$ has the potential for significant harm.  For example, California OSHA ("Cal/OSHA") made such recommendations in 2010 and 2011 and has since held numerous meetings to discuss the potential changes.  On February 15, 2024, it approved a new lead standard for general industry, effective January 1, 2025, drastically reducing the PEL from 50 $\mu g/m^3$ to 10 $\mu g/m^3$, and the action level from 30 $\mu g/m^3$ to 2 $\mu g/m^3$ as the

action level in order to keep employee BLLs below 10 μg/dL.  Similarly, Washington's Division of Occupational Safety and Health ("Washington DOSH") initiated rulemaking proceedings with participation from various stakeholders to consider amending its lead standard in 2016 after being petitioned to do so by Public Health – Seattle & King County.  The latest discussion draft, published June 2019, proposed using 20 μg/m$^3$ as the PEL and an airborne lead action level of 10 μg/m$^3$.  Oregon OSHA convened a PEL advisory committee in 2016 to consider whether to adopt Washington DOSH's proposal in Oregon.  In 2018, Michigan OSHA ("MIOSHA") officially revised its lead standards to require medical removal when an employee's BLL reaches 30 μg/dL, and the employee may not return to work involving lead exposure until his or her BLL falls below 15 μg/dL.

85.     On June 28, 2022, OSHA published a notice in which it indicated that it was considering updating the OSHA Lead Standard based on medical findings since it was first published that adverse health effects in adults can occur at BLLs lower than those set forth in therein.  *See* 87 Fed. Reg. 38343 (2022).  Indeed, OSHA has publicly stated that "[r]ecent studies have provided evidence that lead can cause health effects at blood levels [BLLs] lower than those established by OSHA's 1978 Lead standard."  In particular, OSHA now believes that regular exposure to resulting in BLLs as low as 10 mg/dL in adults are associated with impaired kidney function, high blood pressure, nervous system and neurobehavioral affects, and cognitive dysfunction later in life, and exposures between 20mg/dL and 40 mg/dL can cause adverse effects on sperm/semen quality and conception, and are associated with deficits in visuomotor dexterity and lower reaction times.  According to OSHA, levels above 60 mg/dL can cause coma or death.

### 4.     Lead Poses Significant Threats to the Environment

86.     Lead poses a variety of significant threats when released into the environment. Because lead is often imperceptible to the naked eye, it can pose a risk to humans who

unknowingly come in contact with lead particles deposited in the environment.  Environmental lead can also compete with other metals found in and on plant surfaces potentially inhibiting photosynthesis and plant growth and survival, resulting in a change of plant life and biodiversity. In addition, the presence of lead on soils and plants can allow it to proliferate through the food chain affecting microorganisms and animals that form part of that ecosystem, including, ultimately, humans.  As stated by EPA, "[e]levated lead in the environmental can results in decreased growth and reproduction in plants and animals, and neurological effects in vertebrates."

87.     Lead is an especially dangerous in nature because of the way it is distributed and deposited throughout the environment.  When lead is released into the air, it may travel long distances before settling to the ground, where it usually sticks to soils and particles and can remain for hundreds to thousands of years.  Even worse, lead can move from soil into ground water depending on the type of lead compound and the characteristics of the soil.

88.     The EPA is an independent agency that was formed in 1970 to consolidate the environmental responsibilities of several government agencies under one roof.  Its mission is to protect human health and the environment.  The EPA is responsible for maintaining and enforcing national standards under a number of environmental laws, including those described below.

89.     There have been a number of landmark environmental laws passed by Congress since the formation of the EPA in 1970 that govern the handling or disposal of lead or have prompted the EPA issue regulations governing the handling or disposal of lead, including the Resource Conservation and Recovery Act of 1976 (the "RCRA").  *See* Pub. L. No. 94-580 (1976). The RCRA is the principal federal law governing the disposal of "hazardous waste" in the United States.  It was enacted as an amendment to the Solid Waste Disposal Act of 1965.  Among other things, the RCRA set national standards for the treatment, storage, and disposition of "hazardous

waste," and imposed various reporting requirements for facilities that generate or handle such waste.

90.    Lead is classified as a "hazardous waste" under the RCRA.  Section 1004 of the RCRA defines "hazardous waste" as any solid waste "which, because of its quantity, concentration or physical, chemical, or infectious characteristics may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  42 U.S.C. § 6903(5).  Pursuant to the RCRA, the EPA has promulgated several lists of materials that qualify as such, including a list of materials that are hazardous because they are toxic, also known as toxic waste.  *See* 40 C.F.R. § 261.24.  According to the EPA, toxic wastes are classified as such because they "present a concern as they may be able to leach from waste and pollute groundwater," as confirmed through EPA leaching studies. The EPA's list of toxic waste contaminants contains eight heavy metals known to be highly toxic at small concentrations, commonly referred to as the "RCRA 8," including "lead."  *Id.* tbl. 1.  Other RCRA 8 metals include arsenic and mercury.  In fact, lead has been classified as a toxic waste since the inception of that list in 1980.  *See*  45 Fed. Reg. 33084, 33122 (May 19, 1980).  The EPA has assigned the hazardous wastes on its table of toxic contaminants EPA hazardous waste numbers D004 through D043.  *See* 40 C.F.R. § v261.24 tbl. 1.  Lead is assigned EPA hazardous waste number "D008."  *Id.*

91.    As a toxic waste, lead must be handled and, importantly, disposed of in accordance with the RCRA's strict requirements.  Among other things, EPA regulations prohibit land disposal of toxic waste bearing EPA hazardous waste numbers D004 – D011, including lead (*i.e.*, D008). *See* 40 C.F.R. § 268.34.  The EPA defines "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or

environment or be emitted into the air or discharged into any water."  40 C.F.R. § 260.10.  The EPA has submitted amicus briefing in several appellate cases to make clear that the term "disposal" includes material that are "left to accumulate long after they have served their intended purpose."  In subsequent updates to the definition of the term "solid waste," the EPA referred to these appellate decisions to note that "Congress used the term 'discard' in its ordinary sense, to mean 'disposed of' or 'abandoned.'"  Thus, the abandonment of lead on land after it has served its intended purpose is prohibited by the RCRA.

92.     In 1992, Title X of the Housing and Community Development Act of 1992 added Title IV to the Toxic Substances Control Act of 1976 (the "TSCA").  *See* Pub. L. No. 102-550 (1992) § 1021.  As amended by Title X, Section 403 of the TSCA required the EPA to promulgate regulations that identify what constitutes lead-contaminated soil for purposes of Title X.  Section 401 of the TSCA defines lead-contaminated soil as "bare soil on residential real property that contains lead at or in excess of levels determined to be hazardous to human health."  In January 2001, the EPA promulgated a final rule which established that lead is a hazard to human health when it equals or exceeds 400 parts per million (μg/g) (ppm) in play areas or 1,200 ppm elsewhere.  *See* 66 Fed. Reg. 1206 (2001) (codified at 40 C.F.R. § 745.65(c)).

93.     Other environmental laws provide the EPA with the power to regulate the cleanup of hazardous materials that are released into the environment, including lead.  The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA is the primary federal law governing the cleanup of contaminated sites.  *See* Pub. L. No. 96-510 (1980).  As amended, CERCLA provides the EPA with broad authority to investigate and remediate the release, or threatened release, of hazardous substances into the environment with money collected for that purpose in a "Superfund" program and makes certain classes of parties connected thereto

financially liable for response costs and natural resource damages, known as potentially responsible parties ("PRPs").  Section 101 of CERCLA defines "hazardous substance" to include any material designated as a "hazardous waste" under the RCRA.  Accordingly, the "lead" is expressly subject to CERCLA.  *See* 40 C.F.R. § 302.4 tbl. 302.4.  Once a site is identified, CERCLA authorizes the EPA to either (1) use "Superfund" money to cleanup a site and then file an action to recover its costs once remediation is complete; or (2) issue an administrative order compelling a PRP to cleanup a site on its own.  *See* 42 U.S.C. §§ 9606-07.  However, a CERCLA investigation is extraordinarily prolonged.  It takes, on average, nearly 12 years to complete cleanup at a single site, and, on average, over eight years to issue an administrative order for a PRP to clean up a site on its own.

94.    Several other federal laws give the EPA "emergency powers" to issue orders for abating contaminants that enter ground or surface water, including lead.   For example, Section 1431 of the Safe Drinking Water Act ("SDWA") grants the EPA "emergency powers" to issue orders for abating an imminent and substantial endangerment to public health when (1) a contaminant "is present in or is likely to enter a public water system or an underground source of drinking water" and (2) the appropriate state and local authorities have not acted to protect public health.  Section 504 of the Clean Water Act also grants the EPA "emergency powers" to issue orders for mitigating a discharge of a pollutant into U.S. waters, if warranted, to abate an imminent and substantial endangerment to human health or the welfare of persons.  Lead is specifically identified on the EPA list of toxic pollutants and/or contaminants subject to those laws.  *See* 40 C.F.R. § 141.51 (SDWA), 40 C.F.R. §§ 116.4, 401.15 (Clean Water Act).

95.    As the preceding text shows, lead has been recognized as a harmful environmental contaminant for decades.  Indeed, in late 1991, the Secretary of Health and Human Services, Louis

35

Wade Sullivan, called lead the "***number one environmental threat to the health of children in the United States***."

  **C. Lumen Owns an Extensive Network of Old Copper Telecommunication Cables Are Covered In Thousands of Miles of Decaying Lead**

  96. Despite its professed robust commitments to environmental stewardship, Lumen has long—and largely outside the public's view—owned, operated, and maintained a massive, decaying web of copper telecommunication cables encased with lead, a toxic contaminant that presents significant health and environmental protection risks.

  **1. Origins of Lead in the National Telecommunications Network**

  97. Prior to 1887, there were a number of different types of cable used for telephone wire. In 1887, a conference was held between a number of companies to establish uniform standards. The standard, issued in 1888, called for a pair of 18 gauge copper wires twisted around each other, also known as the "twisted pair cable," covered with at least two layers of oil-soaked cotton, placed in a protective alloy covering consisting of 97% lead and 3% tin. Soon thereafter, strips of waxed paper were introduced as a more effective insulation. By 1891, the lead-covered, paper insulated copper cable was the standard for telephone wire.

  98. The vast majority of the nation's telephone network was built during the first half of the twentieth century by a legally authorized monopoly known as the Bell System. The Bell System was managed by a predecessor to modern-day AT&T and carried out its business through a network of operating companies which provided local telephone services to most of the United States. It also held a near-total monopoly over long-distance calling through its "Long Lines" division. This network of companies was known as the "Bell System" and AT&T, as the head of the monopoly, was commonly referred to as "Ma Bell."

99.     The manufacturing arm of the Bell System, Western Electric, was an early adopter of the paper-insulated lead sheathed copper telephone cable.  It maintained at least six factories across the United States which continuously manufactured this cable-type *en masse* and then loaded them onto wooden spools for distribution to Bell System operating companies on demand.  By 1956, the Bell System was using around 100 million pounds of lead a year, according to internal documents.  As the *WSJ* observed, "[t]hat's heavier than more than 6,660 male African elephants."

100.    Lead continued to be used by Western Electric as a protective sheathing until approximately the 1950s, when it was phased out after a new type of plastic sheathing was developed.  But by that point, the damage had already been done.  Because the Bell System had a near-total monopoly over the telephone industry for the first half of the twentieth century, Western Electric's equipment was used pervasively across the country.  By the 1950s, approximately 90% of all telecommunications wire was sheathed in lead and, thus, foundational to the prolific growth of the telecommunications industry and its wireline network.

101.    Even after lead cables were phased out for plastic sheathing, the expansive network of existing lead cables remained in the network and were maintained by the Bell System, as it previously admitted to the federal government.  On December 29, 1978, AT&T and associated Bell System companies (including Lumen predecessor US WEST) petitioned OSHA to reconsider the OSHA Lead Standard in an proceeding styled, *In the Matter of Promulgation of Final Standard on Occupational Exposure to Lead (29 CFR S 1910.1025).*  The OSHA Petition for Reconsideration acknowledged the continued use of lead sheathed cables in the Bell System:

> Petitioners' use of lead products has been primarily in the form of lead-sheathed cables and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end-to-end.  Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. . . .  The maintenance and on-going removal of these facilities require

37

that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved.

In fact, the Petition emphasized the extent of such lead cables in an effort to overturn the OSHA Lead Standard: "There are millions of poles carrying lead cable [and] some 700,000 manholes in the Bell System many of which house lead cable."  Nevertheless, the Petition assured that, "*[u]ltimately, these cables will be removed and the metals recycled*."  As explained below, the companies within the Bell System (including Lumen predecessor US WEST) did not make good on that promise.  On the contrary, they took affirmative steps to neither remove nor recycle those cables.

102.    Lumen's latest CEO, Defendant Kate Johnson, was plainly aware of this history. According to a LinkedIn post by Johnson, she toured the "telecommunications museum at Lumen's historic 14th Street building in Denver, formerly known as 'Colorado's Bell Palace'" soon after joining the Company, in approximately January or February of 2023.  The post stated that Johnson enjoyed "learning about the leaders and workers who helped shape this great company" and referred expressly to "Alexander Graham Bell" in the next sentence.  CW1 often visited the museum during breaks when working on a job at the Colorado Convention Center, across the street.  CW1 recalls seeing a display at the museum with a timeline that showed the different types of cables used.  CW1 specifically remembered seeing a display with a Harley Davidson pulling old cables down a street.  Johnson has seemingly displayed knowledge of the industry's history.  In a post to her LinkedIn profile in August 2023, Johnson spoke about the "history of telecommunications" and pointed out the progress of moving from "telegraphs to telephones, radios to TVs, semiconductors to satellites, and networks to the internet."

### 2.      Lumen's Acquisition of Lead-Covered Cables

103.    Lumen has had lead-covered cables in its telephone network since the very beginning.  As explained above (¶¶ 38-43), Lumen is comprised of rural telecommunication companies and/or copper line assets that it acquired from other companies over the years.  Several of these companies operated prior to the 1950s and/or owned wireline assets that predated the 1950s when they were acquired by Lumen.

104.    Extensive amounts of lead-sheathed copper telephone cable were redistributed to other companies when the Bell System was broken up by the federal government in 1984.  In response to an antitrust lawsuit brought by the DOJ, AT&T agreed to break up the operating companies within the Bell System that provided local telephone service in the United States into seven independent regional operating companies, often referred to as the "Baby Bells," including Bell Atlantic Corporation ("Bell Atlantic"), NYNEX Corporation ("NYNEX"), and US WEST, effective January 1, 1984, as displayed in the graphic below:



105.    Subsequently, several of the Baby Bells were acquired by other telecommunication companies and/or merged to form other telecommunication companies.  NYNEX was acquired by

39

Bell Atlantic in 1996.  On June 30, 2000, Bell Atlantic merged with another telecommunications company, GTE Corp., to form Verizon.  That same day, US WEST was acquired by Qwest.

106.    Lumen acquired a substantial portion of its nationwide copper wire network from several of these Baby Bells and/or their successors.  As described more fully above (¶¶ 40-41, 44) Lumen acquired (i) Pacific Telecom in 1997, including the telephone lines that it recently purchased from US WEST; (ii) regional copper wire access lines from Verizon in 2002; and (iii) Qwest in 2011, including all the copper wireline assets that it inherited from US WEST.

### 3.    Vast Amounts of Old Lead Cased Cables Remained in Lumen's Legacy Copper Network During the Class Period

107.    To this day, vast amounts of lead remain in Lumen's massive wireline network of old copper telephone cables, which its frontline frequently encountered in the normal course of business.  In fact, the heaviest concentrations of these cables exist older urban areas, where Lumen maintains its central switching offices into which all local lines run, as these were often the parts of the telephone network first built by the Bell System, like those represented in following graphic of Portland (a city where Lumen operates) prepared by Oregon State University:



40

108.    Worse still, many of the lead cables in this part of Lumen's network hang overhead on utility poles without any cover, fully exposed to the elements, as shown in the images below, taken in several of the neighborhoods in the shaded area from the map above of Portland:





This is especially concerning alarming because older metropolitan areas are often densely populated with large numbers of people who maintain business and residences in close proximity to the utility poles that hold telephone lines.

109.    Individuals with first-hand knowledge have confirmed this.  For example, CW2 reported that there were heavy concentrations of lead cables in a number of older metropolitan

areas at the time CW2 negotiated a lead abatement settlement with CenturyLink in late 2013 (¶¶ 147-159).  In connection with these negotiations, CW2 needed survey results from CenturyLink employees who worked with lead in CWA's District 7, which included Alaska, Arizona, Colorado, Iowa, Idaho, Minnesota, Montana, North Dakota, Nebraska, New Mexico, Oregon, South Dakota, Utah, Washington, and Wyoming.  CW2 sent the survey out to CWA local branches, including those in Denver, Minneapolis, Portland, St. Paul, and Seattle.  Before doing so, however, CW2 personally confirmed with the local CWA office in each location that members employed by CenturyLink in each such location worked with lead cables.

110.    Consistent with the above, CenturyLink has privately acknowledged that lead is often found in downtown metropolitan areas.  On or around July 28, 2016, CenturyLink extended a contract that Qwest had with Maricopa County, Arizona, which includes Phoenix, in which endorsed the fact that, "[h]istorically, telecommunications facilities have used lead sheathed cable in downtown core environments" and, as a result, "Contractor [CenturyLink] has developed a replacement process . . . to remove lead sheathed cable" when necessary.

111.    This continued to be the case during the Class Period.  A collection of former employees confirmed that they frequently encountered lead-encased cables prior to and during the Class Period in the areas included within Lumen's wireline footprint, including metropolitan areas:

- CW3 reported that there were "lead cables all over the place" from March 2018 through October 2022.  CW3 explained that photographic evidence was necessary to gain access to the parts of Lumen's network subject to "joint use" and CW3 recalled seeing evidence of lead cables in Colorado Springs, Denver, Las Vegas, Minneapolis, Portland, and Seattle.  In fact, CW3 recalled one photograph of a worker in Colorado Springs in a manhole with so many lead splices on the floor that the worker stood through the manhole cover when standing on top of the pile.  CW3 added that all of these photographs are stored in a Lumen system referred to as JRM.

- CW1 advised that lead cables were "everywhere" in Denver, especially North Denver.  CW1  recalled working with lead cables in "Denver East, Denver North, Denver South, Denver Main, pretty much anything in metro Denver."  Until transitioning into a role

42

working with fiber optic cable 2016, CW1 performed repair work on lead cables in Denver multiple times each year, sometimes for several months at a time. The work was so frequent that CW1 said "I couldn't tell you how many times I worked on lead cables" over the years "but it was a lot." CW1 confirmed that the lead cables were both underground and overhead, on utility poles.

- CW4 encountered lead cables at least "once a week" in Denver and St. Louis, and sometimes more often than that. CW4 said this included both aerial and underground cables. As for the mix, CW4 said there was "quite a bit of lead cable exposed in the air." In fact, CW4 reported that "*there's also lead cable that goes into apartment buildings and businesses and things like that all the time*" in both Denver and Missouri. CW4 added, "in the areas I came into contact with every system, every local exchange had some amount of lead in it."

- CW5 said lead was "all over" the east side of Salt Lake City, meaning east of State Street, adding "it ran all the way up to the Capitol." As CW5 recalled, "9 times out of 10" the lead cable was aerial, on a utility pole.

- CW6 "consistently" encountered lead cable in Lumen's copper network in Michigan before leaving the Company at the end of October 2022. As part of CW6's job, CW6 personally inspected lead cables whenever they were encountered by local technicians to determine appropriate engineering work. CW6 recalled seeing lead cables in at least four separate locations in Michigan, including a manhole system in Newport, Michigan that was "all lead" inside.

- CW7 observed aerial lead cables at job sites visited in the Seattle area "once or twice a week." CW5 also recounted that lead cables are "everywhere in Seattle" and there is even "way more" in Tacoma.

- CW8 came across several active lead cables in Rochester, Minnesota and confirmed that there were many in the area around the "central office" there. CW8 also reported that North Dakota had its "share" of lead cables "because you've got Fargo, Bismark, and Grand Forks, which are older cities with some of that older cable style."

112. That Lumen's "legacy" network contained an extensive amount lead is not subject to debate. As provided more fully below (¶ 232), Defendant Stansbury admitted on August 1, 2023 that "[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but confirmed that it still comprises "5% of our approximately 700,000-mile copper network." In other words, Lumen still owns approximately 35,000 miles of lead cables. To put that into perspective, that is almost enough lead cable to *wrap around the Earth one and a half times*. By comparison, telecommunications behemoth Verizon—which generated almost eight

43

times more revenue than Lumen in 2022—has admitted to only having 8,400 miles of lead in its network.  Furthermore, that figure does not even account for the 371,000 miles of copper cable plant that it sold to Brightspeed in 2022.  Using the same 5% estimate offered by Stansbury, this means that there could be up to *18,550 additional miles of lead* in the copper cable network that Lumen sold to Brightspeed.  And there is every reason to believe that there is:  as Linemen, CW3 and CW6 personally handled lead cables in North Carolina and Michigan, two of the states with ILEC assets included in the sale to Brightspeed.

113.    Accordingly, many of Lumen's frontline workers worked with lead cables in the normal course of business, often without adequate training or protection, including minimum requirements provided in the OSHA Lead Standard:

- CW1 was taught to sand the ends of lead cable sections that were opened for repair before rejoining them with a poly plastic case without *any* training on lead exposure or *any* PPE.  CW1 was "never" told to wear PPE and "never" told "hey, this stuff is dangerous." CW1 recalled that, after sanding lead cables, "[t]here would be millions of silver flakes floating in the air.  It'd be all over your hands.  It smelled like pennies. . . . You could taste it too.  *It was horrible*."  CW1 "always wondered why don't they train us?"

- CW5 explained that those who worked with lead *were never notified they would be working on aerial lead cables* and *did not follow a protocol* when they did.  As CW5 recalled, aerial lead work was "happenstance" and often performed with "bare hands." CW5 was taught to "scuff" the lead cable to make it rough for tape to stick to it, which would release lead dust into the air.  If the wind was blowing, CW5 would "get that in my lungs" otherwise, CW5 confirmed, *the dust would fall to the ground below the cable.*

- Similarly, CW8 was exposed to airborne "lead dust" when using a shave hook and carving brush to "scuff" outer layer of the sheath for adhesives.  CW8 described the debris produced as similar to "regular dust."

- Despite being a role that required working with lead, CW6 *never received any training* on the hazards of doing so.

- CW4 was *never* told that the job on any given day would likely involve lead.  As CW4 put it, working with lead was "luck of the draw."  As such, CW4's truck did not have any "specialized lead handling kits" or specialized PPE beyond "leather gloves" and "safety glasses."  CW4 regularly had fits of coughing while in this position.  In addition,

44

CW4 knew *at least four dozen* other technicians subject to the same working conditions and lead exposure, *or even worse exposure*.

- Like others, CW7 would *never* receive advance notice that there were lead cables at a job site. CW7 recalls having conversations with cable maintenance staff who worked on lead 40 hours per week, at times.

- CW3 was not given any type of PPE when working with underground lead cable. The extent of CW3's PPE was "company polyester pants, shirts, and polo." CW3 was simply told to "use orange wipes" and "don't touch your face."

114. To the extent Lumen provided any training on working with lead, CW3, CW5, and CW4 confirmed that the Company had *no control measures* in place to ensure they were followed and took *no effort* to check if they were. CW3 observed that the Company's approach was "we'll put the safety measures out there" and never speak of it again. This is corroborated by CW5, who said Lumen offered occasional safety training but workers were left to their own devices. Indeed, CW5 confirmed that Lumen never took any action to check whether or not its workers were following any particular protocol. CW4 also confirmed that no one ever "enforced" the guidelines. On the contrary, "if you had to go in and work on that stuff, you didn't have the equipment to do it, there was no one else to call or any sort of protocols to follow to eliminate the potential lead hazard," said CW4.

### 4. Lumen Abandoned Obsolete Lead Cable In Place As a Matter of Standard Practice To Decompose Over Time As It Remained Unused

115. Long before the start of the Class Period, as the use of the internet was spreading, Lumen began to install more advanced copper cable and/or fiber plant to accommodate the increase in demand for such services as it began to displace the use of traditional phone lines. On November 8, 2018, after the Company completed integrating Level 3 and its next-generation products, Lumen's CEO, Defendant Storey, outlined an ambitious strategy to meet the ongoing "digital transformation" among customers going forward, including through "product evolution." Storey explained that this meant that the Company's products "will be more and more fiber-based as

opposed to copper-based." As Defendant Dev stated during a subsequent call on December 4, 2018, the Company "stopped investment in the copper network" because "long-term, we believe, it's the fiber assets that will continue to gain traction." By the end of 2018, Lumen announced that "[w]e no longer report or discuss access lines as a key operating metric given the significant migration in our industry from legacy services to IP-enabled services," including fiber.

116. As "legacy" copper cables—most of which in downtown areas were encased in lead—became increasingly obsolete, it became imperative for Lumen to properly retire those that were no longer being used. It failed to do so, opting instead to simply convert its customers to new fiber technology, while leaving the old copper cables, including those sheathed in lead, in place. Because many of the lead cables no longer served a useful purpose, Lumen ceased to maintain them, allowing them to decompose over time under changing environmental conditions. Many of these abandoned lead cables hang aerially on utility poles in downtown core environments, above densely populated areas frequented by children.

117. For example, CW2 learned from many conversations with CWA members that Lumen's predecessors including CenturyLink abandoned large segments of lead cable in place, instead of removing it. CW2 observed that "lead cables were never replaced or removed, even where the polyurethane cables were put in the same manhole as the lead cables."

118. This was corroborated by a cross section of former frontline workers:

- CW1 regularly came across lead cables abandoned underground in manholes and overhead on utility poles in Denver. In underground locations, CW1 said "they were chopped off close to the wall so you knew they were just abandoned in place" and "we'd just take orange spray paint" to mark them abandoned with an "X." CW1 added "there is still a ton of lead down in those holes." CW1 also confirmed the same practice was used for aerial cables: "We'd put orange spray paint on it for 'Not in Use.'"

- CW4, who commonly came across "abandoned or dead" lead cable in Denver. CW4 recalled seeing "something cut off or stubbed off that was still in a conduit or suspended

from a pole." Even worse, CW4 said "*you could see a little bit of oxidation on the lead; you could tell it was old and breaking down*."

- CW5 reported that "we would abandon aerial cable and buried [cable]—we would abandon both," and added that happened "all the time." CW5 personally cut the cable on many occasions before leaving it. This was done because CW5 received instructions to do so from Lumen's engineering department. CW5 that this was "widespread" in Salt Lake City.

- CW6 recalled seeing "lead cable in the air that wasn't taken down" in Michigan.

- CW7 also specified that "they would abandon but not necessarily always rip out stuff." In fact, CW7 said there were "areas where people would hang fiber right next to the old lead, and it would be abandoned in place" in the air like that. CW7 added "I've seen so much abandoned lead in the aid, you have to have your blinders on not to see it." Indeed, "abandon in place was, to my knowledge, their MO," said CW7. According to CW7, "unless they could sell off the cable for more than it'd be worth to rip it down, they were leaving it in place."

119. Former managers at Lumen unanimously confirmed that the decision to retire in place purely financial. CW3 confirmed that Lumen abandon lead cable in place underground and in the air as a matter of course. CW3 was involved in discussions to retire lead cable subject to interconnection agreements impacted by municipal projects in Colorado, Montana, North Dakota, Oregon, South Dakota, and Washington. CW3 explained that the standard practice for underground lead cables impacted by those projects was "cutting the lead cables at both ends and leaving it in the ground." CW3 also reported that Lumen "always" decided to transfer aerial lead cables from old utility poles to new ones installed next to it even if they were no longer in use. As far as CW3 recalled, the decision to retire unused lead cable in place was "never" about safety and "always specifically a financial discussion." This is consistent with the account of CW9, who confirmed that it was standard practice to abandon lead cables in place at CenturyLink and Lumen during the Class Period. CW9 reported that Lumen had appropriate procedures to remove lead cable but consistently abandoned it in place rather than remove it because it was "cheaper" option. CW11 also confirmed that this was the "understood" practice at Lumen for years. CW11 added,

47

"sure, there's ways to migrate and replace the [lead] cable but it takes a lot of engineering time and hours."  In other words, "it was just cheaper to leave it."

> **D.      Lumen and Its Senior Leaders Have Known for Years That The Lead Cables In Its Vast Network Were Harmful to Employees and the Environment**
>
> **1.      Lumen EHS Leaders Formally Reported the Company's Disposal of Lead to the Government As a Hazardous Waste Under the RCRA**

120.    Lumen and its EHS leadership were aware for years, including throughout the Class Period, that lead was a heavily regulated "hazardous waste" as a result of its reporting obligations under relevant environmental laws.

121.    Subtitle C of the RCRA authorized the EPA to establish controls for the handling of hazardous waste.  The EPA promulgated such rules, now codified at 40 C.F.R. §§ 260-273. Because these rules govern the management of hazardous waste from creation through final disposition, they are often referred to as the EPA's "cradle to grave" rules.  Among other things, the EPA's cradle to grave rules require that any facility which handles hazardous waste must first obtain a permit from the EPA before it may do so and subjects such facilities to various record-keeping and reporting requirements.  *See* 40 C.F.R. §§ 262.18(d), 262.40-44,  264.70-77, 270.

122.    To secure a hazardous waste permit from the EPA, the owner of a facility must submit an application to the EPA containing the information set forth in 40 C.F.R. § 270.13 and applicable parts of 40 C.F.R. §§ 270.14-270.29.  *See* 40 C.F.R. §§ 270.1(b), 270.10(d).   The application is divided into Part A and part B.  *Id.*  Part A consists of the information called for by 40 C.F.R. § 270.13 and is submitted on EPA Form 8700-23, which includes a RCRA Subtitle C Site Identification Form as well as a Hazardous Waste Permit Part A Form.   Part B of the application contains the information called for by 40 C.F.R. §§ 270.14 - 270.29 and is submitted in narrative form.  Among other things, the RCRA Subtitle C Site Identification Form requires that the applicant (i) list the EPA hazardous waste code of every regulated waste handled at the site

48

(*e.g.*, D001, D002, etc.); (ii) provide a site contact for the facility; and (iii) certify that the information contained therein is true, accurate, and complete, based on a system designed to assure that qualified personnel properly gather and evaluate all such information.  Similarly, the Hazardous Waste Part A Form requires the applicant to provide a permit contact and specify by EPA hazardous waste number all forms of regulated waste handled at the site.  The narrative for Part B is often lengthy and generally includes a description of numerous topics, including how the facility will be operated to be protective of public health and the environment and how potential emergencies and/or spills will be addressed.  Notably, a formal modification must be requested to introduce a new hazardous waste at an existing facility.  *See* 40 C.F.R. § 270.42.

123.    Permitted facilities must also furnish various reports to the EPA on a periodic basis. Among other things, such facilities are required to "re-notify" the EPA regarding their activity status by filing an updated RCRA Subtitle C Site Identification Form on a two to four year cycle and/or a biennial report on Form 8700-13.  *See* 40 C.F.R. §§ 262.18(d), 262.41, 264.75.  The RCRA Subtitle C Site Identification Form requires all of the information set forth in the preceding paragraph.  The biennial report on Form 8700-13 is otherwise known as a Hazardous Waste Report, and requires even more detailed information about the regulated waste managed at the facility, including, much like the RCRA Subtitle C Site Identification Form, the EPA hazardous waste number for all forms of regulated waste handled at the site during the reporting cycle.

124.    The EPA advises permitted facility owners in the instructions accompanying the RCRA Subtitle C Site Identification Form and the Hazardous Waste Report that it "enters information submitted by respondents into RCRAInfo, the EPA national database."  According to RCRAInfo, Lumen and/or its consolidated subsidiaries operated at least 250 facilities that handled hazardous waste, including approximately 85 of which were listed as "active" as of December 27,

2023.  From 2010 through the present, at least 3 of these facilities reported that one of the regulated wastes handled at the site was "Lead," using the EPA-specific hazardous waste number "D008," as specified more fully in the table below:

| EPA Site ID | Site Name | Location | City | State | Zip | Contact |
|---|---|---|---|---|---|---|
| MT0000061473 | Qwest Communications Butte | 1301 Dakota St. | Butte | MT | 59701 | Fritz Mehr |
| SDR000213116 | Qwest - Sioux Falls Co | 125 South Dakota Ave. | Sioux Falls | SD | 57104 | Gerard Breen |
| WAT540012739 | Qwest E Central Pike St Office | 1708 E. Pike St. | Seattle | WA | 98122 | Joe Robertson |

125.  Thus, Lumen and/or its consolidated subsidiaries filed a permit application for each of the facilities in the table above to handle lead and continued to re-notify the EPA or otherwise disclose in a biennial report that the facility continued to handle such material from 2010 through the present.  Indeed, the last report submitted for the site in Seattle, Washington was submitted on or around February 3, 2020, *during the middle of the Class Period*.  The regulatory contact for that facility was Joe Robertson, the same employee from the Company's EHS department that participated in the Oregon OSHA PEL advisory committee for proposed changes to its lead exposure regulations in 2017 and 2023, as detailed more fully above (¶¶ 169, 172).  According to RCRAInfo, the "Owner" of this site is "Qwest Corp," one of Lumen's many subsidiaries.

### 2. Lumen's Internal Documents Recognized That Lead Sheathing Is a Hazardous Material Subject to the RCRA

126.  Lumen has long recognized in internal documents that lead, including the lead sheathing on its old copper cables, is a hazardous material subject to the RCRA.  For example, Technical Publication 77368, issued in June 2017, advises that "[h]azardous materials are those materials that are potentially hazardous to human health and the environment," and the "handling, packaging, storage, transportation and disposal of these materials are governed and regulated by various federal, state and local laws," including, among others, "the Resource Conservation and

50

Recovery Act (RCRA)."  Consistent with the RCRA (¶ 121), Technical Publication 77368 further notes that "CenturyLink is responsible for hazardous materials from cradle to grave."  The same section of that document then expressly states that "hazardous material" include "Cable and Sleeves containing Lead (Pb)."   Nearly identical statements are also included in Technical Publication 77339, issued in January 2010.  Likewise, Chapter 12 of Technical Publication 77350, governing the handling of "Hazardous Materials" in Central Office wreckouts and installs, contains a table that expressly identifies "LEAD Cable Sleeves" as one type of "Hazardous Material" that may be present.  All of the foregoing documents were in effect through at least September 2023.

127.     Similarly, policies prepared by Lumen for commercial partners also recognize that lead is a hazardous substance subject to regulation under federal law.  For example, Exhibit SH for Suppliers (Safety and Health Requirements) includes a section with the requirements that all suppliers must follow for "Hazardous Materials."  That section defines "Hazardous Materials" as "any hazardous, radioactive, or toxic substance, material or waste, defined or regulated as such under any environmental, health or safety law," including regulations promulgated by the "Environmental Production Agency."  The same section includes a Notice which expressly warns that "asbestos containing materials, lead and polyichlorinated biphenyl (PCB) have been found in some CenturyLink facilities and equipment," according to "past surveys" conducted by Lumen, and requires all suppliers to stop work any notify Lumen if "Supplier encounters on the site material reasonably believed to be asbestos, lead, or PCB, or other potentially dangerous substance."  This document was also in effect throughout the Class Period.

**3. EHS Insiders Openly Discussed the Dangers Associated with Decaying Lead Cables at Industry Meetings Attended by Senior Lumen Officials**

128. The Environmental, Health & Safety Communications Panel ("EHSCP") is a consortium of communications environmental, health, and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry. Formerly the National Telecommunications Safety Panel, the group traditionally served as the primary forum for safety professionals in the telecommunications to openly discuss current topics. As of 2011, its "member companies" included Alcatel-Lucent, AT&T, CenturyLink, Ericsson, Cincinnati Bell, NextG Networks, Sprint Nextel, T-Mobile, Verizon, Verizon Wireless, and Windstream Communications.

129. The organization's purpose has always been "to encourage consistent and coordinated safety policies throughout the telecommunications industry, and to present a unified voice for the industry in response to government regulatory actions." Lumen itself has said that the EHSCP is a forum where "Environmental Health & Safety (EHS) professionals across the industry share best practices, monitor emerging issues, and engage with policy makers directly by commenting on and providing recommendations related to various proposed regulations."

130. The EHSCP is a private group generally closed to the public. Only companies that operate in the communications industry are eligible to apply and must be accepted by a two-thirds vote of the membership. Once accepted as a member, employees of the "member company" may register to gain access to EHSCP's exclusive members-only content, including an exclusive members-only newsletter and access to materials presented at past and upcoming ICS conferences.

131. CenturyLink and later Lumen have been deeply involved in the EHSCP. As explained below, its employees have led the group, served on its leadership council, sat on subject

52

matter-specific committees, and attended its annual ICS events every year since CenturyLink's formation in 2010, and the Company itself has hosted several ICS conferences during that time.

132.    From at least 2010 through the present, Grif Bond, Senior Manager of EHS at CenturyLink and then Lumen, has been a member of the head EHSCP leadership council.  In fact, he served as Chairperson for the EHSCP's leadership council from 2011 to 2013.  In addition, Bob Gurdikian, the Company's Regional EHS Manager, has been a member of this panel since 2019.

133.    To carry out its mission, the EHSCP has organized several subject matter committees to keep members updated on current events and coordinate advocacy activity in their respective area, including the (i) Environmental Committee; (ii) Industrial Hygiene Committee; and (iii) Occupational Safety Committee.  The EHSCP formed the Industrial Hygiene Committee in early 2011.  It was established "to provide a forum among [EHSCP] member companies to identify industrial hygiene concerns and issues in the communications Industry, and assist member companies in addressing those concerns through shared experience and knowledge."  The Committee meets approximately every four months, or at least four times per year.  Among other subjects, one of the "proposed committee topics" from the outset of the Committee's formation was "Lead Safety – (cable & battery straps)."

134.    Senior Lumen EHS Since at least 2014, the Company has been represented on the Committee by Bob Harding, its Manager of EHS Field Operations.  He remained in that role throughout the Class Period, during which he reported to Global Head of EHS, Mike Beekman, who came to the Company from Level 3.  By 2019, the Committee included members from AT&T, Verizon, Frontier, Comcast and Bell Canada, among others.  Senior Lumen EHS professionals participated on other EHSCP Committees as well.  For example, Grif Bond and Mike Beekman have both continuously served on the Occupational Safety Committee since its formation in 2012.

53

In addition, a rotating group of specialists from the Company's EHS group participated as members of the Environmental Committee every year since 2010, including Ed Clement, EHS Manager from 2006 through the present, Robin Seguin, Lead for Sustainability and Compliance from May 2006 to April 2022, Stephanie Miller, EHS Manager from August 2012 through the present, and Bob Gurdikian.

135.    In addition to committee activity, the EHSCP hosts a well-known, three-day annual conference known as the International Communications Symposium ("ICS"), which has historically included presentations by nationally known safety experts from industry, academia, and government along with opportunities for member companies to present details from relevant safety programs at their business.  In fact, Lumen hosted several of the EHSCP's annual ICS events since 2010.  For example, the annual meeting in 2010, from September 14, 2010 to September 16, 2010, was hosted by Lumen predecessor company Qwest Communications at its headquarters in Denver, Colorado.  Similarly, CenturyLink hosted the 2014 conference that took place September 9, 2014 to September 11, 2014, in Raleigh, North Carolina.  As the host, the Company appointed representatives to the Annual Symposium Host Committee, which is responsible for arranging the venue, special events, and related logistics.  For the 2014 conference, the Annual Symposium Host Committee was chaired by Grif Bond and included CenturyLink EHS leaders Jennifer Scarpino and Bob Harding as well as Gerard Breen, Senior Regional EHS Manager since April 2011, David Burk, Regional EHS Manager from June 2012 until the sale of Brightspeed to Apollo in October 2022, and Brett Holz, EHS Engineer since January 2012.

136.    EHS employees from the Company regularly attended the annual ICS conference. Among others, Grif Bond personally attended and either presented or moderated at the ICS

conferences held in 2010, 2013, 2015, 2018, and 2019.  In fact, Bond served on the "Program Committee" for the 2019 ICS event, which helps develop the program agenda for the event.

137.    As far back as 2010, influential EHSCP Committee members were sounding alarm bells about dangers posed by the lead sheathing used on cables in nation's telecommunications infrastructure.  At the 2010 ICS hosted by Qwest Communications in Denver, Colorado, John Malone, Senior Manager of EHS at AT&T, gave a presentation titled "Lead Exposure in Outside Plant Operations" in which he discussed the EHS concerns raised by continued use and/or abandonment of such cables.  One of the slides cautioned that "[s]ome older metropolitan areas may still have over 50% lead cable."  The presentation explained that a variety of lead-based compounds can "leach" to the surface of the sheathing over time and become "airborne," posing a risk to employees working on the cable and the surrounding environment.  Indeed, one slide emphasized that "*soils retained between 83 and 98 percent of the released lead within 2 inches*" from such cables.  According to the *WSJ*, Malone "worked for AT&T for more than two decades and is considered an industry lead expert."

138.    Three years later, at the 2013 ICS held between September 10, 2023 and September 12, 2023, Joe Malone provided a detailed, 48-page presentation dedicated to the topic of "Managing Lead Exposure During Cable Removal Operations."  The presentation explained that "[w]hen lead-sheathed cable is removed, abrasion can cause surface lead compounds to rub off, and some become airborne," and displayed exactly how those particles can enter a worker's body:

55



A presenter's note accompanying this slide provides that "***airborne particles are easily inhaled by any worker in the vicinity of the point of generation***."  Even worse, Malone confessed to his peers that ***workers were being exposed to lead in amounts that exceeded the OSHA standards***:



Malone observed that the "OSHA standard is designed around lead abatement jobs," not those where workers who regularly work on non-hazardous materials occasionally encounter lead-based objects, and therefore suggested posting prominent signs around the job site with a POISON warning:



Malone also suggested that, when reclaiming lead cables from underground sources, workers should "install plastic sheeting to prevent lead particles from settling onto the ground" around the manhole or entry point.  Finally, Malone emphasized that any amount of lead should be treated as "Hazardous Waste," a term of art under environmental laws, for purposes of disposing it.

139.    The EHSCP continued to regularly speak about lead exposure and environmental risks in Committee meetings and ICS conferences through early 2020, when attention shifted to working in a world with COVID-19 as the pandemic spread across the globe.  For example, at the 2015 ICS conference, held from September 22, 2015 to September 24, 2015, the Industrial Hygiene Committee—which included CenturyLink EHS leader Bob Harding—provided an update on its work year to date.  One of the slides prepared for the presentation identified "lead sheathed cable" as an accomplishment and stated that "***management of lead-sheathed cable . . . is an issue for most member companies***" and Committee members were attempting to "share best practices":



In fact, Tom Wangerin, a renowned environmental consultant and then Director of the Asbestos and Lead Program at University of California at Berkley, led a breakout session during the second day of the 2015 ICS on the topic of "Lead & Asbestos Regulations." Similarly, during the 2018 ICS, John Malone led a breakout session called "Lead in the Communication Industry." As explained more fully below (¶¶ 161-164, 166-167, 170-171), lead exposure and regulation was also discussed by EHSCP Committees and/or at the ICS conference in 2014, 2016, 2019, and 2020.

### 4.    Lumen Officials Opposed New EPA Regulations That Would Create Additional Burdens For Owners of Lead-Sheathed Cables

140.    Because hazardous waste is considered a form of solid waste under the RCRA (¶ 90), materials that do not qualify as "solid waste" are not subject to regulation under Subtitle C of the RCRA. The RCRA defines solid waste as any "discarded material . . . resulting from industrial, commercial, mining, and agricultural operations." *Id.* § 6903(27).

141.    Historically, the EPA interpreted the term "solid waste" to include hazardous waste that will be recycled. On May 19, 1980, the EPA promulgated an interim definition for solid waste that established criteria for the term irrespective of whether the material is destined for recycling. *See* 45 Fed. Reg. 33084 (1980). On January 4, 1985, the EPA overhauled its definition of solid waste to provide that hazardous waste which will ultimately be recycled, also referred to as

58

"hazardous secondary material," is considered solid waste unless it satisfies a handful of limited exceptions or exclusions. *See* 50 Fed. Reg. 614 (1985). In 1997, the EPA amended its solid waste rule to add an exclusion for certain forms of "scrap metal" that are recycled, codified in 40 C.F.R. § 261.4(a)(13). *See* 62 Fed. Reg. 25998 (1997).

142.    In response to a series of legal challenges raised in response to the EPA's broad definition of "solid waste," on October 30, 2008, the EPA revised its definition of that term to exclude certain hazardous secondary materials reclaimed for recycling (the "2008 DSW Rule"), including hazardous secondary material recycled under the control of the generator (the so-called generator-controlled recycling exclusion), and hazardous secondary material transferred to a third party for recycling (the so-called transfer-based recycling exclusion). *See* 73 Fed. Reg. 64667 (2008). The rule was scheduled to become effective on December 29, 2008. *Id.*

143.    On or around January 29, 2009, the Sierra Club submitted an administrative petition requesting that the EPA repeal the 2008 DSW Rule on grounds that, among other things, hazardous waste recycling causes substantial harm to human health and the environment. On September 7, 2010, the EPA entered into a settlement agreement with Sierra Club pursuant to which the Sierra Club agreed to withdraw its administrative petition and the EPA agreed to prepare a new rule that would address the issues raised in the Sierra Club's petition.

144.    As a result, on July 22, 2011, the EPA published a notice which proposed a variety of changes to the 2008 DSW Rule (the "2011 DSW Proposal"). *See* 76 Fed. Reg. 44094 (2011). Among other things, the 2011 DSW Proposal outlined potential revisions to the generator-controlled recycling exclusion from the EPA's definition of solid waste, and requested public comment on additional revisions under consideration that would codify enhanced recordkeeping and notification requirements for the preexisting exclusions, including the exclusion for the forms

59

of scrap metal covered in 40 C.F.R. § 261.4(a)(13), adopted in 1997.  *Id.*  By subsequent notice, the EPA extended the comment period to October 20, 2011.  *See* 76 Fed. Reg. 53376 (2011).

145.    On October 20, 2011, Grif Bond, who was then serving as the Chair of the EHSCP, submitted a comment letter on behalf of the EHSCP in response to the 2011 DSW Proposal which evidenced his knowledge of lead-sheathed telecommunication cables and their status as a RCRA regulated waste when not recycled.  The letter acknowledged that the 2011 DSW Proposal outlined potential revisions to the EPA's solid waste rules under the RCRA, including the exclusions contained therein.  In a section of the letter bearing the heading "Impacts to generators of recyclable materials covered by existing exclusions and exemptions," Bond explained that "[t]he proposed rule would apply to several types of recyclable materials that are ***commonly generated by EHSCP member companies***," including "lead-acid batteries" and "***lead-sheathed telecommunications cable***."  He then explained that the EHSCP opposed the new administrative requirements because of the potential burdens they would impose on member companies like CenturyLink who maintained lead-sheathed cables in their network:

> ***An even greater challenge would be posed by regulating lead-sheathed telecommunication cable.  Such cable is removed from the ground, for example, when a road-widening project requires a buried cable to be moved, in which case it is replaced with new cable.  The removed cable typically is brought back to a company or contractor facility, from which a contracted hauler transports it to a metal reclamation facility.***  Regulating such activity could turn every roadside into a regulated generating site, creating enormous registration and paperwork burdens for no environmental benefit.

> ***We suspect that there are other businesses with comparable situations.***  We are concerned both with the administrative burden to us and with the impact of applying paperwork requirements to numerous small businesses that may not have the resources available to comply and may thus be encouraged toward less environmentally sound management options.

The letter was signed by Grif Bond as "Chair" of the EHSCP as well as "Manager Environmental, Health & Safety" at CenturyLink.

146.    Shortly after EHSCP filed the letter described above on October 20, 2011, AT&T and Verizon both prominent member companies of the EHSCP, each submitted a letter in response to the 2011 DSW Proposal which incorporated by reference the concerns and recommendations expressed in the letter submitted by Grif Bond on behalf of EHSCP earlier that day.   Both letters attached a copy of the October 20, 2011 letter from Grif Bond.   Such a close level of coordination would be unlikely unless the EHSCP letter was shared with AT&T and Verizon before it was filed.

**5.      Lumen Agreed to a Nationwide Lead Abatement Program to Settle Ten "Serious" OSHA Violations Arising from Lead Cable Exposure**

147.    The CWA is the largest communications and media labor union in the United States, representing approximately 700,000 members in both the public and private sectors across 1,200 chartered CWA local unions.   The CWA was founded in 1938 as a union for telephone workers but has since grown to cover workers in telecommunications, information, news media, airlines, broadcast, and other industries.   Major employers of union workers include AT&T, Verizon, General Electric, the New York Times, and NBC and ABC television networks.   Before Lumen sold part of its ILEC network to Brightspeed in 2022, the CWA represented approximately 7,163 employees of Lumen and its subsidiaries, including cable splicers, technicians, and linemen. CWA has stated that it has "been at the forefront of advocating for workplace lead protections in telecommunications for decades, demonstrating a longstanding commitment to the safety and well-being of telecom workers."

148.    In late 2012, a legacy Qwest cable worker and member of CWA Local 7201 employed as a technician by CenturyLink began feeling physical discomfort following work in a manhole with a lead-covered telecommunications cable in St. Paul, Minnesota.   According to CW2, this worker visited a doctor with his two children, and, after informing the doctor that his

occupation involved working with lead, the doctor took blood samples from all three individuals. CW2 confirmed that all three showed elevated BLLs.

149.    The worker contacted CW2 after learning that his children were being exposed to lead that he brought home on his work clothes from his job with CenturyLink.  CW2 spoke with the worker and other CenturyLink workers in the surrounding area to vet the details about their standard work environment.  CW2 confirmed that CenturyLink did not perform air monitoring as required by the OSHA Lead Standard.  CW2 contacted a senior manager in the EHS group at CenturyLink, who was unwilling at that time to adhere to the OSHA Lead Standard.  The CenturyLink EHS leader took the position with CW2 that the worker's lead exposure "might be related to the workplace, but it might be related to other things as well, like non-work exposures."

150.    Because CenturyLink was unwilling to conform to the OSHA Lead Standard on its own, CW2 helped prepare a complaint for the worker that was filed with OSHA and referred to the Minnesota Occupational Safety and Health Administration ("MNOSHA"), which operates an OSHA-approved State Plan for Minnesota.  Like many other State Plans, MNOSHA has adopted federal OSHA rules from the Code of Federal Regulations, including the OSHA Lead Standard. *See* Minn. R. 5205.0010.

151.    From approximately February 6, 2013 to June 26, 2013, MNOSHA conducted a comprehensive investigation into the work conditions and practices at the Company's underground vaults and manholes, including the manhole that contained the lead-covered cable referenced in the preceding paragraph.  Among other things, MNOSHA interviewed the ill employee and conducted site visits at several locations, including a site visit on April 26, 2013, to observe work conditions and practices while employees performed utility hole work in a manhole containing a lead-covered cable.  During the April 26, 2013 field inspection, employees wore regular work

62

clothes without requisite PPE, failed to use a lead entrapment compound, performed work on the lead cable with a pneumatic hammer and power tools, and wore their work clothing home after finishing their work on the lead cable.  Even worse, OSHA performed air quality sampling while the employee performed work on the lead cable which confirmed that there was a concentration of airborne lead over an eight-hour period of 76 $\mu g/m^3$, in excess of the maximum PEL of $\mu g/m^3$ set forth in the OSHA Lead Standard, and well above the level OSHA now considers to be lethal.

152.    MNOSHA held a "closing conference" with CenturyLink and/or its representatives at the end of its investigation on or around June 26, 2013.  Under MNOSHA rules, MNOSHA will hold a closing conference with the employer at the end of the investigation during which the investigator will describe the apparent safety and health violations revealed by the investigation. *See* Minn. R. 5210.0470(5).  During this closing conference, the employer has the opportunity to provide the investigator with pertinent information regarding workplace conditions.  *Id.*

153.    On July 9, 2013, MNOSHA issued a nine item citation to CenturyLink for 10 distinct violations of the OSHA Lead Standard, each of which was classified as "serious," pursuant to which CenturyLink was required to abate (*i.e.*, correct) each violation by August 6, 2013, and pay penalties totaling $21,600.  Specific violations addressed in the citation included:

- Exposure to lead above the OSHA PEL of 50 $\mu g/m^3$ over an eight-hour period (29 C.F.R. § 1910.1025(c)).

- Failure to perform air monitoring for lead concentrations before the assigned manhole work was performed (29 C.F.R. § 1910.1025(d)(2)).

- Failure to implement necessary engineering controls, work practices, and respiratory controls to reduce lead exposure below the OSHA permissible exposure level (29 C.F.R. § 1910.1025(e)(2)(ii)).

- Failure to implement a written respiratory protection program as required by the OSHA Respirator Standard (29 C.F.R. § 1910.1025(f)(2)(i)).

63

- Failure to provide affected workers with the required and appropriate protective work clothing and equipment while performing work on lead sleeves (29 C.F.R. § 1910.1025(g)(1)).

- Failure to provide for the cleaning and laundering of work clothing (29 C.F.R. § 1910.1025(g)(2)(ii)).

- Failure to inform persons who were laundering lead-contaminated clothing of the potentially harmful effects of lead (29 C.F.R. § 1910.1025(g)(2)(vi)).

- Failure to provide clean change rooms after exposure to lead in excess of the OSHA Lead Standard (29 C.F.R. § 1910.1025(i)(2)(i)).

- Failure to require the affected worker to shower at the end of the work shift after being exposed to lead in excess of the permissible exposure level (29 C.F.R. § 1910.1025(i)(3)(i)).

- Failure to provide an adequate lead training program as required by the OSHA Lead Standard (29 C.F.R. § 1910.1025(l)(1)(i)).

Under MNOSHA rules, the employer must post a copy of each citation at or near the place a violation occurred for 20 days or until the violation is corrected, whichever is longer.  *See* Minn. R. 5210.0530(3)-(4).

154.    Despite the overwhelming amount of evidence collected by MNOSHA, on or around July 26, 2013, CenturyLink filed a notice formally contesting each item in the citation rather than agreeing to abate the violations.  Under MNOSHA rules, union representatives are afforded the right to object to the terms of any proposed agreement settling a citation and, as such, the notice of contest must be served on the authorized union representative, in this case the CWA. *See* Minn. R. 5210.0536(1)(B), 5210.0596(3).

155.    On September 10, 2013, MNOSHA held a call to discuss a potential settlement of the citations against CenturyLink attended by representatives from CWA and representatives from CenturyLink's EHS and legal departments.  Following a two hour meeting, CenturyLink and CWA agreed to the terms of a settlement proposed by MNOSHA (the "MNOSHA Settlement").

156.    Among other things, the MNOSHA Settlement required CenturyLink to administer a lead abatement program which would bring it into compliance with the OSHA Lead Standard. The lead abatement program required by the MNOSHA Settlement Agreement expressly focuses on "Lead Sheath Cable Cleaning, Preparation for Splicing and Removal" and includes provisions that address, among other things, notification and training, coverage of safe and healthful work practices and procedures, provision of appropriate PPE, medical surveillance, and personal hygiene.  By its terms, the MNOSHA Settlement became effective November 18, 2013.

157.    At or around this time, CW2 informed CenturyLink that CWA was interested in expanding the MNOSHA Settlement to the entirety of CWA District 7, which includes Alaska, Arizona, Colorado, Iowa, Idaho, Minnesota, Montana, North Dakota, Nebraska, New Mexico, Oregon, South Dakota, Utah, Washington, and Wyoming.  CW2's counterpart in CenturyLink's EHS group told CW2 that "as far as we're concerned this case is limited to St. Paul and that one worker in that one manhole."

158.    Undeterred, CW2 developed a survey with informal input from contacts in OSHA and NIOSH to gather empirical evidence from local CWA branches throughout District 7 on compliance with the OSHA Lead Standard.  CW2 sent the survey out to local CWA branches in Minneapolis, St. Paul, Portland, Seattle, and Denver, among other locations.  CW2 informed the EHS contact at CenturyLink that CWA was finding "a lot of violations of the OSHA lead standard, in particular the personal protective equipment, wash facilities and areas where there could be disposable clothing."  According to CW2, the Company was "very displeased" when it learned about this.  In response, CW2 said:  "Lead kills. I'm not just concerned about the workers; I'm concerned about their kids."  CW2 also informed the Company that CWA planned to file a

65

complaint with OSHA in every local branch where there were violations of the OSHA Lead Standard by CenturyLink.

159.    CenturyLink subsequently agreed to expand the scope of the lead abatement program set forth in the MNOSHA Settlement Agreement.  In October 2013, CenturyLink and CWA Local 7201 entered into a separate agreement to implement the lead abatement program established by the MNOSHA Settlement Agreement across the entirety of CWA District 7, which includes Alaska, Arizona, Colorado, Iowa, Idaho, Minnesota, Montana, North Dakota, Nebraska, New Mexico, Oregon, South Dakota, Utah, Washington, and Wyoming.  Between October 2013 and November 2013, CWA's central Occupational Safety and Health Department and CenturyLink further agreed to expand the lead abatement program to cover ***all affected CenturyLink employees nationwide***.

160.    On November 21, 2013, the CWA's central office sent an "urgent" notice to CWA leadership across the country about the events giving rise to the MNOSHA Settlement.  In this notice, Louis J. Grimes-Patow, Administrative Director of the CWA, highlighted that "***CenturyLink understood the seriousness of this issue*** . . . and that is why they chose to not only enter the agreement but to expand it."

161.    The events leading to the MNOSHA Settlement were discussed extensively by high-ranking members of Lumen's EHS group in the months that followed.  On January 23, 2014, a joint meeting was held between CWA personnel and high-ranking members of the Company's EHS department, including Grif Bond and then-head of the EHS group, Jennifer Scarpino, during which the CWA stated that the practices observed by OSHA were "status quo" in many areas in CWA District 7 and it was not clear to field personnel that disposable PPE was available and to be used in jobs involving lead.  At a subsequent meeting by the same group on June 3, 2014, Jennifer

66

Scarpino advised that air sampling was performed in New Mexico and North Carolina in connection with the EHS group's response to the lead sheathed cable issue.

162.    Further demonstrating the widespread knowledge of these events within the Company, at the EHSCP's 2014 annual ICS conference hosted by CenturyLink from September 9, 2014, to September, 11, 2014, less than a year after entering into the MNOSHA Settlement, senior EHS leaders gave a detailed presentation on the OSHA investigation with the title "Working with Lead."  The presentation was delivered by Jennifer Scarpino and EHSCP Industrial Hygiene Committee member and EHS department regional manager, Bob Harding, and featured the following cover page:



163.    In their "Working with Lead" ICS presentation, Scarpino and Harding summarized relevant provisions of the OSHA Lead Standard, including those set forth in ¶¶ 82-83.  In addition, Scarpino and Harding acknowledged that an employee "had elevated levels of lead" in a slide that referred to the events precipitating the OSHA investigation as "CenturyLink Lead Issue":



Subsequent slides reviewed the MNOSHA citation received by the Company, and included what appeared to be excerpts from the citation itself:



164.   Thus, senior leaders in the Company's EHS department, including Jennifer Scarpino, Grif Bond, and Bob Harding, knew by no later than September 2014 that the lead on the cables in the Company's legacy wireline network not only posed a significant threat to the well-being of employees but that it had, in fact, harmed them.

**6.    Lumen Officials Monitored and Opposed Proposed Changes to OSHA Regulations That Would Impose Tighter Lead Exposure Restrictions**

165.    As explained above (¶ 84), in recent years, several states have initiated proceedings to considered changing their OSHA-approved State Plan to adopt lead exposure standards more restrictive than those set forth in the OSHA Lead Standard based on a growing body of scientific evidence that exposure to lead at levels below 50 μg/m$^3$ has the potential for significant harm, including California, Michigan, Oregon, and Washington.  Lumen officials and/or EHSCP Committees on which Lumen officials sat actively monitored these regulatory changes and, in certain instances, directly participated in the rulemaking process.

166.    For example, the EHSCP's 2015 ICS, held in Universal City, California from September 22, 2015, to September 24, 2015, which was attended by Lumen EHS leader Grif Bond, included a presentation by Mike Manieri, Principal Safety Engineer for the Cal/OSHA standards board, entitled "Updates on California Standards."  As noted above, (¶ 84), Cal-OSHA initiated proceedings to consider changes its standard for workplace lead exposure in 2010, which remained pending as of September 22, 2015.  One media article covering the 2015 ICS described it as a "series of high-profile sessions focused on key industry safety and health topics . . .attended by stakeholders representing prominent companies from throughout the wireless ecosystem."

167.    Similarly, EHSCP's 2016 ICS, held from September 13, 2016 to September 15, 2016, featured a panel discussion on the "Washington State Standard."  Washington DOSH began holding meetings with stakeholders on potential changes to the lead standard set forth in its OSHA-approved State Plan in October 2015 and formally initiated the rulemaking process in 2016.

168.    In fact, Lumen EHS officials directly participated in such proceedings by Washington DOSH.  On June 29, 2017, Washington DOSH released an initial draft of an updated lead exposure rule and sought feedback from stakeholders on the initial draft.  On August 9, 2017,

69

an unnamed representative from CenturyLink participated in a stakeholder meeting on August 9, 2017, to discuss the initial draft of the lead exposure rule published on June 29, 2017.  Then, on August 23, 2017, Bob Harding—the same Bob Harding that made the "Working With Lead" presentation at the 2014 ICS—sent a letter to Washington DOSH on behalf of CenturyLink in which he stated that "*CenturyLink has reviewed the proposed lead rule being pursued by Washington DOSH*" and "[a]s written, *CenturyLink is not in favor of this rule* and feels that the implementation in the current format will be burdensome for the telecommunications industry." In the letter, Harding stated that "[l]owering the PEL will trigger additional air sampling while providing a limited benefit and limited worker protection."  Harding also urged Washington DOSH to "give consideration of a de Minimis [sic] level for lead work."  He explained that "*[o]ur technicians who perform work on lead casings do it infrequently*" and "[a] de Minimis [sic] level would allow CenturyLink to except certain individuals from the regulations *based upon the work they would be expected to perform*."

169.    Lumen EHS professionals also participated in the parallel proceedings to consider similar changes to the lead standard in Oregon.  In mid-2017, Oregon OSHA convened a lead PEL advisory committee to consider the changes to the lead exposure standard being evaluated by Washington DOSH.  Joe Robertson, Senior Regional EHS Manager for Washington and Oregon in Lumen's EHS department, was present for the second meeting of this lead PEL advisory committee, held on September 21, 2017, in Wilsonville, Oregon.  Among other things, the group discussed a leading study by Michael J. Kosnett *et al.* which indicated that medical removal from lead work may be appropriate when an employee's BLL exceeds 30 50 µg/dL.  The group also agreed that "often, in the 'average' employer, proper respirator use is rare."  On or around November 8, 2017, Robertson sent an email to Oregon OSHA in which he asked to be added to

70

the distribution list for "the future lead standards discussion."  In the message, Robertson explained that "I was able to attend the meeting in Wilsonville but I found out through someone else that was on your original list" and stated, "I look forward to working with you on the new standards."

170.     By 2019, lead exposure regulation was a hot topic within the EHSCP.  For example, slides presented by the Industrial Hygiene Committee at the 2019 ICS, held September 17, 2019 to September 19, 2019, stated that topics addressed in 2019 by the Committee, which included Lumen EHS official Bob Harding, included "Lead Regulations – California, Oregon, Washington, & Michigan" and further stated that one of the Committee's objectives is to "[p]rovide responses to proposed regulations affecting the industry."  Similarly, an OSHA presentation made at the 2019 ICS, attended by Lumen EHS leader Grif Bond, by a regulatory consultant noted that "CA OSH Standards Board to complete rulemaking for revised lead PEL by 2/1/20" and included a slide summarizing major milestones by CA OSH in connection with its lead PEL rulemaking:

**LEAD**

- Revised drafts available on website from November 2016.
- The Standardized Regulatory Impact Analysis-completed and at Department of Finance for review.
- After approval, staff to revise initial statement of reasons, expected in mid 2019.
- Proposed rule expected in "soon".

In addition, the Occupational Safety Committee, which in 2019 included Grif Bond and the head of Lumen's EHS department, Mike Beekman, presented slides at the 2019 ICS which confirmed that one of the main topics it addressed that year was "Lead Regulations."

171.    EHSCP Committee interest in the proposed changes to lead exposure regulations continued until the onset of the COVID-19 pandemic in 2020.  For example, the Q1 2020 edition of the EHSCP's quarterly newsletter, *The Wire*, said that the Industrial Hygiene Committee was "closely following" the lead PEL rulemaking in California, noting that it "is going to have ***a huge impact on work with lead-sheathed cable in California***."

172.    Lumen's EHS leadership has continued to remain involved in state-level proceedings focused on potential changes to lead exposure regulations well into the Class Period. For example, the rulemaking on potential changes to the lead exposure standards in Oregon were suspended in 2020 to allow for rulemaking on COVID-19 to be completed but restarted in May 2023.  On April 19, 2023, Oregon OSHA sent an email to the previous distribution list for the lead PEL advisory committee in which it indicated that Oregon OSHA was reconvening the stakeholder group to consider changes to the lead exposure standards, and asked all who wished to participate in future meetings to provide relevant contact information.  On April 20, 2023, Joe Robertson sent a message to Oregon OSHA providing his contact information in which he stated "I'm the EHS manager or [sic] Lumen technologies (formerly known as Centurylink)" and "I'd like to be involved in the stakeholder's group for working with lead."

### 7.    The CWA Informed Lumen EHS Leadership That Supervisors Are Violating Its Lead Abatement Safety Policies

173.    The District 7 Regional Mutual Occupational Safety & Health Committee for CenturyLink / Legacy Qwest (CTL / LQ) ("MOSHC") employees is a joint committee between CWA and EHS leadership formed to "evaluate safety concerns in CenturyLink territory" and "maintain a process for identifying and resolving occupational safety and health issues as they arise."  As of 2019, the MOSHC included EHS leaders Grif Bond and Mike Beekman, the Global Head of EHS at the Company.  In fact, Beekman served as co-chair of the MOSHC.

174.     In approximately April to May 2019, several CWA safety activities informed the MOSHC that local CenturyLink / Legacy Qwest local supervisors in *numerous states* within CWA District 7 "advised the techs to go into manholes without proper safety training as long as a tech that has the training is above ground on site," in direct violation of the language added to Series 9.1 of its internal Safety & Health Practices for field workers by Grif Bond in response to the MNOSHA Settlement.  On June 4, 2019, the CWA sent a Safety Alert to all CWA local branches within District 7 in which it outlined the issue and stated "[w]e have discussed this safety issue with Mike Beekman, CTL Director – Global EHS."

**8.     Storey and Dev Authorized the Abandonment of Lead Cables As Lumen Sought to Aggressively Cut Costs as It Invested in Fiber**

175.     As detailed more fully above (¶¶ 46-47, 115), Storey joined Lumen in connection with its $34 billion acquisition of Level 3, and quickly decided to exist the market for copper-based services and, instead, pivot to fiber.  However, by the start of the Class Period, the Company was facing declining revenues from legacy products based on its copper-wire infrastructure and was laser focused on removing costs from that part of the business after acquiring Level 3 for $34 billion and selling investors on a transition to fiber optic technology.  As Defendant Storey explained on November 8, 2018, a key pillar of the Company's "digital transformation" was to "remove cost from the business."   On that same call, Defendant Dev advised that "we do expect significant cost transformation savings in 2019" and indicated the Company would "say more about that on the fourth quarter call" in early 2019.  On the fourth quarter call, held on February 13, 2019, Dev explained that "over the next three years, we expect to achieve $800 million to $1 billion in annualized run rate adjusted EBITDA savings."

176.     During this time, Storey and Dev ordered sweeping cost reduction measures.  CW3 recalled that, as soon as Storey took over as CEO, he shifted the Company's overall strategy from

73

growth through acquisitions to aggressive cost-cutting.  This was echoed by CW11, who reported that while the Company was always trying to find ways to save money the cost cutting got even worse after CenturyLink merged with Level3.

177.    In addition, Defendants Storey and Dev closely examined what to do with its copper assets during the strategic review it performed at the start of the Class Period, which ultimately led to the decision to manage it for cash as business slowly wound down.  For example, on November 2, 2022, Storey explained on his final conference call before leaving the Company that "3 or 4 years ago, we took a hard look at should we be in the consumer fiber business?" and "should we be in the consumer copper business?" and "candidly, coming out of that analysis, we decided the thing that we should do is manage it [copper] for cash in the markets where that makes sense and invest in fiber in the markets where that makes sense."  CW12 recalled discussing the opportunity of reclaiming unused copper wireline for scrap value.  CW12 was told by Senior Vice President of Network Solutions, Mike Riederer, or Executive Vice President of North America Operations, Richard Batelaan, who reported to Storey, that after crunching the numbers it was determined that it would be too costly to mine the copper.  As CW12 explained, "we were struggling financially so we had to be smart about how do we spend the money" and "there was no business case" for it.

178.    It was at this time that the decision was made to simply abandon all unused copper in place.  CW3 explained that, around this time, one of the measures to cut costs included petitioning various states to release the Company from its "provider of last resort" ILEC obligations to avoid repairing or maintaining the aging, expensive copper infrastructure as the Company shifted to fiber.  CW3 added that it was during this time that the decision was made to simply leave *all* retired wireline in place, including aerial cable, especially when it could be "overlashed" with fiber.  CW3 reported that this was common knowledge within the Company,

and recalled having numerous "VP-level meetings" where it was openly discussed.  CW3 is "certain" Storey and Dev were aware.  This is reinforced by CW10, who confirmed that Story was "totally" aware of Lumen's abandonment of lead-sheathed cables.  CW10 learned this from attending town halls led by Storey where he would regularly explain how he grew up working his way through the ranks in the Bell System and was familiar with its operations.

### 9.   Lumen Was Required to Report Its Retirement of Copper Cables, Including Lead Sheathed Cables, to the FCC Under Rules It Opposed

179.   As the telecommunications industry transitioned from legacy copper lines to wireless technology, the FCC grew concerned that customers still reliant on copper wires for communicating would not be properly serviced by the major carriers.  In 2003, the FCC set rules governing the retirement of copper wires.  *See Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978 (2003) (the "Triennial Review Order").  Among other things, the Triennial Review Order required ILECs to provide public notice of any proposed retirement of copper wireline.  *Id.* ¶ 281.  Since the Triennial Review Order, these notification requirements have been codified in the FCC's regulations at 47 C.F.R. § 51.325(a).

180.   In response to "fiber becoming the preferred choice for new greenfield deployments" and causing the "the pace of copper retirement [to] accelerate[]", the FCC initiated a new rulemaking process in November 2014 to consider revisions to the Triennial Review Order in order "to help guide and accelerate the technological revolutions that are underway."  *See Ensuring Customer Premises Equipment Backup Power for Continuity of Communications, Notice of Proposed Rulemaking and Declaratory Ruling*, 29 FCC Rcd. 14968, 14974-75 (2014) ("NPRM").  Among other things, the NPRM proposed updating the FCC's rules to require notice to consumers of any copper retirement.  *Id.* ¶ 5.  In addition, the FCC specifically noted that there

were "allegations in the record that in some cases carriers are allowing copper networks to deteriorate prior to retirement" and sought comment on potential changes to the definition of "copper retirement" that could make such practices, if true, less likely to occur, including *de facto* retirement arising from a failure to maintain copper wireline. *Id.*

181.    On February 5, 2015, CenturyLink filed a filed a comment to the NPRM that categorically opposed the rule change, including the enhanced notification and disclosure requirements proposed by the FCC in the NPRM. *See* Comments of CenturyLink, PS Docket No. 14-174 (filed Feb. 5, 2015).

182.    In August 2015, the FCC issued its final rule on the retirement of copper by incumbent local exchange carriers ("ILEC"). *See Technology Transitions, et al.*, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 30 FCC Rcd. 9372 (2015). The final rule clarified that retirement includes both "removal *or disabling*" of copper wires as well as *de facto* retirement, *i.e.*, failure to maintain the copper facilities. *Id.* ¶ 80 (emphasis added). Indeed, the FCC explained therein that "[w]e adopt this change to ensure incumbent LECs are aware that intentional neglect of copper facilities triggers their notification responsibilities." *Id.* ¶ 90. It also required additional notice to be provided to consumers and impacted CLECs, codified in a new section of the FCC's regulations at 47 C.F.R. § 51.332. *Id.* ¶¶ 38-78.

183.    In November 2017, the FCC reversed course and repealed 47 C.F.R. § 51.332. *See In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 32 FCC Rcd. 11128 (2017). However, the FCC retained the definition of copper retirement as covering both "removing *or disabling*" and incorporated that definition directly into the definition of 47 C.F.R. § 51.325(a) (emphasis added). *Id.*

184.    Lumen and its consolidated subsidiaries published at least 34 notices pursuant to 47 C.F.R. § 51.332 (while in effect) and/or 47 C.F.R. § 51.325(a) between August 2015 and the present under the updated, and expanded, definition of "copper retirement."   In addition, CenturyLink filed at least 41 notices pursuant to 47 C.F.R. § 51.325(a) between December 2010 and the August 2015, before the definition of "copper retirement" was updated.

185.    In addition, as explained by CW1, CW3, CW4, CW5, CW6, and CW8, Lumen like any major carrier maintains a technical database of its cable network that contains detailed information on each segment of cable, including whether the sheathing is made of lead, which is actively updated to incorporate any changes to the network, including the retirement of any sections of cable (¶¶ **Error! Reference source not found.-Error! Reference source not found.**). Therefore, as Lumen retires copper cables, and provides public notice thereof, it confronts and acknowledges the extent of its copper cable network which is sheathed in lead and that it has decided to leave behind to degrade in the environment over time.

### 10.    Other FCC Proceedings Put Lumen On Notice That Its Own Workers Believed That It Failed to Properly Maintain Its Legacy Copper Lines

186.    As set forth more fully above (¶ 54), Lumen announced that it planned to sell its legacy ILEC assets to Apollo on August 3, 2021.  In accordance with the Telecommunications Act and FCC rules promulgated thereunder, Lumen and Apollo filed an application with the FCC seeking the FCC's approval of the transfer of control over its licenses to operate the assets subject to the sale.  *See* Consolidated Application for Consent to Transfer Control of Domestic and International Section 214 Authorizations, WC Docket No. 21-350 (filed Sept. 1, 2021) (the "Brightspeed Application").  The Brightspeed Application was signed by Stacey W. Goff, Executive Vice President and General Counsel of Lumen.

77

187.    On December 16, 2021, the FCC provided public notice of the Brightspeed Application and invited interested parties to provide comments on it.

188.    On January 18, 2022, the CWA filed comments in response to the Brightspeed Application in which it informed the FCC that **_Lumen's frontline workers reported that it has historically failed to maintain its legacy copper wire network_**.  Specifically, the CWA stated:

> CWA, as part of its ongoing obligation to its members, has frequently investigated the conditions of CenturyLink's plants and equipment. CWA's investigation and interviews with members have revealed that Lumen has failed to maintain its physical copper plant.

Comments of Communications Workers of America, WC Docket No. 21-350 (filed Jan. 18, 2022). Thereafter, several other parties filed comments in response to the Brightspeed Application expressing general agreement with the views and arguments made by the CWA, including the Michigan Public Service Commission.  *See* Reply Comments of the Michigan Public Service Commission, WC Docket No. 21-350 (filed Feb. 2, 2022).

189.    Lumen filed a response to the comments submitted by the CWA on February 2, 2022, in which **_it did not deny that it failed to maintain its legacy copper wires_**.  Instead, Lumen argued that the CWA's claim about its copper wire maintenance (or lack thereof) was "not transaction-specific" and, if anything "is a reason to endorse the new owner, not to bar the door." Reply Comments of Lumen Technologies, Inc. and Connect Holdings LLC, WC Docket No. 21-350 (filed Feb. 2, 2022).

**11.    Lumen Management Was Aware That AT&T Faced Liability for Openly Abandoning Lead-Covered Cables in California and Texas**

190.    The risk that Lumen could be required to remediate and remove its crumbling lead cable infrastructure or otherwise liable to properties owners became even more concrete when AT&T was hit with two lawsuits concerning its abandoned lead cables.

78

191.    *First*, on March 1, 2016, AT&T was sued in the class action, *Cook v. AT&T Corp.*, 4:16-cv-00542 (S.D. Tex.) (the "Texas Action") by six Texas landowners seeking "damages for pollution of their land," among other things.  This class action lawsuit alleged that, in the 1950s, AT&T's predecessor had been granted an easement to lay its lead cables along their property, among many other landowners' properties.    After being granted the easement, AT&T's predecessor "buried a six-inch cable within the easement." The Texas Action further alleged that the lead cables remained on each of the plaintiffs' land, and had "been cut in multiple places and is in disrepair."  The plaintiffs in the Texas Action alleged as follows:

> The buried cable "contains lead . . . Corrosion of the lead sheath on this type of cable is a mechanism that can result in lead being released to the environment.  Such corrosion is a common occurrence with older cables, especially when the cable is cut or damaged.  Cables of the type used on [p]laintiffs' property require routine inspection and maintenance.  If the cover surrounding the lead is damaged, the lead will contaminate the immediate area.  The Environmental Protection Agency has stringent rules for the storage and disposal of lead.

The plaintiffs alleged that the lead cable coverings were "badly damaged", and that the lead was "directly contacting the soil" on their land.  Specifically, the plaintiffs alleged that the lead cable was continuing to deteriorate and "contaminate the subsurface of the [p]laintiffs' real property."

192.    The plaintiffs in the Texas Action retained David Howell, an expert on the subject of abandonment of rights of way, and easements.  His company, Pipeline Equities, has removed over 12 million feet of retired, abandoned or out of use pipelines and cables.  In Mr. Howell's report submitted in the case, he opined that the cost to remove the cables buried under the plaintiffs' land was approximately $33.43 per foot.  Mr. Howell reached this conclusion by considering the following factors: mobilization equipment and labor to prepare for removal; excavation, removal, cut and load 3-inch cable; land and title work for right of way; damages to landowners; transportation of hazardous waste to a certified land fill; disposal of hazardous waste at a licensed land fill; removal of underground vaults, soil remediation and replacement.

79

193.    AT&T sought to have Mr. Howell excluded as an expert in the Texas Action.  The court denied the motion to exclude.  In August 2019, the Court also denied AT&T's motion for summary judgment.  The case was proceeding to trial when the plaintiffs abruptly dismissed their claims in February 2020.

194.    ***Second***, on January 14, 2021, an environmental group called California Sportfishing Protection Alliance filed a lawsuit in the United States District Court for the Eastern District of California against Pacific Bell Telephone Company ("Pac Bell"), an AT&T subsidiary. *See Cal. Sportfishing Protection Alliance v. Pac. Bell Tel. Co.*, 2:21-cv-00073 (E.D. Cal.) (the "Lake Tahoe Action").

195.    In the Lake Tahoe Action, the environmental group asserted claims under RCRA and the California State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65"). According to the complaint, there are approximately 41,600 feet (approximately 7.9 miles) of lead cables owned by Pac Bell located at the bottom of Lake Tahoe:  "The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick. . . .  Each foot in length of the cables contains approximately 3.3 pounds of lead."  The Lake Tahoe Action further alleged that these lead-sheathed cables have been abandoned, left to decay away in the water of Lake Tahoe. The plaintiffs alleged that a portion of the lead cables were removed and tested to determine if the cables were likely to leach lead into the Lake Tahoe water.  Based on the testing results, "[a] reasonable inference . . . can be drawn . . . that lead in the [c]ables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead."

196.    On September 13, 2021, the plaintiff in the Lake Tahoe Action filed a motion to "Approve Settlement and for Entry of Consent Decree."  The supporting papers explained that the

parties reached an agreement to settle the claims, in the form of a consent decree.  Pac Bell agreed to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million."  Pac Bell was required to secure all authorizations within six months.  The parties agreed to certain extensions, but it appeared that Pac Bell was working to secure necessary approvals to remove the lead cables for almost two years.  On May 19, 2023, Pac Bell submitted a status update stating that it was still "in the process" of seeking further approvals from state parks "so the cables can be removed promptly after the peak recreation season ends."  Pac Bell committed to "file a further status report after State Parks acts on the written request" to "inform the Court as to when removal of the Cables is expected."

197.    On June 15, 2023—less than a month before the WSJ exposé was published—Pac Bell filed another status update claiming that the parties were at an impasse as to when Pac Bell would be permitted to remove the cables per the directives of the applicable local agencies.  In June 2023, it is likely that Pac Bell knew of the impending WSJ exposé because, as reflected in the *WSJ*'s reporting, it had asked AT&T to comment on the litigation and AT&T's ownership of lead-sheathed cables more generally before the stories were published.

198.    On July 19, 2023, Pac Bell filed another status update with the court. It attached a "meet and confer" letter that it had sent to the environmental group plaintiffs. The letter stated that "in 2021, AT&T agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense of litigation." It further stated that it no longer wished to abide by the Consent Decree it had agreed to two years prior. Instead, "the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than

sensationalized media coverage." In other words, in the wake of the WSJ reporting, Pac Bell (AT&T) was reneging on its agreement to remove its abandoned lead cables from Lake Tahoe.

**E.    The Public Learns That Telecom Companies, Including Lumen, Have Vast Networks of Decaying Lead Cables That Are Leaching Into the Environment**

199.    The public first began to learn the shocking truth about Lumen's lead cables and their effects on the environment, particularly the fact that they are placing lead contaminants in the surrounding air, water, and land, through a series of prominent stories published by the *WSJ* in July 2023. As detailed more fully below, the *WSJ*'s reports were the product of a thorough 18-month investigation involving scientific sampling, field inspections, interviews with former telecommunication executives, and more. This reporting led to a series of events that revealed more details about Lumen's lead cables and its related exposure.

**1.    The *WSJ*'s Thorough Eighteen-Month Investigation**

200.    Founded in 1889, the *WSJ* is one of the world's leading newspapers primarily covering business and financial news. The WSJ had an estimated average circulation of over 3.9 million as of August 2023. Its intended audience includes business professionals as well as active investors. As part of its mission, it endeavors to provide its audience with "facts, data and information, not assertions or opinions." Since its founding, the WSJ has won numerous awards for its work and publications, establishing its global credibility. It is known for having high standards of journalistic integrity.

201.    The *WSJ*'s investigation into abandoned lead cables began with an anonymous tip that AT&T was removing an old lead cable in Lake Tahoe. This was of particular interest because, according to Shalini Ramachandran ("Ramachandran"), a WSJ correspondent who has covered the telecom industry for many years, the use of "lead" in telecommunications cables was almost unheard of. Ramachandran said that she "***had covered cable and telecom for a long time and had***

82

*never heard of lead cables in the telecom networks*.”  Ramachandran and colleague Susan Pulliam ("Pulliam") began to ask how many of these cables still exist.  By no later than January 2022, the investigation was underway.

202.    To locate cables in waterways, *WSJ* staff secured permits—some of which were over a century old—from the U.S. Army Corps of Engineers and its various district offices, and made similar requests from 30 states and the U.S. Bureau of Reclamation.  They wrote code to process the aged records and created a database to store the information.  The *WSJ* only included permits and records from before 1965, which was when the Bell System phased out its use of lead, unless later permits referenced earlier cables that were not present in the database.  Army Corps officers told the *WSJ* that many permits were likely lost or discarded over the years.  In addition, the *WSJ* obtained maps of water bodies from the U.S. Geological Survey and created a computer program that identified the shortest path across the water in order to approximate the likely path of the cable from bank to bank.

203.    The team also extracted images from Google Street View in front of each school in the nation's five most densely-populated states, 16 of the 20 most densely-populated counties, and a random sampling of nearly 10,000 NJ Transit bus stops in New Jersey, the most densely populated state in the country.  A machine-learning algorithm was used to detect if there were lead-sheathed cables in these images. Whenever the algorithm recognized the existence of lead-sheathed cables in the images, *WSJ* employees would then manually review the images to verify the existence of lead-sheathed cables.  Over 100,000 images were analyzed and those flagged as featuring lead-sheathed cables were manually reviewed by *WSJ* staff.  The *WSJ* had a former AT&T EHS professional review a sample of the images and confirm the validity of the analysis.

83

204.    Through these exhaustive investigative efforts, the *WSJ* identified approximately 1,700 underwater cables and 450 aerial cables, most of which run next to schools, bus stops, parks, and homes.  But *WSJ* investigators stressed that both figures likely represent only a "fraction" of those still remaining in the United States given the sampling used to conduct its investigation, limited as it was.  Notably, the *WSJ* shared with the EPA these identified locations, and learned that approximately 330 sites were located at what was called a "Source Water Protection Area," which meant that it provided drinking water.

205.    To confirm the existence of these cables, and their threat to the environment and surrounding communities, *WSJ* reporters drove to approximately 300 sites they identified across the country with research divers, university scientists, and environmental consultants, and found cables, or evidence of them, in nearly every site they visited, including bayous in Louisiana.

206.    Interested in whether lead was leaching from the cables hanging from utility poles, Pulliam met with researchers from New York University led by Dr. Jack Caravanos ("Caravanos") to investigate a site located in Wappingers Falls, a town in the Hudson Valley of New York.  In the neighborhood where the site was located, they found cables sheathed in lead running along and around a playground called Temple Park.  Next to the playground, close to a sign that said "Children at Play," Dr. Carvanos performed an X-ray fluorescence test and found that the area close to the cable indicated a rating of 1,000 ppm for lead.  As indicated above (¶ 91), the EPA's threshold is 400 ppm for areas where children play.  Dr. Caravanos noted the particular dangers of lead in the soil of a playground: "You just need a little dirt on your fingers and your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5%."  The park has since been dubbed "toxic park."

207.    Pulliam also investigated a site at New Iberia, Louisiana frequented by the local populace.  This location was situated by the bank of Bayou Teche, and there was a cable protruding from the ground.  The investigation demonstrated levels of lead that were 14 times the EPA level that is safe for play areas.  A woman living in the area, who said she had been unaware of the cable, told the *Journal* that "kids come down here and play all the time on the edge of the bayou."

208.    In Coal Center, Pennsylvania, the *Journal* found mile-long cables that were sagging in the previously-determined investigation sites. Testing the soil samples obtained from a residential property owned by a family with children adjacent to the cables revealed lead levels that were more than 40% above the level the EPA deems safe for play areas.

209.    The *WSJ*'s general protocol for extracting samples required that all containers to be used for sample collection be cleaned and rinsed with deionized water before being used.  The team also needed to wear single-use nitrile gloves, which had to be changed whenever multiple samples were to be collected.  Sediment and soil samples were collected using clean stainless-steel scoops. Samples were collected up to 6 inches from cables, and double bagged.  Lead cable scrapings were taken and double bagged after soil and water sample collections were completed.

210.    For underwater locations, the *WSJ* collaborated with an organization called Marine Taxonomic Services, led by Seth Jones ("Jones") and Monique Ridell ("Ridell") to identify underwater lead cables and collect samples for testing.  With the *WSJ* team, Jones and Ridell collected a sample of water next to the cable in Lake Tahoe.  They also collected water samples from other locations where lead cables were present, including Michigan and Oregon.

211.    In collecting samples from cables found submerged under deep waters, divers like Jones would collect the water sample using a clean plastic syringe from a distance of less than an inch from the cable.  Samples from shallow water were likewise collected from a distance of less

than an inch from the cable, through the use of a clean plastic syringe and in accordance with the general operating procedure outlined above.

212. The *WSJ* team took water samples around the underwater cable in Lake Tahoe, and found that there were "very high" levels of lead. Lead was also found moving away from the cables and toward the beach, confirming that lead was, in fact, leaching from the severed ends of the cable. Other samples tested by the *WSJ* were taken from areas where people swim, camp and boat. Notably, one sample collected was more than *2,500* times the level that the EPA says is safe for drinking water. The samples from waterways in Michigan and Oregon (where Lumen operates) also showed that lead was leaching into rivers there as well.

213. Since lead is a naturally occurring metal, the *WSJ* used several methods to connect the lead found in soil and water to the cables. To ensure that the lead was indeed sourced from the cable and not a natural occurrence, "background" samples were collected at various distances from the cables to test the naturally occurring lead levels in the vicinity. As interpreted by experts, a higher lead reading closer to the cables indicated the high likelihood of the cables being the cause of the contamination. As mentioned above, Dr. Caravanos' findings in New York were similar: that lead contamination in the soil was the highest in the area directly beneath or adjacent to the cables, within up to two feet, which indicated that the cable's exposure to the elements caused it to bleed lead onto the ground, where lead accumulated over time.

214. Several sets of samples were provided to Professor Bruce Nelson, a geochemistry professor at the University of Washington, who operates a laboratory that performed isotopic analyses of the samples. This analysis links the lead from the cables to the lead in the ground or water. Professor Nelson used a mass spectrometer, which measures the four common atomic masses that constitute lead, giving each sample a specific fingerprint. Professor Nelson concluded

86

that the samples selected by the *WSJ* team from cables in New Iberia, Louisiana, and Coal Center,

Pennsylvania were the likely source of lead contamination found in the nearby soil.

### 2.    Publication of the *WSJ*'s Series on Lead Telecom Cables

215.    The *WSJ* released its first story in its series about the decaying lead cables dispersed

throughout the country, titled "America Is Wrapped in Miles of Toxic Lead Cables," on July 9,

2023.  The story stated, in pertinent part:

> ***AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.***
>
> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.
>
> ***The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators.  These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.***
>
> ***Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency.***  At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.
>
> ***For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees.  They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.***
>
> Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further

87

exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

In Coal Center, Pa., medical tests independently sought by the mother of 6-year old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable.

In response to the Journal's reporting, AT&T, Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes.  They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

*　　*　　*

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

88

**Among the findings:**

—Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. ***"This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."***

**An ancient network**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water.  For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.  Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership.  The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount.

89

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at some locations. They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood— more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk. Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

**The known risks**

AT&T has previously noted the risks from its cables. *"Underground cable presents real possibilities for overexposure" for workers removing them, AT&T said in a 2010 presentation about employee safety at an industry conference. "Some older metropolitan areas may still have over 50% lead cable," it added.*

(Emphasis added.)

90

216.    The *WSJ* published another article on July 12, 2023, titled "What AT&T and Verizon Knew About Toxic Lead Cables." That article provided in pertinent part:

> *At a gathering of telecom officials more than a decade ago, John Malone, a senior AT&T manager, cautioned the group about a little-known danger crisscrossing the nation.*
>
> His topic was lead-covered cables, which once carried phone service and had long been obsolete. Weren't these ancient cables gone?
>
> "NO," his slide presentation said. "*Some older metropolitan areas may still have over 50% lead cable*," the slide said. *In some places, they posed risks for phone company workers and the surrounding environment*, Malone said.
>
> *For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.*
>
> They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. . . . *Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.*
>
> \*        \*        \*
>
> Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. *The telecom industry's lead-covered cables have been largely unknown to the public.* The industry doesn't have a program to remove or assess their condition. *Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.*
>
> \*        \*        \*
>
> *In the 2010 presentation, Malone acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cable*.
>
> "They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

91

*        *        *

Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College. Like asbestos, lead must either be sealed away or removed completely to eliminate the risks.

USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used. The group declined to provide or describe any such studies and literature.

*        *        *

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

*        *        *

*Evidence suggests that workers have still faced exposure to lead in the modern era. A worker at CenturyLink, a company that descended from Ma Bell, alerted the CWA union that he was feeling intensely fatigued following work in manholes, triggering a 2013 Minnesota OSHA investigation that led to nine "serious" lead-related citations, according to union officials and regulatory records for CenturyLink, which now goes by Lumen Technologies.*

*A Minnesota OSHA document called the company's lead training "inadequate" and showed that a worker handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit.*

"The well-being of our employees and communities is of the utmost importance," a Lumen spokeswoman said, adding that the company has specialized safety training for handling lead-sheathed cables and will provide testing to current and former employees.

*        *        *

In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

92

(Emphasis added.)

217.     As detailed more fully below (¶¶ 237, 304, 307, 309, 313), the *Journal* published a number of other stories as part of its series on lead-sheathed telecommunication cables.

### 3.     Lumen's Immediate Response

218.     In the initial article in the series, published on July 9, 2023, the *WSJ* said that "AT&T, Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes" and that "they follow regulatory safety guidelines for workers dealing with lead."  Before running the story, the *WSJ* also provided lists of cable locations to major telecom providers, but they declined to detail cable locations.

219.     By no later than the evening of July 9, 2023—the same day the *WSJ* published its first story—the United States Telecom Association ("USTelecom"), an industry trade association for telecommunications-related businesses, created a website dedicated to lead cables disputing the environmental and public health impacts titled "Telecom Cable Facts."  Lumen is a member of USTelecom.  Among other things, the site declares in bold letters "***We have not seen, nor have U.S. regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue***."  It added that "[t]he present of lead in soil, sediment, or water is not sufficient to conclude that the source of lead is telecom cables."  The site also maintained that "[r]isks associated with legacy lead-sheathed telecom cables are mitigated by the nature of the material, their location, coatings on them, conduits surrounding them, and other factors" and most "are generally in locations that minimize the potential for public contact."  Finally, the site asserted that "in some situations, telecom cables are appropriately left in place

93

when no longer in current use and may stand by to be used if and when needed," as "with many other types of infrastructure, such as rail lines or pipelines."

220.    Soon thereafter, USTelecom provided a statement to the *WSJ*, which it included in a story that it ran on July 11, 2023.  In the statement, USTelecom declared as follows:  "We have not seen, nor have regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue."  As indicated in the preceding paragraph, this is a direct quote from the "Telecom Cable Facts" website that it launched days earlier.

221.    Lumen provided a direct comment in response to the *WSJ*'s story on July 12, 2023, which described the events precipitating the Company's OSHA citation for employee lead exposure in 2013, in which it appeared ready to meaningfully engage on the issue.  In the statement, a spokeswoman for the Company stated that "[t]he well-being of our employees and communities is of the utmost importance."  The *WSJ* added that the spokeswoman also indicated that the Company would provide testing to current and former employees.

222.    But Lumen's tune soon changed.  In a story on lead cabling published July 17, 2023 by *Fast Company*, a business and innovation magazine, a Lumen spokesperson referred to the USTelecom website set up to dispute the *Journal*'s claims about lead-sheathed cables.  That same day, the *Journal* reported that USTelcom said that it did not believe that the cables "are a public health hazard or a major contributor to environmental lead."

### 4.    Government Response and Related Fallout

223.    The response by lawmakers to the *WSJ*'s initial report was swift.  On July 11, 2021, Senator Markey, an author of the Telecommunications Act and a nationally-recognized leader on telecommunications policy, sent a letter to USTelecom in which he said the indifference shown by its member companies to the known risks of lead was "corporate irresponsibility of the worst kind"

94

and posed a series of questions including "[w]hy have the companies that knew about the cables—and the potential exposure risks they pose—failed to monitor them or act?"  He added that the companies responsible for the cables have "a duty—both civic and legal—to ensure that they do not put Americans in harm's way."  Later that day Representative Frank Pallone of New Jersey posted on the social media platform X that "There is no safe level of lead exposure—*none*—which is why I'm so disturbed by these reports of lead cable lines throughout the country."

224.    Representative Pat Ryan, responsible for the district where Temple Park is located, was particularly outspoken.  On July 11, 2023, he told the *WSJ* that telecommunication companies should "do the right thing and clean up their mess."  At a Congressional hearing on July 13, 2023, he urged EPA representatives testifying at the hearing to compel a cleanup of any contamination caused by lead cables.  On July 20, 2023, Representative Ryan wrote to USTelecom, demanding answers about the location of the lead cables and their plans for remediation.  On July 26, 2023, Jonathan Spalter, President and CEO of USTelecom, sent a response which large reiterated verbatim text from the USTelecom website on lead cables and said "[w]e will work diligently both to pursue the facts, and to coordinate closely with regulators and local authorities to make appropriate determinations regarding where and whether removal best serves public health and safety."  On July 28, 2023, Representative Ryan issued a press release indicating that Spalter "did not address either of [his] concerns" and called upon fellow lawmakers to have telecommunication company CEOs testify before Congress.

225.    A mix of regulators sprang into action as well.  By no later than July 11, 2023, the EPA and FCC were evaluating various enforcement options.  In fact, immediately after the publication of the first article by the *WSJ* on July 9, 2023, FCC staff convened with the EPA and the White House Council on Environmental Quality to discuss interagency coordination.  By July

95

17, 2023, the EPA was actively coordinating with the FCC.  On July 20, 2023, FCC Chairwoman Jessica Rosenworcel publicly stated that "[w]e want to discuss with them [EPA stuaff] what their plans are and want to figure out how we can assist them going ahead."  In addition, the FCC met with the President's interagency Task Force on Environmental Health Risks and Safety Risks to Children to discuss this matter.

226.    On July 17, 2023, three environmental groups sent a letter to EPA Administrator, Michael S. Regan, urging him to take immediate action to protect communities from the dangers posed by abandoned lead cables.  In particular, the group appealed to Regan to use the Agency's authority under CERCLA and the Safe Drinking Water Act.

227.    By no later than July 26, 2023, the U.S. Attorney's Office for the Southern District of New York had launched a civil inquiry on whether telecommunication companies had knowledge of the potential risks to their workers and the environment when they left behind the lead cables.  In addition, the EPA formally launched an investigation into the potential environmental impact of the lead cables using Superfund authority under CERCLA.  In a press statement, the EPA said it takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution."

228.    On September 20, 2023, a group of 12 U.S. Senators, including Senator Markey, sent separate letters to EPA Administrator, Michael Regan, and FCC Chair, Jessica Rosenworcel. In the letter to the FCC, the Senators expressed "great concern regarding reports of lead-lined telecommunications cables throughout the United States" and asked the FCC to provide answers to a series of questions so they could "understand the full scope of this source of lead toxicity in soil and drinking water."  The letter highlighted that OSHA recently "conducted an investigation into CenturyLink (a descendent of Ma Bell) and issued nine lead-related citations."  In the letter

to the EPA, the Senators "urge[d] the EPA to investigate and ascertain the scope of this problem and move swiftly to hold any potentially responsible parties accountable and ensure they engage any needed remediation activities to mitigate harms affecting communities, families and children, current and former employees and contractors, and ecosystems that were exposed to lead-sheathed telecommunications cables."

229.    On November 29, 2023, Kris Mayes, Attorney General for the state of Arizona, announced that the Attorney General's office opened an investigation into lead-covered cables that may be present in Arizona.  The release specified that, as part of the investigation, "the Attorney General has sent letters to 200 telecommunication operators, including Verizon, AT&T, ***and CenturyLink***, requesting information on lead-covered cables they may own."

230.    On November 14, 2023, the EPA provided a written response to the letter sent to her by 12 U.S. Senators on September 20, 2023 (¶ 228) which confirmed that it was "vigorously engaged" in work to better understand the issue and had established a national working group to "guide longer-term actions related to lead-covered cables."  The letter also advised that the EPA remained committed to "using our enforcement authorities to hold parties accountable to address the threats from dangerous contaminant release associated with lead-covered cables" and was "coordinating with the [DOJ] and [FCC] to determine how we can harness our respective authorities."  On December 21, 2023, the FCC also provided a written response which confirmed that the FCC "has continued to follow reports on this issue" and, by that date, the Chairwoman had "directed the Commission's Wireline Competition Bureau to contact the carriers identified in the media reports to discuss their testing and any remediation effort, and to encourage carrier cooperation with the federal and state authorities."  In addition, the FCC had also "engaged with the General Services Administration and the Department of Justice" on the topic.

231.    Congress also evaluated options for addressing the lead cables now that the issue is in the spotlight.   On December 26, 2023, Congressional Research Service issued a briefing, "Legacy Lead-Sheathed Telecommunications Cables: Status and Issues for Congress" CRS "operates solely at the behest of and under the direction of Congress."  The lead cable briefing noted that "EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands."   The CRS Issue Brief noted that "[i]f lead derived from lead-sheathed telecommunication cables were to migrate into groundwater or surface water, enforcement actions under two other federal statutes might be used to mitigate potential impacts on water quality," and cited the Safe Drinking Water Act and the Clean Water Act.

**5.      Lumen Finally Discloses the Risk of Loss Related to Its Lead Cables and Refutes the Accuracy of the Reporting**

232.    On August 1, 2023, Lumen held its first earnings call since the story about lead cables first broke a month earlier.  During the call, Lumen CFO, Defendant Stansbury stated that "[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but confirmed that "less than 5% of our approximately 700,000-mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure."  The very first question asked by analysts on the call was whether the Company has had any "discussions around remediation."  Stansbury downplayed the issue and indicated it was too early to determine:

> So, I guess first of all, I think it's very early for that.  Again, we spent a lot of time just determining how much lead is in the system.  And ***the good news is, it's quite small.***  But beyond that, we don't really think there's any meaningful way to estimate what that would be at this point.  And so, we will continue to, as we said, work with regulators and outside experts as this moves forward.  But, again, we feel good about our network and the fact that a lot of it is conduit based and subterranean.

(Emphasis added.)  Later on the call, an RBC Capital Markets analyst asked if "there is any residual responsibility for the ILEC asset divestiture to Apollo."  Stansbury responded with a non-answer and again downplayed the significance of the issue:

> The ILEC sale was a stock sale.  So, all assets and liabilities were sold with that. And, as it relates to our network, we talked about it in my prepared remarks, less than 5% of our 7000,000-mile copper network contained lead, and most of that is conduit based and subterranean.  So, *we don't think that this is a major issue for us*, and it's something we'll continue to work on and monitor.

(Emphasis added.)

233.    In a quarterly report on Form 10-Q filed by Lumen that day, the Company also added a new disclosure to the text accompanying its consolidated financial statements which recognized that the lead cables it owned all along gave rise to a "loss contingency" for future costs and liabilities that the Company never previously reported to investors during the Class Period.

234.    During a conference with analysts a month later at the Goldman Sachs Communacopia + Technology Conference on September 7, 2023, Stansbury criticized the reporting around the topic of lead cables:

> *[I]t's unfortunate, I think, the reporting that took place around that.*  But, look, we take the safety of our employees and our customers very seriously.  If you look back through history, we really haven't seen any claims that would suggest that there was a problem.  But, that aside, what we disclosed on the earnings call was that, of our copper footprint, less than 5% was lead sheathed or is lead sheathed, and it is less than 5%, and we'll get more precise about that over time.  But the majority of that is either subterranean and/or conduit based. *And there's, I think, real debate that isn't going to get solved anytime soon as to whether disturbing that's actually a good or a bad thing.* And so that has to play itself out. We'll obviously participate in those conversations, but the net of all of it is, I think, *the exposure for us is very low.*

(Emphasis added.)

235.    Stansbury continued to minimize the significance of the issue consistent with the messaging from USTelecom on another call with analysts at the Bank of America Media, Communications, and Entertainment Conference on September 14, 2023.  The analyst hosting the

99

call, David William Barden, began the call by asking for a status update on the lead cable issue.

In response, Stansbury stated:

> [T]he reality is majority of that is subterranean or conduit-based. And, so, our view on the whole thing is this has to play itself out. We obviously take employee and community safety seriously. We've actually had, over the years, very, very few medical claims. So I think there's good evidence there that it hasn't been an issue. But, ultimately, as we work with the various authorities that will investigate, we're happy to obviously participate in that, and we'll see where it ends up. But I think ***there's a real debate as to whether things that are subterranean should even be disturbed at this point***. So we'll see where that goes. But it will take years to figure out, and again, with the divestitures that we've done, ***the amount of the footprint that's impacted is quite small.***

(Emphasis added.) Asked whether the EPA had reached out to the Company, Stansbury confirmed

that "we've been engaged where they've had questions, but we're at the very early stages."

236. On October 31, 2023, Lumen filed another quarterly report with the SEC on Form 10-Q, in which it admitted that it anticipated incurring various "investigation costs" not due to its ownership of lead-sheathed cables, but due to "recent media coverage" on the topic.

### 6. The EPA Decides to Move Ahead with Its Superfund Investigation

237. By no later the end of August 2023, the EPA was already having discussions with lead cable owners about developing a long-term remediation solution. On September 1, 2023, the Mayor of West Orange, New Jersey—one of the locations where the *WSJ* identified lead-covered aerial cables hanging above a school—informed residents that EPA representatives have "advised the Township that ***discussions are occurring with the various telecommunication providers involved to develop a long-term remediation solution.***"

238. On January 11, 2014, the *WSJ* reported that the EPA was accelerating its Superfund review and designated its investigation as "high priority," in continuing coordination with the DOJ, after the EPA completed its initial review of three sites identified in the *WSJ*'s reporting:

> The Environmental Protection Agency sent letters requesting telecom companies to meet with the agency about their lead-sheathed phone cables, ***in a new phase of***

100

*an investigation in the EPA's efforts to protect the public from potential lead hazards.*

The agency's move comes on the heels of the EPA finding more than 100 soil and sediment readings with lead above the regulator's safety guideline for children at some phone lead-cable sites identified by the *Wall Street Journal* in three states.

"*This is lead that could be concerning*" based on factors like "exposure and pathways" into the body, *said Clifford Villa, head of the EPA's "Superfund" office that cleans up contaminated sites*, in an interview with the Journal. *The preliminary data from the agency's sampling supports the EPA determination that the investigation of lead telecom cables is a "high priority," said Grant Cope, senior counselor to EPA Administrator Michael Regan.* Both officials are helping oversee the EPA's investigation.

\*     \*     \*

AT&T, Verizon and other telecom companies with legacy lead cables have said the cables pose no public health hazard and aren't a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. . . . *EPA testing in three states near some telecom lead-cable locations identified by the Journal found 101 results, or 41% of the samples taken near lead cables, exceeded the EPA's lead safety guideline for children.*

\*     \*     \*

*The EPA is coordinating closely with the Justice Department*, whose Southern District of New York is investigating whether telecom companies had knowledge of any potential risks to their workers and future environmental impact when they left behind the lead cables, the Journal previously reported. *The DOJ has requested data from the companies, including a list of their lead-cable locations around the country, a person briefed on the investigation said.*

According to the *WSJ*, the EPA is engaging in a "multistep Superfund review process" that will "examine[] whether any other longer-term remedies should be remediation" and the initial site tests described in the article were only the "first stage" in that process. In response to this news, *Bloomberg* reported that the EPA was "increasing its probe" and "step[ping] up" its inquiry under CERCLA.

239. Less than a week later, on January 17, 2024, the EPA announced that it was decreasing the acceptable limit for lead in residential play areas for the first time in 30 years from

101

400 ppm to 200 ppm.  The release announcing this news stated that "EPA expects to investigate more residential properties for potential cleanup under the Superfund law" as a result of this action. It also reiterated the same message EPA published years ago:  "***The science is clear:  there is no known safe blood lead level in children.***"

### F.      Post Class-Period Developments

#### 1.      Continued Interest by Regulators and Lawmakers

240.     On February 5, 2024, Senator Markey—who was the first lawmaker to speak out in the wake of the *WSJ*'s investigative report—conducted a site visit in Chicopee, Massachusetts, which revealed unsafe levels of lead in soil under hanging lead-covered cables and hosted a roundtable event with state and local lawmakers to discuss the issue.  At the event, Senator Markey stated "[w]e need to protect the families in the 21st century from corporate decisions made in the 19th and 20th centuries."  He added, "***Telecommunications companies own these cables, and now they must own the solutions.***"

241.     Most recently, on February 26, 2024, the Chief of the FCC's Wireline Competition Bureau sent a letter to the President of the National Association of Regulatory Utility Commissioners ("NARUC"), a national association representing state public service commissioners who regulate essential utility services, to offer assistance with interagency coordination and exchange of information between its members and the EPA and other federal and state agencies with jurisdiction over the matter.  The letter indicated that "EPA and other federal authorities have been working to determine which carriers may have used lead-sheathed cables, the extent of these remaining cables, and where these cables are located."  It further provided as follows:  "[T]he FCC and your state public utility commission (PUC) members have a shared responsibility for the communications services that were, or may continue to be, provided via these cables in each state.  Accordingly, I expect that we have similar interest in ensuring information

102

sharing and interagency coordination to support efforts to identify and remediate any ongoing environmental and public health danger from these cables."

242.     On September 16, 2024, the CSPA filed a Motion to Approve Settlement and for Entry of Consent Decree.   The moving papers explained that the parties reached another conditional agreement to settle its claims in the form of a new Consent Decree (the "Second Consent Decree").   As stated therein, Pac Bell agreed to use commercially reasonable efforts to remove the lead cables by November 30, 2024.

243.     On September 18, 2024, the *WSJ* published a follow-up story to report on AT&T's agreement to finally remove the lead cables from the bottom of Lake Tahoe.   Citing recent discussions with EPA officials, the article also confirmed that "EPA officials have been meeting in recent months with industry representatives about ***potential remediation actions***."

244.     Indeed, Lumen has recently confirmed that it continues to manage regulatory inquiries arising from its abandonment of lead cables.   On February 20, 2026, Lumen filed its annual report on Form 10-K for the year ended December 31, 2025 (the "2025 Form 10-K").   The 2025 Form 10-K confirms that the matters uncovered by the *WSJ* have led to "regulatory inquiries" that that the Company is apparently still managing.

### 2.     Mass Liability Lawsuits Arising from Lumen's Abandonment of Lead Cables

245.     On approximately November 6, 2023, a class action petition was filed in Louisiana state court against a group of telecommunication companies, including Lumen and CenturyLink Communications, LLC, on behalf of all Louisiana property owners for abandoning their obsolete lead cables on property throughout the State.   The suit seeks damages and injunctive relief for a collection of state law claims, including negligence, breach of the duty owned by owners of rights-of-way, abuse of right, trespass, nuisance, and remediation under the Louisiana Ground Water Act.

On December 12, 2023, the case was removed to the United States District Court for the Western District of Louisiana, where it is now pending under the caption *Blum v. AT&T Corp.*, No. 6:23-cv-01748 (W.D. La.) (the "*Blum* Action"). Thereafter, plaintiffs sought jurisdictional discovery from the defendants. On December 6, 2024, the plaintiffs filed an amended complaint and a motion to remand, which was denied on September 30, 2025. On December 12, 2025, Lumen and CenturyLink, LLC filed a motion to dismiss, which remains pending.

246.   On July 9, 2024, a class action petition was filed in Louisiana state court by the Parish of St. Mary, asserting Louisiana environmental law claims on behalf of all parishes, municipalities, and citizens owning real properties in the State of Louisiana that have been affected by lead cables abandoned by telecommunications companies, including Lumen. The case was removed to the United States District Court for the Western District of Louisiana (Case No. 6:24-cv-01001), whereupon on December 6, 2024, plaintiffs voluntarily dismissed the suit. On December 13, 2024, St. Mary's Parish along with other parishes, municipalities (including the Village of Parks), and two individuals served upon Lumen a notice of intent to file citizen suit under the Louisiana Environmental Quality Act, with claims identical to the previous Parish of St. Mary class action. In April 2025, Village of Parks filed a petition under the Louisiana Environmental Quality Act in the 16th Judicial District Court for the Parish of St. Martin, seeking damages and injunctive relief related to lead cables abandoned on their property, in an action called *Village of Parks v. Lumen Technologies, Inc.*, Case 95026.

247.   On June 11, 2024, a class of shareholders filed a derivative action on behalf of Lumen against its directors and officers for the liabilities created by their failure to disclose the Company's extensive use and abandonment of lead-sheathed cables in the United States District Court for the Western District of Louisiana. *See Brown v. Lumen Technologies Inc*, No. 3:24-cv-

104

00798 (W.D. La.). At least three other similar derivative actions have been filed since *Brown* in the Western District of Louisiana. *See Pourarian v. Johnson*, No. 3:24-cv-01017 (W.D. La.); *Capistrano v. Lumen Technologies Inc.*, No. 3:24-cv-01234 (W.D. La.); *Murray v. Allen*, No. 3:24-cv-01320 (W.D. La.). All four actions have been consolidated under the caption *In re Lumen Technologies, Inc. Stockholder Derivative Litigation*, No. 3:24-cv-00798-TAD-KDM, and have been stayed pending the resolution of this action.

248.    On September 16, 2024, a class of shareholders filed a derivative action on behalf of Lumen against its directors and officers for the liability created by their failure to disclose the Company's extensive use and abandonment of lead-sheathed cable in the 4th Judicial District Court, Ouachita Parish. On September 17, defendant Hal Jones removed the litigation to the United States District Court for the Western District of Louisiana.  On October 17, 2024, the plaintiff filed a motion to remand, which was denied on June 17, 2025. On July 22, 2025, the Court entered a stay pending the resolution of the action.

## RELEVANT FINANCIAL REPORTING AND ACCOUNTING RULES

249.    In accordance with 15 U.S.C. §§ 78m(a) and 78o(d), the SEC has promulgated rules which require domestic issuers with registered securities to file annual reports on SEC Form 10-K at the end of each fiscal year and quarterly reports on SEC Form 10-Q at the end of the first three quarters of the fiscal year on an ongoing basis.  Among other things, every Form 10-K or Form 10-Q filed with the SEC must contain a "financial statement" for the period covered by the filing that meets the requirements of Regulation S-X, codified in 17 C.F.R. § 210 *et seq.*  The financial information reported in each of these various components of the financial statement is important to investors because it offers insight on the performance and financial position of the filing entity.

250.    Among other things, Regulation S-X requires that all financial statements filed with the SEC must be prepared in accordance with GAAP.  17 C.F.R. § 210.4-01(a)(1).  Regulation S-

X makes clear that interim financial statements, *i.e.*, those included in quarterly reports filed on Form 10-Q, must follow GAAP as well. 17 C.F.R § 210.10-01(a).  Any financial statement filed with the SEC that is not presented in accordance with GAAP is ***presumed to be misleading***, despite any footnotes or other disclosures to the contrary.  17 C.F.R. § 210.4-01(a)(1).

251.    GAAP refer to those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time promulgated by the Financial Accounting Standards Board ("FASB"). The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC").

252.    Under ASC 450, a company must disclose certain loss contingencies. A loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  ASC 450-20-20.  Uncertainty is inherent in all loss contingencies, and does not excuse their non-disclosure.  Common examples of loss contingencies include litigation loss and environmental remediation liabilities.  Indeed, the resolution of the uncertainty in the context of a loss contingency may confirm the loss, the impairment of an asset, or the incurrence of a liability.  Nevertheless, the contingency itself must in certain cases be quantified and/or disclosed.

253.    ASC 450-20-25 provides that "[w]hen a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote."  *See* ASC 450-20-25.  ASC 450 uses the terms "probable, reasonably possible, and remote, to identify three areas within that range."  *Id.*; *see also* ASC 450-20-20, Glossary.  The terms "probable," "reasonably possible," and "remote" in ASC 450-20 refer to the degree of likelihood that a future event that will confirm a loss, an impairment of an asset, or the incurrence of a liability.  Further, ASC 450-20-25 provides that "an estimated

loss from a loss contingency" depends on "information available before the financial statements are issued or are available to be issued."

254.    Although only "probable" loss contingencies must be recognized and accrued (ASC 450-20-25-2), ASC 450-20-50 makes clear that *any loss contingencies that are reasonably possible must be disclosed*.  Specifically, ASC 450-20-50 explains that "[d]isclosure of the contingency shall be made if there is at least a *reasonable possibility* that a loss or an additional loss may have been incurred and either of the following conditions exists: (a) An accrual is not made for a loss contingency . . . [or] (b) An exposure to loss exists in excess of the amount accrued . . . ."  Therefore, if a contingency is "at least a reasonable possibility", the issuer *must* disclose "(a) The nature of the contingency" and, if possible, "(b) an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

255.    As provided more fully below, Defendants made materially false and misleading statements during the Class Period on the topics of:  (i) recycling retired copper wireline; (ii) the cost savings associated with transitioning from copper to fiber cable products; (iii)  EHS contingencies and risks; and (v) GAAP compliance.  Plaintiffs assert that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein.  Statements that are not bolded and italicized are included for context.

### A.    Statements About Recycling Retired Copper Wireline

256.    Scheduled to coincide with Earth Day, on April 22, 2019, Lumen released its CSR Report for 2018 (the "2018 ESG Report").  The 2018 ESG Report began with a personal note from Storey introducing the report.  The 2018 ESG Report stated as follows:

> The CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year. *CenturyLink recycles telecommunications equipment and many other items such*

*as* batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents.  CenturyLink Recycled more than 3,450 metrics tons of these materials in 2018.

257.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Lumen failed to disclose that:  (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing; (ii) such cables were not recycled upon retirement but, rather, abandoned in place across the United States.  To the extent these statements were not technically untrue, they gave the false impression that Lumen was at least attempting to recycle retired copper wireline, not actively leaving them scattered across the country, much less in a manner contrary to waste disposal laws.

258.    On April 22, 2020, Lumen released its ESG Report for 2019 (the "2019 ESG Report").  The 2019 ESG Report began with a personal note from Storey introducing the report.  Under the heading "Waste," the 2019 ESG Report stated as follows:

> CenturyLink is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, re-use, and recycling.  ***These programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes.***  The EHS team assists in determining waste management methods, submitting annual reports to regulatory agencies regarding disposal, and auditing disposal facilities for environmental compliance.

> \*       \*       \*

> Recycling and product end-of-life management

> The CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year.  ***CenturyLink recycles telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents.

259.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not

misleading, because, as detailed more fully above, Lumen failed to disclose that:  (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing; (ii) lead is classified as a hazardous waste by the EPA for purposes of the RCRA; (iii) such cables were not recycled upon retirement but, rather, abandoned in place across the United States; and (iv) doing so is prohibited by the RCRA and/or other waste disposal laws.  To the extent these statements were not technically untrue, they gave the false impression that Lumen disposed of retired copper wireline in a manner consistent with waste disposal laws, especially any containing hazardous waste, when, in fact, it did not.  Indeed, these statements specify that the programs detailed therein were designed to "ensure the appropriate disposition of hazardous waste."  No reasonable investor would read that to mean that Lumen affirmatively disposed of thousands of miles of hazardous waste in a manner contrary to the RCRA.

260.    In September 2020, Lumen revamped its website in connection with its name change and new image.  By no later than September 27, 2020, Lumen published an "Environment" page in the "Corporate Responsibility" section of its official website, which represented as follows:

**Environmental Compliance and Management**

We are focused on complying with applicable environmental regulatory requirements.  Our environmental management systems (EMS) help us identify and mitigate the environmental impacts of our operations, drive continuous improvement and facilitate regulatory compliance.

*    *    *

**Waste Management**

Lumen is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, re-use, and recycling. ***Our waste management programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes and to reduce waste through managing product-end-of-life, which includes recycling and reuse of electronic and communications equipment.***

109

261. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 259. Indeed, these statements specified that Lumen was focused on "complying with applicable environmental regulatory requirements" and the programs detailed therein, including its program to recycle communications equipment at product-end-of-life, were designed to "ensure the appropriate disposition of hazardous waste."

262. On April 22, 2021, Lumen released its ESG Report for 2020 (the "2020 ESG Report"). The 2020 ESG Report began with a personal note from Storey introducing the report. Under the heading "Waste," the 2020 ESG Report stated as follows:

> We are reducing waste through minimization, re-use, and recycling. ***Our internal waste management programs and initiatives also focus on the appropriate disposition of hazardous wastes.*** Our EHS team implements waste management methods, submits annual reports to regulatory agencies regarding disposal and audits disposal facilities for environmental compliance.

> \*      \*      \*

> Recycling and product end-of-life management

> We divert millions of pounds of electronic and communications equipment from landfills each year. ***We recycle telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. Lumen recycled more than 3,509 metric tons of these materials in 2020.

263. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 259.

264. On November 4, 2022, Lumen released its ESG Report for 2021 (the "2021 ESG Report"). The 2021 ESG Report began with a personal note from Storey introducing the report. Under the heading "Reducing waste impacts," the 2021 ESG Report stated as follows:

110

**Our approach**

To reduce our environmental impact, we establish and maintain effective waste management programs and initiatives that focus on reducing waste through minimization, re-use, and recycling. ***Our approach is also designed to ensure that hazardous waste is appropriately disposed.*** Our EHS collaborates with various business units to implement and optimize waste management methods, policies and procedures. . . .

**Waste reduction**

Recycling and product end-of-life management

Each year, we divert millions of pounds of electronic and communications equipment away from landfills. ***We recycle telecommunications equipment and items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents.

265.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 259.

B.    **Statements About Converting Legacy Copper Cables to Fiber and the Associated Cost Savings**

266.    On November 8, 2018, Lumen held a conference call with analysts to discuss its financial results for the quarter ended September 30, 2018.  During his prepared remarks, before opening the floor to questions from analysts, Defendant Neel stated:

From the third quarter 2018, capital expenditures were $665 million. . . .  In addition, ***we put in place a capital governance process comprised of senior leaders of the company to ensure all investments are in line with business and financial objectives.*** The financial rigor and discipline led to several decisions to redirect investments. ***One example is our decision to minimize investment in our copper-based plant for the consumer business.*** However, we are ramping up investments in our fiber footprint for consumer to complement our micro-targeting strategy.

267.    The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, these statements gave the false impression that Lumen's legacy infrastructure

111

would not be phased out in a manner that increased its exposure to costly scrutiny, liability, and reputational harm, but failed to disclose, as detailed more fully above, that:  (i) its legacy wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in myriad locations across the United States, including on overhead utility poles; (ii) lead is classified as a hazardous waste by the EPA for purposes of the RCRA; (iii) this form of sheathing leached lead particles into the surrounding environment over time or otherwise released lead particles when disturbed through physical contact; (iv) many such cables were abandoned in place as they were displaced by fiber and no longer maintained by the Company thereafter; (v) doing so was prohibited by the RCRA and/or other waste disposal laws; and, thus, (vi) doing so significantly increased the likelihood that the Company would incur substantial costs or liabilities in connection with legislative actions, regulatory enforcement, investigative efforts, removal, remediation, litigation, and/or related penalties.  Indeed, Lumen has already faced (i) a multistage Superfund investigation by the EPA into its lead-covered cables in which the EPA has made clear that it wishes to develop a "long-term remediation solution"; (ii) requests for information about its lead-covered cables by Arizona's Attorney General's Office; and (iv) several class action lawsuits arising from its use and/or abandonment of lead-covered cables.  Further, Lumen has ***admitted*** that (i) the lead cables it has owned since the outset of the Class Period gives rise to a loss contingency under ASC 450 that needs to be disclosed in its SEC filings; and (ii) it anticipates incurring investigative costs due to the discovery of these lead cables.

268.   On February 13, 2019, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2018.  On this call, Defendant Storey described the cost savings associated with moving away from copper cable-based services:

> For the Wholesale business, we expect to see much of what we've seen over the
> past few years, generally declining but predictable revenue. . . .  Although there are

112

a lot of things we can do to manage the Consumer business for cash, we are always open to evaluating other ways to maximize shareholder return from these assets. *A big part of our story for 2019 is our focus on transformation. Our operational model is based on decades-old legacy systems and processes, which deliver a lower customer experience and a higher cost to serve than we want. We believe we can transform the experience and simultaneously greatly improve the cost structure.* But whether you're talking about investing for growth or investing to transform our company, as I've said many times before, our focus is always on generating significant free cash flow per share. We will carry that focus into 2019 and beyond. We have a lot of work ahead, but we believe our asset base, our focus and our financial strength give us good reasons to be excited about the future.

269. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about how moving away from "legacy systems," which includes Lumen's copper-based infrastructure, will "greatly improve the cost structure."

270. On February 25, 2019, Defendant Storey attended the Morgan Stanley Technology, Media & Telecom Conference hosted by Morgan Stanley analyst, Simon William Flannery. Asked about "the interplay between the legacy product sets and the strategic product sets" in terms of "transition," Storey stated as follows:

That's going to occur for a while. But it's also something, as an industry, that we're very good at. If you look at our company, CenturyLink, we have had a number of legacy products that have traded over time. . . . *And, so, we are very good at cannibalizing our products and services and augment them—augmenting them and replacing them with others—meanwhile taking cost out faster than revenues decline. And, so, we'll continue to do that with legacy services.* It's early still to before I can tell you where that bottoms out and where it starts to climb, but we've been pretty good as an industry and very good as a company.

271. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the benefits of

113

transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs."

272. On February 12, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2019, during which Storey stated:

> ***We've prioritized fiber deployment for consumers over previous investments in copper-based technologies like bonding and vectoring.*** We now have enabled more than 2 million fiber households, a number we expect to continue to grow. And we're making it easier for our consumer customers to access these networks by standardizing our product set and enabling a digital environment. That digital environment allows customers to immediately initiate service using automated and seamless provisioning processes. ***In turn, this lowers our cost to operate and improves our customer experience. This type of transformation creates a virtuous cycle. We optimize our capabilities to reduce costs***, which drives a better customer experience; and happy customers buy more and churn less.

273. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the benefits of transitioning away from "copper-based technologies," in terms of reducing "costs."

274. On February 25, 2021, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2020 (the "2020 Form 10-K"), which was signed by Defendants Storey and Dev. The 2020 Form 10-K stated the following about the Company's rebranding and new segments:

> As part of the recent Lumen rebranding, we refined our marketing approach to better align with our customer base. Lumen is the name of our company and our flagship brand for serving the enterprise and wholesale markets. We also launched our Quantum Fiber brand and reconfirmed the importance of our expansive CenturyLink platform name. Quantum Fiber is our brand for providing fiber-based services to small business and residential customers. ***Our CenturyLink brand covers our mass-marketed legacy copper-based services, managed for optimal cost and efficiency.***

275. The same statements as those quoted in the paragraph above were made in Lumen's annual report on Form 10-K for the full year ended December 31, 2021 (the "2021 Form 10-K").

114

276.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the Lumen's "copper-based services" being managed to optimize "cost."   Indeed, these statements gave the false impression that Lumen's copper-based services would not be managed in a fashion which would create costly scrutiny, liability, and reputational harm, when, in fact, they were.

277.    On August 5, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2020.  Asked about "the pace at which certain legacy services roll off" and "your ability to take legacy costs out" as the digital transformation accelerates, Defendant Storey responded as follows:

> So, a big part of the digital transformation is new opportunities for us as our customers are adapting to virtual reality and augmented reality and really the fourth industrial revolution.  And, so, that's good opportunity for us.  There are certainly products that are declining, and we see that, and we'll continue to see that.  But I don't think that—and there are aspects of our—helping our customers evolve in digital transformation that could affect those products.  But my goal is not only to help CenturyLink—existing CenturyLink customers go out and transform digitally, but it's my goal to go out and get other companies' customers to digitally transform.  And that brings new business to us.  It brings the profitable, high-margin business that we're focused on to the company.  And, so, yes, is there some aspect of it that can harm our legacy?  Yes, **but there's far more opportunity for us than downside.**

278.    Defendant Dev added immediately thereafter:

> I think just to add to Jeff's is—**and yes, we can take cost out faster on the legacy platforms**—it helps with our network simplification, it helps in terms of how we rightsize our real estate portfolio. So yes, we can do that to offset any impact from higher erosion on legacy products.  But the key point, like Jeff mentioned, is we've never seen it be like-for-like.

279.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the benefits of moving away from legacy services as part of the digital transformation in terms of reducing "costs."

115

280.    On September 15, 2020, Defendant Storey participated in the Goldman Sachs Communacopia Conference hosted by equity analyst Brett Joseph Feldman.  Feldman noted that ILECs appear to grapple with "cost associated with maintaining legacy services, which are typically in some state of decline" and asked whether the COVID-19 pandemic "accelerate[s] your ability to start addressing some of those structural legacy costs and take them out more quickly." Storey responded as follows:

> ***Yes.  We see that on both sides of the equation, on the revenue side and on the cost side.***  My expectation of our team is that we go out and that we help accelerate the transition, the digital transformation that our customers are going through.  We bring them to new technologies.  But we also go out and accelerate the digital transformation of people that are not our customers today.  And, so, we will continue to bring new products and services, new platforms online to bring those customers to us, and ***we'll continue to focus on taking out costs for the businesses that are declining.  We've proven we're very good at really both sides of that and want to continue to drive both sides of that.***

281.    The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the benefits of transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs."

282.    On February 7, 2023, Lumen hosted a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2022.  In response to a question about the ability to begin removing "legacy fixed costs" in rural areas, Stansbury stated:

> [W]hen you look at our existing footprint, we've obviously still got a lot of areas that are rural.  And as we've said, our plans for Quantum are dense urban areas and major metros, and that remains.  We're not going to be looking to run fiber to lower density areas because the numbers just don't make sense.
>
> As it relates to those areas, though, they—their overall performance has been more stable than the 20 states that we've sold.  So the performance there has been good. ***We will manage that very closely for things like*** rates and ***costs as time goes on.***

116

*But at this point, those are assets that are attractive to us, and we'll continue to manage them closely.*

283. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about managing Lumen's "legacy" assets to control "costs." Indeed, these statements gave the false impression that Lumen's legacy assets, including its copper-based network infrastructure, would not be managed in a fashion which would create costly scrutiny, liability, and reputational harm, when, in fact, they were.

284. On February 23, 2023, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2022 (the "2022 Form 10-K"), which was signed by Defendants Johnson and Stansbury. The 2022 Form 10-K offered the following description of Lumen's business segments:

We conduct our operations under the following three brands:

- "Lumen," which is our flagship brand for serving the enterprise and wholesale markets

- "Quantum Fiber," which is our brand for providing fiber-based services to residential and small business customers

- *"CenturyLink," which is* our long-standing brand for providing mass-marketed legacy copper-based services, *managed for optimal cost and efficiency.*

285. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 267 insofar as they speak about the Lumen's "copper-based services" being managed to optimize "cost." Indeed, these statements gave the false impression that Lumen's copper-based services would not be managed in a fashion which would create costly scrutiny, liability, and reputational harm, when, in fact, they were.

117

C.    **Statements About EHS Contingencies and Risks**

286.    On November 9, 2018, the day after the start of the Class Period, Lumen filed a quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q 2018 Form 10-Q"), which expressly incorporated by reference "the risk factors discussed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."  That filing, in turn, stated as follows in Part I, Item 1A:

> **Risks posed by other regulations**. All of our operations are also subject to a variety of environmental, safety, health and other governmental regulations. ***In connection with our current operations, we use, handle and dispose of various hazardous and non-hazardous substances and wastes.***  In prior decades, certain of our current or former subsidiaries owned or operated, or are alleged to have owned or operated, manufacturing businesses, for which we have been notified of certain potential environmental liabilities regarding those past operations. ***We monitor our compliance with applicable regulations or commitments governing these current and past activities***.  Although we believe that we are in compliance with these regulations in all material respects, ***our use, handling and disposal of environmentally sensitive materials, or the prior operations of our predecessors, could expose us to claims or actions that could potentially have a material adverse effect on our business, financial condition and operating results.***

287.    The same, or substantially similar, statements as those quoted in the paragraph above were made in Part 1, Item 1A of Lumen's annual report on Form 10-K for the full year ended December 31, 2018, filed March 11, 2019 (the "2018 Form 10-K"), and Lumen's annual report on Form 10-K for the full year ended December 31, 2019, filed February 28, 2020 (the "2019 Form 10-K").[1]  The 2018 Form 10-K and 2019 Form 10-K were signed by Storey and Dev.

288.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Lumen failed to disclose that:  (i) its wireline

---

[1] In the 2019 Form 10-K, this disclosure refers to "former manufacturing businesses" rather than "manufacturing businesses" standing alone but the text is otherwise identical, including the bold and italicized portions thereof alleged to be false and misleading.

118

network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement equipment; and, thus, (v) the risk that the company failed to comply with applicable environmental, safety, health and other governmental regulations and commitments was not merely hypothetical.  This statement is also false and misleading when made because, far from monitoring its compliance with applicable regulations or commitments, Lumen had no system in place prior to, or during, the Class Period to monitor worker compliance with the OSHA Lead Standard, the MNOSHA Settlement, or its internal guidelines addressing those matters.

289.    On March 11, 2019, Lumen filed its 2018 Form 10-K.  The 2018 Form 10-K stated as follows:

> From time to time *we may incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment.* Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, *we do not currently believe that future environmental compliance and remediation expenditures will have a material adverse effect on our financial condition or results of operations.  For additional information, see "Risk Factors—Risks Relating to Legal and Regulatory Matters—Risks posed by other regulation" in Item 1A of Part I of this report and Note 17—Commitments, Contingencies and Other Items included in Item 8 of Part II of this report.*

290.    The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because (i) the "Risks posed by other regulation" disclosure set forth in Item1A of Part I of that filing was itself false and misleading for all the reasons set forth in ¶ 288; and (ii)

119

Note 17—Commitments, Contingencies and Other Items to the consolidated financial statements failed to disclose that the lead cables owned by the Company gave rise to a loss contingency as set forth in ¶ 297. Indeed, Lumen has admitted that the lead cables it has owned since the outset of the Class Period give rise to a loss contingency which needs to be reported in that very section of its periodic SEC filings under ASC 450 (¶ 233).

291. On February 28, 2020, Lumen filed its 2019 Form 10-K. The 2019 Form 10-K stated as follows:

> From time to time **we may incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment.** Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, **we do not currently believe that future environmental compliance and remediation expenditures will have a material adverse effect on our financial condition or results of operations. For additional information, see (i) "Risk Factors—Risks Relating to Legal and Regulatory Matters—Risks posed by other regulation" in Item 1A of Part I of this report . . . and; and (ii) Note 19— Commitments, Contingencies and Other Items included in Item 8 of Part II of this report.**

292. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because (i) the "Risks posed by other regulation" disclosure set forth in Item1A of Part I of that filing was itself false and misleading for all the reasons set forth in ¶ 288; and (ii) Note 19—Commitments, Contingencies and Other Items to the consolidated financial statements failed to disclose that the lead cables owned by the Company gave rise to a loss contingency as set forth in ¶ 297. Indeed, Lumen has admitted that the lead cables it has owned since the outset of the Class Period give rise to a loss contingency which needs to be reported in that very section of its periodic SEC filings under ASC 450 as described more fully in ¶ 233.

120

D.    **Statements About GAAP Compliance**

293.    As provided herein, Lumen released consolidated financial statements in its periodic reports filed with the SEC throughout the Class Period.  In each of these filings, Defendants represented that the financial statements had been prepared in accordance with GAAP. As detailed more fully above (¶¶ 252-254), GAAP requires the disclosure of loss contingencies that are reasonably possible.

294.    The continued maintenance and/or condition of Lumen's extensive network of lead-sheathed cables represented "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity" under ASC 450-20.  The exposure to Lumen was, throughout the Class Period, massive, and included regulatory risk and scrutiny, litigation risks, operational risks, compliance risks, remediation risks and the risk of severe reputational harm, with the potential to adversely affect business and business relationships.

295.    At all times during the Class Period, Lumen faced at least a "reasonable possibility"—*i.e.*, more than a remote possibility—of loss related to potential removal and litigation costs associated with its lead cable network.  As detailed above, there are myriad facts supporting the proposition that, throughout the Class Period, Lumen faced a reasonable (and increasing) possibility that it would suffer a loss related to its lead cable network and physical plant.  Those risks of loss included:

296.    In the 2018 Form 10-K  and the 2019 Form 10-K, Defendants Lumen, Storey, and Dev stated: "***Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles.***"

297.    The statements identified in bold and italicized text in the preceding paragraphs were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, because, as detailed herein, Defendants failed to disclose

121

Lumen's risk of loss related to its lead sheathed copper cable network which was reasonably possible to occur based on the foregoing facts, including: (i) the scope of Lumen's lead sheathed cable network which spanned over 37 states of tens of thousands of miles; (ii) the acute public health concerns associated with lead contamination; (iii) the extensive federal and state regulation holding private actors liable for lead contamination and remediation; (iv) the known contamination caused by lead sheathed cables as acknowledged by industry officials; (v) Lumen's neglect of its lead sheathed cable network; (vi) the systemic exposure of Lumen employees to lead; and, (vii) Lumen's widespread failures to protect its employees from dangers of lead exposures.

298.    In the 2020 Form 10-K and 2021 Form 10-K, Defendants Lumen, Storey, and Dev stated: "***Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles.***"  Similarly, in the 2022 Form 10-K, Defendants Lumen, Johnson, and Stansbury stated:  "***Our consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles.***"

299.    The statements identified in bold and italicized text in the preceding paragraph were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 297, and for the additional reason that, as of January 2021, AT&T—one of Lumen's primary competitors—was sued by an environmental group to remediate lead cables in Lake Tahoe, which further indicated that Lumen could suffer loss related to its legacy lead sheathed copper network.  AT&T agreed to settle and remove the lead cables for a cost of up to $1.5 million in November 2021.

## LUMEN'S STOCK PRICE DECLINES AS THE TRUTH EMERGES

300.    As detailed more fully above, the *WSJ* published a series of stories in July 2023 on the widespread existence of decaying lead cables left behind by telecommunications companies, which prompted a series of actions by lawmakers and regulators and, ultimately, Lumen to confess

122

to the exposure it faces as a result of its continued ownership of such cables.  Each of these reports revealed, for the first time, new facts about the lead cables in Lumen's wireline network and its related exposure to various risks.  Investors had been in the dark about the lead cables and, thus, as this news was released, and investors were able to consider the ramifications of Lumen's extensive network of lead cables, the price Lumen's stock dropped.

### A.    July 9, 2023

301.    As detailed more fully above (¶ 215), on Sunday, July 9, 2023, the *WSJ* released an article entitled "America is wrapped in miles of toxic lead cables" which revealed that major telecommunication companies who inherited copper line assets from Bell System companies have left behind a sprawling web of abandoned lead cables across the country and summarized the results of the *Journal*'s investigation, which indicated that these cables were leaching life-threatening lead into waterways and communities where people live, work, and play.

302.    The *WSJ*'s story took many—including those intimately familiar with the telecommunications industry—by surprise.  For example, *Fierce Telecom*, a publication dedicated to the telecommunications industry, ran a story on July 10, 2023, about the *Journal*'s report, which stated that "the lead-covered telco cables seem to have flown under the radar, until now."  Analyst Craig Moffett of SVB MoffettNathanson, who covered the industry for more than 20 years said "we had never previously encountered the topic of lead in telecom networks."  Indeed, ***four former FCC Chairs told the WSJ that they were unaware of lead in legacy copper wire networks.***  Brett Foldman, a senior analyst with Goldman Sachs, later told *Yahoo! Finance* on July 28, 2023, that "[t]his was a surprising issue to investors," adding "[i]t's not something that has been talked about by the companies."

303.    On this news, Lumen's stock fell 5.93% to close at $2.06 on July 10, 2023, damaging investors.

123

**B.     July 11-12, 2023**

304.    After the close of trading on July 11, 2023, the *WSJ* published another story in its series on lead cables titled "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After WSJ Investigation."   That article revealed that a number of Congressmen were demanding that the owners of the lead telecom cables take immediate action to protect Americans and revealed that regulators were evaluating enforcement options.  The article read in part:

> Lawmakers are demanding that telecom firms act to ensure that Americans are safe after a Wall Street Journal investigation revealed that phone companies have left behind a network of cables covered in toxic lead, tainting water and soil in some locations.

> "***This is corporate irresponsibility of the worst kind***," Sen. Edward Markey, a Massachusetts Democrat, said in a letter Tuesday to USTelecom, the industry group representing telecom companies, including giants AT&T and Verizon.

> "The telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects. ***The members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way***."

> In the letter, viewed by the Journal, Markey demanded answers to a number of questions by July 25.

> *         *         *

> Rep. Patrick Ryan, a New York Democrat, said he is considering introducing legislation to address remediating contamination from the lead cables, following discussions with the Environmental Protection Agency.

> Journal testing in a playground in Wappingers Falls, N.Y., a town off the Hudson River that is in Ryan's district, registered high levels of lead underneath an aerial cable running along the perimeter of the park.

> Telecom companies should "***do the right thing and clean up their mess***" Ryan said.

> Ryan said he plans to enter the Journal's story about its lead-cable investigation into the record in testimony before a subcommittee of the House Transportation and Infrastructure committee on Thursday regarding budget requests.  The EPA is expected to testify at the hearing.

"There is no safe level of lead exposure—*none*—which is why I'm so disturbed by these reports of lead cable lines throughout the country," said Rep. Frank Pallone, Jr., a New Jersey Democrat and ranking member of the House Energy and Commerce committee.  "It is imperative that these cables be properly scrutinized and addressed."

*     *     *

***The EPA said it is reviewing the Journal investigation, adding: "Protecting Americans from lead exposure—especially those living in communities already overburdened by pollution and other health and social stressors—is a key focus of the agency's mission to protect public health"***

"Exposure to lead in our soil and water can significantly harm public health, especially for children in frontline communities," Sen. Tom Carper (D., Del.), chairman of the Environment and Public Works Committee, said in a statement. "As we learn more about the impact of these abandoned lead cables across our country, we must ensure that we are taking all the necessary steps and actions to protect communities from lead exposure."

*     *     *

***The Federal Communications Commission, which regulates telecom companies, said it has reached out to the EPA and the White House Council on Environmental Quality about the issues raised by the Journal's report and stands "ready to assist addressing these public health concerns."***

"We take seriously the concerns raised about potential lead exposure from communications lines—including the infrastructure that first connected so many remote and rural parts of the country," an FCC spokesperson said.  ***"We are currently looking into what authorities may exist under the Communications Act to address this issue."***

(Emphasis added.)

305.   As detailed more fully above (¶ 216), the *Journal* released a follow-up article about lead telecommunication cables on July 12, 2023, which revealed that Lumen workers were exposed to unsafe levels of lead as recently as 2013 and that ***Lumen knew about it***.  In fact, the article confirmed Lumen developed a "specialized safety training for handling lead-sheathed cables," conceding its longstanding knowledge of their existence and dangers.

125

306. On this news, Lumen's stock fell from $2.07 on July 11, 2023 to close at $2.04 on July 12, 2023, damaging investors. Many drew a direct link between the steady decline in the value of telecommunication company stocks and the *Journal*'s initial three stories. For example, Citigroup analyst Michael Rollins cited the *Journal*'s findings in a note to investors, warning that stocks with exposure to wireless networks with lead could trade lower in the near-term because of uncertainty and risk related to the lead cable issue. Similarly, the Business section of the *Journal* highlighted on July 14, 2023 that "Lumen Technologies, another telecom company with Bell assets, is down more than 13% this week" since the lead cable stories first broke.

**C. July 14, 2023**

307. On July 14, 2023, the business section of the *Journal* published a report, "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables," which estimated that it could cost the industry as much as $59 billion to clean up the lead cables and specifically identified Lumen as one of the most exposed, behind only AT&T and Verizon.

308. On this news, the price of Lumen's stock declined by $0.21, or 10.2%, to close at $1.85 on July 14, 2023, damaging investors.

**D. July 17, 2023**

309. On the morning of July 17, 2023, the *WSJ* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables." The article stated, in pertinent part:

> ***Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.***
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

126

* * *

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

***The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.***

* * *

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

* * *

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"***Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water. Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC on this so we are happy to follow up in the coming weeks."***

(Emphasis added.)

310.    On this news, the price of Lumen stock tumbled by $0.15 to close at $1.70 on July 17, 2023. Media linked the continued decline to the mounting signs that the Company faced significant exposure for its lead cables. For example, *Fast Company* observed in a story that ran on July 17, 2023 that "telecom investors are racing for the exists over fears that AT&T, Verizon, and other industry giants could be on the hook for potential health risks posed by decades-old

127

infrastructure," including, specifically "Lumen Technologies." Industry publication *Fierce Telecom* pointed out that "Telecommunication stocks saw a notable downturn last week amid uncertainty brought on by an investigative journalism exposé published by the Wall Street Journal that shed light on the lead contamination issue," noting "Lumen down 10%." The *Journal* reported on the morning of July 18, 2023, that "[s]maller carriers" including "Lumen have seen their shares plunge 34% and 22%, respectively, on worries about their larger reliance on wireline services" since the *Journal*'s report first ran on July 9, 2023. The story continued that this was not an "overreaction" considering "how little is known about the true extent of the problem, or what the ultimate financial exposure may be for telecom carrier holding legacy networks."

### E. July 18, 2023

311. On the morning of July 18, 2023, *Fierce Telecom* ran a story that contained a quote from a Lumen spokesperson which confirmed for the first time that the Company was "***working with outside experts to prioritize and sequence our investigative efforts***, including site testing and implementation of science-based steps where advisable."

312. On this news, the Company's stock fell by 4.71% to close at $1.62 on July 18, 2023.

### F. July 26, 2023

313. After the close of trading on July 26, 2023, the *WSJ* released another article in its lead cable series titled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> ***The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.***

> ***The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.***

128

*The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days.* Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

*The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.*

314. On this news, Lumen's stock tumbled 5.5% to close at $1.71 on July 27, 2023.

**G.     August 1, 2023**

315. As detailed more fully above (¶ 232), Lumen hosted an earnings call after market close on August 1, 2023, in which it revealed that its legacy wireline network still contains up to **35,000 miles** of lead-covered cables.

316. At approximately the same time, Lumen filed a quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2023 (the "2Q 2023 Form 10-Q"), in which it revealed that the lead-clad cables it owned all along gave rise to a risk of loss that it never previously disclosed to investors during the Class Period:

From time to time, we are involved in other proceedings incidental to our business, including patent infringement allegations, regulatory hearings relating primarily to our rates or services, actions relating to employee claims, various tax issues, environmental law issues, grievance hearings before labor regulatory agencies and miscellaneous third-party tort actions or commercial disputes.

. . . .

We are subject to various foreign, federal, state and local environmental protection and health and safety laws. From time to time, we are subject to judicial and administrative proceedings brought by various governmental authorities under these laws. . . . *In addition, in the past we acquired companies that installed lead-*

129

> *sheathed cables several decades ago, or operated certain manufacturing companies in the first part of the 1900s. Under applicable environmental laws, we could be responsible for environmental liabilities arising from the historical operations of our predecessors.*

None of the periodic reports that Lumen previously filed with the SEC during the Class Period on Form 10-Q or Form 10-K included the bold and italicized statements in the preceding text in any Note to the consolidated financial statements or otherwise. Notably, this disclosure was made in Note 12 to the consolidated financial statements contained therein covering "Commitments, Contingencies and Other Items," which includes the information required by ASC 450.

317. On this news, Lumen's stock price declined by 11.8% to close at $1.79 on August 2, 2023, damaging investors.

### H.    October 31, 2023

318. After market close on October 31, 2023, Lumen filed a quarterly report on Form 10-Q for the quarterly period ended September 30, 2023, in which it revealed that the Company anticipates incurring "investigative costs" associated with its ownership of lead-clad cables:

> Our network includes some residual lead-sheathed copper cables installed years ago. These lead-sheathed cables constitute a small portion of our network. ***Due to recent media coverage of potential health and environmental risks associated with these cables, we anticipate incurring certain investigative costs.*** We also may include other costs from related proceedings, including litigation, regulatory initiatives, and remediation.

319. On this news, Lumen's stock price dropped by 32.8% to close at $0.98, a Class Period and all-time low.

### I.    January 11, 2024

320. As detailed more fully above (¶ 237), before market close on January 11, 2024, the *WSJ* released a follow-up article about lead telecommunication cables, which revealed that (i) the EPA decided to enter the next stage of a multi-step Superfund review, and designate the investigation as "high priority," after testing at three sites identified in the *WSJ*'s initial reporting

130

confirmed that lead levels exceeded safety standards for children; and (ii) the DOJ was continuing to move forward with its investigation into whether the companies that owned the lead cables, including AT&T, had knowledge of their potential risks to employees and the environment.

321.    On this news, Lumen's stock fell more than 7% from the closer of trading the previous day to close at $1.58 on January 11, 2024.  Market professionals attributed the prompt decline to the new details reported by the *WSJ*.  For example, an article by *Seeking Alpha* that same day reported that "[m]ajor U.S. telecom stocks slipped late Thursday as Environmental Protection Agency called on them to meet about their lead-sheathed phone cables, the *WSJ* reported."

**ADDITIONAL FACTS PROBATIVE OF SCIENTER**

322.    The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Lumen's name, they knew, or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts.  The Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

323.    The Individual Defendants received information reflecting the true facts regarding Lumen and its operations and business practices, had control over and/or received the Company's materially misleading misstatements, and/or their associations with the Company made them privy to confidential proprietary information concerning Lumen.  Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud

as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of Lumen, including the Individual Defendants.

324.    These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

### A.    Defendants Had An Affirmative Legal Obligation to Protect Workers and the Environment from Lead Contamination

325.    Throughout the Class Period, Lumen was under a known legal obligation to ensure that its work environment and practices comply with the OSHA Lead Standard , applicable state lead standards, the MNOSHA Settlement Agreement and related side agreements with the CWA (¶¶ 82-84).  In addition, the Company was obligated to ensure that hazardous wastes such as lead were properly disposed at a certified waste disposal or recycling site in accordance with the RCRA (¶¶ 88-90, 120-121).  Any argument that retirement in place does not amount to disposal for purpose of the RCRA is incorrect.  Abandonment is effectively the same as abandonment, particularly where the cable has reached the end of its economic life and is "snipped."  Stated differently, if Lumen removed the cable and disposed it by putting back in the exact same place where it first was, the disposal would be subject to the RCRA.  Either Defendants knew about the failure to adhere to their legal obligations or were severely reckless in not knowing.

### B.    The Individual Defendants Were Repeatedly Made Aware Of the Dangers of Lead Through Their Lead Paint Disclosure Obligations

326.    Like most any homeowner in the United States, all the Individual Defendants were made aware of the dangers of lead before making any of the misstatements during the Class Period through the real estate disclosure requirements.

327.    In addition to the lead pain disclosures mandated by HUD and the EPA (¶¶ 72-**Error! Reference source not found.**), many states have passed their own lead paint disclosure

132

requirements beyond those mandated by HUD and EPA. For example, since 1995, Oklahoma has required sellers to furnish a disclosure statement approved by the Oklahoma Real Estate Commission which includes information on a number of items, including the "existence of hazardous or regulated materials and other conditions having an environmental impact." Okla. Stat. tit. 60 § 833(B). The form promulgated by the Oklahoma Real Estate Commission, last updated November 2020, is known as the Residential Property Condition Disclosure Statement and under the heading "Environmental" asks the seller "Are you aware of the presence of lead-based paint?" and "Have you tested for lead-based paint?" The form requires the seller to sign the form and state that "based on seller's CURRENT ACTUAL KNOWLEDGE of the property, the information contained above is true and accurate." Similarly, in Washington, sellers of residential property must complete and furnish a standardized form, often referred to as Form 17, which requires sellers to affirmatively state if there are "any substances . . . in or on the property that may be environmental concerns, such as . . . lead-based paint." Wash. Rev. Code § 64.06.020. This includes both real property and condominiums. Wash. Rev. Code § 64.06.05(3). As required by law, Form 17 provides on the cover page in large letters "SELLERS MAKE THE FOLLOWING DISCLOSURES . . . TO BUYER BASED ON SELLER'S ACTUAL KNOWLEDGE." In addition, the buyer must sign the statement and represent that "Buyer has read and reviewed the Seller's responses to this Seller Disclosure Statement" and "waives Buyer's right to revoke Buyer's offer based on this disclosure."

328. Before or during the Class Period, Defendant Jeff Storey and/or trusts that he operated as trustee entered into real estate transactions to acquire residential properties that included a home built prior to 1978. For example, in April 2012, a trust established and operated by Storey purchased a residential property in Boulder, Colorado for $575,000. At the time of the

133

transaction, this property included a single family home originally built in 1969. Storey also owned a number of properties in and around Tulsa, Oklahoma and Haskell, Oklahoma, including a residential property in Tulsa, Oklahoma that he and his wife acquired in May 2021 for $900,000. At the time of the transaction, this property included a single family home originally built in 1938. Accordingly, in connection with each of the preceding transactions, Storey was required by federal law to sign a lead paint addendum to the sale contract in which he acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 72 and certified that he reviewed the statement explaining that lead poses significant health hazards and received notice of any lead paint hazards from the seller.

329.     Storey and/or trusts that he operated as trustee also sold a number of residential properties before the start of the Class Period that were subject to lead disclosure rules. For example, Storey sold a home he owned in Bixby, Oklahoma in May 2000. He sold another home he owned in Bixby, Oklahoma in March 2007. Storey also sold a home he owned in Broken Arrow, Oklahoma in September 2015. He sold another home he owned in Bixby, Oklahoma in July 2016. Meanwhile, Storey sold the home he owned in Boulder, Colorado described in the preceding paragraph in April 2023 for $5 million. Accordingly, , Storey was required by applicable state law to sign a disclosure statement in connection with each of the preceding transactions in Oklahoma in which he certified whether he was aware of environmental hazards, including lead-based paint, and, thus, on notice that lead was an environmentally sensitive material.

330.     Before the Class Period, Defendant Indraneel Dev entered into numerous real estate transactions to acquire residential properties that included a home built before 1978. For example, on October 19, 2016, Dev purchased a residential property in Broomfield, Colorado that included

134

a home originally build in 1972. In March 2018, Dev purchased a residential property in Aurora, Colorado that included a home originally built in 1953. Several months later, in May 2018, Dev purchased another residential property in Aurora, Colorado with a home originally built in 1976. Accordingly, in connection with each of the preceding transactions, Dev was required by federal law to sign a lead paint addendum to the sale contract in which he acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 72 and certified that he reviewed the statement explaining that lead poses significant health hazards and received notice of any lead paint hazards from the seller.

331.    Before starting at Lumen, Defendant Kate Johnson entered into several real estate transactions to acquire residential properties subject to lead disclosure rules, including one with a home built before 1978. For example, in approximately July 2004, Johnson and her husband purchased a residential property in Raleigh, North Carolina. At the time of the transaction, this property included a single family home originally built in 1925. Accordingly, in connection with this real estate acquisition, Johnson was required by federal law to sign a lead paint addendum to the sale contract in which she acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 72 and certified that she reviewed the statement explaining that lead poses significant health hazards and received notice of any lead paint hazards from the seller. Johnson also owned several properties in Washington after moving there from the East Coast. In July 2017, Johnson and her husband purchased a residential property in Mercer Island, Washington for $5.5 million. Johnson and her husband also purchased a condominium in downtown Seattle, Washington in February 2020. Accordingly, in connection with the two preceding transactions, Johnson was required by applicable state law to receive a disclosure statement from the sellers

135

which identified certain "environmental concerns," including lead-based paint, and certify that she reviewed such disclosures before proceeding with the transaction.

332.    Johnson also sold several homes before starting at Lumen that were subject to lead disclosure rules, including at least one subject to the federal Lead Disclosure Rule.  For example, in January 2017, Johnson and her husband sold the property they owned in Raleigh, North Carolina for approximately $1.9 million.  Because this property included a home originally built before 1978, Johnson was required by federal law to disclose to the seller if it contained any lead paint or lead paint hazards, provide a copy of the EPA-approved lead paint pamphlet described more fully in ¶ 72, and certify to this best of her knowledge that the information she provided was true and accurate.  In addition, in July 2020, Johnson and her husband sold the condominium they owned in downtown Seattle, Washington.  Accordingly, Johnson was required under applicable state law to sign a disclosure statement in connection with the preceding transaction in which she was required to certify whether she was aware of any "environmental concerns," including lead-based paint, and, thus, on notice that lead was an environmentally sensitive material.

333.    Before starting at Lumen, Defendant Stansbury and/or trusts that he operated as trustee entered into real estate transactions to acquire residential properties that included a home built before 1978.  In November 2013, trusts established and operated by Stansbury and his wife purchased a presidential property in Vail, Colorado for approximately $850,000.  At the time of the transaction in November 2013, the property included a single family home originally built in 1965.  In August 2017, trusts established and operated by Stansbury and his wife purchased a residential property in Greenwood Village, Colorado for approximately $1.8 million.  At the time of the transaction in August 2017, this property included a single family home originally built in 1976.  Accordingly, in connection with the real estate acquisitions described above, Stansbury was

136

required by federal law to sign a lead paint addendum to the sale contract in which he acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 72 and certified that he reviewed the statement explaining that lead poses significant health hazards and received as well as a notice of any lead paint hazards from the seller.

334.    Stansbury and/or trusts that he operates as trustee also sold, or is also actively seeking to sell, property that is subject to the federal Lead Disclosure Rule.  In November 2019, a trust that operated by Stansbury as trustee sold its interest in the property in Vail, Colorado described in the preceding paragraph for over $ 1 million.  Because this property included a home originally built before 1978, Stansbury was required by federal law to disclose to the seller if it contained any lead paint or lead paint hazards, provide a copy of the EPA-approved lead paint pamphlet described more fully in ¶ 72, and certify to this best of his knowledge that the information he provided was true and accurate.  In addition, Stansbury and his wife put the home they own in Greenwood Village, Colorado back on the market in March 2023 for $13 million after performing renovations on it.  Because the original structure was built before 1978, Stansbury was required by federal law to provide the same lead paint information as he did for the property he sold in Vail, Colorado, if he has not done so already.

C.    **Defendants Had Powerful Economic Incentive to Hide Lumen's Widescale Abandonment of Highly Toxic Hazardous Waste Across the Country**

335.    During the Class Period, Defendants were motivated to hide the substantial exposure to liabilities from lead cables to protect their outsized incentive compensation.  Lumen's executive compensation plan had three main components: base salary, non-equity incentive plan compensation, and equity awards, in the form of restricted stock units.  The incentive components far outweighed the salary component, by up to as much as *1,522%* of base salary.

137

336.    Lumen's 2018 executive compensation is described in its definitive proxy statement for 2019, filed on Form DEF14A on April 10, 2019 (the "2019 Proxy Statement").  The non-equity incentive plan compensation was 90% based on financial targets, of which 65% was based on adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") and 25% was based on free cash flow.  Of the equity awards, 60% were awarded based on EBITDA growth over a two-year period, and 40% were awarded based on the executive's time with the Company.  Thus, both the non-equity incentive plan compensation and the equity awards would be significantly diminished if Lumen revealed a widescale practice that exposed it to a nationwide environmental liability.

337.    As reported in the 2019 Proxy Statement, in 2018, Storey was granted more than $25 million in incentive compensation tied to metrics described in the preceding paragraph, or 1,522% more than his base salary, and Dev was granted more than $1.8 million in incentive compensation tied to the metrics described in the preceding paragraph, or 403% more than his base salary.

338.    Lumen's 2019 executive compensation is described in its definitive proxy statement for 2019, filed on Form DEF14A on April 8, 2020 (the "2020 Proxy Statement").  The non-equity incentive plan compensation was 90% based on financial targets, of which 65% was based on adjusted EBITDA and 25% was based on free cash flow.  Of the equity awards, 60% were awarded based on EBITDA growth over a two-year period, and 40% were awarded based on the executive's time with the Company.  Thus, both the non-equity incentive plan compensation and the equity awards would be significantly diminished if Lumen revealed a widescale practice that exposed it to a nationwide environmental liability.

138

339.     As reported in the 2020 Proxy Statement, in 2019, Storey was granted nearly $11 million in incentive compensation tied to the metrics described in the preceding paragraph, or 611% more than his base salary, and Dev was granted more than $3 million in incentive compensation tied to metrics described in the preceding paragraph, or 481% more than his base salary.

340.     Lumen's 2020 executive compensation is described in its definitive proxy statement for 2021, filed on Form DEF14A on April 7, 2021 (the "2021 Proxy Statement").  The non-equity incentive plan compensation was 90% based on financial targets, of which 50% was based on adjusted EBITDA, and 25% was based on free cash flow.  Of the equity awards, 60% were awarded based on EBITDA growth over a two-year period (with a potential 20% modifier based on relative TSR), and 40% were awarded based on the executive's time with the Company.  Thus, both the non-equity incentive plan compensation and the equity awards would be significantly diminished if Lumen revealed a widescale practice that exposed it to a nationwide environmental liability.

341.     As reported in the 2021 Proxy Statement, in 2020, Storey was granted more than $12 million in incentive compensation tied to the metrics described in the preceding paragraph, or 676% more than his base salary, and Dev was granted more than $3.5 million in incentive compensation tied to the metrics described in the preceding paragraph, or 489% more than his base salary.

342.     Lumen's 2021 executive compensation is described in its definitive proxy statement for 2022, filed on Form DEF14A on April 8, 2022 (the "2022 Proxy Statement").  The non-equity incentive plan compensation was 90% based on financial targets, of which 50% was based on adjusted EBITDA, and 25% was based on free cash flow.  For the equity awards, 60%

139

were awarded based on performance (50% of which was based on cumulative adjusted EBITDA and 50% of which was based on relative TSR), and 40% were awarded based on the executive's time with the Company.  Thus, both the non-equity incentive plan compensation and the equity awards would be significantly diminished if Lumen revealed a widescale practice that exposed it to a nationwide environmental liability.

343.    As reported in the 2022 Proxy Statement, in 2021, Storey was granted more than $16 million in incentive compensation tied to the metrics described in the preceding paragraph, or 913% more than his base salary, and Dev was granted nearly $5 million in incentive compensation tied to the metrics described in the preceding paragraph, or 644% more than his base salary.

344.    Lumen's 2022 executive compensation is described in its definitive proxy statement for 2022, filed on Form DEF14A on April 5, 2023 (the "2023 Proxy Statement").  The non-equity incentive plan compensation was 90% based on financial targets, of which 50% was based on adjusted EBITDA, and 25% was based on free cash flow.  For the equity awards, 60% were awarded based on performance (50% of which was based on cumulative adjusted EBITDA and 50% of which was based on relative TSR), and 40% were awarded based on the executive's time with the Company.  Thus, both the non-equity incentive plan compensation and the equity awards would be significantly diminished if Lumen revealed a widescale practice that exposed it to a nationwide environmental liability.

345.    As reported in the 2023 Proxy Statement, in 2022, Storey was granted more than $14 million in incentive compensation tied to the metrics described in the preceding paragraph, or 790% more than his base salary, Dev was granted more than $3.5 million in incentive compensation tied to the metrics described in the preceding paragraph, or 1,873% more than his base salary, Johnson was granted more than $2.5 million in incentive compensation tied to the

metrics described in the preceding paragraph, or 1,432% more than her base salary, and Stansbury was granted more than $7 million in incentive compensation tied to the metrics described in the preceding paragraph, or 1,280% more than his base salary.

**D.      Defendants Had Additional Motivate to Suppress Information about Lumen's Network of Abandoned Lead Cables from Becoming Public**

346.    As explained above (¶¶ 175-178), from the outset of the Class Period, Storey and Dev decided implement sweeping cost reductions with respect to Lumen's legacy network in order to make its investment in fiber viable.  Call after call, and filing after filing, Defendants stressed during the Class Period that they were focused on reducing costs from the Company's "legacy services" (*e.g.*, ¶¶ 268, 270, 274, 277, 278, 280, 282, 284)

347.    The costs associated with lead cable removal and remediation were fundamentally incompatible with the Company's public commitment to reduce costs.  Indeed, this is precisely why Lumen as a matter of practice knowingly retired copper cable wires in place when they reached the end of their economic life rather than incur the cost of safety removing them from the environment, even in densely populated urban locations with large numbers of children, much less addressing the enormous web of previously-retired lead cables littered across the country.

348.    As described more fully above (¶ 192), an expert retained by landowners in the Texas Action against AT&T estimated that it would cost approximately $33.43 per foot to remove lead cables buried on the landowners' property.  Applying this estimate to the 35,000 miles of lead-encased cable remaining in Lumen's legacy network, the total cost to remove and remediate those cables would be *$6.2 billion*, or $176,510.4 per mile.

349.    In August 2010, Northeast Utilities Service Company informed the EPA that it would cost approximately $800 million to remove all 1,200 miles of its paper insulated lead cable within its underground electric distribution system.  This represents a cost of approximately

$666,666.67 per mile, or $126.26 per foot. Not even accounting for inflation, applying this real-world estimate to the 35,000 miles of lead-encased cable remaining in Lumen's legacy network, the total cost to remove and remediate those cables would be a staggering *$23.3 billion*, or $666,652.80 per mile.

350. In other words, it would cost Lumen anywhere from *$6.2 billion to $23.3 billion* to appropriately remove and remediate the extensive amount of lead cables that admittedly remained in its legacy network as of August 2023.

351. The foregoing estimate does not even account for the 371,000 miles of ILEC wireline infrastructure that Lumen sold to Brightspeed in 2022, which, as detailed more fully above (¶ 112), could be reasonably expected to contain up to 18,550 additional miles of lead cable. This is significant because, unlike prior owners that have dissolved or merged out of existence, Lumen could be responsible for some or all of the remediation costs if the EPA decides to take action in its ongoing CERCLA investigation. While determination of liability under CERCLA depends on various factors, in a response action to address risks of lead from a telecommunications cable, PRPs could include the company that installed and operated the cable, current and some past owners of the site on which the cable is located. *See* CRS In Focus IF11790, *Liability Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)*.

**E. Stansbury Engaged In a Close, Month-Long Review of Lumen's Legacy Assets Upon Joining the Company for the Purpose of Enhancing Its Disclosures**

352. Defendant Stansbury joined Lumen as CFO on April 4, 2022. On May 4, 2022, Lumen hosted a conference call with analysts to discuss its financial results for the quarter ended March 31, 2022, the first such call since Stansbury joined the Company a month earlier.

353. During the call on May 4, 2022, an analyst from Citigroup, Inc. asked for more detail on the subject of "legacy revenue," including the rate of which "legacy converts to strategic."

Lumen's CEO, Defendant Storey, responded, "'great question, and I'll ask Chris to answer it because that's what he spends a lot of time over the last month that he's been here," adding "[h]e's thinking about how do we give appropriate disclosures, better disclosure." Stansbury confirmed that this was "an exercise that we're going through now" but indicated that "[w]e didn't have enough time to get through that before this call."

### F.    The Company Regularly Reviewed Data on Cable Retirement

354.    As detailed more fully below (¶¶ 369-371), Lumen considers its network to be one of its most important assets. Like any other asset, the value of Lumen's property, plant, and equipment, including physical cable plant, must be recorded on Lumen's balance sheet. Lumen uses the "straight-line" method specific unit or group method to depreciate the value of those assets over the course of their useful economic life until they are retired. The group method provides for the recognition of the remaining net investment, less anticipated net salvage value.

355.    Because of the sheer amount of property, plant, and equipment owned by Lumen, even a minor adjustment to the anticipated useful economic life of those asset can have a significant impact on their value. For example, as of 2019, a hypothetical one year increase or decrease in the estimated remaining useful lives of Lumen's property, plant and equipment would require a decrease in depreciation expense by approximately $360 million annually or an increase in depreciation expense by approximately $470 million annually, respectively.

356.    As such, and because of the rapid changes in technology and competition in the telecommunications industry, the Company has stated that "*[w]e regularly review data on* utilization of equipment, *asset retirements and salvage values* to determine adjustments to our depreciation rates" used for property, plant, and equipment, including, necessarily, its copper cable plant. As such, the Company regularly reviews data concerning its retirement of copper wires assets and whether any such wires that remain have any salvage value. Indeed, the Company

143

recently reported that depreciation expenses decreased by $193 million "***due to the early retirement of certain copper-based infrastructure during the fourth quarter of 2021***."

### G.       Defendants' Denials Support an Inference of Scienter

357.    Since the news first broke on July 9, 2023, Defendants have repeatedly denied and downplayed the significance of the public health and safety issues posed by Lumen's lead cables.

358.    For example, on or around July 17, 2023, a Lumen spokesperson referred a reporter who asked for a statement to the USTelecom's website on telecommunications cables (¶ 222). That site was established just days earlier to ***refute*** the conclusions reached by the *WSJ*.  Indeed, that website repeatedly proclaims that "we have not seen, nor have regulators identified, evidence that lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue."

359.    Similarly, Defendant Stansbury has consistently dismissed the reporting by the *Journal* and the significance of Lumen's exposure.  For instance, in August and September of 2023, Stansbury referred to the reporting as "unfortunate" and repeatedly stated that there is an ongoing "debate" about whether telecommunication companies like Lumen should even do anything about it (¶¶ 234, 235).  During these calls, Stansbury also repeatedly claimed that the amount of lead was "small" and not a "major issue" even though Lumen owns enough to wrap around the entire Earth more than once (¶¶ 232, 235).

### H.       Storey and Johnson Repeatedly Professed To Be Tuned In To Sustainability, the Environment, and Employee and Community Health

360.    Throughout the Class Period, Defendants Storey and Johnson repeatedly professed to be tuned into sustainability, the environment, and employee and community health.  This further supports an inference of scienter of the wrongs alleged herein.

144

361. For example, in Lumen's 2019 ESG Report, published in April 2020, Storey declared that "we have very intentionally committed to growing our business in an ethical and sustainable manner" and that "[b]eing a good corporate citizen is a priority for CenturyLink." Similarly, in Lumen's 2020 ESG Report, published in April 2021, Storey personally stated that "environmental sustainability and social responsibility are core to our business priorities."

362. In November 2022, shortly after the Company announced the appointment of Defendant Kate Johnson as CEO, Storey said that "Kate brings a long track record of success with some of the world's most admired technology companies and will continue to move our ESG strategy forward." In the Company's ESG Report for 2022, published in December 2023, Johnson stated that "[w]e aim to contribute to a more sustainable future for all" and "I'm excited about the role Lumen is playing in making our world a better place for everyone." In the press release announcing the publication of the report Johnson also stated that "Lumen started on a journey into a new era" in 2022 and, going forward, "we are mindful that digital trust, social responsibility, and environmental stewardship are inherent to our purpose."

I.    **Lumen Maintained Sophisticated Information Systems That Provide Detailed Information on the Lead In Its Copper Cable Network**

363. Numerous CWs confirmed that Lumen and its predecessor maintained proprietary engineering maps detailing the layout and composition of its legacy copper line network, including the portions thereof that contained lead.

364. CW3 explained that Lumen's engineering department maintained a live database with detailed maps of its copper cable network that contained the location of every telephone cable, the location of every pole, and an alphanumeric code for each segment of cable signifying the type of cable, its fill, and insulation, and allowed users who had access to draw in changes or updates as appropriate. CW3 specified that the database used by CenturyLink was known as Engineering

145

Work Order, or EWO, and the database used on the Qwest side of the business was known as OSP-FM, but both were migrated over to a new system in 2016 or 2017 called National Design System, or NDS. CW3 had access to, and used, all these databases because of utility pole changes. This is corroborated by CW6 and CW8, who both recalled that Lumen had a mapping system called NDS which contained diagrams of the cable network, including their location, length, and sheathing/cable type. Consistent with CW3, CW8 said that this information was previously housed in a database called OSP-FM.

365.    As CW3 explained, any "jobs" performed on the network were input into these databases once approved by engineers and automatically updated on the system's server. Similarly, CW8 reported that NDS was where "engineers would draw the plans" and "add on" to the existing maps. CW5 also recalled that, generally, engineers were in charge of maintaining and editing the Company's network maps. Notably, CW3 specified that aerial cables abandoned in place continued to be reflected in the network maps maintained in NDS.

366.    CW6 reported that Lumen leadership had access to the engineering database. In fact, CW6 recalled one occasion where he brought an issue to the attention of Josh, Vice President of Engineering & Construction, and "he actually brought it [NDS] up on the computer."

367.    Numerous CWs confirm that Lumen gave frontline workers access to read-only versions of the maps from the engineering database to perform repair work through various software applications. When CW3 started in 2005, technicians were given laptops with pre-loaded portions of the network maps from EWO through an application called Map Viewer but eventually Lumen provided access to the read-only maps through a smartphone application, which remained in use from 2018 throughout at least October 2022. CW3 added that, unlike the maps pre-loaded maps, which needed to be updated periodically, the smart phone application incorporated "real-

time updates" from the engineering database.   Any segment of cable where an engineer commissioned an update would "light up" in green and offer further detail on the nature of the update, said CW3.  CW1 , CW4, CW5, and CW8 all reported that they were given access to read-only maps maintained by the engineers through their laptop or smartphone.  CW1 , CW4, and CW8 also specified that these maps displayed the location of each cable and included an alphanumeric code for each segment of cable that relayed information about the type of cable, including gauge, pair count, fill, and sheathing.

368.   According to the CWs who accessed these maps, the alphanumeric code for each segment of cable *indicated whether the cable had lead sheathing*.  CW3 and CW8 both explained that if, for example, the alphanumeric code began with "XX" or ended with the letter "L" that the cable contained lead.  Similarly, CW1  recalled that, on the schematics received from the engineering department, any cable with "XX" in alphanumeric parenthetical next to the cable indicated that it was covered in lead.  Both CW3 and CW6 also stated that the designation for Stalpeth cable, STL, was often used to designate paper insulated cable, which indicated that the cable was lead.  CW3 said that anyone using the viewing tool could retrieve this information by clicking (tapping) on a particular cable line.

J.   **Lumen's Telecommunications Network Is Admittedly At the Core of Its Business**

369.   The Individual Defendants' knowledge of the practices discussed herein can be inferred from the fact that Lumen's cable network was core to the operation of Lumen's business throughout the Class Period and the focus of great attention during the Company's "digital transformation."

370.   Throughout the entirety of the Class Period, Lumen stated in its periodic SEC filings that its network of fiber-optic and copper cables was the means by which it provided "most

of our products and services."  As such, Lumen has noted shied away from reporting in its 2020 Form 10-K, 2021 Form 10-K, and 2022 Form 10-K that "*we view our network as one of our most critical assets*."  That same section of Lumen's SEC filings explains that its network "consists of fiber-optic and copper cables."

371.    Although business from "legacy" services was eroding as new technology took hold, Lumen's copper wire infrastructure remained a key piece of its business.  Before Lumen sold its ILEC assets in 20 states to Brightspeed at the end of 2022, it still had at least *double* the amount of copper wire infrastructure than fiber optic infrastructure.   But the same is true thereafter.  As late as June 5, 2023—practically the end of the Class Period—Defendant Stansbury admitted that "*[t]oday over half of our revenue is in legacy products.*"  It is apparent why:  as of December 31, 2022, Lumen reported that, in addition to the 160,000 commercial buildings that are directly connected to its fiber network, "approximately 3.1 million" of the 21.8 million residential units serviced by its network "were capable of receiving services from our fiber-based infrastructure, with the remainder connected with copper-based infrastructure."  In other words, approximately 18.7 million, or *85 percent*, of the 21.96 million units connected to its network were serviced through its legacy copper-wire system.

### K.    Defendants' SOX Certifications Support An Inference of Scienter

372.    Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("SOX") to protect investors by improving the accuracy and reliability of corporate disclosures.

373.    Among other things, Section 404 of SOX directed the SEC to prescribe rules which effectively required all public companies to establish and maintain a system of internal controls over financial reporting ("ICFR"), and to assess the effectiveness of those controls on a periodic basis. As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only

148

maintain ICFR but evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter. Other provisions of SOX require the CEO and CFO of any such company to certify compliance with SOX in each annual and quarterly report filed with the SEC on Form 10-K or Form 10-Q, including that it complies with GAAP.

374. During the Class Period, the Individual Defendants included such SOX certifications in each Form 10-K and Form 10-Q that Lumen filed with the SEC. Specifically, each Individual Defendants signed SOX certifications accompanying the filings in the table below:

| Defendant | Filings Including a SOX Certification |
|---|---|
| Storey | 3Q 2018 Form 10-Q, 2018 Form 10-K, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 2019 Form 10-K, 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 2020 Form 10-K, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 2021 Form 10-K, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, and 3Q 2022 Form 10-Q |
| Johnson | 2022 Form 10-K, and 1Q 2023 Form 10-Q |
| Dev | 3Q 2018 Form 10-Q, 2018 Form 10-K, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 2019 Form 10-K, 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 2020 Form 10-K, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, and 2021 Form 10-K |
| Stansbury | 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, 2022 Form 10-K, and 1Q 2023 Form 10-Q |

375. Among other things, the SOX certifications accompanying each of these filings certified that the signatory was "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

## LOSS CAUSATION

376. At all relevant times, Lumen securities traded in an open, well-developed, and efficient market which promptly digested new information regarding the Company from all

reasonably accessible public sources and reflected such information in the price of Lumen's securities.

377.   As described above, throughout the Class Period, Defendants made false and misleading statements which misrepresented and/or failed to disclose the adverse facts detailed herein.   Defendants' false and misleading statements caused Lumen securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

378.   As detailed herein, the price of Lumen securities fell precipitously on high volume in response to disclosures made on July 9, 2023, July 11, 2023, July 12, 2023, July 14, 2023, July 17, 2023, July 18, 2023, July 26, 2023, August 1, 2023, and October 31, 2023.  The price of Lumen securities fell in response to each such disclosure by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased such securities during the Class Period at inflated prices.

379.   Each decline in the price of Lumen securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud.  The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

380.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered

150

significant losses and damages. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.,* damages under the federal securities laws.

### PRESUMPTION OF RELIANCE

381. Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because, among other things:

    (a) Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

    (b) the misrepresentations and/or omissions were material;

    (c) the Company's securities traded in an efficient market;

    (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    (e) Plaintiffs and other members of the Class purchased Lumen securities between the time that Defendants misrepresented or failed to disclose material facts necessary to make the statements that they made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

382. At all relevant times, the market for Lumen securities was efficient for the following reasons, among others:

    (a) Lumen's securities met the requirements for listing on the NYSE, a highly efficient and automated market;

    (b) as a regulated issuer, Lumen filed periodic public reports with the SEC;

    (c) throughout the Class Period, Lumen's common stock was highly liquid, with an average daily trading volume over 15.1 million shares;

151

(d)    Lumen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)    Lumen was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and, thus, entered the public marketplace; and

(f)    new, company-specific information was reflected and incorporated into the stock price for Lumen's securities.

383.    As a result of the foregoing, the market for Lumen securities promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Lumen's securities.  Under these circumstances, all purchasers of Lumen securities during the Class Period suffered similar injury through their purchase of Lumen securities at artificially inflated prices and the presumption of reliance applies.

384.    In addition, a presumption of reliance is also appropriate under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the omission of material facts for which there was a duty to disclose.  As this action involves Defendants' failure to disclose material adverse information regarding Lumen's operations, forecasts, and business prospects—information that Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

**NO SAFE HARBOR**

385.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to be false or misleading.

386.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made or prior to the time the statements were made.  Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

387.    To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as such when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, Defendant Storey did not identify any particular type of statement as forward looking during the presentations he made at conferences held on February 25, 2019 or September 15, 2020, much less caution that actual results might differ or direct investors to another document that contains additional information concerning the factors that could cause actual results to differ.  To the extent Defendants issued any statements designed to "warn" or "caution" investors of certain risks, those statements were not meaningful because they warned only of theoretical future risks at times when such risks were not merely hypothetical and/or identified risks that already began to materialize.

153

Thus, the boilerplate and abstract cautionary statements made by Defendants were themselves false and misleading and insufficient to insulate Defendants from liability.

388.    In addition, Defendants are liable for any forward-looking statements because, at the time each such statement was made, the speaker knew that the forward-looking statement was false or misleading or had actual knowledge of material facts undermining the statement, and/or the forward-looking statement was authorized or approved by an executive officer of Lumen who knew that the statement was materially false or misleading when made or had actual knowledge of material facts undermining the statement.

## CLASS ACTION ALLEGATIONS

389.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are  Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period, any entity in which such excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

390.    The members of the Class are so numerous and geographically dispersed that joinder is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Lumen's securities were actively traded on the NYSE.  As of October 27, 2023, there were approximately 1,008,898,542 shares of common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be

154

notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions arising under the federal securities laws.

391.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act, as complained of herein.

392.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

393.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether the acts described herein violated the Exchange Act and/or SEC rules promulgated thereunder;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted material facts necessary to make the statements made, in the circumstances under which they were made, not misleading;

(c)    whether Defendants acted with the requisite level of scienter;

(d)    whether the material misstatements and omissions alleged herein artificially inflated the market price of Lumen securities during the Class Period;

(e)    whether the Individual Defendants were controlling persons; and

(f)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

394.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is

155

impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

395.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

396.    This Count is brought pursuant to Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5, on behalf of the Class against all Defendants.

397.    Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by means or instrumentalities of interstate commerce, including but not limited to the mails and the internet, and/or the facilities of a national securities exchange, carried out a plan, scheme, or course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, in that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Lumen securities during the Class Period.

398.    Specifically, throughout the Class Period, Defendants made or caused Lumen to issue untrue statements of material fact and/or omit material facts from its public disclosures that

156

were necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, including those specified above, which were intended to, and did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the price of Lumen securities; and (iii) cause Plaintiffs and members of the Class to purchase Lumen securities at artificially inflated prices.

399.    Defendants are individually and collectively responsible for making such statements by virtue of having made the public statements or otherwise prepared, approved, signed, and/or disseminated documents that contained those statements to the investing public.

400.    The Individual Defendants made the false and misleading statements and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Lumen securities during the Class Period.

401.    As a result of disseminating the materially false and misleading statements specified above, the market price for Lumen securities was artificially inflated during the Class Period.  Relying directly or indirectly on those statements or upon the integrity of the market price for Lumen securities, Plaintiffs and other members of the Class purchased Lumen securities at prices that were artificially inflated by the fraud described herein.  As set forth herein, Plaintiffs and other members of the Class suffered damages as a direct and proximate result of Defendants' wrongful conduct when the true facts were subsequently disclosed or the risks concealed by the misstatements materialized and the inflation was removed from the price of such securities.

402.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of the fact that they were materially false or omitted material facts necessary to make them not misleading, and believed them to be true.  Plaintiffs and the other

157

members of the Class would not have purchased Lumen securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and/or the material adverse facts which the Defendants did not disclose.

403.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

404.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

405.    This Count is brought pursuant to Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants.

406.    As alleged herein, the Individual Defendants, and each of them, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material facts necessary to make the statements that were made not misleading in connection with the purchase or sale of the Company's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

407.    Throughout the Class Period, the Individual Defendants, as Lumen's most senior executives, had direct involvement in the day-to-day operations of the Company, and conducted and participated, directly and indirectly, in the conduct of Lumen's business affairs.

408.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lumen's business operations, financial condition, and prospects.  In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or shortly

158

after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

409.    Because of their positions as senior officers and/or directors of Lumen, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the contents of the reports, press releases, public filings, and other statements alleged to give rise to the primary violations alleged herein.

410.    The Individual Defendants, therefore, were "controlling persons" of Lumen within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Lumen securities.

411.    Because of their senior positions, the Individual Defendants knew of or recklessly disregarded the adverse, non-public information about Lumen's business practices, financial condition, and prospects.  The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute culpable participation in the primary violation.

412.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.      Granting such other and further relief as the Court may deem just and proper.

**<u>DEMAND FOR TRIAL JURY</u>**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: February 23, 2023

O'BELL LAW FIRM, LLC

*/s/ Eric J. O'Bell*
Eric J. O'Bell (La. Bar #26693)
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone: (504) 456-8677
Facsimile: (504) 456-8653
ejo@obelllawfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Justin D. D'Aloia (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*